**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| **WSOU INVESTMENTS, LLC d/b/a,** | § | |
| **BRAZOS LICENSING AND** | § | |
| **DEVELOPMENT** | § | **Civil Case No. 6:20-cv-573-ADA** |
| | § | **Civil Case No. 6:20-cv-575-ADA** |
| *Plaintiff,* | § | **Civil Case No. 6:20-cv-577-ADA** |
| v. | § | **Civil Case No. 6:20-cv-585-ADA** |
| | § | |
| **GOOGLE LLC,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant.* | § | |
| _____ | § | |

**SUR-REPLY IN SUPPORT OF DEFENDANT**
**<u>GOOGLE LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.    U.S. PATENT NO. 7,620,967 (CASE NO. 6:20-CV-573-ADA) ..............................................1

    A.    "broadcast/broadcasting" (claims 1, 7) ...............................................................1

II.   U.S. PATENT NO. 8,559,928 (CASE NO. 6:20-CV-575-ADA) ..............................................2

    A.    "contact information" (claims 1, 15, 23) .............................................................2

    B.    "tree structure" (claims 1, 15, 23)......................................................................4

III.  U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA) ..............................................5

    A.    "stationary state" (claims 1 and 11) ...................................................................5

    B.    "incrementing [of] a count[er] for a stationary state" (claims 1 and 11)........................7

    C.    "determin[e/ing] a primary set of stationary states" (claims 1 and 11) .........................8

IV.   U.S. PATENT NO. 8,751,585 (CASE NO. 6:20-CV-577-ADA) ..............................................9

    A.    "moving the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," "to move the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," and "moving the first electronic message from the inbox of the electronic mail client associated with the user to the first storage location associated with the first archiving rule after the first action specified in the first archiving rule is detected" (claims 1, 9, 17) ................10

    B.    "a list of actions" and "a plurality of actions" (claims 1, 9, 17) ....................................11

    C.    "client management processor configured to enable the user to select an electronic message from the inbox" (claim 9) ...............................................................12

    D.    "a detection processor configured to detect the action defined in the archiving rule assigned to the selected electronic message was carried out" (claim 9).................12

    E.    "a collaborative application management processor configured to manage collaborative applications" (claim 9).........................................................................12

## **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008).................................................................................................5

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342 (Fed. Cir. 2005).................................................................................................9

*Diebold Nixdorf, Inc. v. ITC*,
899 F.3d 1291 (Fed. Cir. 2018)...............................................................................................12

*Egenera, Inc. v. Cisco Sys., Inc.*,
972 F.3d 1367 (Fed. Cir. 2020)...............................................................................................14

*Infinity Computer Prod., Inc. v. Oki Data Americas, Inc.*,
987 F.3d 1053 (Fed. Cir. 2021).................................................................................................9

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014).................................................................................................9

*Lemelson v. Gen. Mills, Inc.*,
968 F.2d 1202 (Fed. Cir. 1992).................................................................................................4

*Lucent Techs., Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed. Cir. 2008).................................................................................................5

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005).................................................................................................5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)...................................................................................................................9

*Qcue, Inc. v. Digonex Techs., Inc.*,
Case No. 12-484, 2013 WL 4784120 (W.D. Tex. Sept. 5, 2013), *aff'd*, 575 F. App'x
895 (Fed. Cir. 2014)..............................................................................................................7, 9

*Wang Labs., Inc. v. Am. Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999).................................................................................................8

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Exs. 1-16 | As filed in Google's Responsive Claim Construction Brief (Dkt. 34) |
| Ex. 17 | Applicant Arguments/Remarks Made in an Amendment dated Jan. 17, 2011 |

<u>**TABLE OF ABBREVIATIONS**</u>

| Abbreviation | Description |
|---|---|
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development |
| Google | Defendant Google LLC |
| '967 patent | U.S. Patent No. 7,620,967 |
| '928 patent | U.S. Patent No. 8,559,928 |
| '961 patent | U.S. Patent No. 8,737,961 |
| '585 patent | U.S. Patent No. 8,751,585 |
| Group 3 Patents | Collectively, U.S. Patent Nos. 7,620,967; 8,559,928; 8,737,961; and 8,751,585 |
| POSITA | Person Of Ordinary Skill In The Art |

\* *Emphasis added unless indicated otherwise.*

\*\* *For the Court's convenience, Google cites to WSOU's opening brief, Google's responsive brief, and WSOU's reply brief by referring to the briefs and exhibits filed in Case No. 6:20-cv-573-ADA (which is the same for all of the above-captioned cases) and to the pagination generated by CM/ECF (at the top of the page) rather than the pagination at the bottom of the page.*

