**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING & DEVELOPMENT, | ) ) ) |
| Plaintiff, | ) Case No. 6:20-cv-00572-ADA ) Case No. 6:20-cv-00584-ADA ) Case No. 6:20-cv-00585-ADA |
| v. | ) ) |
| GOOGLE, LLC, | ) **JURY TRIAL DEMANDED** ) |
| Defendant | ) ) |

**PLAINTIFF'S RESPONSIVE SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     GOOGLE'S REPEATED RELIANCE ON EXTRINSIC EVIDENCE IS MISPLACED .. 1

III.    U.S. PATENT NO. 8,041,806 (CASE NO. 6:20-CV-572-ADA) ........................................ 3

    A.    "Internet Protocol Television (IPTV) Service" ........................................................3

        1.    Google relitigates proposed constructions this Court has already
rejected ............................................................................................................ 3

        2.    The intrinsic evidence clearly supports plain and ordinary meaning ......... 5

            a)    the "access network" need not be limited to an ISP ........................5

            b)    the IPTV service need not be "private" or "managed" ........................7

        3.    Google's deficient extrinsic evidence does not justify a departure
from the plain and ordinary meaning ........................................................... 8

IV.     U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA) ..................................... 11

    A.    "incrementing of a count for a stationary state associated with the set of
one or more distinct signal sources at the current time"  (claims 1, 11) ...............12

        1.    Plain and ordinary meaning suffices ........................................................ 12

        2.    Brazos's infringement contentions do not justify departing from
plain and ordinary meaning ...................................................................... 13

        3.    The "incrementing of a count . . . " term's breadth does not render
it indefinite ............................................................................................... 15

    B.    "the set of wireless transmitters" (claim 3) ........................................................15

V.      U.S. PATENT NO. 8,803,697 (CASE NO. 6:20-CV-584-ADA) ..................................... 20

    A.    "mobile communication device" ........................................................................20

        1.    The Court should adopt the plain and ordinary meaning of "mobile
communications device" (claims 1-6 and 13-17) ..................................... 20

        2.    The intrinsic evidence supports the plain and ordinary meaning of
"mobile communications device" ............................................................. 21

        3.    The extrinsic evidence validates Brazos's plain and ordinary
meaning ..................................................................................................... 24

4.      Google's reliance on *Eon Corp.* is misplaced...........................................27

# TABLE OF AUTHORITIES

**Cases**

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) ................................................................. 1, 8, 13

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) ...........................................................................15

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) ............................................................................. 15

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
   No. 1:18-cv-760, 2019 U.S. Dist. LEXIS 109980 (E.D. Va. July 1, 2019)............................ 20

*Certain Digital Set-Top Boxes & Sys.*,
   Inv. No. 337-TA-1315, 2022 WL 4465560 (I.T.C. Sep. 22, 2022).................................... 10, 11

*Chimie v. PPG Indus.*,
   402 F.3d 1371 (Fed. Cir. 2005) ............................................................................ 15

*CloudofChange, LLC v. NCR Corp.*,
   No. 19-CV-00513-ADA, 2020 U.S. Dist. LEXIS 124625 (W.D. Tex. July 15, 2020) .............. 2

*Digital Retail Apps, Inc. v. H-E-B, LP*,
   No. 6:19-cv-00167-ADA, 2020 U.S. Dist. LEXIS 11094 (W.D. Tex. Jan 23, 2020) .............. 19

*Dish Network L.L.C. v. Broadband ITV, Inc.*,
   IPR2020-01267, 2021 WL 220200 (P.T.A.B. Jan. 21, 2021) ........................................... 10, 11

*Energizer Holdings, Inc. v. ITC*,
   435 F.3d 1366 (Fed. Cir. 2006) .................................................................. 16, 18, 19

*Eon Corp. IP Holdings v. Silver Spring Networks*,
   815 F.3d 1314 (Fed. Cir. 2016) ...................................................................... 21, 28

*Halliburton Energy Servs. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ............................................................................ 15

*Icon Health & Fitness, Inc. v. Polar Electro Oy*,
   656 Fed. Appx. 1008 (Fed. Cir. Aug. 8, 2016)......................................................... 15

*In re Downing*,
   754 F. App'x 988 (Fed. Cir. 2018) ...................................................................... 20

*Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*,
   987 F.3d 1053 (Fed. Cir. 2021) ............................................................................ 20

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) ......................................................................... 20

*Kopykake Entps., Inc. v. Lucks Co.*,
   264 F.3d 1377 (Fed. Cir. 2001) ........................................................................... 9

*Lighthouse Consulting Grp., LLC v. BB&T Corp.*,
   476 F. Supp. 3d 532 (W.D. Tex., 2020) ............................................................ 2, 8

*Micropairing Techs. LLC v. GM LLC*,
   No. 6:21-cv-0071-ADA, 2022 U.S. Dist. LEXIS 117471 (W.D. Tex. July 5, 2022) .............. 16

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (S. Ct. 2011) .................................................................................. 12

*Mission Competition Fitness Equip. LLC*,
   No. 21-cv-00771-ADA, 2022 U.S. Dist. LEXIS 90904 (W.D. Tex. May 20, 2022) ................ 9

*Nautilus, Inc. v. Biosig Instruments*,
   572 U.S. 898, (S. Ct. 2014) ......................................................................... 11, 15

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................... passim

*Pisony v. Commando Constr., Inc.*,
   No. 17-CV-00055-ADA, 2019 U.S. Dist. LEXIS 31524 (W.D. Tex. Jan. 23, 2019) ............... 2

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010) ........................................................................... 1

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
   824 F.3d 999 (Fed. Cir. 2016) ........................................................................... 12

*Sol IP, LLC v. AT&T Mobility LLC*,
   No. 2:18-cv-0526, 2020 U.S. Dist. LEXIS 2944 (E.D. Tex. Jan. 6, 2020) ...................... 20

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   No. 2:07-CV-497, 2010 U.S. Dist. LEXIS 74808 (E.D. Tex. July 26, 2010) ..................... 16

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
   587 F.3d 1339 (Fed. Cir. 2009) ......................................................................... 15

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ......................................................................... 2, 8

## I.    INTRODUCTION

Plaintiff Brazos herein presents its responses to Defendant Google's unsupported and misguided supplemental claim construction positions.[1]

## II.   GOOGLE'S REPEATED RELIANCE ON EXTRINSIC EVIDENCE IS MISPLACED.

The general rule is that claim terms are given their plain-and-ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312-13) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning."). Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). But for claim terms with less-apparent meanings, courts may consider "sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

It is well settled, however, that extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317. Critically, "reliance on [extrinsic] evidence is unnecessary, and indeed improper, when the disputed terms can be understood from a careful reading of the public record . . . [n]or may [extrinsic evidence] be used to vary claim terms from how they are defined, even implicitly, in the specification or

---

[1] Google's opening supplemental claim construction brief was filed at Docket No. 134 in the 572 Case; Docket No. 122 in the 584 Case; and Docket No. 127 in the 585 Case. Citations throughout to "Google Br." reference these identical filings. Docket numbers referenced within individual sections below reference the corresponding case docket (i.e., Section III: 572 Case; Section IV: 585 Case; and Section V: 584 Case).

file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996). Indeed, "[w]hen this intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence is improper." *Lighthouse Consulting Grp., LLC v. BB&T Corp.*, 476 F. Supp. 3d 532, 540 (citing *Vitronics*, 90 F.3d at 1582).

