# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |  |
|---|---|---|
| **WSOU INVESTMENTS, LLC d/b/a, BRAZOS LICENSING AND DEVELOPMENT** | § § § § § § § | |
|  | | **Civil Case No. 6:20-cv-572-ADA** |
|  | | **Civil Case No. 6:20-cv-584-ADA** |
| *Plaintiff*, | § | **Civil Case No. 6:20-cv-585-ADA** |
| v. | § § | **JURY TRIAL DEMANDED** |
| **GOOGLE LLC,** | § § | |
| *Defendant.* | § § | |
| _____ | § | |

## GOOGLE'S REPLY CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ........................................................................................ iv

I.      U.S. PATENT NO. 8,041,806 (CASE NO. 6:20-CV-572-ADA) ..................................... 1

II.      U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA) ..................................... 5

        A.      "incrementing of a count for a stationary state associated with the set of one or more distinct signal sources at the current time" (claims 1, 11) ................ 5

        B.      "the set of wireless transmitters" (claim 3) ........................................................ 8

III.      U.S. PATENT NO. 8,803,697 (CASE NO. 6:20-CV-584-ADA) .................................. 12

## <u>TABLE OF AUTHORITIES</u>

Page

**CASES**

*Ajinomoto Co. v. ITC*,
    932 F.3d 1342 (Fed. Cir. 2019)....................................................................................14

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017)......................................................................................7

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.*,
    262 F.3d 1258 (Fed. Cir. 2001)......................................................................................2

*Bicon Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)....................................................................................5, 8

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002)......................................................................................10

*Comaper Corp. v. Antec, Inc.*,
    596 F.3d 1343 (Fed. Cir. 2010)......................................................................................8

*Energizer Holdings, Inc. v. ITC*,
    435 F.3d 1366 (Fed. Cir. 2006)....................................................................................11

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016)................................................................................12, 13

*Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996)........................................................................................8

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)......................................................................................3

*Horizon Pharma, Inc. v. Dr. Reddy's Labs. Inc.*,
    839 F. App'x 500 (Fed. Cir. 2021) .................................................................................9

*Icon Health & Fitness, Inc. v. Polar Electro Oy*,
    656 F. App'x 1008 (Fed. Cir. 2016) ...............................................................................5

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)....................................................................................12

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).............................................................................................8

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005)........................................................................13

*O2 Micro Int'l Ltd. v. Beyond Innovation Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................................................................1, 12

*Paragon Sol'ns, LLC v. Timex Corp.*,
566 F.3d 1075 (Fed. Cir. 2009)........................................................................15

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).......................................................15

*SynQor, Inc. v. Artesyn Techs., Inc.*,
2010 U.S. Dist. LEXIS 74808 (E.D. Tex. 2010) ..............................................8

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009)..........................................................................8

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development |
| Google | Defendant Google LLC |
| '806 patent | U.S. Patent No. 8,041,806 |
| '961 patent | U.S. Patent No. 8,737,961 |
| '697 patent | U.S. Patent No. 8,803,697 |

***Emphasis added unless otherwise indicated.***

**** Element notation is omitted from quotations of the patents' disclosures unless otherwise indicated.***

## I.      U.S. PATENT NO. 8,041,806 (CASE NO. 6:20-CV-572-ADA)

*WSOU's Brief Confirms That Construction of "IPTV Service" Is Necessary.*  Google's construction captures the term's ordinary meaning as of the filing date:  a private, managed IP network that was the bedrock of "IPTV service."  WSOU interprets the term as any "television delivered by Internet Protocol." 572 Dkt. 135 at 13.  Although public and private networks both use Internet Protocol, skilled artisans at the time of filing (2006) did not understand public Internet video to be an IPTV service.  572 Dkt. 134 at 7-11; Dkt. 134-1 ¶¶ 36-51.  By adding public Internet video to the term's scope, WSOU seeks a more recent interpretation diverging from the term's contemporaneous meaning.  Because both parties assert their construction reflects the ordinary meaning, "the 'ordinary' meaning of a term does not resolve the parties' dispute, and claim construction requires the court to determine what claim scope is appropriate." *O2 Micro Int'l Ltd. v. Beyond Innovation Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

