—1—

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                        WACO DIVISION

 3   WSOU INVESTMENTS LLC      *
                              *      February 16, 2023
 4   VS.                      *
                              *      CIVIL ACTION NOS.
 5   GOOGLE LLC               * W-20-CV-572/580/584/585

 6           BEFORE THE HONORABLE ALAN D ALBRIGHT
             MOTION and MARKMAN HEARING (via Zoom)
 7
     APPEARANCES:
 8
     For the Plaintiff:   Joseph M. Abraham, Esq.
 9                        Folio Law Group PLLC
                          13492 Research Blvd, Ste. 120, #177
10                        Austin, TX 78750

11                        Moses Xie, Esq.
                          Folio Law Group PLLC
12                        1200 Westlake Ave. N., Ste. 809
                          Seattle, WA 98109
13
     For the Defendant:   Tharan Gregory Lanier, Esq.
14                        Jones Day
                          1755 Embarcadero Road
15                        Palo Alto, CA 94303

16                        Edwin O. Garcia, Esq.
                          Tracy A. Stitt, Esq.
17                        Jones Day
                          51 Louisiana Avenue, N.W.
18                        Washington, DC 20001

19                        Jennifer A. Kash, Esq.
                          Warren Lex LLP
20                        2261 Market Street, No. 606
                          San Francisco, CA 94114
21
                          Israel Sasha Mayergoyz, Esq.
22                        Jones Day
                          77 West Wacker, Suite 3500
23                        Chicago, IL 60601

24

25
```

```
1                              Michael E. Jones, Esq.
                               Shaun William Hassett, Esq.
2                              Potter Minton PC
                               110 North College, Suite 500
3                              Tyler, TX 75702

4                              Erika Hart Warren, Esq.
                               Warren Lex LLP
5                              2261 Market Street, No. 606
                               San Francisco, CA 94114 ^
6
     Court Reporter:          Kristie M. Davis, CRR, RMR
7                              PO Box 20994
                               Waco, Texas 76702-0994
8                              (254) 340-6114

9        Proceedings recorded by mechanical stenography,

10    transcript produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

09:32  1                    (Hearing begins.)

09:32  2                    DEPUTY CLERK:  A civil action in Cases

09:32  3    6:20-CV-572, 580, 584, and 585, WSOU Investments LLC

09:32  4    versus Google LLC.  Cases called for a Markman and

09:32  5    motions hearing.

09:32  6                    THE COURT:  Announcement from counsel,

09:32  7    please.

09:32  8                    MR. ABRAHAM:  Good morning, Your Honor.

09:32  9    This is Joseph Abraham with Folio Law Group here on

09:32  10   behalf of plaintiff Brazos Licensing and Development.

09:32  11                   With me today arguing the summary

09:32  12   judgment motion will be Ms. Alexandra Fellowes, whose

09:32  13   acquaintance you made last week, I believe.

09:32  14                   And then arguing the Markman term will be

09:32  15   Mr. Moses Xie, who's making his first appearance in

09:32  16   district court.

09:32  17                   THE COURT:  Well, that'll be fun for me

09:32  18   at least, so I look forward to it.

09:32  19                   Mr. Jones?

09:33  20                   MR. JONES:  Your Honor, this is Mike

09:33  21   Jones for Google.  Together on the phone for Google are

09:33  22   Greg Lanier, Edwin Garcia, Shaun Hassett, Sasha

09:33  23   Mayergoyz, Tracy Stitt, Erika Warren and Jenna Kash.

09:33  24   And from Google itself, Mr. Charles Stiernberg.

09:33  25                   And Mr. Lanier will be making our

4

| | | |
|---|---|---|
| 09:33 | 1 | arguments.  And I think he's done it before on an |
| 09:33 | 2 | occasion, I'm not sure. |
| 09:33 | 3 | We're ready to proceed, Your Honor. |
| 09:33 | 4 | THE COURT:  I've gotten to enjoy |
| 09:33 | 5 | Mr. Lanier arguing in front of me many times, and I |
| 09:33 | 6 | talk about it frequently to anyone who will listen.  So |
| 09:33 | 7 | I look forward to hearing the motion. |
| 09:33 | 8 | I'll hear from Google. |
| 09:33 | 9 | MR. JONES:  Thank you, Your Honor. |
| 09:33 | 10 | MR. LANIER:  Thank you, Your Honor.  Good |
| 09:33 | 11 | morning.  I apologize my new camera has cut out my |
| 09:33 | 12 | guitar that's usually in the background.  I only have |
| 09:33 | 13 | one showing today, but sorry about that. |
| 09:33 | 14 | Thank you, Your Honor, and thank the |
| 09:33 | 15 | Court's team for the preliminary constructions. |
| 09:33 | 16 | As Your Honor has probably heard, the |
| 09:33 | 17 | parties had reduced the issues on which they would like |
| 09:34 | 18 | to be heard this morning to two issues that arise in |
| 09:34 | 19 | the 572 case, and that relate to the '806 patent. |
| 09:34 | 20 | The first is cross-motions for summary |
| 09:34 | 21 | judgment relating to the issues of validity under 101 |
| 09:34 | 22 | and then one term, "IPTV." |
| 09:34 | 23 | And with the Court's permission, we'll |
| 09:34 | 24 | turn first to our motion on the 101 issues. |
| 09:34 | 25 | THE COURT:  That would -- yes, please. |

| | | |
|---|---|---|
| 09:34 | 1 | MR. LANIER:  Thank you, Your Honor.  My |
| 09:34 | 2 | colleague Mr. Garcia is going to share his screen and |
| 09:34 | 3 | pop the slides up. |
| 09:34 | 4 | And, Mr. Garcia, if you could just jump |
| 09:34 | 5 | to Slide 3. |
| 09:34 | 6 | So, Your Honor, we thought it made sense, |
| 09:34 | 7 | just to explain how we're going to go about this, to |
| 09:34 | 8 | remind the Court of just some of the procedural history |
| 09:34 | 9 | relevant to this particular motion. |
| 09:34 | 10 | So we had brought our motion, Google's |
| 09:34 | 11 | motion, in 2021.  And at the time all of the claims of |
| 09:34 | 12 | the patent were asserted.  So we directed our motion |
| 09:34 | 13 | for summary judgment of invalidity of all of the claims |
| 09:35 | 14 | of the patent.  That was briefed. |
| 09:35 | 15 | In the course of this case as it's |
| 09:35 | 16 | evolved over time, WSOU subsequently narrowed its |
| 09:35 | 17 | asserted claims from this patent to Claims 2, 3, 5 and |
| 09:35 | 18 | 7.  Thereafter WSOU brought its own motion for summary |
| 09:35 | 19 | judgment of validity of Claim 3 under Section 101. |
| 09:35 | 20 | So we have, at least in part, cross |
| 09:35 | 21 | motions for summary judgment, Your Honor, though |
| 09:35 | 22 | brought separately as two different motions. |
| 09:35 | 23 | Of note are two things:  One is that all |
| 09:35 | 24 | of asserted Claims 2, 3, 5 and 7 are dependent claims. |
| 09:35 | 25 | They depend from Claim 1.  So we will spend a little |

6

09:35    1    time talking about Claim 1, even though it's not

09:35    2    asserted any longer.

09:35    3                    And secondly, if we could go to Slide 4.

09:35    4                    After these motions were briefed, the

09:35    5    Court issued yet another decision on these issues.  And

09:35    6    that's in the Broadband iTV case from 2022 last

09:35    7    September.

09:35    8                    And to start with, that decision --

09:36    9    decision's relevant for two reasons.  As we'll see, the

09:36   10    claim at issue there was remarkably similar to the

09:36   11    issues we'll be talking about here.

09:36   12                    But to start with, it sets forth the now

09:36   13    familiar two steps under the Alice analysis.  And in

09:36   14    short, Google's argument is that the asserted -- the

09:36   15    '806 patent and the asserted claims are all directed to

09:36   16    an abstract idea.

09:36   17                    And there is nothing, no basis for the

09:36   18    Court to conclude other than that the claims do not

09:36   19    contain something sufficient to transform them into a

09:36   20    patent eligible -- or application or invention.

09:36   21                    So if we could go, Mr. Garcia, to

09:36   22    Slide 5.

09:36   23                    Just to briefly establish the point that

09:36   24    the patent makes clear from the very beginning that

09:36   25    it's directed to, focused on and only makes claims that

09:36   1   get to targeted electronic content delivery control

09:36   2   systems and methods.  It's all about that.  We've cited

09:36   3   portions of the title and abstract here.

09:36   4               If we could go to Slide 6.

09:36   5               The description of the field of the

09:37   6   invention, the summary of the invention, the background

09:37   7   of the invention, all make it crystal clear that this

09:37   8   patent relating to targeted content, specifically

09:37   9   targeted advertising, but targeted content delivery.

09:37   10  Which, as the Court is well familiar, there are

09:37   11  abundant cases that talk about that as being an

09:37   12  abstract idea.

09:37   13              Go to Slide 7.

09:37   14              So truly I think the issue here is, does

09:37   15  a claim with that many words and that many -- at least

09:37   16  to the simple philosophy, major technical sounding

09:37   17  terms -- does that somehow become nonabstract?  Or does

09:37   18  that somehow become sufficient to get over Step 2 just

09:37   19  because of all of those words and all of those

09:37   20  technical terms?

09:37   21              And the answer is no.

09:37   22              The case law is very, very clear about

09:37   23  that.  That what we look to is what's the thrust of the

09:37   24  claim?  What is it doing?  And this claim refers to a

09:37   25  lot of preexisting, existing technologies.  And we'll

8

09:37    1    talk about the details of that when we get into the

09:37    2    Step 2 analysis.  But it's all about picking the

09:38    3    content to be delivered to someone.

09:38    4                    Let's go to Slide 8.