I.      **U.S. PATENT NO. 7,620,967 (CASE NO. 6:20-CV-573-ADA)**

     A.      **"broadcast/broadcasting" (claims 1, 7)**

The parties' dispute regarding the scope of this term boils down to two issues: does "broadcasting" require that the information be ***simultaneously*** transmitted to ***all*** receivers in a network? Google's brief establishes that the answer is yes on both counts.  (Dkt. 34 at 8-11.) Google also showed that the simultaneous transmission of information to all receivers is what distinguishes "broadcasting" from "unicasting" (transmission to only a single receiver) or "narrowcasting" (simultaneous transmission to a subset of all receivers).  (*Id*.)  WSOU's insistence that "broadcasting" need not be "simultaneous," or to "all" receivers in a network reveals that what it really seeks is no construction at all, implicitly expanding the scope to include other types of data transmission, such as unicasting and narrowcasting.  (Dkt. 36 at 4-5.)  That is inconsistent with both the intrinsic and extrinsic evidence.

Radio and network television are classic examples of "broadcasting" as used in the '967 patent—*i.e.*, "simultaneously transmitting to all receivers in a network."  (*See* Dkt. 34 at 8-11; Ex. 2 at 5).  WSOU attempts to side-step this known meaning by taking part of a sentence from the specification out of context and distorting Google's construction.  (Dkt. 36 at 4.)

First, the full statement WSOU relies on from the specification states that a benefit of the invention is that "a large proportion of the data of interest to users can be broadcast ahead of time, preferably during the night, but also during the daytime *by exploiting the bit rate fluctuations that constantly occur when a network is used*."  (Ex. 1 at 1:63-67.)  That explains that the objective of "smoothing the load on the network" can be achieved by broadcasting information during low periods of usage in the daytime, as well as at night.  (*See* Ex. 1 at 1:15-42, 2:29-31.)  It does not, as WSOU suggests, allow for serial transmission of the same information to different receivers—that is contrary to the invention's stated goal of avoiding "the network saturation problems that arise because the same information is sent several times to different users."  (*Id*. at 1:34-37.)

Second, contrary to WSOU's assertion, "simultaneously transmitting" simply means the information is *sent* to all receivers at the same time, it does not require "instantaneous" transmission.  (*See, e.g.*, Ex. 2 at 4 (Newton's Telecom Dictionary, 16th Ed.: "to send information to two or more

receiving devices simultaneously").)

Moreover, WSOU's assertion that one extrinsic definition proffered by Google supports its position is incorrect.  (Dkt. 36 at 4).  That definition (signals directed to "large, unspecified number of receiving stations") simply reflects that the total number of receivers is not limited, like in the case of radio transmissions—it does not, as WSOU contends, mean that the transmission is to less than "all" of the receivers in a network.  WSOU has no response to the intrinsic evidence that confirms transmission must be to all receivers.[1]  (*See., e.g.*, Ex. 1 at 9:6 ("Step 14: The transmissions are broadcast to all receivers."); 2:24-26 ("Expressed differently, the method according to the invention consists of sending all information items likely to be of interest to all users to all the receivers of the network.").)  The numerous references in the specification to "each" receiver receiving the information that is broadcast further confirm that Google's construction is correct.  (*Id*. at 8:36-39 ("Each user terminal or receiver receives the descriptors…"); 9:10-11 ("Each receiver stores locally…"); 11:8-22 (references to "in each receiver…").)

Finally, WSOU entirely ignores Google's argument distinguishing broadcast from other types of data transmission.  Google presented extrinsic evidence describing a unicast and a narrowcast as data transmissions to less than all receivers in a network.  (Dkt. 34 at 9-10.)  As Google explained, these transmissions differ from broadcasting because they are targeted to one or more specific receivers, as opposed to indiscriminately sent to all receivers in the network.  (*Id*.)  The construction of broadcast should not cover these different approaches, and WSOU's failure to address them reveals its intent to improperly expand the scope of this term.