This Court rarely considers extrinsic evidence. *See, e.g.*, *Pisony v. Commando Constr., Inc.*, No. 17-CV-00055-ADA, 2019 U.S. Dist. LEXIS 31524, at *12 (W.D. Tex. Jan. 23, 2019); *see also, e.g.*, *CloudofChange, LLC v. NCR Corp.*, No. 19-CV-00513-ADA, 2020 U.S. Dist. LEXIS 124625, at *10 (W.D. Tex. July 15, 2020). In *Pisony*, the defendants relied on the prosecution history of a continuation patent application of the patent-in-suit to support their proffered construction. *See Pisony*, 2019 U.S. Dist. LEXIS 31524 at *12. This Court rejected the defendants' reliance on extrinsic evidence, stating "[t]his Court understands that it may utilize extrinsic evidence, but it rarely intends to do so other than in the context of a dispute over whether a claim is indefinite as a matter of law." *Id.*

Google's attempt to rewrite claim terms in the 572 and 584 Cases via its extensive use of extrinsic evidence should be rejected because the terms are plain on their face and the intrinsic evidence is unambiguous. **In the 572 Case** in which "Internet Protocol Television (IPTV) service" is at issue (*see infra* Section III), Google even elevates extrinsic evidence over intrinsic. Notably, Google chooses to address extrinsic evidence first and intrinsic evidence second. Google Br. at 2-9. In its opening brief, Google submits over ***500 pages*** of extrinsic evidence, including 1 expert declaration, 3 online articles, 3 marketing materials, 3 reports, 4 treatises, 4 dictionaries, 2 presentation slide decks, 1 scientific paper, and 1 online video course. Google also dedicates almost four pages of briefing to addressing it, more than it does to the intrinsic evidence. *Id.* at 2-6. But the term "Internet Protocol Television (IPTV) service" is clear and the

intrinsic evidence is unambiguous about what it means. *See infra* 5-8. Moreover, much of Google's extrinsic evidence contradicts the patent itself because the extrinsic references are used to import words into the claims that the patentee never used. *See infra* 8-11.

Similarly, **in the 584 Case** in which "mobile communications device" is at issue (*see infra* Section V), Google submits 7 dictionary entries in support of its narrowing construction—none of which define the disputed claim term in its entirety. *See* Google Br. Exs. 24-30. Here again, the term "mobile communications device" is plain on its face, and the intrinsic evidence does not support the limitations "portable device" or "communicates while moving" that Google proposes. *See infra* Section V. The Court should accord no weight to Google's irrelevant extrinsic evidence submissions.

## III.   U.S. PATENT NO. 8,041,806 (CASE NO. 6:20-CV-572-ADA)

### A.   "Internet Protocol Television (IPTV) service"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "An internet service provider (ISP) service that delivers television content to subscribers over a private, managed Internet Protocol (IP) network connection" |

#### 1.   Google relitigates proposed constructions this Court has already rejected

Google's proposed construction for the term "IPTV service" is a barefaced attempt to relitigate its failed construction previously proposed for the term "access network" during the February 2021, round of claim construction briefing. Indeed, Google's construction does not even provide a meaning for the term IPTV; both "IP" and "TV" are simply spelled out in the construction as "Internet Protocol" and "television" respectively. Google's construction instead improperly limits the claims by importing two limitations on how the IPTV service is delivered to the subscriber: (1) it must be delivered by an ISP; and (2) it must be delivered over a private,

managed network connection. Google's brief repeats the same arguments it made previously for its construction for "access network"—which also sought to insert the requirement that the electronic content is delivered by an ISP. Those arguments were rejected then and should be rejected now for the same reason—namely that these constructions contradict the intrinsic evidence. "IPTV service" should be given its plain and ordinary meaning. There is no support in the specification for importing Google's additional limitations and improperly limiting the scope of the claims.

Claim 1 states that the access network comprises an electronic content source, and that electronic content source provides an IPTV service:

> communication traffic exchanged with a **communication network subscriber** over an access communication link . . . ;
>
> . . .
>
> wherein the access communication link comprises a network link in an access network, **the access network comprising an electronic content source** that is operable to deliver the accessed electronic content to the subscriber,
>
> wherein the electronic content source provides an Internet Protocol Television (IPTV) service, . . .

'806 patent cl. 1 (emphasis added). Google's first attempt to narrow claim 1 and its dependent claims came in the form of its proposed construction for "access network." Google proposed that "access network" should be construed as "a network that connects a communication network subscriber to their Internet Service Provider (ISP)." Dkt. 38 at 2. In short, Google argued that "an **IPTV service is** a type of content **provided by the ISP** to its subscribers via the access network." Dkt. 37 at 11-12 (emphasis added). Today, Google is nominally construing a different term[2] but

---

[2] Google has also shifted its interpretation of the claim. As shown above, in the first round of briefing its construction proposed that the access network sat between the subscriber and the ISP.

4

the argument is exactly the same: "***the IPTV service is*** an ***ISP-provided*** source of electronic content." Google Br. at 8 (emphasis added). The Court has already rejected this argument. Dkt. 46 at 2. Google is thus exploiting this second round of claim construction to rehash the same arguments, under the guise of construing a new term. As before, this Court should reject Google's proposed construction.

### 2. The intrinsic evidence clearly supports plain and ordinary meaning

Along with retreading old and previously rejected grounds, Google's renewed arguments simply mischaracterize the specification. As discussed above, Google's construction—"An internet service provider (ISP) service that delivers television content to subscribers over a private, managed Internet Protocol (IP) network connection"—adds two limitations.

### a) The "access network" need not be limited to an ISP

Google first argues that "the access network [which] is operable to deliver the accessed electronic content" must be an ISP. Google Br. at 6-9. In support of this limitation Google makes several claims about the intrinsic evidence, each of which is incorrect.

First, Google claims that the ISP always implements the access network. *Id.* at 6. Yet nothing in claim 1 limits the access network to an ISP. The claim simply requires that the access network comprises an electronic content source that delivers an IPTV service. Google relies on portions of the specification that clearly state that they are describing just one embodiment, and that the configurations in Figures 1 and 2 are illustrative—but by no means exclusive. '806 patent at 5:1-16, 4:56-61; 6:12-16 ("It should be appreciated that the system 20 represents one illustrative example of an embodiment of the invention. Other embodiments may include fewer,

---

Now, Google's construction proposes that the access network *is* the ISP. Nevertheless, the imported limitation has remained the same: according to Google only an ISP can deliver the IPTV service.

further, or different components, with similar or different interconnections, than shown."). There is no basis for importing the limitation that the access network is always an ISP into the claims.