*Construction Of "Access Network" Did Not Resolve The Meaning Of "IPTV Service."*  "IPTV service" and "access network" are different limitations, and the Court did not previously construe "IPTV service."  WSOU inaccurately describes Google's position regarding "access network."  Google's proposed construction of that term cited intrinsic evidence disclosing IPTV as electronic content provided by ISPs.  As typically happens, the same passages in the specification are relevant for construing multiple limitations.  Here, Google relies on similar passages to show consistency between the ISP-implemented IPTV service disclosed in the patent and actual IPTV implementations as of the filing date.  572 Dkt. 134 at 14-15.

*WSOU Misunderstands The Intrinsic Evidence.*  Google's brief establishes that IPTV service was provided within a private, managed IP network, and skilled artisans would have understood that the access network meets that description.  *Id.* at 12-14.  Contrary to WSOU's argument, the ISP's exclusive implementation and management of the access network and IPTV

service supports Google's construction.   The claims require an access network to include an electronic content source providing the IPTV service; the specification identifies the ISP as the electronic content source; in every embodiment ISPs exclusively implement and operate the access network providing the IPTV service; and the ISP-built access network is distinguished from the public Internet.  *Id.* at 12-14; *see* 572 Dkt. 1-1 at 5:11-23, 7:39-49, 15:46-49.  A patent may define a term by consistent usage in the specification.  *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1270 (Fed. Cir. 2001).  The patentee's uniform use of ISP-implemented access networks to host IPTV services requires a privately managed, ISP-created network.[1]

WSOU's other arguments opposing the private, managed aspects of IPTV service are equally misplaced.  WSOU incorrectly asserts that "privately managed" cannot be part of the ordinary meaning because that phrase does not appear verbatim in the specification.  That inverts controlling precedent by requiring a patentee to expressly set forth a term's ordinary meaning in the specification.  Here, contemporaneous extrinsic evidence confirms that IPTV services required a private, managed, which aligns with the intrinsic evidence.

The specification also refutes WSOU's argument that the IPTV service is not ISP-provided. 572 Dkt. 135 at 11-12. Every IPTV embodiment in the patent is explicitly implemented and hosted by an ISP, demonstrating that the patentee understood that IPTV services are ISP-provided. WSOU also misreads the passage at 7:39-49, which distinguishes between electronic content sources that are "internal to" and "external from" the access network.   The patent describes "electronic content source 58," which is external from the access network, as "any electronic publisher such as a traditional portal (webpage), a video content provider, etc."  572 Dkt. 1-1 at

---

[1] WSOU's reliance on exemplary embodiments of "signal sources" in the '961 patent (Dkt. 135 at 20-23) undercuts its criticism of Google's argument here.

7:39-41, Fig. 2 (electronic content source 58 external from access network 24). By contrast, the patent identifies an ISP as "[a]n electronic content source [that] could also or instead be *implemented within the access network* 24." *Id.* at 7:42-44. Thus, the disclosure that "[a]n ISP might host its own IPTV service, for example," means that an ISP specifically (not just "any electronic publisher") is an electronic content source internal to the access network, and the ISP hosts its IPTV service within the access network. This conforms with claims requiring the access network to include an electronic content source providing the IPTV service, and other disclosures stating "an ISP provides an Internet Protocol TV (IPTV) service as a source of electronic content" within the access network. *Id.* at 5:11-23, 16:32-38.

  ***Extrinsic Evidence Confirms The Contemporaneous Ordinary Meaning.*** The patent does not expressly state the ordinary meaning of "IPTV service." In such cases, "[w]hen the intrinsic evidence is silent as to the plain meaning of a term, it is entirely appropriate for the district court to look to dictionaries or other extrinsic sources for context—to aid in arriving at the plain meaning." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). Contrary to WSOU's assertion, the abundance of extrinsic evidence is not "overcompensation"; rather, it is the *best evidence* of the contemporaneous ordinary meaning.