09:38    5                    Now, we have what's here on this issue

09:38    6    the obligatory lots of cases slides.  We will not go

09:38    7    through all of those cases, I promise, Your Honor, and

09:38    8    I promise the team.

09:38    9                    But we want just to emphasize that this

09:38   10    is an issue with which this Court is familiar and which

09:38   11    many courts are familiar.  And claims directed to

09:38   12    collecting, analyzing and using intent data, claims

09:38   13    relating to targeting the content, delivered to someone

09:38   14    based on their history, are regularly routinely found

09:38   15    in this Court and the Federal Circuit and the district

09:38   16    courts to be abstract -- relate to abstract ideas, to

09:38   17    be patent ineligible.  And to fail the Step 1 analysis

09:38   18    or require us to get to the Step 2 analysis.

09:38   19                    Let's go to Slide 7 -- or, excuse me,

09:38   20    Slide 9.

09:38   21                    Thank you.  Thank you, Mr. Garcia.

09:38   22                    This is the collection of the cases that

09:39   23    are cited also in our papers, but a collection of

09:39   24    Federal Circuit decisions on exactly this point.  We

09:39   25    will not walk through all of them.  They are all --

09:39  1   happy to address any of them, but they're all to the

09:39  2   same point.

09:39  3                Your Honor cited the Intellectual

09:39  4   Ventures, the Bridge & Post case, the Free Stream Media

09:39  5   case and Customedia Techs and Your Honor's Broadband

09:39  6   iTV decision, so we know the Court's familiar with

09:39  7   these issues.

09:39  8                Let's go to Slide 10.

09:39  9                These are several district court cases,

09:39  10  at least four of which OpenTV, Netflix, Morsa and Sound

09:39  11  View Innovations were also cited in the Court's

09:39  12  Broadband iTV decision.

09:39  13               And they all get to the same proposition,

09:39  14  they all establish the same proposition that we don't

09:39  15  think is meaningfully endowed in this case, which is

09:39  16  that a claim such as Claim 1 which is directed to

09:39  17  targeted content delivery is a patent-ineligible

09:39  18  concept.  So we have to do the Step 2 analysis.

09:39  19               So let's go to Slide 11.

09:39  20               So now we get to the analysis of Claim 1,

09:39  21  again, the one independent claim, to determine whether

09:40  22  it gets -- itself gets over the Step 2 analysis.

09:40  23               And the way we plan to proceed, Your

09:40  24  Honor, is to talk about whether Claim 1 gets over the

09:40  25  Step 2 analysis because then we just need to look at

09:40   1   what's added, the limitations that are added in the

09:40   2   asserted dependent claims to see if they give us

09:40   3   anything more that require us to look differently at

09:40   4   them than we will, as you'll see, look at Claim 1.

09:40   5           And the answer is just because of all of

09:40   6   those words, just because of those technical terms,

09:40   7   Claim 1 doesn't get over the Step 2 analysis.  It does

09:40   8   nothing more than say, we want to target content using

09:40   9   generic conventional hardware and components.

09:40   10          And it's not a matter of unique

09:40   11  organization.  It's not a matter of inventiveness that

09:40   12  improves the performance of a computer.  It's a matter

09:40   13  of using well-known things to accomplish a goal that's

09:40   14  an abstract idea.

09:40   15          But let's dive in a little bit more and

09:40   16  look at Slide 12.

09:40   17          So Slide 12 is two claims.  One is the --

09:41   18  one of the claims that was considered by the Court in

09:41   19  the Broadband iTV case, and one is the claims that --

09:41   20  or the claim that was dealt with by the Federal Circuit

09:41   21  in the Bridge & Post claim.

09:41   22          Both of these claims, notwithstanding

09:41   23  their words, their length, their reference to

09:41   24  technical-sounding terms, were determined to be patent

09:41   25  ineligible and to not get over Step 2.

09:41  1                    Claim 1 of the asserted patent in -- of

09:41  2  the '806 patent in this case should suffer the same

09:41  3  fate.

09:41  4                    The Court's familiar with or has issued a

09:41  5  decision sometime ago, so it may recall the Claim 1 of

09:41  6  the iTV -- Broadband iTV case.

09:41  7                    The Bridge & Post case is also worth the

09:41  8  Court's attention in considering this issue.  And it's

09:41  9  worth noting as well that the Bridge & Post case

09:41  10 affirmed a ruling finding invalidity on a motion to

09:41  11 dismiss.

09:41  12                    So this is a motion for summary judgment,

09:41  13 but even on a motion to dismiss, these issues can

09:41  14 properly be decided even with claims of this level of

09:42  15 superficial but not actual complexity.

09:42  16                    So let's turn to Slide 13.

09:42  17                    Now, WSOU argues in a variety of ways

09:42  18 that, well, we're missing the point.  We're missing the

09:42  19 characterization where we're not properly

09:42  20 characterizing the claims.

09:42  21                    Their primary argument to get to Claim 1

09:42  22 and to get to the '806 patent overall is to say, well,

09:42  23 you're missing the point.  Because we're not -- we're

09:42  24 dealing with providing targeted content delivery in the

09:42  25 context of a maintained pattern of ongoing subscriber

09:42   1    behavior over time.

09:42   2                    Now, I'm going to use a visual aid that's

09:42   3    not on the screen.  But I'll display it to the camera.

09:42   4    It's two visual aids.

09:42   5                    Here's my trusty notepad.  Here's my pen.

09:42   6    If I were to use the analogy that the Court used in the

09:42   7    Broadband iTV case, the clerk of a video store, and I

09:42   8    was keeping track of some lawyer named, let's say, Greg

09:42   9    Lanier, who comes in and rents videos, I would start

09:42   10   writing down what video Greg Lanier got and when he got

09:42   11   it.  What was the subject of the video.

09:43   12                   And I notice, oh, he gets a lot of guitar

09:43   13   videos.  And over time I might notice, boy, he gets a

09:43   14   lot of videos about Martin guitars.  Then I might

09:43   15   notice he gets a lot of videos about OM-18 guitars

09:43   16   because he might be interested in buying one.  So I'm

09:43   17   going to give him an ad about that.  Next time he comes

09:43   18   in I'll give him a pamphlet.

09:43   19                   But I would be doing that with my trusty

09:43   20   pad and my trusty Uni-Ball pen, keeping track of it

09:43   21   over time, in the context of a maintained pattern of

09:43   22   ongoing subscriber behavior over time.  And that is

09:43   23   nothing I couldn't do on paper.

09:43   24                   The Court's well familiar with the

09:43   25   pen-and-paper test as one way to look at the both

| 09:43 | 1 | abstract idea and getting over Step 2 analysis.  This |
| 09:43 | 2 | claim fails that test as characterized by WSOU. |
| 09:43 | 3 | Let's turn to Slide 14. |
| 09:43 | 4 | But we also know it fails the test by |
| 09:43 | 5 | looking at what the patent itself says about what is |
| 09:43 | 6 | claimed.  So we have these claims with lots of words, |
| 09:43 | 7 | lots of technical terms and lots of steps.  But what |
| 09:43 | 8 | you really notice here is that they actually say none |
| 09:44 | 9 | of that matters. |
| 09:44 | 10 | Look what we have here on these excerpts |
| 09:44 | 11 | from the specification.  I won't read them into the |
| 09:44 | 12 | record.  They're on the slide, but they're all from |
| 09:44 | 13 | Column 4, 6 and 7 of the '806 patent. |
| 09:44 | 14 | The components of the system may be |
| 09:44 | 15 | implemented in any of various ways.  Each component may |
| 09:44 | 16 | be implemented in hardware, software, firmware or |
| 09:44 | 17 | combinations.  These components are described herein |
| 09:44 | 18 | primarily in terms of their functions.  We want |
| 09:44 | 19 | something to be done.  The components themselves are |
| 09:44 | 20 | what matters. |
| 09:44 | 21 | And our present invention is not limited |
| 09:44 | 22 | to any particular type of subscriber or network |
| 09:44 | 23 | equipment.  So the equipment doesn't matter. |
| 09:44 | 24 | Yet to our goal, and you've accomplished |
| 09:44 | 25 | what we're claiming, it doesn't matter how you do it, |

09:44   1   notwithstanding all the words of our claims.

09:44   2                    But there's more.  Slide 15.

09:44   3                    The topology is typical.  But there are

09:44   4   many examples of these networks that are at issue that

09:44   5   will be familiar.  And the key sentence for me -- or

09:45   6   two key sentences in the middle box in Column 5, Lines

09:45   7   24 to 32:  Since the present invention is not limited

09:45   8   to any particular types of equipment, protocols or

09:45   9   operation...

09:45   10                   And then the third box:  [The] memory

09:45   11  devices [and the databases] are common in communication

09:45   12  and processing equipment...

09:45   13                   Now, we have slides that we've discussed

09:45   14  in the papers as well.  But it's clear the SAP case

09:45   15  from the Federal Circuit makes it clear that invoking

09:45   16  already existing computers and functionality doesn't

09:45   17  get you over the Step 2 analysis.

09:45   18                   Let's go to Slide 16.

09:45   19                   Now, essentially WSOU says, boy, well,

09:45   20  again, Google's missing the point.  Because look at

09:45   21  Figure 2.  Look at system 20.  Look how complicated

09:45   22  that is.  Look how many boxes there are.  Look at how

09:45   23  many steps and connections and communications and

09:45   24  technical terms in all of these boxes and cylinders

09:45   25  that we have there.  It's got to be sufficient to get

09:45 | 1    over step 2.

09:45 | 2              It's not abstract if it gets over Step 2.

09:46 | 3    But, again, the specification, the discussion of the

09:46 | 4    patent belies that.