## II.     U.S. PATENT NO. 8,559,928 (CASE NO. 6:20-CV-575-ADA)
### A.     "contact information" (claims 1, 15, 23)

Google's opening brief establishes that construction of this term is required because there is a dispute as to its scope.  (Dkt. 34 at 11-12.)  In response, WSOU wholly ignores that dispute and simply

---

[1] The specification of the '967 patent focuses on radio transmissions.  (*See* Ex. 1 at 7:42-44 ("To make it easy to understand, the remainder of the description is based on information items constituting radio programs, referred to hereinafter as "transmissions").)

reprises its prior arguments.  (Dkt. 36 at 5.)  While purporting to advocate for a plain and ordinary meaning, WSOU really seeks no construction at all by arguing that "contact information" means *any* information.  As set forth in Google's brief, it is WSOU's position—not Google's—that is inconsistent with the specification.  (Dkt. 34 at 11-12.)

Google demonstrated that the "contact information" described in the '928 patent "related to the identity of and communication with an entity."  (Dkt. 34 at 11-12.)  Google further noted WSOU's attempt to equate information that is *not* related to contacting an entity, such as "settings" or "permissions" assigned to users, with "contact information," and invited WSOU to justify its interpretation.  (Dkt. 34 at 12.)  WSOU failed to do so, brushing aside Google's reference to actual positions taken in the infringement contentions as "speculative accusations against WSOU."  (Dkt. 36 at 5.)  Notably, WSOU does not deny that it seeks to avoid a construction in order to preserve their untenable position that non-contact information is "contact information."

WSOU's renewed attacks on Google's construction also fall flat.  Contrary to WSOU's assertion, Google's construction is consistent with every disclosed embodiment, including the one described in Figure 4 for John and Mary Johnson.  (Dkt. 36 at 5, citing Ex. 7 at 4:43-44.)  The specification explains that "images, text, symbols, sounds, red-letter days and/or web addresses can also be incorporated in this structure *for enabling more personalized, informative, and accessible contact information*."  (Ex. 7 at 4:63-5:3.)  Thus, not just any "photo" or "red letter day" can comprise "contact information" for Mary.  Rather, the '928 patent itself requires that such information be personalized to Mary—*i.e.*, related to her identity and communication with her.  This relationship follows directly from the invention's objective of allowing "a user to choose the right contact information at any situation for *keeping in contact with* either John or Mary."  (*Id*. at Fig. 4, 4:24-57.)  The patent makes clear: "In particular, an objective is to provide contact information storage and/or access in a way that is intuitive to a user…structuring contact information according to the relations experienced by a user will provide an intuitive contact management, and thus improved storing of and access to contact information."  (*Id*. at 1:29-36.)  WSOU's attempt to expand claim scope to include information unrelated to contacting an

entity is contrary to the invention's objective and finds no support in the intrinsic evidence.

**B.     "tree structure" (claims 1, 15, 23)**

Contrary to WSOU's assertion, the choice facing the Court is not one between plain and ordinary meaning and Google's construction.  Rather, as Google's brief demonstrates, those two are coextensive in scope.  (Dkt. 34 at 13-15.)  It is undisputed that a "tree" was a well-known data structure with specific properties, including being acyclic.  (Dkt. 34 at 13-15, Dkt. 36 at 6.)  It is also undisputed that the applicant adopted that "well understood" meaning during prosecution.  (Dkt. 34 at 13-15.)

Despite its purported proffer of plain and ordinary meaning, WSOU's briefs demonstrate that it actually seeks a construction *inconsistent* with the well-established meaning of a "tree structure" that is based on the patentee's alleged lexicography shown in Figures 2-4.  The sole property that differs between the established meaning of "tree structure" and those figures is that they are *not* acyclic—a single node in each has more than one parent.  Thus, the Court must choose whether to apply: (i) Google's construction reflecting the well-established meaning of "tree structure," which does not encompass Figures 2-4; or (ii) an alternative construction that is inconsistent with that established meaning, but encompasses Figures 2-4.

The intrinsic evidence establishes that Google's construction is correct.  "The prosecution history gives insight into what the applicant originally claimed as the invention, and often what the applicant gave up in order to meet the Examiner's objections."  *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).  Here, the applicant admitted during prosecution that a "well understood" definition of "tree structure" included all of the properties identified in Google's construction, including the requirement that it be acyclic.  (Ex. 9 at 6.)  WSOU attempts to avoid this admission by claiming it was cited simply as an "example" of a tree structure.  (*See* Dkt. 36 at 7.)  But the applicant expressly relied on the scope of that definition to argue that a prior art reference lacking certain characteristics did not disclose a "tree structure."  (Ex. 9 at 6.)  WSOU's *post-hoc* attempt to rewrite the prosecution history fails because citation to a mere "example" is insufficient to overcome prior art.  Simply put, the applicant obtained allowance by relying on a well-understood definition of "tree structure" and in doing

so disclaimed any coverage of Figures 2-4.  This is neither surprising nor unusual.  When the intrinsic evidence requires, the Federal Circuit "ha[s] construed the claims to exclude all disclosed embodiments." *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1216 (Fed. Cir. 2008); *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) ("[T]he fact that claims do not cover certain embodiments disclosed in the patent is compelled when narrowing amendments are made in order to gain allowance over prior art.").