Second, Google claims that in the specification the IPTV service is always delivered by an ISP. Google Br. at 8. But the specification clearly states that is not the case: "An ISP **might** host its own IPTV service, **for example**." '806 patent at 7:43-44 (emphasis added). In claim 1 the access network comprises an electronic content source that delivers the IPTV service. Google attempts to substitute "ISP" for "access network" by arguing that all embodiments of the '806 patent are limited to an ISP-hosted IPTV service. Specifically, Google argues that there are two distinct ways to deliver the electronic content: either the IPTV service is delivered by the ISP (aka access network); or traditional electronic content such as webpages and video content are delivered from outside the access network. Google Br. at 8. This false dichotomy is made possible only by Google's selective quoting from column 7. The full paragraph is quoted here:

> The electronic content source 58, another participant in the system 20, represents any electronic content publisher such as a traditional portal (webpage), a video content provider, etc. An electronic content source could also or instead be implemented within the access network 24. An ISP might host its own IPTV service, for example. Thus, embodiments of the invention may control delivery of targeted content for presentation to a subscriber, illustratively via a display screen or other output device, with other electronic content from electronic content sources that are internal to or external from an access network.

'806 patent at 7:39-49. As stated in the specification, the electronic content source thus represents "*any* electronic content publisher." *Id.* at 7:39-41 (emphasis added). This electronic content could be IPTV and it could be delivered by the access network. But the specification also clearly states that this is not a limitation on the invention. In other embodiments the electronic content could be, for example, a webpage, and it could come from "sources that are internal to or external from an access network." Of course, claim 1 is narrower: the access network comprises

an electronic content source that delivers an IPTV service. However, there is no basis for Google's assertion that the intrinsic evidence only describes an IPTV service that is delivered by an ISP. The specification expressly contemplates several embodiments of which an ISP-hosted IPTV service is just one.

Lastly, Google claims that the IPTV service must be delivered by an ISP because the IPTV service is a service offered by the access network to a subscriber, and that subscriber is in some embodiments a subscriber to an Internet service. Google Br. at 8-9. There is no dispute that the IPTV service is offered to a subscriber, but it does not follow that the access network is an ISP. The intrinsic evidence cited by Google contradicts its own argument: "The subscriber 22 is in *some embodiments* an Internet service subscriber, or more generally a subscriber to a service offered by the access network 24." '806 patent at 7:27-29. Thus, there is no basis to import the limitation that an ISP delivers the IPTV service.

### b)  The IPTV service need not be "private" or "managed"

The second limitation in Google's proposed construction is that the IPTV service must be delivered to subscribers "over a private, managed Internet Protocol (IP) network connection." Google Br. at 6-7. Nowhere does the specification mention the words "private" or "managed" in connection with Internet Protocol. This limitation does not come from the specification. Instead it seems to be imported from a handful of extrinsic evidence sources. The distinction between a "private network" and "public internet" is entirely Google's, and there is no support in the specification for importing this limitation into the claims. Moreover, it is not actually clear what a "private, managed IP network connection" means or how that definition would be useful to a jury in understanding the meaning of the term "IPTV service." Again, Google cites portions of the specification that clearly state that they are describing just one embodiment. *See, e.g.*, Google Br. at 7, citing '806 patent at 6:29-32 (beginning the sentence "In one embodiment . . . ").

7

Google also relies on a description in the specification of the subscriber management element (SME) and its implementation on certain servers. *Id.*, citing '806 patent at 6:29-32, 8:4-13. But Claim 1 does not claim an SME, so the exemplary description of the SME in the specification has no bearing on the implementation of the claimed access network.

In sum, Google has sought to load up the term "IPTV service" with two limitations that are unsupported by the specification and in fact contradict it. This argument rightly failed for "access network" and it fares no better for "IPTV service."

### 3. Google's deficient extrinsic evidence does not justify a departure from the plain and ordinary meaning

Perhaps recognizing that the intrinsic evidence does not support its narrowing construction, Google overcompensates with extrinsic evidence. There is a "heavy presumption that claim terms are to be given their ordinary and customary meaning" and none of the material cited by Google overcomes this presumption. *Aventis*, 715 F.3d at 1373 (citing *Phillips*, 415 F.3d at 1312-13). Google submits over *500 pages* of extrinsic evidence but Google's reliance on these references is improper because the term "IPTV service" can be understood by a plain reading of the claims and the specification. *See Vitronics*, 90 F.3d at 1584-85; *see also Lighthouse Consulting*, 476 F. Supp. 3d at 540 ("When this intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence is improper.").

The plain and ordinary meaning of "IPTV service" is unambiguous and easily understood on its face: television delivered by Internet Protocol. Google's extrinsic references contradict the intrinsic record because they are being used to impose limitations that the patentee did not choose to include. In order to argue that the extrinsic evidence is relevant to the meaning of "IPTV service" Google claims that the definition of the term was narrower at the time the '806 patent was filed than it is today. Google Br. at 7-8 (citing *Kopykake Entps., Inc. v. Lucks Co.*,

264 F.3d 1377, 1383 (Fed. Cir. 2001). Yet Google provides no evidence that the meaning of IPTV has changed at all. Google's extrinsic references should be summarily set aside.

None of Google's extrinsic references justifies a departure from plain and ordinary meaning. First, Google's own references support the plain and ordinary meaning of IPTV service. *See, e.g.*, Google Br. Ex. 18 at 17 (referring to IPTV as "primarily used to offer services that duplicate or exceed the features and functions of a CATV or direct broadcast satellite system by means of an IP network"); *Id.* Ex. 19 at 8 (characterizing IPTV as "simply a way to deliver traditional broadcast channels to consumers over an IP network in place of terrestrial broadcast, CATV, and satellite services").

Second, this Court has warned that "[d]efinitions do not always correctly convey the intended meaning in the patent . . . the definitions must be considered in light of the patent." *Mission Competition Fitness Equip. LLC*, No. 21-cv-00771-ADA, 2022 U.S. Dist. LEXIS 90904, at *19 (W.D. Tex. May 20, 2022) (citing *Phillips*, 415 F.3d at 1318-19). The intrinsic record is clear: "IPTV service" is not limited to an ISP service delivered over a private, managed IP network connection. '806 patent at 7:43-44; *see also supra* Section III.B. But Google's proffered "definitions" consider "IPTV" in a vacuum divorced from these teachings from the intrinsic record. Moreover, Google's jumbled extrinsic evidence underscores there was not even a consensus "definition" separate from the disclosures in the patent. *Compare* Google Br. Ex. 14 at 4 (defining IPTV as "a Microsoft project . . . designed to let telecommunications and cable companies offer new subscriber services that use their two-way broadband networks") *with* Dkt. *Id.* Ex. 19 at 8 (defining IPTV as "simply a way to deliver traditional broadcast channels to consumers over an IP network in place of terrestrial broadcast, CATV, and satellite services"). That *Google's own* extrinsic references cannot agree on a consensus definition demonstrates that

no single one should arbitrarily be imported into the claims in contravention of the intrinsic evidence.