  WSOU wrongly asserts that Google provided no evidence that the meaning of IPTV has changed. In his expert declaration, which WSOU entirely ignores, Mr. Wes Simpson explains:

> *Based on my research and experience in the telecommunications industry, in recent years "IPTV" is becoming more frequently interpreted as covering television content transmitted over both private and public IP networks*. However, as of the '806 patent's filing date, an IPTV service was understood in terms of not only the content it provided, but also in terms of the closed type of network used to deliver that content. Specifically, IPTV services were delivered exclusively over private, managed network connections, not over the public Internet.

572 Dkt. 134-1 ¶ 39. Mr. Simpson has forty-plus years of industry experience, including

development of IP video transport standards and teaching IEEE courses in video technology.  *Id.* ¶¶ 5-18.  WSOU offers no rebuttal to Mr. Simpson's analysis, which definitively establishes the skilled artisan's contemporaneous understanding of "IPTV service."

WSOU's remaining arguments cannot disturb the extrinsic evidence's showing that skilled artisans understood IPTV services as provided over a private, managed network.  WSOU mischaracterizes excerpts from two extrinsic references as supporting WSOU's construction.  572 Dkt. 135 at 14.  Those two references confirm that an IPTV service used a private, managed network.  The first reference states that "[b]oth IPTV and Internet Video use IP technology for video delivery, but that's where the similarities end," and "[i]n a typical [IPTV] system, a *private*, high-speed IP network is used."  572 Dkt. 134-18 at 16-17.  The second reference states:  "IPTV is a method for delivering traditional, linear television programming to consumers over a private IP network….  Contrast this with Internet video, which consists of millions of video clips that are … delivered over a public network."  572 Dkt. 134-19 at 34.

Without any support, WSOU wrongly asserts that certain Google's exhibits are not relevant because they were "written for commercial and business purposes."  572 Dkt. 135 at 15.  Google's exhibits are highly relevant because their authors developed and implemented IPTV services.  572 Dkts. 134-2 (written by the president of Alcatel, original assignee of the asserted patent), 134-3 and 134-5 (written by AT&T, developer and implementer of IPTV services), 134-4 (same for SBC).  WSOU also incorrectly contends certain Google exhibits are irrelevant because they are "silent as to 'IPTV.'"  The relevance of Exhibits 9-13 is clear from Mr. Simpson's declaration explaining that "'IPTV' is often mistaken or mischaracterized as a service that provides videos over the public Internet ... because the 'IP' in 'IPTV' means 'Internet Protocol,' which includes the word 'Internet.'"  572 Dkt. 134-1 ¶¶ 36-38.  Mr. Simpson also discusses Exhibits 10-12 to

show how the specification's references to Remote Access Server (RAS) support Google's construction, which WSOU ignores. *Id.* ¶ 56.

Finally, the ITC's and PTAB's constructions are confirmatory. They construed terms similar to "IPTV service." The disputed patents were filed contemporaneously with the '806 patent, disclosing the same IPTV technology referenced in the '806 patent. In fact, the claim construction dispute in those cases and here is the same: whether IPTV is served over proprietary network connections rather than the public Internet. In those cases, the patents excluded Internet video from IPTV for the same reasons set forth in Google's brief and expert declaration.

## II.    U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA)

### A.    "incrementing of a count for a stationary state associated with the set of one or more distinct signal sources at the current time" (claims 1, 11)

A "plain and ordinary meaning" construction is not a license to ascribe different, inconsistent meanings to the same term. Rather, a term's meaning must be fixed, unambiguous, and cannot render language superfluous. *Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008, 1016 (Fed. Cir. 2016); *Bicon Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).[2] WSOU does not dispute this. Instead, WSOU attempts to duck the indefiniteness issue by arguing that this term "incorporates easy-to-understand language that needs no construction." 585 Dkt. 128 at 12. That misses the point. Regardless of whether individual words in this term