09:46 | 5              And what we got here is Lines 11 to 28 of

09:46 | 6    Column 6 of the specification of the '806 patent and it

09:46 | 7    emphasizes the same things I've already said:  The

09:46 | 8    components of system 20 and the interconnections

09:46 | 9    between those components may be implemented in any of

09:46 | 10   various ways.

09:46 | 11             They may be local connections.  They may

09:46 | 12   be network connections.  But the sentence that's really

09:46 | 13   key here is the second sentence of the first paragraph:

09:46 | 14   Other embodiments may include fewer, further or

09:46 | 15   different components with similar or different

09:46 | 16   interconnections than shown.

09:46 | 17             So this isn't an enablement analysis or a

09:46 | 18   written description analysis or a novelty analysis.

09:46 | 19   This is just the question of does the abstract idea --

09:46 | 20   or is there anything in the claims that gets the

09:46 | 21   abstract idea of targeting content delivery, including

09:46 | 22   advertising, over the hurdle of Step 2?

09:46 | 23             And the answer is the specification tells

09:46 | 24   you no.  They are just simply invoking existing

09:47 | 25   functionality, known functionality.  And it doesn't

09:47  1    even matter how -- what the components are or how

09:47  2    they're arranged.  And it's all functional.

09:47  3                    So we respectfully submit, for all the

09:47  4    reasons we've articulated in our papers, that at this

09:47  5    point we've demonstrated that Claim 1 fails the

09:47  6    analysis.

09:47  7                    So now we turn to the asserted claims,

09:47  8    Claims 2, 3, 5 and 7, to determine whether anything

09:47  9    added to them gets over Step 2.

09:47  10                   And just as a sidenote, Your Honor, I'm

09:47  11   going to deal with Claims 2, 5 and 7 first because

09:47  12   that's our affirmative motion for summary judgment.

09:47  13   And then we'll come back to Claim 3 which -- and

09:47  14   respond also to WSOU's motion for summary judgment.  So

09:47  15   2 5, 7, and then I'll get to Claim 3.

09:47  16                   So Slide 17 shows this Claim 2.  We've

09:47  17   got the additional limitations.  So the first question

09:47  18   is:  Is there anything about this claim that makes it

09:47  19   not an abstract idea?

09:47  20                   And the answer's no.  All it does is it

09:47  21   takes this targeted -- this idea of targeted content

09:47  22   delivery and says, we are going to focus -- we're going

09:47  23   to make our decisions based on one type of content.

09:48  24                   As if I decided using my trusty pad and

09:48  25   paper to say, I am only going to look for videos where

09:48   1   that Greg Lanier lawyer came in with his wife, what did

09:48   2   they like together?

09:48   3                    We're going to narrow down the sources of

09:48   4   information we look to.  That does not make this idea

09:48   5   or this claim patent eligible.

09:48   6                    So then we look to see whether there's

09:48   7   any dispute that it doesn't get over Step 2.

09:48   8                    Let's go to Claim -- Slide 18, please.

09:48   9                    And it doesn't.  And we know it doesn't

09:48   10  because there's no dispute of fact here.  We brought a

09:48   11  motion for summary judgment.  WSOU's argument is, well,

09:48   12  there's disputes of fact because we've -- each

09:48   13  dependent claim adds meaningful limitations.

09:48   14                    But whether that limitation is meaningful

09:48   15  for the analysis here is something this Court can

09:48   16  decide as a matter of law.  There's no actual dispute

09:48   17  of fact.  There's simply the attorney assertion that

09:48   18  there is a dispute of fact.

09:48   19                    We've cited the Dropbox case as one of

09:48   20  many that makes it clear you can't just rely on

09:48   21  attorney assertions, but it's also -- the undisputed

09:49   22  argument -- or it's undisputed that there isn't any

09:49   23  dispute here.  That meaningful limitation says, we're

09:49   24  going to narrow down the source of the information we

09:49   25  consider to target content.

—18—

09:49  1            That is something that is, you know, as
09:49  2    old as targeted advertising, as old as the specialized
09:49  3    Yellow Pages that might get dropped on your driveway
09:49  4    depending on what neighborhood you live in, what city
09:49  5    you live in, depending on what different providers of
09:49  6    those decide to consider as their sources of
09:49  7    information.
09:49  8            So Claim 2 fails.  There's no dispute of
09:49  9    fact preventing summary judgment that Claim 2 is
09:49  10   invalid under Section 101.
09:49  11           Let's turn to Claim 5 on Slide 19.
09:49  12           Now, Claim 5 does even worse because
09:49  13   Claim 5 just says, well, the targeted electronic
09:49  14   content is an advertisement.  And we will not repeat
09:49  15   all the cases.  We will not repeat the point, other
09:49  16   than to say it's unequivocal that targeting advertising
09:49  17   is a patented-ineligible concept under abundant
09:49  18   authority, including authority from this Court.
09:49  19           So let's look to see, well, is there
09:50  20   something that's claimed in there that gets over Step
09:50  21   2?
09:50  22           Slide 20.
09:50  23           The answer's no.  It's exactly the same
09:50  24   argument.  And that's telling, Your Honor.  WSOU's
09:50  25   argument in opposition to our motion for summary

09:50  1  judgment as to Claims 2, 5 and 7 is exactly the same.

09:50  2  It's the same words, it's the same piece of their

09:50  3  argument.  Each dependent claim adds meaningful

09:50  4  limitations.

09:50  5              There's nothing about that limitation

09:50  6  that makes this claim patent eligible.  There's nothing

09:50  7  about it that says, well, there's something here

09:50  8  that -- there's something that renders that

09:50  9  patent-ineligible concept to be patent eligible.

09:50  10  There's nothing technical.  There's nothing about

09:50  11  improving the performance of the computer at all.

09:50  12             We won't repeat anymore.  But we think

09:50  13  we've -- it's abundantly clear that Claim 5 is also

09:50  14  patent ineligible under -- or invalid under 101.

09:50  15             Go to Slide 21 and Claim 7.

09:50  16             This is the last of the dependent claims

09:50  17  where -- remaining in the case where we have moved for

09:50  18  summary judgment and WSOU has not moved for summary

09:50  19  judgment of validity.

09:51  20             And this one -- actually it's got a

09:51  21  technical term in it.  The added limitation is:  One or

09:51  22  more network elements for providing a subscriber system

09:51  23  access to electronic content through the access

09:51  24  network.

09:51  25             But, again, all this does is say we will

09:51    1    use existing things to target our advertising.  It

09:51    2    doesn't turn the ineligible idea into an eligible one.

09:51    3    And as we saw from the specification --

09:51    4                    Let's go to Slide 22.

09:51    5                    We saw from the specification earlier how

09:51    6    this -- the '806 patent makes it clear it doesn't

09:51    7    matter what components you use.  It doesn't matter how

09:51    8    you arrange them.  We just want to achieve a result --

09:51    9    however you achieve our result, that's practicing what

09:51   10    we've claimed.

09:51   11                    And for that reason Claim 7 fails, just

09:51   12    like Claims 2 and Claim 5 and Claim 1 before that, even

09:51   13    though it's no longer asserted.  And, again, WSOU makes

09:51   14    the same argument.  But there's no dispute of fact

09:51   15    here.  There's an attorney assertion about a meaningful

09:51   16    limitation.  But that fails for the reasons I've

09:51   17    described with respect to the other claims.

09:52   18                    So now let's go to Slide 23.

09:52   19                    And here we have -- this is where WSOU's

09:52   20    cross-moved for summary judgment of validity.  So here

09:52   21    the key -- the one key point is that the parties agree

09:52   22    that summary judgment's appropriate on Claim 3.  It's

09:52   23    just a question of which way that, you know, ought to

09:52   24    go.

09:52   25                    We think we've established it's

09:52   1   appropriate as to Claims 2, 5 and 7.  But focused on

09:52   2   Claim 3 now where we agree summary judgment's

09:52   3   appropriate.

09:52   4            Basically what WSOU says -- and I could

09:52   5   see why they picked this one claim because at least

09:52   6   it's got a few more technical terms in it.  But it also

09:52   7   fails the Alice analysis.

09:52   8            First, let's start off with Claim 3.  It

09:52   9   says, okay, let's take Claim 1 which we've already

09:52   10  established is patent-ineligible.  And let's have:  A

09:52   11  Deep Packet Inspection module that operatively coupled

09:52   12  to the behavioral information collector and operable to

09:52   13  monitor the access communication traffic.

09:53   14            So let's take a bunch of things that

09:53   15  we're not actually claiming we didn't invent, we didn't

09:53   16  improve, we didn't do anything to but use those known

09:53   17  things to accomplish this goal.  Doesn't render this

09:53   18  patent eligible.  And that doesn't get over Step 2.

09:53   19            Now, they say a bunch of things to

09:53   20  suggest to Your Honor that, well, of course it does.

09:53   21  It's an unconventional arrangement at a location remote

09:53   22  from the subscriber device.

09:53   23            There are a couple of problems with that.

09:53   24  That's actually attorney assertion, pure attorney

09:53   25  argument, not supported by facts.  It's also

09:53    1    inconsistent with the language of the specification

09:53    2    that says it actually doesn't matter where everything

09:53    3    is.

09:53    4         And lastly, it's not in the claim.  The

09:53    5    claim doesn't talk about that.  And other cases we've

09:53    6    cited, the Ultramercial versus Hulu case here make

09:53    7    clear that just saying we'll do this, not just on a pen

09:53    8    and paper, but do that over the Internet, that doesn't

09:53    9    make something patent eligible.  And it doesn't get

09:53   10    over Step 2.

09:53   11         Let's go to Slide 24.

09:53   12         So they also say, well, we're using this

09:54   13    behavioral information clicker and a DPI module, and

09:54   14    we're going to reduce computational resource usage on

09:54   15    subscriber devices.

09:54   16         Again, pure assertion, no evidence, no

09:54   17    facts, no nothing.  Number one.