However, if this Court construes the term to cover Figures 2-4, then Google's alternative construction should be adopted because it follows the established meaning as closely as possible while accounting for the one difference depicted in Figures 2-4.  WSOU should not be permitted to broaden the scope to "a plurality of logical levels" as it now seeks to do in its reply.  (Dkt. 36 at 6.)  Such a broad construction would encompass the very prior art that the applicant argued around during prosecution, which included a navigable menu with multiple levels displaying groups of contacts.  A party "cannot recapture claim scope disavowed during prosecution to prove infringement." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008).

## III.    U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA)

### A.    "stationary state" (claims 1 and 11)

| Google's Proposed Construction | WSOU's Proposed Construction |
| --- | --- |
| indefinite | plain and ordinary meaning |

WSOU's reply attempts to sidestep the dispute before the Court: does the claimed "stationary state" require some (unspecified) degree or duration of being stationary?  WSOU largely seems to contend that the plain and ordinary meaning of "stationary" does not require the device to be stationary at all, but instead only to remain within a "specified area" of any size.[2]  WSOU is unwilling or unable to say whether the examples Google offered under WSOU's supposed "plain and ordinary meaning"— such as driving through Big Bend National Park—would meet the "stationary state" limitation or not.

---

[2] WSOU briefly argues that "Google apparently argues that a term must be indefinite unless the specification provides express lexicography."  (Dkt. 36 at 9.)  Not so: it is indefinite because, as WSOU agrees in some places, the patent *does* require something different than merely being stationary, but fails to say what.

As Google's brief explained, based on the specification and confirmed by WSOU's own arguments, a person of skill could not know whether "stationary state" required that a device be "not moving" at all, not moving "outside a specified area," "not moving substantively," not moving "frequently," or not moving for the duration of a "stay."  (Dkt. 34 at 19.)  WSOU's reply brief claims that a person of skill would easily grasp the plain and ordinary meaning of this term, but then proceeds to offer the *same conflicting examples*, in largely verbatim language, of "not moving" at all, not moving "outside a specified area," "not moving substantively," not moving "frequently," and not moving for the duration of a "stay."  (Dkt. 36 at 7-8.)  As WSOU tacitly concedes, the patent nowhere explains how stationary a device must be, or for how long, or even whether it must be stationary at all, to infringe the claimed "stationary state."

WSOU purports to seek the plain and ordinary meaning of "stationary state," but offers conflicting explanations of what its plain and ordinary meaning includes.  WSOU contends the plain and ordinary meaning of "stationary state" can be met, without more, if "the mobile device is determined to be not moving outside a specified area."  (*Id*. at 7.)  Under this definition, a user driving through Big Bend National Park, without stopping, is in a "stationary state."  WSOU's allegedly plain and ordinary meaning of "stationary state" would thus not require that a device be stationary at all.  WSOU elsewhere appears to concede that some degree and duration of being stationary *is* required, though, by noting that "there is no issue regarding 'how long a user must stay,' at least because the specification provides exemplary embodiments, for example, ten minutes along with sampling intervals" (*id*. at 8 (internal citations omitted)), and that "there is nothing subjective about '[w]hen mobile terminal 150 is not moving substantively'" because the specification describes "a user staying within the 'limited or otherwise specified area,' such as 'an apartment. . .'"  (*Id*.)  WSOU does not explain how these requirements are captured in the purported "plain and ordinary meaning" of "stationary state."  In any event, WSOU misses the point: the patent provides examples of what would be *sufficient* to be stationary—say, ten minutes, or in an apartment—but not what is *necessary*.  One minute?  A National Park?  WSOU does not say, because it does not know.  The patent thus "fails to

notify[ ] the public of the [scope of the] patentee's right to exclude" and is indefinite.  *Qcue, Inc. v. Digonex Techs., Inc.*, Case No. 12-484, 2013 WL 4784120, at *9 (W.D. Tex. Sept. 5, 2013) (alteration in original) (internal quotations omitted), *aff'd*, 575 F. App'x 895 (Fed. Cir. 2014).