Third, Google proffers extrinsic references that were written for commercial and business purposes, and not from the perspective of a POSITA, and therefore do not demonstrate a plain and ordinary meaning of "IPTV." *See, e.g.*, Google Br. Ex. 2 (article explaining the business case for IPTV); *Id.* Ex. 3 (same); *Id.* Ex. 4 (article by SBC describing adoption of Internet technology for investors); *Id.* Ex. 5 (graphic by AT&T showing AT&T U-verse timeline). These extrinsic references are thus not relevant to a POSITA's understanding of "IPTV service."

Fourth, several of Google's extrinsic references are silent as to "IPTV" and are therefore irrelevant to the plain and ordinary meaning of "IPTV service." Specifically, Exhibits 9, 10, 11, 12, and 13 to Google's brief do not address "IPTV" in any manner. These references are thus not relevant to the plain and ordinary meaning of "IPTV service."

Finally, Google's citations to unrelated ITC and PTAB constructions are not relevant because they involved different patents. *See Certain Digital Set-Top Boxes & Sys.*, Inv. No. 337-TA-1315, 2022 WL 4465560 (I.T.C. Sep. 22, 2022) ("*Digital* ITC case"); *Dish Network L.L.C. v. Broadband ITV, Inc.*, IPR2020-01267, 2021 WL 220200, at *15 (P.T.A.B. Jan. 21, 2021) ("*Digital* PTAB case"). In both the *Digital* ITC and PTAB cases,[3] the inventor set forth a narrower scope for "IPTV" that expressly *did not include* television delivered by the Internet. For example, the patent specification in the *Digital* ITC case held out that "IPTV . . . transmit[s] digital video in packetized streams within closed, proprietary broadband system." *Digital* ITC

---

[3] The patents for which "IPTV" was construed in the *Digital* ITC and PTAB cases are related and share portions of their specifications and figures. *Compare* Ex. A (U.S. Patent No. 9,936,240) *with* Ex. B (U.S. Patent No. 10,028,026). *See also Digital* ITC Case at 1; *Digital* PTAB case at 1.

Case at 46 (citing Ex. A at 2:40-42). Indeed, that patent's specification went as far as to teach away from television delivered by the Internet, stating "[t]he Internet is not an infinitely scalable resource, and placing a burden such as high-bitrate, high definition, full-screen video streams in any significant volume can overwhelm the Internet in its present form." *Id.* (citing Ex. A at 17:29-32). In the *Digital* PTAB case, the same inventor put forth identical narrow definitions and disavowals. Ex. B at 14:8-10, 17:17-20. Here, there is no such express narrow definition nor disavowal. Rather, quite the opposite: the patentee made clear that the IPTV service may or may not be delivered by an ISP: "An ISP *might* host its own IPTV service, *for example*." '806 patent at 7:43-44 (emphasis added). Google's citation to this unrelated case does not justify a departure from the plain and ordinary meaning.

In conclusion, Google's extrinsic evidence is deficient on multiple fronts and does not justify a deviation from the plain and ordinary meaning.

## IV.    U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA)

Google argues that two terms of the '961 patent are indefinite. As to both terms, Google fails to provide the required clear and convincing proof. In support of neither argument does Google submit actual evidence—let alone clear and convincing evidence—to demonstrate that the scope of the claim cannot be reasonably discerned by one of ordinary skill. Google relies only on its own unilateral and flawed interpretations, and invites this Court to do the same. *Cf, e.g.*, *Nautilus, Inc. v. Biosig Instruments*, 572 U.S. 898, 912 n.10 (2014) (*citing Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) for the proposition that "invalidity defenses must be proved by 'clear and convincing evidence'"). Further, in accordance with the canons of claim construction, the claims of the '961 patent should be construed to preserve validity. *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) (rejecting a claim construction that would encompass subject matter that would render the claim invalid for

lack of written description). The Court should reject Google's invitations.

### A. "incrementing of a count for a stationary state associated with the set of one or more distinct signal sources at the current time" (claims 1, 11)

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| Plain and ordinary meaning; not indefinite | Indefinite |

The above "incrementing of a count . . . " term is not indefinite, and there is no reason for the Court to deviate from its plain and ordinary meaning. First, this term—at least part of which was previously construed by the Court[4]—is supported with ample explanation throughout the specification, and a POSITA should have no trouble understanding the meaning of the term in the context of the claims in which it appears. Second, Google's complaints regarding the evidence cited by Brazos in its Amended Infringement Contentions misconstrue those infringement contentions. Third, even if the evidence cited by Brazos can be considered to constitute distinct infringement theories (which they are not), breadth of claim scope does not equate to indefiniteness.

### 1. Plain and ordinary meaning suffices

As a preliminary matter, the above term incorporates easy-to-understand language that needs no construction; there are no terms of art that the Court needs to untangle, no extrinsic evidence to weigh, and no special meaning to assign. The plain and ordinary meaning of the term should suffice. *See, e.g.*, *Aventis*, 715 F.3d at 1373 ("[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning" and courts must therefore "look to the claims themselves . . . to define the scope of the patented invention."). Moreover, the term is

---

[4] *See* June 2, 2021 Claim Construction Order (Dkt. 49) at 5 (determining that the terms "stationary state" and "incrementing [of] a count[er] for a stationary state" ought to have their plain and ordinary meaning); Brazos's January 22, 2021 Opening Claim Construction Brief (Dkt. 38) at 5-6 (explaining why the terms deserve plain and ordinary treatment); Brazos's February 26, 2021 Reply Claim Construction Brief (Dkt. 41) at 4-6 (same).

well-supported by the specification; Google does not argue otherwise. *See*, *e.g.*, '961 patent, 8:60-9:28 (describing an exemplary embodiment with "count fields" that hold "data that indicates the number of sample intervals for which that particular set of transmitter IDs was received simultaneously"); 11:8-18 ("The prior state and count field 270 holds data that indicates the transition state (e.g., Za to Zb) observed just before the transition state . . . The prior state and count field 270 also includes data that indicates how many times that previous state (e.g., Za to Zb) was observed just prior to the current transition state."); 13:51-60 (updating the count of a stationary state means incrementing a count if the stationary state (as defined by a set of transmitter IDs) has a matching record; that is, if a mobile device has been in a particular geographic location before, then a count for that user's mobile device in that geographic area is incremented). The plain and ordinary meaning should apply.