---

[2] WSOU fails to distinguish these cases. <u>First</u>, WSOU claims that *Icon Health*, *Chimie*, and *Halliburton* are "inapplicable" because they involve construction of relative terms. 585 Dkt. 128 at 14. But the term here is also relative, featuring "stationary state" as opposed to "transition state," "current time" as opposed to others in "a plurality of different times," and "a count for a stationary state associated with … distinct signal sources at the current time" as opposed to any other "count." These relative relations are the heart of the indefiniteness issue. In any event, those cases are not limited to relative terms. <u>Second</u>, WSOU asks the Court to ignore *Bicon* because it did not hold any term indefinite. That is a red herring. WSOU does not contest *Bicon*'s holding that "superfluous [claim language] would render the scope of the patent ambiguous," 441 F.3d at 950, which concerns indefiniteness.

have known meanings, the dispute is about the scope of the term's "ordinary meaning."  As Google's explained, the different "plain meanings" that WSOU applies ignore the claim language, thus rendering the term with no meaning at all.  585 Dkt. 127 at 10-15.  WSOU has no response to Google's showing that this term is indefinite because the so-called "ordinary meaning" that WSOU advocates is a moving target that vitiates the claim language.

This term requires more than mere "incrementing of a count."  The "count" must be "for a stationary state," and the "stationary state" must be "associated with *the set of one or more distinct signal sources at the current time*."  585 Dkt. 1-1 at 37:14-17, 38:27-29.  Claims 1 and 11 supply the antecedent basis for the last part of this term:  "a set of one or more distinct signal sources from which signals are received at a mobile device for each of a plurality of different times."  *Id.* at 37:7-9, 38:20-22.  Thus, the count incremented must be for a single mobile device's current stationary state.  But that is not how WSOU interprets this term.  Google identified four inconsistent "plain meanings" that WSOU ascribes to this term for different accused products, individually rendering claim language superfluous and collectively demonstrating a lack of fixed meaning:  (1) the aggregate *number of multiple mobile devices* at a particular location at any point in time; (2) the *number of times a particular advertisement was shown in a geographic area* across *all* mobile devices for *some past period of time*; (3) the number of times *in its history* that a single mobile device has visited an area; and (4) *movement* of a single mobile device at some undefined point in time.  585 Dkt. 127 at 11-15.

WSOU never attempts to argue that its contentions interpret this term consistently.  Rather, WSOU distances itself from its own contentions, claiming for the first time that it is *not* alleging that the different features it points to for this term meet the claim requirements.  Even setting aside the specifics of WSOU's shifting sands approach to its infringement theories, WSOU's

inconsistent positions confirm that it seeks to use an "ordinary meaning" construction to erase the requirement that the count be "for a stationary state associated with the set of one or more distinct signal sources at the current time," and instead cover any count conducted at any time.  This interpretation ignores the claim language and has no bounds, rendering it indefinite.

WSOU's other arguments are non-responsive.  <u>First</u>, WSOU's cited specification passages confirm that its various "ordinary meanings" are inconsistent with the specification.  The first passage (8:60-9:28) supports only a count for a single mobile device's stationary state:  it describes a "stationary state record" as having "count fields" and a "user ID" field that "indicates the user" associated with this record because "each user is expected to have different stationary and transition states."  Contrary to WSOU's assertion, this passage discusses neither current time nor incrementing.  The second passage (13:51-60) supports only incrementing a count for a single mobile device's current stationary state:  it incorporates the stationary state record embodiment of the first passage and describes one step of Figure 3, which in turn describes the ordered process of "receiv[ing] current data in single data stream," then "classify[ing] current time as moving/not moving," and if "no[t moving]," then "updat[ing] stationary states," followed later by "deliver[ing] service based on current/predicted state."  *Id.* Fig. 3.  The third passage (11:8-18) is entirely irrelevant as it describes a "transition state record," *id.* at 9:58, but the disputed claim term concerns "stationary" states, not "transition" states.  WSOU's brief thus demonstrates that the specification supports only incrementing a count for a single mobile device's current stationary state—a meaning that WSOU never applies.