09:54   18         Number two, known components that exist.

09:54   19    There's no question that everything here is known,

09:54   20    we're just saying use these known things to accomplish

09:54   21    our goal.

09:54   22         And as we established before -- and I

09:54   23    won't repeat this is, it doesn't matter what components

09:54   24    you use.  It doesn't matter how you arrange them.  It's

09:54   25    purely functional claiming.  And, again, putting aside

| | | |
|---|---|---|
| 09:54 | 1 | whether that's appropriate claiming, it doesn't get you |
| 09:54 | 2 | over Step 2. |
| 09:54 | 3 | Let's look to Slide 25. |
| 09:54 | 4 | And that's another emphasis on a specific |
| 09:54 | 5 | technique for sampling a network subscriber's |
| 09:54 | 6 | communication traffic. |
| 09:54 | 7 | And what's really interesting here, we |
| 09:54 | 8 | should have highlighted the word "recites." |
| 09:54 | 9 | Furthermore, Claim 3 recites a specific technique.  And |
| 09:54 | 10 | absolutely it does.  No question. |
| 09:55 | 11 | But it recites, it's saying use this |
| 09:55 | 12 | thing everybody knows about as the specification, |
| 09:55 | 13 | Column 6, Lines 38 to 47, makes crystal clear. |
| 09:55 | 14 | Something people already know about, let's use that |
| 09:55 | 15 | thing to accomplish our goal.  That doesn't render this |
| 09:55 | 16 | a patent-eligible claim, and it doesn't get over Step |
| 09:55 | 17 | 2. |
| 09:55 | 18 | Let's turn to Slide 26. |
| 09:55 | 19 | So, again, last-ditch effort, you know, |
| 09:55 | 20 | maybe cookies will save the day.  Cookies saved the day |
| 09:55 | 21 | in many contexts.  It certainly saved many of my days |
| 09:55 | 22 | at the end of a long one, but they don't save things |
| 09:55 | 23 | here. |
| 09:55 | 24 | The fact that this is a -- created a |
| 09:55 | 25 | targeted electronic content delivery system that does |

09:55  1    not rely on cookies and enables cookieless sampling and

09:55  2    more accurate behavior profiling, again, taking

09:55  3    advantage of existing technology, not claimed, not

09:55  4    invented, not improved, this is simply using known

09:55  5    techniques to accomplish a goal described in a way that

09:56  6    makes it clear.

09:56  7              It doesn't matter what known components

09:56  8    you use.  It doesn't matter how you arrange them as

09:56  9    long as you achieve the goal of our essentially

09:56  10   functional claiming.

09:56  11             And the Federal Circuit's actually

09:56  12   addressed this pretty specifically in the Bridge & Post

09:56  13   case, you know, and again on a motion to dismiss, not

09:56  14   even a motion for summary judgment:  According to the

09:56  15   patentee, its inventions solved the problem of

09:56  16   privacy-concerned users deleting cookies and tracking

09:56  17   data by using a persistent device identifier which may

09:56  18   not be deleted or changed.

09:56  19             And so no cookies is basically what that

09:56  20   case is saying.  And what that case also said is just

09:56  21   saying that without actually inventing it, without

09:56  22   actually developing it, saying no cookies is one thing.

09:56  23   Saying a cookie without chocolate chips is one thing.

09:56  24   But if you don't provide the recipe and make a better

09:56  25   cookie and tell people how to do it, that's not what

09:56  1    you're claiming.  That's not what's going on here.

09:56  2                So that doesn't help, as well, get Claim

09:56  3    3 over the hump of Alice.

09:56  4                Let's go to Slide 27.

09:56  5                So this is just a couple more cases, Your

09:57  6    Honor, to really just emphasize the point.

09:57  7                What we are dealing with here is a patent

09:57  8    and an alleged invention that are absolutely

09:57  9    unequivocally directed to the abstract concept of

09:57  10   targeted content delivery saying, we're, going to only

09:57  11   consider certain sources of information or we're going

09:57  12   to focus on advertising or we're going to use these

09:57  13   particular known techniques to accomplish that goal.

09:57  14   Does not say anything of the asserted claims or the

09:57  15   Independent Claim 1 under which they will -- on which

09:57  16   all those dependent claims rely.

09:57  17                And as a result, Google respectfully

09:57  18   submits we're entitled to summary judgment of

09:57  19   invalidity of all those claims under Section 101.

09:57  20                And I'll stop there now, unless Your

09:57  21   Honor has any questions or if there's anything to say

09:57  22   after we hear from WSOU.

09:57  23                THE COURT:  Nope.  Look forward the

09:57  24   hearing a response.

09:57  25                MS. FELLOWES:  Thank you, Your Honor.

09:58   1              The first point that I'd like to address

09:58   2     is that of course this patent uses technical terms.

09:58   3     This a technical invention.  This is an invention about

09:58   4     a computer system.  It isn't simply words that have

09:58   5     been added to the claim in order to give it bulk.

09:58   6     These are the necessary descriptors of the components

09:58   7     that make up the invention, and in particular the

09:58   8     invention that is claimed in Claim 3.

09:58   9              I appreciate the pen and paper analogy,

09:58   10    but there isn't a video clerk in the world who's using

09:58   11    deep packet inspection on Layers 3 through 7 of the RSI

09:58   12    model.  It simply isn't appropriate to reduce what is a

09:58   13    complex invention down to pen and paper.

09:58   14             Now, the reason I want to dive into Claim

09:58   15    3 -- and if you'll give me a second, I'm just going to

09:58   16    pull up our slides.

09:58   17             And I'm now finding it tricky to advance.

09:59   18    There we go.

09:59   19             The reason we focused on Claim 3 is

09:59   20    precisely because it identifies one of the key

09:59   21    inventive concepts that are relevant to this argument.

09:59   22             Now, Mr. Lanier pointed to this notion

09:59   23    that everything is known.  It doesn't matter how you

09:59   24    put it together.  These are known components.  You can

09:59   25    rearrange them as you want.

09:59  1            First of all, it does matter how they are

09:59  2    arranged.  That is part of the claim.  Secondly, a

09:59  3    novel arrangement of conventional components is

09:59  4    patentable.  And that's not really in dispute.

09:59  5            What is problematic about Google's

09:59  6    argument is that they have taken broader language from

09:59  7    the specification.  And in doing so, they've erased the

09:59  8    limitations that are present in the claims.

09:59  9            Claim 3 does not claim any arrangement of

09:59  10   components.  It doesn't claim any arrangement of

10:00  11   components for delivering targeted electronic content

10:00  12   to a subscriber.  In fact, it claims a rather specific

10:00  13   method of doing it -- excuse me -- arrangement of

10:00  14   components for doing that.  And it claims a deep packet

10:00  15   inspection module which is operatively coupled to the

10:00  16   behavioral information collector and operable to

10:00  17   monitor the access communication traffic.

10:00  18            Now, the deep packet inspection module is

10:00  19   described in the specification, Column 6, Line 44

10:00  20   through 47.  But the important feature of that is that

10:00  21   it talks about the way in which the information is

10:00  22   evaluated for the purposes of delivering the targeted

10:00  23   electronic content.

10:00  24            It isn't simply recording what kinds of

10:00  25   videos have been watched in the past.  This is a way of

10:00 1    assessing across different types of communication

10:00 2    traffic, which are passed over an access communication

10:00 3    link, and examining that data below the level of the

10:01 4    packet header in order to pinpoint the specific data

10:01 5    that is important and that merits attention.

10:01 6            This makes the -- excuse me -- this makes

10:01 7    the evaluation of the communication traffic for the

10:01 8    purposes of the invention of Claim 3 both more

10:01 9    comprehensive in that it evaluates across communication

10:01 10   types and also more specific.  Because it targets that

10:01 11   information that is important for assessing what

10:01 12   targeted electronic content should be delivered to the

10:01 13   subscriber.

10:01 14           Now, there are a couple of specific

10:01 15   arguments that I'd like to address from Google.

10:01 16           The first is this notion that the

10:01 17   location of the deep packet inspection module is not

10:01 18   specified anywhere.  I believe that was in Slide 23.

10:01 19           If you'll give me a moment, I'm just

10:01 20   going to switch over for a second to Figure 2.  I'll

10:01 21   pull that up in just a moment.

10:02 22           Here you have -- in Figure 2, you have

10:02 23   the components of the system.  And, yes, it is complex.

10:02 24   It is necessarily complex.  This is a computer system

10:02 25   for assessing communication traffic, the content of

10:02  1    that communication traffic, and then delivering

10:02  2    targeted electronic content with the selected

10:02  3    electronic content to the subscriber.

10:02  4              Now, you'll recall in Claim 3, the deep

10:02  5    packet inspection module is coupled to the behavioral

10:02  6    information collector.  And the claims are read in

10:02  7    light of the specification, and you'll see in Figure 2

10:02  8    the location is identified.

10:02  9              Here we have as No. 28, if you look at

10:02  10   the bottom of Figure 2, there are specific places that

10:02  11   that behavioral information collector can be located.

10:02  12   It can be located in the access network, as exemplified

10:02  13   by Nos. 28 and No. 32; or it can be in an offline

10:02  14   position next to the access network, and that is

10:03  15   identified in Item No. 34.

10:03  16             Importantly, it's not on the subscriber

10:03  17   device.  And that's why this is relevant to one of the

10:03  18   key advantages of the invention.

10:03  19             Yes.  Cookies are known.  And,

10:03  20   importantly, this invention is not claiming the

10:03  21   presence of cookies or the absence of cookies.  What it

10:03  22   is claiming is a system that allows for the

10:03  23   identification of the important information within the

10:03  24   communication traffic, and it does that without

10:03  25   draining the computational resources of the subscriber

10:03   1    device.