### B.   "incrementing [of] a count[er] for a stationary state" (claims 1 and 11)

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| incrementing a count representing time at a stationary state | plain and ordinary meaning |

WSOU's reply brief fails to explain what WSOU believes the "plain and ordinary meaning" of "incrementing of a count for a stationary state" to be.  WSOU declines to identify its specific disagreement with Google's proposed construction, arguing instead that any construction would be improper.  Google's proposed construction gives meaning to "for a stationary state" as described in the patent, and the Court should adopt it.  And while WSOU argues that Google "speculates regarding WSOU's alleged intent," it carefully does not exclude *any* counters on a mobile device from the scope of counters "for a stationary state."  As best Google can discern, WSOU's asserted "plain and ordinary meaning" of "incrementing [of] a count[er] for a stationary state" is actually anything but:  it would stretch this term to mean "incrementing of a counter that may or may not have anything to do with a stationary state."

WSOU's citations to the specification confirm that Google's construction is correct.  WSOU first references "data that indicates the number of sample intervals for which that particular set of transmitter IDs was received simultaneously" (Dkt. 36 at 9 (citing Ex. 13, 8:60 to 9:28)), but "sample intervals" represent time and thus support Google's construction.  (*See* Dkt. 34 at 20.)  WSOU similarly states that "when the stationary state record is updated, if, for example, there is a match to a set of transmitter IDs in a transmitter set field, then 'the associated count is incremented.'"  (Dkt. 36 at 9 (citing Ex. 13, 13:51-60).)  But this too represents time:  the specification defines variable "vi" "where i is an index **for the current sample time, the current window signal v1=vi, vi-1, . . . vi-w; and the previous window signal v2=vi-w-1, vi-w-2 . . . vi-2w.**"  (Ex. 13 at 13:2-6.)  The "associated count" referenced by WSOU is incremented when "the vector vi is

matched to one of the sets of transmitter IDs"—in other words, when a match is found **for a given sample time**.  (*Id*. at 13:51-53.)  As WSOU confirms, no other count "for a stationary state" is described in the patent.  (*See* Dkt. 36 at 8-9.)  *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("claims were correctly interpreted as limited" to the "only embodiment described in the '669 patent specification").  Should the Court find a definite meaning for "stationary state" and thus confront this issue, it should adopt Google's construction.

    **C.**    **"determin[e/ing] a primary set of stationary states" (claims 1 and 11)**

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| indefinite | plain and ordinary meaning |

The patent claims the step of "determining a primary set of stationary states, each stationary state in the primary set associated with a frequently incremented count for one or more similar sets of one or more distinct signal sources when the mobile device is not moving outside the specified area." (Ex. 13 at 37:18-22.)  A skilled artisan must know with reasonable certainty what constitutes a "primary set" in order to be able to "determine" such a set, and thus to know whether she has practiced (or avoided) the claimed invention.  WSOU agrees, as it must, that a "primary set" includes more than one "stationary state" (*e.g.,* Dkt. 36 at 9-10), but points to no objective criteria to determine the set, mathematical or otherwise, nor anywhere in the art discussing or even referencing a "primary set."  One cannot know how to "determine a primary set of stationary states" without knowing the metes and bounds of what constitutes "a primary set of stationary states"; WSOU cannot define these metes and bounds because they do not exist.

WSOU contends that "the claim language itself recites, determining a primary set of stationary states includes stationary states with the most observations, or highest (most frequently) incremented counters."  (*Id*. at 9.)  As an initial matter, this is incorrect.  The claim recites "determining a primary set of stationary states, each stationary state in the primary set associated with a frequently incremented count . . ."; no ranking of "highest" or "most frequently" appears in the claims.  WSOU instead attempts to import this limitation by reference to an example embodiment:  "the specification describes

charting the fraction observations (of all observations) attributed to the first through sixth most frequent stationary states." (*Id.*) Notably, WSOU does not say—because it cannot know—whether the seventh or eighth most frequent stationary state could also be within the primary set. This is precisely the problem. There can be only one "highest" or "most." But the patent—and WSOU—acknowledge that more than one "primary" stationary state is within the "primary set," without saying how many or how to decide. (*E.g.*, Dkt. 36 at 9-10; Ex. 13 at 3:33-37, 23:15-22, 23:23-54, 24:10-18, 37:18-22.) But a skilled artisan is entitled to know "'what is still open to them.'" *Infinity Computer Prod., Inc. v. Oki Data Americas, Inc.*, 987 F.3d 1053, 1059 (Fed. Cir. 2021); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014) ("And absent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims.").