### 2.    Brazos's infringement contentions do not justify departing from plain and ordinary meaning

Google argues indefiniteness by misconstruing Brazos's Amended Infringement Contentions and conflating Brazos's evidence cited in support of the existence of a particular claim element within Google's accused products/services, with the evidence directly meeting the claim element. Brazos, in its Amended Infringement Contentions, indeed called out certain features of Google's products/services, such as Google Maps' Timeline and Popular Times features, and Google Ads' targeting and reporting features. *See* Google Br. at 12-14. But those features simply implicate the existence of a counter consistent with the disclosures in the '961 patent, rather than serve as direct evidence of the counter element. In other words, Brazos infers that Google employs, incorporates, and/or utilizes a counter tracking the number of times a particular mobile device enters a geographic area because the data displayed and/or presented by Google via the implicated features depends on Google keeping track of such data—even if

Google ultimately presents that data as an aggregate over time or across a multitude of users. For example, for Google Ads to correctly display Location Reports concerning the number of times an ad is displayed to users, Google must know which users enter which geographic areas, and how many times such users enter those areas in order to accurately report the delivery of particular ads to such users. Thus, even if Google Ads Location Reports aggregate multiple users' data over time, that aggregation of data necessarily depends upon granular raw data and strongly implies that the disputed claim element—the "incrementing of a count for a stationary state associated with the set of one or more distinct signal sources at the current time"—is present in the accused instrumentalities.

Similarly, for Google Maps to display its Popular Times feature, Google must first know when particular users enter and exit a particular business. Google may then aggregate that data across multiple users over time to predict how busy a location will be on a given day at a given time. But the mere fact that Google displays aggregated data does not refute that Google collects individual data consistent with the claimed invention; rather, displaying such aggregated data only supports the idea that Google maintains individualized data. Accordingly, Brazos is not alleging that the display of aggregated data *is* the claimed counter element, but rather that the display of such data indicates the existence and use of such counter element by Google.

Accordingly, the case law cited by Google to suggest that the term in question is indefinite is inapplicable. This is not a case requiring the construction of a relative term or set of relative terms. *Cf. Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 Fed. Appx. 1008, 1016 (Fed. Cir. Aug. 8, 2016) (opining that terms "in-band" and "out-of-band" were distinct terms that "have meaning only in the context of a defined reference"); *Chimie v. PPG Indus.*, 402 F.3d 1371 (Fed. Cir. 2005) (construing "dust-free and non-dusting" in light of examples of prior art

appearing in the specification); *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1254 (Fed. Cir. 2008) (term "fragile gel" was indefinite because patentee had failed "to distinguish the fragileness of the drilling fluids of the invention from the close prior art"). And the rest of the authority cited by Google does not support finding the claim term in question indefinite. For example, *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006), did not involve a finding of indefiniteness; rather it was an opinion regarding whether a preamble could be found limiting so that all elements of a claim were accorded meaning. And *Nautilus*, 572 U.S. at 900, only sets forth the current governing standard that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."

### 3. The "incrementing of a count . . . " Term's Breadth Does Not Render It Indefinite

Even if Brazos's Amended Infringement Contentions could be interpreted as comprising several distinct infringement theories (which, as above, they cannot), breadth of claim scope does not render a term indefinite. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017); *see also Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1352 (Fed. Cir. 2009) (claim to a formula containing over 5,000 possible combinations was not indefinite because it "notifie[d] the public of the scope of the claims."); *SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-CV-497, 2010 U.S. Dist. LEXIS 74808, at *90-91 (E.D. Tex. July 26, 2010) (rejecting defendant's argument that a term was indefinite because it allowed for four possible configurations without disclosing the preferred configuration).

### B. "the set of wireless transmitters" (claim 3)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning; not indefinite | Indefinite |

Google contends that claim 3 is indefinite because the term "the set of wireless

transmitters" lacks antecedent basis. Google Br. at 15-17. It is well settled law, however, that a claim is not indefinite merely because it lacks antecedent basis, particularly when a claim is reasonably understood by persons of ordinary skill in the art when read in light of the specification. *Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (finding claim term "said zinc anode" is not indefinite despite lack of antecedent basis as the term has a reasonably ascertainable meaning when read in context of the specification). "Claim definiteness is analyzed 'not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art.'" *Id*. Indeed, even if a claim term lacks antecedent basis, Google must prove by clear and convincing evidence that the claim, interpreted in light of the specification fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Micropairing Techs. LLC v. GM LLC*, No. 6:21-cv-0071-ADA, 2022 U.S. Dist. LEXIS 117471 at *44-45 (W.D. Tex. July 5, 2022) (finding no intrinsic ambiguity in the claim and defendant failed to provide clear and convincing evidence otherwise).

Here, Google fails to meet its burden to show that the claim scope when read in light of the specification is indeterminable by a POSITA. Google ignores the surrounding plain language of the claims and the entirety of the specification; instead, it quibbles with the fact that wireless transmitters are not defined or recited previously *within independent claim 1*. Google Br. at 16-17. As detailed below, when read in light of the specification, "the set of wireless transmitters" in claim 3 is understood as the "set of one or more distinct signal sources from which signals are received at a mobile device" recited in claim 1, and is therefore not indefinite.

The '961 patent's specification makes clear that that "signal sources" are "wireless transmitters." For example, Figures 9A and 9B are maps of GSM and WiFi transmitters, which

the specification also refers to as "GSM signal source[s]" and "WiFi signal source[s]." '961 patent at 21:32-44. Table 3 "shows the number of records and the number of *distinct signal sources (e.g., transmitter IDs)*" referring to the GSM and WiFi transmitters. *Id* at 21:45-56 (emphasis added), Table 3. Indeed, the patent explains that the distinct signal sources are wireless transmitters such as GSM, WiFi, or Bluetooth transmitters. *See, e.g.*, *id.* at 5:66-6:14 ("location context for the UE 101 is derived, at least in part, from signals received from *distinct signal sources, such as signals that form wireless links* 107. As used herein, the term stationary wireless transmitters refers to any wireless transmitter used for wireless communications, which persists in one location for an extended period of time . . . Although various embodiments are described with respect to wireless fidelity (WiFi) access points and global system for communications (GSM) base stations, it is contemplated that *the approach described herein may be used with other wireless communication transmitters*.") (emphasis added); *id* at 6:55-60 ("*one or more distinct signal sources within range for one or more types (e.g., WiFi or GSM) of wireless communications*") (emphasis added); *see also id* at 9:16-19 ("transmitter set field 254, e.g., transmitter set field 254a holds data that indicates *one or more distinct signal sources, such as wireless transmitter IDs*") (emphasis added).