<u>Second</u>, this is not a case where the bounds of the claim are clear and merely encompass multiple configurations.  Instead, the bounds of the claim are nonexistent because claim language is vitiated and the term has no fixed meaning.  Accordingly, WSOU's citations to *BASF Corp. v.*

*Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017), *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339 (Fed. Cir. 2009), and *SynQor, Inc. v. Artesyn Techs., Inc*., 2010 U.S. Dist. LEXIS 74808 (E.D. Tex. 2010), are inapposite.  In those cases, even if the claim covered multiple materials, chemical combinations, or mechanical configurations, the claim's meaning was fixed, unambiguous, and did not render any language superfluous.  Not so here.

**B.     "the set of wireless transmitters" (claim 3)**

WSOU concedes that "the set of wireless transmitters" lacks antecedent basis in the claims or specification and instead argues that the "plain and ordinary meaning" of this term is an entirely different claim term.  According to WSOU, the Court should treat "the set of wireless transmitters" as *synonymous* with a *different* term appearing in *both* claims 1 and 3:  "the set of one or more distinct signal sources from which signals are received at a mobile device."  WSOU thus argues that the patentee used different words to mean the same thing.  Nothing in the claims or specification support WSOU's rewriting of the claim; in fact, both claim 3 itself and WSOU's infringement contentions confirm the patentee distinguished between one "set" and the other.[3]

***The patentee clearly distinguished "the set of distinct signal sources" from "the set of wireless transmitters."***  Courts infer "that two different terms used in a patent have different meanings." *Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996)); *Bicon,* 441 F.3d at 950.  WSOU concludes that "[t]he '961 patent's specification makes clear that that 'signal sources' are 'wireless transmitters,'" 585 Dkt. 128 at 16, but provides no authority that supports

---

[3] WSOU purports to announce a new standard for indefiniteness, under which Google must show "that the claim scope when read in light of the specification is **indeterminable** by a POSITA."  585 Dkt. 128 at 16.  The correct indefiniteness standard is whether a claim "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014).

rewriting the claim to treat two terms interchangeably.  WSOU's citations to the specification, as well as its own infringement contentions, confirm it is incorrect.

**Claim 3 differentiates between "the set of wireless transmitters" and "the set of distinct signal sources."**  WSOU argues that, "read in light of the specification, 'the set of wireless transmitters' in claim 3 is understood as the 'set of one or more distinct signal sources from which signals are received at a mobile device' recited in claim 1, and is therefore not indefinite." *Id.*  But WSOU fails to mention that claim 3 itself refers to *both* "the set of one or more distinct signal sources" and "the set of wireless transmitters."  Claim 3 contains two determining steps.  First, "determining a conditional probability for each wireless transmitter of the set of wireless transmitters given an extant stationary state."  585 Dkt. 1-1 at 37:34-36.  Second, using the conditional probability for each wireless transmitter of "the set of wireless transmitters," the claim *then* requires determining a *second* group of conditional probabilities for "the set of distinct signal sources":

> determining a conditional probability for the extant stationary state given *the set of one or more distinct signal sources* <u>based on</u> the conditional probability for *each wireless transmitter of the set of wireless transmitters* given the extant stationary state;

*Id.* at 37:37-41.  The claim itself differentiates between one "set" and the other:  indeed, it uses the *result* of a calculation for one as an *input* for a calculation regarding the other.  Claim 3 illustrates the patentee's understanding of antecedent basis:  "the set of one or more distinct signal sources" in claim 3 refers to the "a set of one or more distinct signal sources" of claim 1.  WSOU's attempt to conflate the two sets would render the second "determining" step meaningless:  if the two sets were synonymous, then one "conditional probability" would be "based on" itself.  WSOU's proposal, if correct, would render the second determining step nonsensical.  "One circumstance in which claims are indefinite is where the claims, as properly construed, are nonsensical." *Horizon*

*Pharma, Inc. v. Dr. Reddy's Labs. Inc.*, 839 F. App'x 500, 505 (Fed. Cir. 2021).