10:03   2                    It is possible to use cookies and a

10:03   3    narrow subset of communication traffic to accomplish

10:03   4    not the claimed invention but to accomplish the

10:03   5    delivery of advertisement.  We're not arguing that.

10:03   6                    But, importantly, this differs.  And this

10:03   7    differs because the deep packet inspection module is

10:03   8    used coupled to a specific behavioral information

10:04   9    collector, which is in a specific location relative to

10:04  10    the subscriber device in order to deliver targeted

10:04  11    electronic content with the selected electronic content

10:04  12    by the subscriber.

10:04  13                    What's problematic especially about

10:04  14    Google's argument is that by constantly saying these

10:04  15    things are known, they've injected attorney argument,

10:04  16    the very thing they've accused WSOU of doing.

10:04  17                    Particularly, Slide 28, that is attorney

10:04  18    argument.  Saying that a deep packet inspection module

10:04  19    is conventional, is well-known and, importantly, is

10:04  20    conventional and well-known in this particular role

10:04  21    with respect to the invention of Claim 3, that is

10:04  22    attorney argument.  They've stated it, but they've not

10:04  23    shown it.  And that's the key distinction.

10:04  24                    Also, there seems to be a validity

10:04  25    analysis and, more importantly, an obviousness analysis

| | | |
|---|---|---|
| 10:04 | 1 | that is being imported into Google's argument. |
| 10:04 | 2 | It is not a question of whether or not |
| 10:04 | 3 | they can locate another patent that may render this |
| 10:05 | 4 | patent obvious.  That is a fight that I am certain we |
| 10:05 | 5 | will have another day.  But that does not mean that |
| 10:05 | 6 | this patent is patent ineligible. |
| 10:05 | 7 | And just to be clear, I'm not conceding |
| 10:05 | 8 | that it's obvious either.  I'm simply making the |
| 10:05 | 9 | distinction between what is patent eligible and what is |
| 10:05 | 10 | patent eligible and may be obvious. |
| 10:05 | 11 | They've said that these are well-known |
| 10:05 | 12 | components.  They can be any arrangement you want.  But |
| 10:05 | 13 | I think I've demonstrated, it can't be any arrangement. |
| 10:05 | 14 | It has to be the specific arrangement as demonstrated |
| 10:05 | 15 | in the specification. |
| 10:05 | 16 | And the claims are not unbounded.  They |
| 10:05 | 17 | are limited.  And as Claim 3 makes clear, that means |
| 10:05 | 18 | that a deep packet inspection module, which cannot be |
| 10:05 | 19 | reduced to a pen-and-paper analogy, is used to examine |
| 10:05 | 20 | the information within the packets below the header |
| 10:05 | 21 | level and to establish what information is important |
| 10:06 | 22 | for determining what targeted electronic content needs |
| 10:06 | 23 | to be delivered. |
| 10:06 | 24 | It's relevant that it can sample across |
| 10:06 | 25 | different types of communication traffic, not just |

10:06  1    simply HTTP traffic.  And this emphasizes all sorts

10:06  2    of -- rather, this illustrates the problems with the

10:06  3    prior art that were identified within the patent.

10:06  4            The problems with the prior art arose

10:06  5    because the delivery of targeted electronic content,

10:06  6    could be advertisements, but it could be other targeted

10:06  7    electronic content, broadly fell into three buckets.

10:06  8    And each of those three buckets had problems.

10:06  9            The first was delivery of targeted

10:06  10   electronic content with the content that you had

10:06  11   selected, that the subscriber had selected.  And that

10:06  12   was simply -- if you watch Game of Thrones, you may be

10:06  13   interested in other things -- excuse me -- relating to

10:07  14   fantasy or dragons or something like that.

10:07  15           Sorry.  I haven't actually seen Game of

10:07  16   Thrones.  I may be the lone person on this planet who

10:07  17   hasn't seen it.

10:07  18           THE COURT:  No.  There are two of us.

10:07  19           (Laughter.)

10:07  20           MS. FELLOWES:  Okay.  All right.  Well,

10:07  21   I'm glad to know I'm not alone in that.

10:07  22           THE COURT:  You're not.

10:07  23           MS. FELLOWES:  The second was delivery

10:07  24   with search.  And that was simply if a subscriber put

10:07  25   in a search string, that search string was used to

10:07   1   deliver targeted electronic content related to that

10:07   2   search string.

10:07   3            So for instance, if I searched for baby

10:07   4   onesies, I might get targeted electronic content

10:07   5   regarding nappies.

10:07   6            And lastly, there was this notion of

10:07   7   delivery of targeted electronic content with behavior,

10:07   8   subscriber behavior.  But that profile of subscriber

10:07   9   behavior was limited.  Crucially it was limited to only

10:07   10  the subscriber behavior that could be determined

10:07   11  through either direct searches or through the use of

10:07   12  cookies on the subscriber device.

10:08   13           And as we've discussed, that consumes

10:08   14  computational resources.  And that is a problem that

10:08   15  needed to be overcome.  And that's why the arrangement

10:08   16  of the components that are claimed, particularly in

10:08   17  Claim 3, are so important to this invention.

10:08   18           It is an inventive system.  The fact that

10:08   19  it doesn't drain those computational resources, the

10:08   20  fact that the DPI module which is coupled to the

10:08   21  behavioral information collector is remote from the

10:08   22  subscriber device, these are things that add to the

10:08   23  inventive concept.

10:08   24           And this is why, Your Honor, we pointed

10:08   25  to, in our supplemental authority, the Cooperative

| | | |
|---|---|---|
| 10:08 | 1 | Entertainment versus Kollective Technology case which |
| 10:08 | 2 | came out of the Federal Circuit in September of last |
| 10:08 | 3 | year.  And that's a case that recognized that not every |
| 10:08 | 4 | computer system is patent ineligible simply because it |
| 10:08 | 5 | is a computer system. |
| 10:08 | 6 | Computer networks will use known |
| 10:08 | 7 | components.  You must build a computer network from its |
| 10:08 | 8 | building blocks.  That's not in -- that's not the |
| 10:09 | 9 | subject of our disagreement.  But the case did point |
| 10:09 | 10 | out there can be an inventive concept in a particular |
| 10:09 | 11 | arrangement for distributing content within that |
| 10:09 | 12 | network. |
| 10:09 | 13 | I don't need to go into the details of |
| 10:09 | 14 | the case.  The point is that of all the cases that |
| 10:09 | 15 | Google has cited, and I agree there are many, there are |
| 10:09 | 16 | also many that go the other way.  And that because this |
| 10:09 | 17 | is a fact-specific analysis, it can't be generalized. |
| 10:09 | 18 | And so all we're asking is that Your |
| 10:09 | 19 | Honor take a specific look at the claims of this |
| 10:09 | 20 | patent, in particular Claim 3, and recognize that -- |
| 10:09 | 21 | the inventive arrangement of components and the use of |
| 10:09 | 22 | a novel module in a novel arrangement is the key to |
| 10:09 | 23 | this invention and, thus, it is patent eligible. |
| 10:09 | 24 | Thank you, Your Honor.  If you have any |
| 10:09 | 25 | questions, please let me know. |

| | | |
|---|---|---|
| 10:09 | 1 | THE COURT:  I'm good. |
| 10:09 | 2 | Mr. Lanier? |
| 10:09 | 3 | MR. LANIER:  Brief response, Your Honor. |
| 10:09 | 4 | And, Mr. Garcia, if we could switch over. |
| 10:10 | 5 | And, Mr. Garcia, please pull up Slide 24. |
| 10:10 | 6 | MS. FELLOWES:  Yes.  I'm sorry.  I will |
| 10:10 | 7 | stop sharing. |
| 10:10 | 8 | MR. LANIER:  Thank you. |
| 10:10 | 9 | And just so the record's clear, I also |
| 10:10 | 10 | have not seen the Game of Thrones, so... |
| 10:10 | 11 | (Laughter.) |
| 10:10 | 12 | MS. FELLOWES:  We're the last holdouts. |
| 10:10 | 13 | MR. LANIER:  Good. |
| 10:10 | 14 | So, Your Honor, if I wanted to build a |
| 10:10 | 15 | better mousetrap, I might think, well, there's some |
| 10:10 | 16 | problems with mice.  We actually have -- we have a |
| 10:10 | 17 | chicken coupe out back, and we have a problem with mice |
| 10:10 | 18 | and other critters.  And I'd like something that |
| 10:10 | 19 | catches smaller ones and bigger ones. |
| 10:10 | 20 | So I might say, solve the problem with |
| 10:10 | 21 | keeping chickens by coming up with a mousetrap that |
| 10:10 | 22 | catches smaller mice and coming up with a mousetrap |
| 10:10 | 23 | that catches larger mice and place it optimally to |
| 10:10 | 24 | catch the mice, right? |
| 10:10 | 25 | That's a great idea.  Build a better |

—36—

10:10   1   mousetrap and the world will beat a path to your door,

10:10   2   I believe, is the analogy.  But unless I tell you how

10:10   3   to build that mousetrap that catches smaller mice or

10:10   4   bigger mice or how to place it somewhere in a way

10:10   5   that's other than just saying "accomplish my goal," I

10:10   6   don't have a patentable invention.  I have simply tried

10:11   7   to claim an abstract idea, and that's what's going on

10:11   8   here.

10:11   9              Now, it appears that we do not have much

10:11   10  to talk about on Claims 1, 2, 5 and 7.  So we'll focus

10:11   11  on Claim 3.

10:11   12             And if we could go, Mr. Garcia, to Slide

10:11   13  24.  I apologize.

10:11   14             So let's start with Claim 3.  And just

10:11   15  briefly, Your Honor, what we heard is that the

10:11   16  invention is patent-eligible.  And it gets over Step 2

10:11   17  because there's a recitation of a deep packet

10:11   18  inspection module operatively coupled to the behavioral

10:11   19  information collector and operable to monitor the

10:11   20  access communication traffic.  That's what we heard,

10:11   21  boiling it all down.