WSOU seeks to save this term by arguing that "Google only complains of the lack of mathematical precision" (Dkt. 36 at 10), but it misstates Google's argument. Google seeks only to enforce the requirement that the "claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). "Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005)). WSOU cannot mask its inability to identify the objective boundaries behind its unsupported statements that they are obvious, and WSOU cannot salvage a subjective term by injecting additional subjective criteria. Thus "[a]ny system designed by a competitor necessarily faces some litigation risk," and the claim fails as indefinite. *See Qcue*, 2013 WL 4784120, at *9.

**IV.     U.S. PATENT NO. 8,751,585 (CASE NO. 6:20-CV-577-ADA)**

    **A.     "moving the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," "to move the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," and "moving the first electronic message from the inbox of the electronic mail client associated with the user to the first storage location associated with the first archiving rule after the first action specified in the first archiving rule is detected" (claims 1, 9, 17)**

WSOU's reply confirms that construction is required because the parties dispute the scope of two aspects common to all three claims[3]: (1) what must detect the action, and (2) must the archive/first storage location be a *different* location in *memory* than the inbox.  (*See* Dkt. 36 at 12-14.)

With respect to the first issue, Google noted that the claims expressly require that the actions "***can*** be detected by the communication system"  (Ex. 16 at 8:21-22, 9:51-52, 11:21-22), and the specification is replete with references to "detection by the said communication system"  (*Id*. at Abstract, 2:27-36, 4:35-37; Dkt. 34 at 26.)  Contrary to WSOU's assertion, the use of "can" in the context of these claims does not mean that the action may be detected by something other than the communication system, rather it means the action must be "susceptible of being detected by the said communication system."  (Ex. 16 at 2:28-30.)

Regarding the second issue, WSOU repeats its untenable assertion that absence of the word "memory" is fatal to Google's construction, but memory is not an "extraneous" element here.  (Dkt. 36 at 13.)  Google established that a POSITA would understand that the plain and ordinary meanings of "archive" and "storage" locations within the communication system refer to memory locations.  (Dkt. 34 at 26.)  This meaning is not controversial.  During prosecution, the applicant argued that the alleged invention is directed to a "communication system which includes the common structural components of a computer system."  (Ex. 17 at 10.)  A POSITA would also understand that memory is a fundamental component of a computer system.  WSOU does not even attempt to explain how "location" in the context of a computer system could mean something other than "memory location" to a POSITA.

The intrinsic evidence also demonstrates that the claimed movement of the selected message is from the inbox to a *different* location in memory within the communication system—the location previously defined as the "archive location" or "first storage location."  (Dkt. 34 at 27 (citing Ex. 16 at 2:30-37, 2:44-54, 7:35-54).)  WSOU isolates an excerpt from the passage Google cites (Dkt. 36 at 13, citing Ex. 16 at 7:43-50), claiming it does not require movement of the selected message to a "different

---

[3] WSOU's claim differentiation argument is a sideshow.  (Dkt. 36 at 12.)  Google's opening brief establishes that none of the minor differences in the wording of these terms is material to the proper construction of these terms.  (Dkt. 34 at 25.)

location in memory," but that excerpt describes a different aspect of the alleged invention, namely how an external storage database can be updated when the selected message is already stored in a location external to the electronic message client.  WSOU ignores the other portions of that passage that do require movement to a different location, such as: "which can … update the message storage database *so that the message will be moved to the location indicated in the command*…" and "archiving of the message is translated into *removal of the message from the list of messages in the inbox and its listing in a folder related to the message's new location*."  (Ex. 16 at 7:36-38, 7:52-54.)

### B.   "a list of actions" and "a plurality of actions" (claims 1, 9, 17)

The parties agree that the claim language mandates certain limits on the "list" or "plurality" of "actions" from which a user can choose when assigning the archiving rule, namely each action: (1) "can be subsequently carried out using at least some portion of the communication system," (2) must be "defined in the archiving rule," (3) "can be detected by the communication system," and (4) must be "based at least in part on content of the selected electronic message."  (Dkt. 33 at 13.)  But WSOU disputes whether each action must also be selectable by the user and correspond to an executable function.  (Dkt. 36 at 11.)  Construction is required to resolve this dispute.