Google argues that the claim fails to instruct a skilled artisan on how to define "the set of wireless transmitters" for determining a conditional probability. Google Br. at 17-18. This is incorrect. The claim specifies in plain language that a conditional probability is determined "for each wireless transmitter of the set of wireless transmitters *given an extant stationary state*." '961 patent at 37:34-36 (emphasis added). In other words, the set of transmitters—which are the signal sources as explained above—is defined by those particular transmitters or signal sources *associated with a stationary state* from the set of stationary states recited in claim 1. *Id* at 37:15-

18. Indeed, the antecedent basis of "the set of wireless transmitters" is found by implication in claim 1's recitation of "a set of one or more distinct signal sources from which signals are received at a mobile device" when read in light of the specification as detailed above. *See, e.g.*, *Energizer Holdings*, 435 F.3d at 1371 (finding "anode gel" is the antecedent basis for "said zinc anode" in a claim that recited "an anode gel comprised of zinc" and "said zinc anode" because an antecedent basis can be present by implication).

Claim 1 recites a set of stationary states in which each of those stationary states are associated with a set of one more distinct signal sources. '961 Patent at 37:15-18. Claim 3 recites individual wireless transmitters from the set of wireless transmitters—i.e., the set of distinct signal sources, associated with an extant stationary state, which refers to one of the stationary states from the set of stationary states recited in claim 1. Therefore, because the "set of one or more distinct signal sources" is defined by its association to a stationary state from a set of multiple stationary states, as explained in claim 1 (e.g., "a primary set of stationary states"), a skilled artisan would understand that the set of wireless transmitters given an extant stationary state recited in claim 3 is defined by the transmitters that are associated with that extant stationary state from the set of stationary states.

Google also attempts to create confusion based on a cursory read of the specification's discussion of stationary and non-stationary transmitters by arguing that a skilled artisan would be unable to recognize which of those two types of wireless transmitters are contemplated in claim 3. Google Br. at 18. This is a red herring. The specification explains that either of these wireless transmitters may be employed in the invention, with further detail on additional steps that must be taken if non-stationary transmitters are used: "The wireless transmitters indicated may be stationary or non-stationary transmitters. Using non-stationary transmitters (e.g.,

Bluetooth) involves a step to localize these transmitters . . . After this step, the localized non-stationary transmitters are used in some embodiments for the purpose of determining stationary states." '961 patent at 9:29-41. Thus, despite the additional step of localizing the transmitter, non-stationary wireless transmitters can be used in the same way as and/or in combination with stationary wireless transmitters. *See also id* at 21:1-4 ("The client is highly customizable, with the capabilities of monitoring multiple sensors (GSM, WiFi, GPS, Bluetooth, etc.) at the same time.").

The cases Google cites are inapplicable. For example, Google cites a case in which this Court placed significance on usage of the article "the." Google Br. at 16 (citing *Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6:19-cv-00167-ADA, 2020 U.S. Dist. LEXIS 11094, at *22 n.6 (W.D. Tex. Jan 23, 2020). But that case looked to the usage of the article "the" for the purpose of finding antecedent basis in the preamble. *Digital Retail*, U.S. Dist. LEXIS 11094, at *22 ("these terms make no sense without the preamble of claim 1, which provides the antecedent basis for each term"). Here, the antecedent basis of "the set of wireless transmitters" is found by implication in claim 1's recitation of "a set of one or more distinct signal sources from which signals are received at a mobile device." *See, e.g.*, *Energizer Holdings*, 435 F.3d at 1371. Similarly, the *Downing* case Google cites does not support indefiniteness. Google Br. at 17. In that case, the court considered the claim language and specification to find that the claims are not indefinite for lacking antecedent basis. *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) ("While the specification discloses many different end users . . . , claim 1's recitation of one end user could only refer to the end user using the product. Who else could the end user be?").

Conversely, other cases Google cites only found indefiniteness where the claim language and specification did not provide a sufficient predicate for the term, which is not true here with

respect to the '961 patent as explained above. *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014) (recognizing that a "patent which defines a claim phrase through examples may satisfy the definiteness requirement," but declining to find the claim term definite "based on a single 'e.g.' phrase from a lengthy written description to serve as the exclusive definition of a facially subjective claim term"); *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, No. 1:18-cv-760, 2019 U.S. Dist. LEXIS 109980, at *6-13 (E.D. Va. July 1, 2019) (neither the surrounding claim language nor the specification provided a clear antecedent basis or resolved the ambiguities in the claim); *see also, e.g.*, *Sol IP, LLC v. AT&T Mobility LLC*, No. 2:18-cv-0526, 2020 U.S. Dist. LEXIS 2944, at *39-43 (E.D. Tex. Jan. 6, 2020) (finding claim indefinite because the claim language and prosecution history directly contradicted Plaintiff's interpretation of the claim); *Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 1062 (Fed. Cir. 2021).

## V.     U.S. PATENT NO. 8,803,697 (CASE NO. 6:20-CV-584-ADA)

### A.     "Mobile Communication Device"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | "a portable device that can communicate while it is moving" |

### 1.     The Court should adopt the plain and ordinary meaning of "mobile communications device" (claims 1-6 and 13-17)

The '697 patent describes the use of radar to detect movement of an external object to change the characteristics of a user notification alert on a "mobile communications device." The term "mobile communications device" does not need construction beyond its plain and ordinary meaning, as the specification and prosecution history of the '697 patent provide a POSITA with sufficient information to understand the claim language. Additionally, the extrinsic evidence introduced by Google to present the alleged meaning of "mobile communications device" as "a

portable device that can communicate while it is moving" lacks support from the intrinsic record, and is contradicted by the extrinsic record.

The applicant in the '697 patent did not act as their own lexicographer or disavow any aspects of the plain and ordinary meaning of "mobile communications device" as used in the claim language. Instead, Google relies on the inapposite *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314 (Fed. Cir. 2016) case for justification to construe terms beyond their plain and ordinary meaning and attempts to add unsupported narrowing limitations to the plain and ordinary meaning of "mobile communications device" by cherry-picking exemplary embodiments from the specification and cobbling together unreliable dictionary definitions that will ultimately confuse the jury.

> **2.    The intrinsic evidence supports the plain and ordinary meaning of "mobile communications device"**

Google's proposed narrowing construction of "mobile communications device" as "a portable device that can communicate while it is moving" does not appear anywhere in the intrinsic record and is unsupported by the specification and prosecution history. First, the '697 patent specification never requires that the invention be "portable" or that it "can communicate while it is moving." Rather, the specification describes several exemplary embodiments where the invention is in a stationary state and located some distance from the user, and performs the steps of modifying user notifications triggered by events in response to detecting movement of an external object using radar. '697 patent, figs. 1 & 2, 3:32-4:33. Indeed, the only exemplary embodiment of the specification that actually describes the invention being in motion (such as in a car or being carried by a user) is one that adds an accelerometer precisely so as to *turn off the radar detection functionality* while the invention is in motion. *Id.* at fig. 3, 4:39-4:57.