**WSOU's proposal that "the set of wireless transmitters" is "understood as the 'set of one or more distinct signal sources'" contradicts the specification and its own contentions.**  The specification and WSOU's infringement contentions prevent it from limiting "distinct signal sources" to "wireless transmitters."  The portion of the specification that WSOU cites shows that wireless transmitters are *merely examples* of the many "signal sources" that could be received by a mobile device.  "[L]ocation context for the UE 101 is derived, at least in part, from signals received from *distinct signal sources, such as signals that form wireless links* 107."  585 Dkt. 128 at 17 (emphasis in original).  "'[S]uch as' introduces an example of a broader genus rather than limiting the genus to the exemplary species."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002).  Limiting "distinct signal sources" to "wireless transmitters" is improper.

WSOU's infringement contentions also affirmatively state that "distinct signal sources" include more than just "wireless transmitters," such as device hardware for assessing movement.  For example, for claim element 1.a. "causing at least in part a receiving of signal data that indicates a set of one or more distinct signal sources … ," WSOU asserts that "Awareness API get [sic] contextual signal data from different sensors and interference sources (or, set of one or more distinct signal sources) continuously over different time periods.  For example, Snapshot API captures sensors data (*e.g. motion sensing data*) to determine activities and locations."  585 Dkt. 111-9 at 15; *see id.* at 71 ("[t]his state can be combined with an incremented count for another *signal source such as motion data for activity (e.g. walking)* using one or more sensors such as *motion sensors*, position sensors, etc.") (citing Android hardware and software sensors including gyroscopes and accelerometers); *see also id.* at 74, 93, 96.

***Even if all "distinct signal sources" are "wireless transmitters," WSOU cannot identify any basis in the claims or specification to determine <u>which</u> wireless transmitters are within "the set."*** WSOU misstates Google's argument as "quibbl[ing]" with the definition of "wireless transmitters."[4] But Google does not argue that a skilled artisan would be unsure what a "wireless transmitter" is; it argues that a skilled artisan would be unable to identify "the set" of wireless transmitters with reasonable certainty. 585 Dkt. 127 at 17. Google explained that claim 3 requires determining a conditional probability for *each* wireless transmitter of "*the set* of wireless transmitters," but fails to provide antecedent basis for, or otherwise instruct a skilled artisan how to identify each member of, "*the set* of wireless transmitters." *See* 585 Dkt. 127 at 17-18. A skilled artisan would understand that any number of transmitters—wireless or otherwise—may be received at a mobile device at a given time. But claim 3 requires "determining a conditional probability for *each* wireless transmitter of the set of wireless transmitters," meaning skilled artisans must be able to identify *each member of the set* with reasonable certainty.

Having purportedly identified "the set of distinct signal sources" of claim 1 as the implied antecedent basis for "the set of wireless transmitters," WSOU proceeds to add *new* claim language, which appears nowhere in the patent, to modify the "set of distinct signal sources" in order to give meaning to "the set of wireless transmitters." WSOU argues that "a skilled artisan would

---

[4] WSOU relies heavily on *Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370 (Fed. Cir. 2006), but *Energizer* supports Google's position. There, the court reviewed a determination that the term "said zinc anode" was indefinite for the sole reason that the precise term lacked antecedent basis even though the claim recited "anode gel comprised of zinc as the active anode component" immediately preceding the "said zinc anode." *Id*. at 1369. Noting that no party "argued that they did not understand the intended scope because of the absence of an antecedent," the court held that the "anode gel [comprised of zinc]" is by implication the antecedent basis for "said zinc anode." *Id*. The opposite is true here. Nothing in the claims states that "the set of distinct signal sources" is "comprised of" the set of wireless transmitters. Indeed, the claims distinguish the two "sets." Google's opening brief explains the ambiguity as to what particular transmitters comprise "the set" required by the claim.

understand that the set of wireless transmitters given an extant stationary state recited in claim 3 is defined by the transmitters that are *associated with* that extant stationary state from the set of stationary states."  585 Dkt. 128 at 18.  But WSOU's reading renders the first "conditional probability" of claim 3 meaningless:  if all of the particular transmitters are already "associated with" a particular stationary state, the probability for "each" transmitter "given an extant stationary state" would always be 100%, which is not a probability at all.  WSOU's argument thus confirms that claim 3 "does not provide a reasonably clear and exclusive definition" of the term "the set of wireless transmitters." *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1373 (Fed. Cir. 2014). Consider:  if a device is receiving signals from "Home WiFi," "Neighbor WiFi1," "NeighborWiFi2," "Bluetooth Headphones," "Bluetooth Speaker," and "GSM Tower A," are all of these signals within "the set" for which "each" gets a conditional probability determination?  If not, why not?  WSOU does not say, because it cannot.