10:11   22             And we also heard that, boy, Google says

10:11   23  that that's attorney argument.  But that stuff's

10:11   24  well-known.  But that's actually not our argument.

10:11   25  That's what the patent tells us.

10:11    1                 Let's turn to Slide 25.

10:11    2                 And the '806 patent, Column 6, Lines 38

10:11    3 to 47 makes it crystal clear that you could use an --

10:12    4 as -- it could be implemented as an extended deep

10:12    5 packet inspection DPI platform.  Use of initial caps,

10:12    6 use of an acronym makes it -- without any other

10:12    7 explanation, no claiming of what is that thing?  How

10:12    8 does it work?  How do you operatively couple it?  How

10:12    9 do you use it?  Here is that thing.  They are taking

10:12   10 advantage of a known technology.

10:12   11                 Then we also heard that, well, look at

10:12   12 Figure 2.

10:12   13                 Let's go to Slide 16, please.

10:12   14                 Look at Figure 2.  Look how complex that

10:12   15 is.  It really matters.  And as Ms. Fellowes argued, we

10:12   16 agree.  Read the claims in light of the specification.

10:12   17                 So we just commend the Court to the '806

10:12   18 patent, Column 6, Lines 7 to 28, the specification's

10:12   19 discussion at Figure 2.  That makes it crystal clear.

10:12   20 It doesn't matter what you use.  It doesn't matter how

10:12   21 you connect it.  It doesn't matter, as long as you

10:12   22 achieve our goal.

10:12   23                 So use DPI to narrow down the sources of

10:13   24 information.  Use DPI to deliver certain types of

10:13   25 information together.  Use DPI to avoid having cookies

| 10:13 | 1 | on people's computers.  None of that is the invention. |
| 10:13 | 2 | The question before the Court is whether |
| 10:13 | 3 | the invention is patent-eligible and valid under |
| 10:13 | 4 | Section 101.  And the invention is not.  Because the |
| 10:13 | 5 | invention is not DPI.  The invention is now it's |
| 10:13 | 6 | coupled.  The invention is apply a bunch of well-known |
| 10:13 | 7 | techniques to deliver targeted content, including |
| 10:13 | 8 | targeted advertising. |
| 10:13 | 9 | And additionally, in the notice of |
| 10:13 | 10 | supplemental authority there was the case that |
| 10:13 | 11 | Ms. Fellowes mentioned, a very different case with very |
| 10:13 | 12 | different facts.  We commend that to the Court.  Much |
| 10:13 | 13 | more detailed computer invention there. |
| 10:13 | 14 | And at that same time in our response to |
| 10:13 | 15 | the notice of supplemental authority we've pointed out |
| 10:13 | 16 | what began with which is this Court's discussion of |
| 10:13 | 17 | Broadband iTV.  Claim 1 of the '825 patent is |
| 10:13 | 18 | remarkably similar to the claim at issue here.  These |
| 10:14 | 19 | claims are not patent-eligible.  They don't get over |
| 10:14 | 20 | Step 2. |
| 10:14 | 21 | And we respectfully submit that all of |
| 10:14 | 22 | the asserted claims, all the claims, but all of the |
| 10:14 | 23 | asserted claims certainly, are invalid under Section |
| 10:14 | 24 | 101. |
| 10:14 | 25 | And unless the Court has additional |

10:14   1    questions, I would stop there.

10:14   2                    THE COURT:  Any rebuttal?

10:14   3                    MS. FELLOWES:  Just briefly, Your Honor,

10:14   4    to point out that while, yes.  The claims must be read

10:14   5    in light of the specification, you can't then import

10:14   6    the general language within the specification to the

10:14   7    claims.  There's a reason the claims include the

10:14   8    specific limitations that they do.

10:14   9                    And one of the specific limitations is

10:14   10   that the DPI module is used in an arrangement within

10:14   11   the access network that's coupled to the behavioral

10:14   12   information collector.

10:14   13                   And by virtue of being operatively

10:14   14   coupled to the behavioral information collector, it's

10:14   15   located in a way that lets it access communication

10:14   16   traffic and assess the information from within that

10:14   17   communication traffic that lets it deliver the targeted

10:14   18   electronic content.

10:15   19                   This isn't -- my aim is not to simply

10:15   20   just throw out technical terms, but rather to emphasize

10:15   21   that because the specification says that in other

10:15   22   embodiments things may be arranged differently, that

10:15   23   doesn't mean they can be arranged differently within

10:15   24   the context of Claim 3.

10:15   25                   Also importantly, Claim 1 does require a

10:15  1    particular arrangement.  Claim 1 is not simply that any

10:15  2    component can be in any order.  It requires the

10:15  3    arrangement of specific components that are coupled to

10:15  4    each other in order to accomplish the goal of assessing

10:15  5    the communication traffic and, on that basis,

10:15  6    delivering targeted electronic content with the

10:15  7    subscriber-selected electronic content.

10:15  8              So I simply disagree.  I think it's

10:15  9    attorney argument to say that anything that I pull from

10:15  10   the specification regarding any other embodiment can be

10:15  11   imported into Claim 1 and also Claim 3.

10:15  12             That's all I have, Your Honor.

10:16  13             THE COURT:  Mr. Lanier, anything else?

10:16  14             MR. LANIER:  No, Your Honor.

10:16  15             THE COURT:  I'll be back in a few

10:16  16   seconds.

10:16  17             (Pause in proceedings.)

10:20  18             THE COURT:  Okay.  I'm going to go back

10:21  19   on the record.

10:21  20             And I just want to make sure my

10:21  21   understanding is correct that -- and I'll start with

10:21  22   Mr. Lanier.

10:21  23             Google is moving for summary judgment

10:21  24   with respect to Section 101 on all of the claims that

10:21  25   Google is still -- I don't remember the exact numbers.

| | | |
|---|---|---|
| 10:21 | 1 | It was -- I think there were four of them, 3 -- Claim 3 |
| 10:21 | 2 | and some others. |
| 10:21 | 3 | And your motion is for summary judgment |
| 10:21 | 4 | on all the claims that are -- that Google's still |
| 10:21 | 5 | arguing over essentially, correct? |
| 10:21 | 6 | MR. LANIER:  That's correct, Your Honor. |
| 10:21 | 7 | THE COURT:  Okay.  I'm going to grant |
| 10:21 | 8 | that motion with the exception of Claim 3. |
| 10:21 | 9 | With regard to Claim 3, I'm going to deny |
| 10:22 | 10 | both motions, Google's motion and plaintiff's -- I'm |
| 10:22 | 11 | sorry.  Yes.  Plaintiff's cross-motion -- or I don't |
| 10:22 | 12 | know if it's cross.  I guess it is.  Y'all filed first. |
| 10:22 | 13 | But I'm denying it with respect to Claim |
| 10:22 | 14 | 3, and we'll take up that issue at trial with respect |
| 10:22 | 15 | to the second question. |
| 10:22 | 16 | Now, that means we have a Markman to do, |
| 10:22 | 17 | which always excites me.  And so I look very much |
| 10:22 | 18 | forward to hearing especially -- no offense to anyone, |
| 10:22 | 19 | but I look forward to hearing the young person who's |
| 10:22 | 20 | going to get to argue.  That always -- I think it's one |
| 10:22 | 21 | of the great things I get to do. |
| 10:22 | 22 | The claim term is "Internet Protocol |
| 10:22 | 23 | Television (IPTV) service."  And I'll hear first from |
| 10:22 | 24 | the defendant. |
| 10:22 | 25 | MR. LANIER:  Thank you, Your Honor. |

10:22  1          We're arguing over that still because

10:22  2   that claim appears in Independent Claim 1, which is no

10:22  3   longer asserted.  So it's part of Claim 3, which

10:23  4   remains alive for now.

10:23  5          Let's go to Slide 30.

10:23  6          We appreciate the Court taking time to

10:23  7   have offered preliminary constructions on all of the

10:23  8   issues that were up there.

10:23  9          And so the record's clear, I just happen

10:23  10  to be the one who was arguing 572.  Your Honor would

10:23  11  have heard from many other people, but we decided to

10:23  12  focus down the issues.  So my apologies for that.

10:23  13          But the reason we're putting up Slide 30

10:23  14  is to show what the dispute was that was actually

10:23  15  originally presented to the Court.

10:23  16          It wasn't just the dispute between plain

10:23  17  and ordinary meaning and the construction Google

10:23  18  proposed.  It was really TV over the Internet.  That's

10:23  19  actually the construction for which WSOU has been

10:23  20  arguing.  And adopting plain and ordinary meaning with

10:23  21  nothing more risks adopting that construction.

10:23  22          Let's go to Slide 31.

10:23  23          So we recognize the Court has made that

10:23  24  preliminary construction of plain and ordinary meaning.

10:23  25  And while we believe that the construction we had

10:24  1   originally proposed was correct, we have offered two

10:24  2   alternative constructions that get at the real mischief

10:24  3   of what we think WSOU's actual argument is.  TV over

10:24  4   the Internet is enough to be IPTV as used in the patent

10:24  5   claims.

10:24  6            And so the first construction strikes out

10:24  7   a variety of words and removes one word.  So our first

10:24  8   alternate proposed construction is:  Television content

10:24  9   delivered over a private, managed Internet protocol IP

10:24 10   network connection.

10:24 11            Alternatively, its plain and ordinary

10:24 12   meaning as of 2006, not television delivered over the

10:24 13   public Internet.

10:24 14            And the reason we pointed to 2006 is

10:24 15   because that's when the patent was filed.  And as the

10:24 16   Court's well familiar, to the extent we need to

10:24 17   construe a term, we look to its plain and ordinary

10:24 18   meaning as of when the patent was filed.