Google's opening brief establishes that the intrinsic evidence (Ex. 16 at 8:17-21, 9:47-51, 11:19-21, 11:28-30) and common sense require that actions in the list must be both "selectable" and "executable."  (Dkt. 34 at 28.)  WSOU admits that "the action defined by the archiving rule need be *selected* from a list of actions" (Dkt. 33 at 15), yet it disputes that all of the actions on that list must be *selectable* by the user (Dkt. 36 at 11).  A plain reading of the claim language, "the action defined in the archiving rule is selected from a list of actions," is that the user is presented with a list of selectable actions and selects one of them to define the archiving rule—not, as WSOU contends, that the only action on the list that need be selectable is the one ultimately selected to define the archiving rule.  (*Id.*)  WSOU's argument that the list could be compiled of actions that a user cannot select frustrates the purpose of the patent.

WSOU's sole argument regarding the requirement that each action correspond to an executable

function is that it is unnecessary given the claims' requirement that actions "can be subsequently carried out using at least some portion of the communication system."  (Dkt. 36 at 12.)  While Google agrees that is what the claims require, it submits that its construction does not render that language superfluous, but rather clarifies the scope of the list of actions to include only executable functions.

**C.**      **"client management processor configured to enable the user to select an electronic message from the inbox" (claim 9)**

**D.**      **"a detection processor configured to detect the action defined in the archiving rule assigned to the selected electronic message was carried out" (claim 9)**

**E.**      **"a collaborative application management processor configured to manage collaborative applications" (claim 9)**

Google's opening brief demonstrates that all three of these limitations are properly construed under Section 112, ¶ 6 because the phrase "processor configured to," in the context of the claim language and specification, does not connote sufficient structure to perform the recited functions.  (Dkt. 34 at 29-32.)  Google also established that the specification fails to disclose any corresponding structure for the claimed functions under the second step of the means-plus-function analysis.  (*Id.*)  WSOU's reply mischaracterizes both the intrinsic evidence and legal precedent.

First, Google's reliance on *Dyfan, LLC v. Target Corp.* is proper, and the Federal Circuit flatly rejects WSOU's contention that expert testimony is necessary.  (*See* Dkt. 36 at 14.)  "[N]one of our cases mandate that a party seeking to overcome the presumption against application of § 112, ¶ 6 can only do so by presenting extrinsic evidence that [a POSITA] would fail to understand that a term connotes a definite structure.  Imposing such a requirement would be inconsistent with the Supreme Court's guidance."  *Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1299 (Fed. Cir. 2018).  "[I]n appropriate cases, a party advocating that a claim limitation that does not recite the word 'means' is subject to § 112, ¶ 6 can overcome the presumption against its application solely by reference to evidence intrinsic to the patent."  *Id.* at 1299-1300.  So too here.

Second, WSOU's discussion of *St. Isidore Research, LLC v. Commerica* and *Optis Cellular Tech. v. Kyocera Corp.* actually underscores Google's position that Section 112, ¶ 6 applies.  (Dkt. 36

at 15.)  In *St. Isidore*, the court held that the term "processor configured to" triggered means-plus-function treatment and noted that Section 112, ¶ 6 may not apply if the claims "*describe how* the data processor accomplishes the claimed functions."  2:15-CV-1390, 2016 WL 4988246, at *15.  (E.D. Tex. Sept. 18, 2016).  WSOU's reply demonstrates that claim 9 fails to meet this condition because none of the language it cites explains how any of these three "processors" perform their respective functions. (Dkt. 36 at 15.)

WSOU relies heavily on *Optis*, but that case is inapposite.  Contrary to WSOU's assertion, claim 9 does not "recite[] analogous connection and interaction with other structural components," as in *Optis*.  The claim at issue in that case expressly stated that "a processor causes transmissions from the mobile terminal to a base station in response to activity at the transmit buffer and receiving a grant at the transceiver from the base station."  2017 WL at 541298, at *26 26 (E.D. Tex. Feb. 8, 2017).  Thus, the claim itself identified multiple structural components and recited how the processor interacted specifically with those components.  Claim 9, on the other hand, does not.  WSOU makes no attempt to identify any allegedly analogous language for the "collaborative application management processor." (*See* Dkt. 36 at 15.)  That is because none exists.  With respect to the "detection processor," WSOU again fails to identify language in the claim regarding how it interacts with other structural components, and instead simply argues that because of the function it performs—detecting that an action was carried out—it must be "structurally tied to at least the portion of the communication system carrying out that action."  (Dkt. 36 at 15.)  WSOU's unsupported assertion demonstrates that the claim language lacks the specificity regarding connections and interactions with other structural components that existed in *Optis*.  Further, while the claim requires that the "electronic message client" includes a "client management processor," and recites storage in a "message storage database," unlike the language in *Optis*, it does not recite how the "client management processor" is connected to or interacts with any structural components to perform a function.  Rather, the language WSOU cites merely describes that function—enabling a user to select a message from the inbox.[4]  (Dkt. 36 at 15.)