Indeed, the '697 patent applicant specifically distinguished the invention from prior art in

which radar was used to detect the motion of the recited device, not the motion of the user relative to the device. *See* Ex. C ('697 patent, Non-Final Rejection dated 4/29/2013), Ex. D (Amendment/Request for Reconsideration-After Non-Final Rejection dated 7/29/2013). The examiner asserted that a prior art reference disclosed a device capable of changing the status of user notification alerts based on the detected position of a device and required no activity from the user. Ex. C at 4-5. In response to a Non-Final Rejection under § 103 the applicant stated, "[the prior art] describes a portable telephone in which the position of the portable telephone is determined and an alert for an incoming call is produced based on the detected position of the portable telephone. However, there is no activity needed from the user . . . . This is different than Applicants' invention as defined by amended claim 1 where movement of an external object, such as the user, is detected." Ex. D at 8-9. The prosecution history thus supports Brazos's plain and ordinary meaning that "mobile communications device" does not require portability or continued communication while moving.

The closest the specification comes to Google's requirements that the "mobile communications device" must be "portable" and "can communicate while it is moving" is in describing embodiments that include the potential for portability, such as the optional inclusion of batteries if an external power supply is not available, or the ability to bring the device to the movie theater, the office, or the library. '697 patent, 8:65-9:9; 1:19-1:26. But none of these exemplary use cases requires inserting the limitations that Google requests here. The claim language of the '697 patent never requires movement from the invention itself. While the specification proposes several optional features in embodiments that *could* render them portable, the specification always clarifies that these features "may" be included, not must be included. Thus, allowing Google to require the "mobile communications device" to be "portable" and "can

communicate while it is moving" would not be supported by the actual required features of the described embodiment.

Furthermore, Google's attempts to utilize the '697 patent prosecution history's reference to a "telephone" in an attempt to narrow the construction "mobile communications device" is improper—as demonstrated by the cases Google itself cites. In particular, the cases cited by Google explain that it is *the inventor's words* in the prosecution history that can be used to inform claim construction. Google Br. at 23 ("whether *the inventor* limited the invention in the course of prosecution") (emphasis added). But the prosecution history demonstrates that it was *the patent examiner* who inserted the word "telephone" into the draft claims, while the only words ascribed to the inventor are "apparatus" and "mobile communications device." *Compare id.* at 23-24 *with* Ex. E ('697 patent, claims dated 5/13/2011), Ex. F ('697 patent, claims dated 7/29/2013), & Ex. G ('697 patent, claims dated 2/1/2014).

The examiner's insertion of the word "telephone" and applicant's subsequent replacement with the phrase "mobile communications device" makes clear that the USPTO and the applicant expected the invention to encompass more than cellular telephones. First the applicant started with "apparatus," which covers all physical devices in all configurations. Ex E. Then the examiner proposed the narrower term "telephone," a device requiring no portability. Ex F. Finally, the applicant amended the claims by replacing "telephone" with the broader term "mobile communications device." Ex G. All versions of the claim language including "apparatus," "telephone," and "mobile communications device" are adequately supported by the specification and do not require any of Google's limitations to the plain and ordinary meaning of the terms.

In sum, Google cherry-picks portions of the '697 patent specification and prosecution

history in an attempt to narrowly construe "mobile communications device" as "a portable device that can communicate while it is moving," by reading limitations into the claim language based on an interpretation of an exemplary embodiment. This is improper and the Court should decline to adopt Google's reasoning for deviating from the plain and ordinary meaning. *Phillips*, 415 F.3d at 1323.

### 3.    The extrinsic evidence validates Brazos's plain and ordinary meaning

Extrinsic evidence is less significant than intrinsic evidence in determining the legally operative meaning of claim language. *Phillips*, 415 F.3d at 1317. This is because technical dictionaries and treatises may not be indicative of how the term was used in the patent, and are less reliable than the patent and the patent prosecution history. *Id.* at 1318.

But even Google's improper extrinsic evidence does not actually disclose Google's narrowed construction; rather, Google instead resorts to cobbling together multiple extrinsic sources to support its construction, i.e., Google's list of extrinsic definitions never defines the complete term "mobile communications device." Google instead relies on dictionary definitions of "mobile" (*see* Google Br. Exs. 26, 28, 29, & 30), "mobile communications" (*see id.* Exs. 24-26), and "mobile communications system" (*see id.* Ex. 27). Google can point to only two of these references as making any mention of communication *while* moving, and of those two the only definition that seems to require movement during communication appears to be from a source of questionable authority as it includes unverified anecdotes and does not appear to have been written or compiled by a person of skill in the art.[5]

---

[5] Google's cited reference *Wiley's Electrical Engineering Dictionary* lacks any "while . . . moving" requirement, instead merely proposing that as a possibility. Google Br. Ex. 26 (defining "mobile communications" as "transmission of information between two or more points or entities, one or more of which is moving or able to move easily.").

This reference (*Newton's Telecom Dictionary*) is not one to which a POSITA would have looked for guidance. Specifically, while *Newton's Telecom Dictionary* begins the definition with the single sentence quoted in Google's briefing (Google Br. at 22), the definition continues for over 150 more words, transitioning from mentioning wireless technology, to next mentioning wired technology, and concluding with an anecdote from a speech supposedly given by an FCC chairman at an unspecified time about mobile communications being demonstrated by a "Wild West" cavalryman sending Morse code messages back to the fort through a long wire without dismounting his horse. Google Br. Ex. 24.[6] Furthermore, the author appears not to be a POSITA, but rather a "writer, consultant, investor and public speaker" who in addition to publishing his "dictionary" also dispenses investment advice. *See* Ex. H (www.harrynewton.com, accessed 12/7/2022). Mr. Newton's personal website makes clear he has no education that would make him qualified to define the meaning of terms in the art. *Id.* It is exactly this sort of "dictionary" that the Federal Circuit has contemplated when cautioning about the use of extrinsic evidence, explaining that "while claims are construed as they would be understood by a hypothetical person of skill in the art, extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent." *Phillips*, 415 F.3d at 1318-19.

Google's other selective quotations designed to establish that a "mobile communications device" requires portability and the ability to communicate while moving do not provide

---

[6] Mr. Newton's publication frequently interjects such informal and unsupported meaning into his dictionary definitions, as evidenced in the limited excerpt in Google's filing. For example, the definition of "mobile banking" (on the same page as "mobile communications") provides no discernable meaning for that term, stating simply, "[t]hink of your phone as your bank," and then reciting a lengthy discussion touching on haircuts, groceries, loans, and requesting that the reader "[i]magine that you're poor." Google Br. Ex. 24.

guidance or support for Google's construction when examined in their full context. For instance, *Merriam Webster Dictionary*'s definition of "mobile" states that the subject is "capable of moving or being moved" with no reference to "portable" or "can communicate while it is moving" and gives the illustrative example of a missile launcher which fails to add clarity to the definition. Google Br. Ex. 30. *The American Heritage College Dictionary* offers two potentially relevant definitions of "mobile": 1) "Capable of moving or of being moved readily from place to place"; and 2) "Capable of moving or changing quickly from one state or condition to another," which again do not use the word "portable" and again have no reference to "can communicate while it is moving." Google Br. Ex. 29. The only other definition Google points to in arguing that communication must occur while a device is in movement, *Wiley Electrical and Electronics Engineering Dictionary's* definition of "mobile," requires a POSITA to ignore the first listed definition of that term ("1. [t]hat which can be readily moved from one location to another") and skip to the second definition ("2. [t]hat which can be readily moved from one location to another while uninterruptedly maintaining proper operation"). Google Br. at 22-23. Google selects this second meaning without justification while the *Wiley* ordering of these definitions suggests the first meaning is the more widely accepted definition. Google Br. Ex. 26. Moreover, *Wiley*'s definition of "mobile communications" further demonstrates that the term does not require the device be in a state of operation during movement by proposing the alternative, "is moving or able to move easily." *Id*.