## III.    U.S. PATENT NO. 8,803,697 (CASE NO. 6:20-CV-584-ADA)

WSOU avoids the substance of Google's arguments and never states the ordinary meaning of "mobile communications device."  WSOU's brief makes one thing clear:  The parties dispute the scope of the term's ordinary meaning.  Google construes the term to mean "a portable device that can communicate while it is moving," while WSOU asserts that the term covers corded and wall-mounted devices.  Such disputes about claim scope are "the court's duty to resolve." *O2*, 521 F.3d at 1362.  Without explanation, WSOU asserts that a construction would "confuse the jury." The opposite is true.  Failing to construe the term would leave the "question of claim scope unanswered, leaving it for the jury to decide," which is "legal error." *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).

***WSOU cannot distinguish* Eon.**  WSOU's discussion of its infringement contentions shows that *Eon* is directly on point.  As in *Eon*, the parties here "actively dispute[] the scope of

['mobile communications device']," and "[t]he crucial question [is] whether, as [Google] argue[s], the terms should not be construed so broadly such that they covered 'fixed or stationary products that are only theoretically capable of being moved.'"  *Id.* at 1319.  *Eon* instructs that a "court's duty" is "to resolve a dispute about claim scope that has been raised by the parties."  *Id.*  Contrary to WSOU's assertion, *Eon* did not construe a term to deviate from an ordinary meaning.  Rather, the court construed the term "mobile" to articulate the ordinary meaning.  *Id.*

   ***Google's construction reflects the ordinary meaning, as confirmed by the totality of the intrinsic evidence.***  Seeking to avoid any construction, WSOU asserts that Google "cherry picks" examples from the specification.  But WSOU's argument is "divorced from the context of the written description and prosecution history."  *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).  During prosecution, the applicant amended the claims, surrendering the original "apparatus" for the narrower "mobile communications device."  584 Dkt. 122-31 at 82-83.  The intrinsic evidence must be reviewed in light of this amendment.  As Google established, the relevant intrinsic evidence shows that a "mobile communication device" is portable and can be used while it is moving.  In the "Background Art" section—hardly an "exemplary embodiment," as WSOU asserts—the patent demonstrates that a "mobile communications device" must be portable, otherwise it could not be brought to "places like theaters or cinemas" "or libraries" and could not "be in close vicinity to the user" in such places.  584 Dkt. 1-1 at 1:16-24.  The "mobile communications device" also must be able to communicate while moving, otherwise it could not receive "an incoming call" when brought to these locations."  *Id.*

   The remainder of the specification reinforces Google's construction as the ordinary meaning.  The patent explains that the originally claimed "apparatus" could be either "[1] a *mobile* terminal or [2] *other* communication device."  *Id.* at 7:64-8:3.  WSOU ignores this critical

distinction which, echoing the prosecution, demonstrates that the claimed "*mobile communications device*" must be different than "*other* communications device[s]." The other disclosure Google cites (e.g., radio/movement sensing, using batteries for power, and the ability to carry the device, *id.* at 4:44-52; 6:14-20; 8:4-6, 33-45; 9:6-9), supplies meaning for the term "mobile," making it highly relevant to the term's scope. These passages are not preferred embodiments of a "mobile communications device," as WSOU alleges; rather, they describe the "mobile communications device" itself.

**WSOU uses "plain and ordinary meaning" to recapture surrendered claim scope.** "[W]hen a word is changed during prosecution, the change tends to suggest that the new word differs in meaning in some way from the original word." *Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1351 (Fed. Cir. 2019). Seeking to avoid this rule, WSOU mischaracterizes Google's argument as limiting "mobile communications device" to a "telephone." Not so. Google's construction is based on the *applicant's own choice* to replace the broader term "apparatus" with the narrower "*mobile communications device*." Despite this narrowing amendment, WSOU attempts to gloss over any meaningful change in scope. 584 Dkt. 123 at 23. Indeed, WSOU wrongly asserts that "the claim language … never requires movement from the invention itself." *Id.* at 22. Of course it does. Otherwise "*mobile* communications device" would have no meaning.