10:24 19            Let's go to -- so we'll skip a couple of

10:24 20   slides because the Court is well familiar with this.

10:24 21   Let's go to Slide 33.

10:24 22            The term is "IPTV."  And the

10:25 23   specification uses it as something that is understood

10:25 24   at the time, but the specification does not define

10:25 25   IPTV.

10:25   1                    And so if there's a dispute about it, we

10:25   2   need to look outside of the specification for a

10:25   3   definition.  And, again, it's an acronym, IPTV, using

10:25   4   from an initial cap term.  So it's clearly something

10:25   5   the specification is invoking as something new -- or

10:25   6   something known at the time.  It's not something that's

10:25   7   being invented here.

10:25   8                    Let's go to Slide 34.

10:25   9                    Now, what WSOU says is the plain and

10:25   10  ordinary meaning of IPTV service is unambiguous and

10:25   11  easily understood on its face:  Television delivered by

10:25   12  Internet protocol.

10:25   13                    But that is, in fact, not the case.

10:25   14  Because they missed the point of what IPTV, that

10:25   15  defined term, meant at the time of filing of the '806

10:25   16  patent application.

10:25   17                    Let's go to Slide 35.

10:25   18                    And we know they missed that point

10:26   19  because we've submitted the declaration of Leslie

10:26   20  Simpson.  His qualifications are explained in his

10:26   21  report.  It's Exhibit 1 to our opening claim

10:26   22  construction brief.

10:26   23                    It is unrebutted.  There is no contrary

10:26   24  testimony.  There is no non-attorney argument rebuttal

10:26   25  to his testimony where Mr. Simpson points out that IPTV

10:26 1    is often mistaken or mischaracterized as a service that

10:26 2    provides videos over the public Internet.  So people

10:26 3    sometimes just say, all right, well, it's IP, it's TV.

10:26 4    IPTV is video over the Internet.

10:26 5                    But that's actually not what the

10:26 6    understanding was of a skilled artisan at the time.

10:26 7                    Let's go to Page 36.

10:26 8                    And as Mr. Simpson explained, as of the

10:26 9    filing date it was -- IPTV was understood not only in

10:26 10   terms of the content it provided, but the type of

10:26 11   network used to deliver that content.  And he goes on.

10:26 12                    Now, this testimony is unrebutted.

10:26 13   There's no contrary expert testimony.  And really what

10:26 14   we hear and we infer we'll hear from the slides we saw

10:26 15   this morning is that, well, you don't need to look to

10:26 16   any of the steps because you've got a plain and

10:27 17   ordinary meaning of the term.

10:27 18                    But we've established there's a dispute

10:27 19   as to the plain and ordinary meaning in this case.  So

10:27 20   we do need to try to construe it.

10:27 21                    Let's go to Slide 37.

10:27 22                    Now, we don't need to actually rely on

10:27 23   the expert.  We should, he's unrebutted.  But we could

10:27 24   just look to the extrinsic evidence as of the time of

10:27 25   the filing of this patent.  It's an Alcatel Lucent

10:27  1    patent.  It's not a WSOU patent.  There are no such
10:27  2    things.
10:27  3              The assignee's president explained what
10:27  4    IPTV was.  And we have on Slide 37 an excerpt from
10:27  5    Exhibit 2 to our opening claim construction brief:  It
10:27  6    is not TV that is broadcast over the Internet ... the
10:27  7    "IP" refers to a method of sending information over a
10:27  8    secured tightly managed network.
10:27  9              But we don't just need to look what the
10:27  10   president of the original patent assignee's company
10:27  11   said contemporaneous with filing of the patent
10:27  12   application.
10:27  13             Let's go to Slide 38.
10:27  14             We can look to industry groups.  And
10:27  15   ATIS, as an industry, explained in July of 2005, again,
10:28  16   contemporaneous with the preparation of and filing of
10:28  17   the patent application.
10:28  18             Let's go to Slide 39.
10:28  19             Explain what IPTV is.  So there -- and it
10:28  20   is completely consistent with the construction we
10:28  21   proposed, both our original construction and our
10:28  22   alternate proposed construction, both of them.
10:28  23             And so we won't -- eager as Your Honor is
10:28  24   as well to hear a fresh voice in this argument, we're
10:28  25   not going to repeat everything that's on these slides.

10:28  1   The -- we'll make these points and we'll refer briefly

10:28  2   to the other evidence.

10:28  3                    Let's go to Slide 41.

10:28  4                    Additional industry groups.  The

10:28  5   International Engineering Consortiums, also in 2005:

10:28  6   IPTV is a system used to deliver digital television

10:28  7   services to the consumers who are registered

10:28  8   subscribers for the system ... usually in a managed

10:28  9   network rather than public Internet to preserve the

10:28  10  quality of service guarantees.

10:28  11                    Let's go to Slide 42.

10:28  12                    Same thing.  What IPTV is, what IPTV is

10:29  13  not.

10:29  14                    And let's go to Slide 43.

10:29  15                    So, Your Honor, our argument is very

10:29  16  straightforward.  It's a term that had a meaning at the

10:29  17  time.  We absolutely agree there was a plain and

10:29  18  ordinary meaning at the time.

10:29  19                    That meaning may have evolved over time,

10:29  20  as the unrebutted expert explains.  No rebuttal to that

10:29  21  testimony.  There's no rebuttal to the opinion that's

10:29  22  been offered as to what the meaning of IPTV was at the

10:29  23  time of filing.  The extrinsic evidence of the meaning

10:29  24  was unchallenged.  And that extrinsic evidence should

10:29  25  be considered by the Court.  Because we do have a

10:29   1   dispute over the meaning of the term that is not

10:29   2   argued.  No one's suggesting lexicography here.

10:29   3            So that term was not defined rather in

10:29   4   the '806 patent.  We need to look to what is the

10:29   5   evidence of the plain and ordinary meaning of that term

10:29   6   as of the time of filing to avoid exactly the confusion

10:29   7   that it appears WSOU intends to exploit, an evolved

10:29   8   understanding of that meaning now 17 years -- almost

10:30   9   17 years later.

10:30   10            So with that, Your Honor, we will rest

10:30   11   and ask the Court to adopt either of our alternate

10:30   12   proposed constructions.  And we'll stop there.

10:30   13            THE COURT:  Thank you, sir.

10:30   14            A response?

10:30   15            MR. XIE:  Yes, Your Honor.

10:30   16            If I could have access to the share

10:30   17   screen.  Thank you.

10:30   18            Good morning, Your Honor.  This is Moses

10:30   19   Xie for Brazos.

10:30   20            And I will start on -- I believe it's our

10:30   21   Slide 5.

10:30   22            Internet protocol television service, or

10:30   23   IPTV service, is plain on its face and easily

10:30   24   understood as television delivered by Internet

10:30   25   protocol.  This needs no construction.

10:30  1          But Google attempted to introduce two

10:31  2     separate limitations into this easily understood term,

10:31  3     ISP service and private, managed Internet protocol

10:31  4     network connection.  Language that appears nowhere in

10:31  5     the claims and that is not supported by the record.

10:31  6          Your Honor's preliminary construction

10:31  7     rejected Google's original proposal.  And Google's

10:31  8     alternate proposal simply reshuffles words around but

10:31  9     carries the same meaning, and it should be rejected for

10:31  10    the third time.

10:31  11         We've already litigated the issue of

10:31  12    adding undue limitations to IPTV service during the

10:31  13    last round of claim construction back in early 2021.

10:31  14         In that round, Google wanted the claim

10:31  15    construed in a way that places IPTV service anywhere

10:31  16    but on the Internet side of the ISP because that's

10:31  17    where its products, Google TV and YouTube TV, are

10:31  18    located.

10:31  19         To that end, Google construed access

10:31  20    network in a way that placed the access network and, by

10:31  21    association, also IPTV service between the subscriber

10:32  22    and the ISP and, critically, away from the Internet.

10:32  23         That construction is shown here on the

10:32  24    slide.  Your Honor correctly rejected this restriction

10:32  25    on IPTV service and adopted the plain and ordinary

10:32   1   meaning.

10:32   2                   Today, Google is back to litigating the

10:32   3   same issue.  Although, now it's targeting IPTV service

10:32   4   directly instead of indirectly through the access

10:32   5   network, and now it's placing IPTV service inside of

10:32   6   the ISP instead of between the subscriber and the ISP.

10:32   7                   The result it seeks is the same, and that

10:32   8   is to wall off IPTV service from the Internet.

10:32   9   Specifically by saying "IPTV service is television

10:32   10  delivered over private, managed Internet protocol

10:32   11  network connection" -- "network connection service,"

10:32   12  Google places IPTV service inside of the ISP and away

10:32   13  from the Internet.

10:32   14                  Your Honor got it right the previous two

10:32   15  times, and the Court should reject Google's renewed

10:33   16  attempt to restrict IPTV for the same reasons.

10:33   17                  Google cites to various portions of the

10:33   18  specification for its argument that the ISP always

10:33   19  implements the access network, but each of those

10:33   20  excerpts are clear that they're exemplary.  And it's

10:33   21  blackletter law that embodiments in the specification

10:33   22  should not be imported into the claims.

10:33   23                  In fact, in that third excerpt, it says:

10:33   24  The electronic content source 58, another participant

10:33   25  in system 20, represents any electronic content

10:33  1   publisher, such as a traditional portal, a video

10:33  2   content provider, et cetera.  The electronic content

10:33  3   source is the component that provides the IPTV service.

10:33  4              And this passage says that there is no

10:33  5   limitation on it, and so there should be no limitation

10:33  6   on the provided IPTV service.

10:34  7              Also, to Google's reliance on the

10:34  8   Kopykake case, that ruling was much narrower than

10:34  9   Google makes it out to be.  And it's distinguishable

10:34  10  based on what the specification said in Kopykake.