---

[4] Moreover, *Williamson* rejects arguments like WSOU's: "[T]he claim does not describe how the

WSOU also cites *Optis* for the proposition that means-plus-function treatment applies only when the term '"processors' is meant [] to *generically be anything that manipulates data*." 2017 WL 541298, at \*26 (quoted at Dkt. 36 at 16).  Yet WSOU's citations to the '585 patent show just that, because the specification uses different generic terms when describing the functions performed by the claimed "processors."  For example, WSOU's citation to the specification's description of a "collaborative application management *means*" for alleged structure for the claimed "collaborative application management processor" confirms that "processor" is being used generically—*i.e.*, as an equivalent to "means."  (Dkt. 36 at 16.)  And the alleged structure that WSOU points to for that "means" is a database, not a processor.  (*Id*.)  WSOU's unsupported assertion that the "agents" described in the specification connote structure representing what is generally known as a processor is similarly unpersuasive.  (Dkt. 36 at 17.)  Moreover, the "question is not whether a claim term recites any structure but whether it recites sufficient structure….  [Plaintiff] does not explain how its 'logic'— even assuming it connotes some possible structure…—amounts to sufficient structure for performing [the claimed] function."  *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020).  So too here.

Third, WSOU argues erroneously that the "adjectival modifiers" preceding "processor" are used in the specification "to expressly tie each disputed processor term to respective structural descriptions." (Dkt. 36 at 17.)  WSOU fails to cite any specific language in the specification supporting its sweeping assertion.  Nor could it.  As explained above and in Google's opening brief, the terms modifying processor merely describe the function it performs—not its structure.  (Dkt. 34 at 31.)

---

"distributed learning control module" interacts with other components … in a way that might inform the structural character of the limitation-in-question or otherwise impart structure."  792 F.3d at 1351; *Media Rts Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1373 (Fed. Cir. 2015) (holding that § 112, ¶ 6 applies when the patent "only describes the term's function and interaction with other parts in the system" because "[t]his disclosure fails to provide sufficient structure").

Date: March 12, 2021

Respectfully submitted,

*/s/   Tharan Gregory Lanier, with permission by Michael E. Jones*

Tharan Gregory Lanier (*pro hac vice*)
**Jones Day**
1755 Embarcadero Road
Palo Alto, California, 94303
+1 (650) 739-3939
+1 (650) 739-3900 facsimile
tglanier@jonesday.com

Michael E. Jones (Texas Bar No. 10929400)
Patrick C. Clutter (Texas Bar No. 24036374)
**Potter Minton, P.C.**
110 North College, Suite 500
Tyler, Texas, 75702
+1 (903) 597-8311
+1 (903) 593-0846 facsimile
mikejones@potterminton.com
patrickclutter@potterminton.com

Matthew S. Warren (California Bar No. 230565)
Jennifer A. Kash (California Bar No. 203679) (*pro hac vice*)
Erika Warren (California Bar No. 295570)
Warren Lex LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
20-585@cases.warrenlex.com

Sasha Mayergoyz
**Jones Day**
77 W. Wacker Drive
Chicago, IL 60601
+1 (312) 782-3939
smayergoyz@jonesday.com

Tracy A. Stitt
**Jones Day**
51 Louisiana Avenue NW
Washington, DC 20001

15

+1 (202) 879-3641
tastitt@jonesday.com
Michael A. Lavine
**Jones Day**
555 California Street
26th Floor
San Francisco, California 94104
+1 (415) 626-3939
mlavine@jonesday.com

David E. Anderson
**Jones Day**
325 John H. McConnell Blvd, Suite 600
Columbus, OH 43215
+1 (614) 281-3617
danderson@jonesday.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 12, 2021, I electronically filed this document with the Clerk of Court via the Court's CM/ECF system which will send notification of such filing to all counsel of record, all of whom have consented to electronic service in this action.

*/s/ Michael E. Jones*