Google additionally selectively emphasizes the definition of "mobile communications" from *A Dictionary of Media and Communication* to craft the artificial limitation of communicating while moving. But Google's brief omits the same definition's examples of "mobile communications," which offer an extremely varied array of mobility including "a

battery-powered television, WiFi-equipped laptop, cordless landline telephone, or outside broadcasting facility."

Nonetheless, if the Court determines it is necessary to look to extrinsic sources regarding the plain and ordinary meaning of the term "mobile communications device," the court should also look to Google's own patent language for examples of what a POSITA would have understood to be the plain and ordinary meaning of "mobile communications device." In a Google-owned patent the specification describes the meaning of a "mobile communications device" in the following manner: "In another example implementation, the term computing device or portable computing device, as used herein, may refer to a mobile communication device, such as a smartphone, mobile station (MS), terminal, cellular phone, cellular handset, personal digital assistant (PDA), smartphone, wireless phone, organizer, handheld computer, desktop computer, laptop computer, tablet computer, set-top box, television, appliance, game device, medical device, display device, wearable device or some other like terminology." Ex. K (U.S. Patent No. 10,134,111) at 3:67-4:8. A second Google-owned patent application states, "[t]he terminal 120 may be a mobile communication device, such as wireless telephone, a cellular telephone, a personal digital assistant, a pager, a personal computer, a selective call receiver or *any other device that is capable of sending and receiving communication signals on a network including wireless network.*" Ex. L (International Patent Publication WO2007002524 A1) at pg. 3 (emphasis added). Thus, the extrinsic record provides little authoritative (or even uniform) support to Google's construction of "mobile communications device" as "a portable device that can communicate while it is moving."

### 4.     Google's reliance on *Eon Corp.* is misplaced

Google first misrepresents Brazos's infringement contentions in an effort to manufacture a need to construe "mobile communications device," and then seeks to rely on the inapposite *Eon*

*Corp. IP Holdings* case to justify construing the term beyond its plain and ordinary meaning. Google Br. at 19-20, 24 ("Through its amended complaint and contentions against the stationary and wall-mounted apparatuses, WSOU attempts to broaden the scope of the term 'mobile communications device' . . . "). There is no reason why this case applies to the '697 patent, other than that the word "mobile" appears in both. The parties in *Eon* argued whether the patented invention (a utility company electricity billing meter) "easily" moved or not. *See Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1317 (Fed. Cir. 2016) ("easily moved from one location to another," contrary to "capable of being easily moved . . . but not that it actually has to move"). In contrast, Google makes no argument that in this case any controversy exists as to whether the accused Google Nest Hub 2nd Gen is "easily" moved. Google Br. at 19-24. To do otherwise would be absurd, as the Google Nest Hub 2nd Gen weighs just over one pound, whereas the average computer laptop weighs 2-8 pounds. Ex I (https://store.google.com/product/nest_hub_2nd_gen_specs?hl=en-US (accessed 12/7/2022)), Ex. J (https://techprohelpers.com/laptops-weight/ (accessed 12/7/2022)).

Similarly, Google's attempts to misconstrue Brazos's infringement contentions regarding the Google Nest Thermostat creates a red herring, as it ignores Brazos's contentions that infringement occurs by operating the Nest Thermostat in combination with the Google Home application running on a mobile communication device such as a smart phone (which even Google concedes falls within the plain and ordinary meaning of "mobile communication device"). *See, e.g.*, Dkt. 108 (Amended Complaint) ¶ 66 ("The Nest Thermostat interfaces with a mobile communication device running the Google Home application . . . ").

Instead, Google cites *Eon Corp* simply for the justification to construe terms beyond their plain and ordinary meaning. Google Br. at 20. Google provides no reason why this case applies

to the claim language in the '697 patent other than the fact that the term "mobile" is similar to "mobile communications device"; while simultaneously ignoring that the other contested term in *Eon*, "portable," does not appear in any of the claims in the '697 patent, but is instead injected into Google's own proposed construction. '697 patent cls. 1, 13, 18. Google's reliance on *Eon* is thus misplaced. As a result, and as explained above, Google's attempt to add unsupported limitations on the plain and ordinary meaning of the claim language is improper and will create confusion for the jury.

Date: December 7, 2022                    Respectfully submitted,

                                          **FOLIO LAW GROUP PLLC**

                                          */s/ Joseph M. Abraham*
                                          Joseph M. Abraham, TX SB No. 24088879
                                          Timothy Dewberry, TX Bar No. 24090074
                                          13492 Research Blvd., Suite 120, No. 177
                                          Austin, TX 78750
                                          T: 737-234-0201
                                          Email: joseph.abraham@foliolaw.com
                                                  timothy.dewberry@foliolaw.com

                                          Alexandra Fellowes, *Pro Hac Vice*
                                          Cliff Win, Jr., CA Bar No. 270517
                                          Steven Skelley, WA Bar No. 53017
                                          1200 Westlake Ave. N., Ste. 809
                                          Seattle, WA 98109
                                          Tel:    (206) 880-1802
                                          Email: alexandra.fellowes@foliolaw.com
                                                  cliff.win@foliolaw.com
                                                  steve.skelley@foliolaw.com

                                          Gregory P. Love
                                          State Bar No. 24013060
                                          Mark D. Siegmund
                                          State Bar No. 24117055
                                          **STECKLER WAYNE CHERRY & LOVE, PLLC**
                                          8416 Old McGregor Road
                                          Waco, TX 76712
                                          Tel.: (254) 651-3690
                                          Fax: (254) 651-3689
                                          greg@swclaw.com
                                          mark@swclaw.com

                                          *Attorneys for Plaintiff WSOU Investments,*
                                          *LLC d/b/a Brazos Licensing & Development*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 7, 2022, a true and correct copy of the foregoing was served on all counsel of record who have appeared in this case via the Court's CM/ECF system per Local Rule CV-5.

/s/ Joseph M. Abraham
Joseph M. Abraham