**WSOU's prosecution history citation is inapt.** During prosecution, the examiner rejected the claims based on prior art disclosing a portable telephone with radar to detect its own position. 584 Dkt. 122-31 at 56-57. The applicants distinguished this reference as "different than Applicants' invention … *where movement of an external object, such as the user, is detected.*" *Id.* at 84. They never suggested or argued that the claimed device was not portable. *Id.* at 94-95.

**WSOU's arguments regarding contemporaneous dictionaries are misplaced.** <u>First</u>,

rather than address the definitions in Google's brief, WSOU argues ad hominem that *Newton's Telecom Dictionary* is unreliable. 584 Dkt. 123 at 25. Putting aside that *Newton's* is one of seven cited dictionaries uniformly supporting Google's construction, WSOU ignores that the Federal Circuit approvingly cites *Newton's* in seven opinions, relying on it alongside other dictionaries cited by Google. *E.g.*, *Paragon Sol'ns, LLC v. Timex Corp.*, 566 F.3d 1075, 1092 (Fed. Cir. 2009) (citing *Newton's*, *IEEE 100*, and *Wiley*). Second, WSOU wrongly asserts that other dictionaries cited by Google are not relevant because they offer multiple definitions. *Id.* at 24. A "claim should not rise or fall based on the preferences of a particular dictionary editor, or the court's independent decisions, uninformed by the specification, to rely on one dictionary rather than the other." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir. 2005) (en banc). WSOU agrees that "definitions must be considered in light of the patent." 584 Dkt. 123 at 9. The definitions Google identifies are the most appropriate because they dovetail with the patent's disclosure.

> ***WSOU's use of extrinsic evidence is procedurally improper and substantively erroneous.***

Procedurally, WSOU relies on a Google-owned patent and patent application that WSOU never identified during the Court-ordered extrinsic evidence exchange. Substantively, WSOU admits that evidence from other patents is "not relevant" to the claim construction. *Id.* at 10. WSOU also misreads Google's patent and application. Google's patent states that a "mobile communication device, such as a smartphone," is an example of a "*computing device* or portable computing device." 584 Dkt. 123-11 at 13 (3:67-4:3). The other devices identified are examples of a "*computing device or portable computing device*," not a "mobile communication device," as WSOU contends. *Id.* Likewise, Google's application identifies "a mobile communication device, such as wireless telephone" as one example of a "terminal"; the other identified devices refer to other examples of "[t]he terminal," not a "mobile communications device." 584 Dkt. 123-12 at 6.

Date:  December 21, 2022

Respectfully submitted,

*/s/ Tharan Gregory Lanier, with permission*
*by Michael E. Jones*
Tharan Gregory Lanier (pro hac vice)
**Jones Day**
1755 Embarcadero Road
Palo Alto, California, 94303
+1 (650) 739-3939
+1 (650) 739-3900 facsimile
tglanier@jonesday.com

Michael E. Jones (Texas Bar No. 10929400)
Shaun W. Hassett (Texas Bar No. 24074372)
**Potter Minton, P.C.**
102 North College, Suite 900
Tyler, Texas, 75702
+1 (903) 597-8311
+1 (903) 593-0846 facsimile
mikejones@potterminton.com
shaunhassett@potterminton.com

Matthew S. Warren (California Bar No.
230565)
Jennifer A. Kash (California Bar No. 203679)
(*pro hac vice*)
Erika Warren (California Bar No. 295570)
Warren Lex LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
20-583@cases.warrenlex.com

Sasha Mayergoyz
**Jones Day**
77 W. Wacker Drive
Chicago, IL 60601
+1 (312) 782-3939
smayergoyz@jonesday.com

**Attorneys for Defendant Google LLC**

16