10:34  11             And there, the issue was whether the term

10:34  12  "screen printing" should be construed to include inkjet

10:34  13  printing for a claim about printing on food stuff.

10:34  14             The specification in that case said that

10:34  15  screen printing including -- included any conventional

10:34  16  printing process or any other conventional means or

10:34  17  methods.

10:34  18             And so because of that, the Court had to

10:34  19  determine which processes were conventional at the time

10:34  20  of filing.  And it found that inkjet printing was not

10:34  21  conventional.  That led the Court to reject the

10:34  22  construction that included inkjet.

10:34  23             Here, there is no disclosure in the

10:34  24  specification that IPTV service should be limited to a

10:34  25  conventional service and that the specification

10:34   1   actually contemplates and makes clear that IPTV service

10:35   2   can be any service.

10:35   3           Finally, as we saw, Google points to over

10:35   4   500 pages of extrinsic evidence, but it's not proper to

10:35   5   consider extrinsic evidence when the disputed term can

10:35   6   be understood from a reading of the public record.

10:35   7           IPTV service is readily understood as

10:35   8   television delivered by interpret protocol.

10:35   9           And just one last point about

10:35   10  definitions.  This Court has warned that definitions do

10:35   11  not always carry the intended meaning of the patent and

10:35   12  that definitions must be considered in light of the

10:35   13  patent.

10:35   14          The intrinsic evidence here is clear that

10:35   15  IPTV service is not limited to a service delivered over

10:35   16  private, managed connection.

10:35   17          Google's extrinsic definitions are

10:35   18  uncoupled from the teachings of the patent and do not

10:35   19  convey the intended meaning of the patent.  So Google's

10:35   20  extrinsic evidence should be ignored.

10:36   21          For these reasons, the Court should

10:36   22  maintain its preliminary constructions.

10:36   23          Thank you, Your Honor.

10:36   24          THE COURT:  Thank you, sir.

10:36   25          Mr. Lanier?

| | |
|---|---|
| 10:36 | 1 |

MR. LANIER:  Very briefly, Your Honor.

If we could get the screen back and put up Slide 43.

And I'll be brief, Your Honor, once we've pulled that up.

Thank you, Mr. Garcia.

Your Honor, we didn't -- what we heard was that IPTV has a meaning.  We agree.  It's the meaning as of 2006 that should control.  And we submitted ample evidence, unrebutted evidence, that there is a confusion over that meaning that evolved over time.

So we respectfully submit that the extrinsic evidence, including the unrebutted expert testimony should be considered to be sure that we are considering what is otherwise undisputed the meaning of the term as understood by a skilled artisan in 2006.

So that's big point one.  We need to look for that evidence because there's a disagreement over not whether that term had a meaning in 2006, but what it was.  Big point one.

Big point two.  We take Mr. Xie's point.  And we took the Court's point about the proposed constructions.  And so our alternate proposed construction eliminates the ISP requirement and

10:37  1    eliminates the subscriber requirement.

10:37  2              The key point is that this is -- the

10:37  3    meaning of IPTV as of 2006 when the patent was filed

10:37  4    was not just television delivered over any old public

10:37  5    Internet access.  It meant more and different than

10:37  6    that.

10:37  7              So either way it happens, we believe it's

10:37  8    critical for the Court to provide guidance in the form

10:37  9    of either of those alternate proposed constructions.

10:37  10   Or else we are going to have, at summary judgment or at

10:37  11   trial, an expert standing up and saying, yep, you know,

10:38  12   Google's accused products are not IPTV.

10:38  13             Well, why aren't they?

10:38  14             Well, because they're not -- they're not

10:38  15   just -- it's just video over the public Internet.  It's

10:38  16   not over this managed system.

10:38  17             And then we're going to be back to the

10:38  18   same issue.  So we think the construction should be

10:38  19   done now.

10:38  20             So bottom line, there's no dispute that

10:38  21   this is a term that had a plain and ordinary meaning.

10:38  22   No dispute that it ought to be the meaning in 2006.

10:38  23   There is a dispute over what that meaning is.  And

10:38  24   there is unrebutted evidence as to what that meaning

10:38  25   is.

| | | |
|---|---|---|
| 10:38 | 1 | So we respectfully submit that the Court |
| 10:38 | 2 | should adopt one of Google's alternate proposed |
| 10:38 | 3 | constructions. |
| 10:38 | 4 | With that, I'll stop, Your Honor.  Beyond |
| 10:38 | 5 | congratulating Mr. Xie for his debut and being pleased |
| 10:38 | 6 | to meet him, which unfortunately we can't do in this |
| 10:38 | 7 | virtual setting. |
| 10:38 | 8 | THE COURT:  Anything else, counsel? |
| 10:38 | 9 | MR. XIE:  Just real quick.  And great to |
| 10:38 | 10 | meet you too, Mr. Lanier. |
| 10:38 | 11 | What Mr. Simpson's expert declaration |
| 10:38 | 12 | seems to show is what was conventional in 2006, but |
| 10:38 | 13 | that's not the same as in what -- in Google's own |
| 10:39 | 14 | words, what a POSA would have understood to mean the |
| 10:39 | 15 | term at the time of filing.  So something can be within |
| 10:39 | 16 | the understanding of a POSA yet still not conventional |
| 10:39 | 17 | or widespread. |
| 10:39 | 18 | And they haven't shown that a POSA |
| 10:39 | 19 | couldn't understand the term "IPTV" to encompass |
| 10:39 | 20 | Internet-implemented TV, only that perhaps it might not |
| 10:39 | 21 | have been widespread or adopted by dictionaries or used |
| 10:39 | 22 | by business people. |
| 10:39 | 23 | As an example, if I say "mobile |
| 10:39 | 24 | communication technology," a POSA might understand that |
| 10:39 | 25 | as 4G or 5G, but the POSA might also understand it as |

10:39  1    6G since it's being developed and going to be rolled

10:39  2    out.  But a dictionary definition might only say 4G and

10:39  3    5G.

10:39  4                The same is true here.  IPTV should not

10:39  5    be limited to what was in dictionaries and talked about

10:39  6    on a broader level when it has not been shown that a

10:39  7    POSA could not understand IPTV to mean Internet

10:39  8    implemented and when the patentee made clear that IPTV

10:40  9    was not limited in any way.

10:40  10               And also just to quickly address their

10:40  11   Slide 41, a definition from the International

10:40  12   Engineering Consortium, they use the word "usually."

10:40  13   It's usually delivered over a private, managed network.

10:40  14   But there could be other ways that was within the

10:40  15   understanding of a POSA.

10:40  16               And with that, I'll pass my time, Your

10:40  17   Honor.

10:40  18               THE COURT:  Thank you, sir.

10:40  19               Mr. Lanier?

10:40  20               MR. LANIER:  One sentence, Your Honor.

10:40  21   It's not just any POSA.  It's a POSA in 2006.

10:40  22               With that, we rest.

10:40  23               THE COURT:  I don't know -- I don't know

10:40  24   that I heard counsel for plaintiff address that.  I

10:40  25   think he implied it, but I think you're correct,

| | | |
|---|---|---|
| 10:41 | 1 | Mr. Lanier.  But I took plaintiff's argument that he |
| 10:41 | 2 | understood that with his last arguments. |
| 10:41 | 3 | But if plaintiff's counsel wants to argue |
| 10:41 | 4 | anything else, I'm happy to hear it. |
| 10:41 | 5 | MR. XIE:  None needed, Your Honor.  Thank |
| 10:41 | 6 | you. |
| 10:41 | 7 | THE COURT:  Okay.  I'll be back in a |
| 10:41 | 8 | second. |
| 10:41 | 9 | (Pause in proceedings.) |
| 10:42 | 10 | THE COURT:  I want to thank all counsel |
| 10:42 | 11 | as usual for their usual exceptional work and |
| 10:42 | 12 | arguments. |
| 10:42 | 13 | I'm going to maintain the preliminary |
| 10:42 | 14 | construction of plain and ordinary meaning. |
| 10:42 | 15 | My understanding is that was the only |
| 10:42 | 16 | claim term we had to take up.  Is there anything else |
| 10:42 | 17 | that we needed to take up -- Mr. Lanier, you're in my |
| 10:42 | 18 | screen -- from Google's perspective? |
| 10:42 | 19 | MR. LANIER:  No, Your Honor.  Nothing |
| 10:42 | 20 | more from us.  Thank you for the time today. |
| 10:43 | 21 | THE COURT:  You bet. |
| 10:43 | 22 | And for plaintiff? |
| 10:43 | 23 | MR. XIE:  Correct.  Nothing further for |
| 10:43 | 24 | Brazos. |
| 10:43 | 25 | THE COURT:  And I won't let it go |

10:43   1   unnoticed that I have that Martin guitar, the OM-18.

10:43   2   It's a great one.  So good -- whoever made you pick

10:43   3   that one, that's one of my favorites, so...

10:43   4                   MR. LANIER:  It's right over there.

10:43   5                   THE COURT:  It's not quite Friday, but

10:43   6   I'll tell you have a wonderful weekend anyway.  Take

10:43   7   care.

10:43   8                   (Hearing adjourned.)

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS      )

3

4

5             I, Kristie M. Davis, Official Court

6   Reporter for the United States District Court, Western

7   District of Texas, do certify that the foregoing is a

8   correct transcript from the record of proceedings in

9   the above-entitled matter.

10            I certify that the transcript fees and

11  format comply with those prescribed by the Court and

12  Judicial Conference of the United States.

13            Certified to by me this 17th day of

14  February 2023.

15                          */s/ Kristie M. Davis*
                            KRISTIE M. DAVIS
16                          Official Court Reporter
                            800 Franklin Avenue
17                          Waco, Texas 76701
                            (254) 340-6114
18                          kmdaviscsr@yahoo.com

10:43

19

20

21

22

23

24

25