```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                      WACO DIVISION

WSOU INVESTMENTS LLC      *    September 8, 2023
                          *
VS.                       *    CIVIL ACTION NOS.
                          *
GOOGLE LLC                *  6:20-572, 580, 584, 585

          BEFORE THE HONORABLE ALAN D ALBRIGHT
                  PRETRIAL CONFERENCE

APPEARANCES:

For the Plaintiff:   Joseph M. Abraham, Esq.
                     Timothy Franklin Dewberry, Esq.
                     Folio Law Group PLLC
                     13492 Research Blvd, Ste. 120, #177
                     Austin, TX 78750

                     Alden K. Lee, Esq.
                     Folio Law Group PLLC
                     1200 Westlake Ave. N. Ste. 809
                     Seattle, WA 98109

                     Mark Siegmund, Esq.
                     Craig D. Cherry, Esq.
                     Justin Wayne Allen, Esq.
                     Melissa Samano Ruiz, Esq.
                     Cherry Johnson Siegmund James, PLLC
                     The Roosevelt Tower
                     400 Austin Avenue, 9th Floor
                     Waco, Texas 76701

                     Gregory Phillip Love, Esq.
                     Steckler Wayne Cherry & Love PLLC
                     PO Box 948
                     Henderson, TX 75653

For the Defendant:   Tharan Gregory Lanier, Esq.
                     Jones Day
                     1755 Embarcadero Road
                     Palo Alto, CA 94303

                     Tracy Ann Stitt, Esq.
                     Edwin O. Garcia, Esq.
                     Jones Day
                     51 Louisiana Avenue, N.W.
                     Washington, DC 20001
```

```
 1                         Rita J. Yoon, Esq.
                           Jones Day
 2                         555 California Street
                           Ste 26th Floor
 3                         San Francisco, CA 94104

 4                         Michael E. Jones, Esq.
                           Shaun William Hassett, Esq.
 5                         Potter Minton PC
                           110 N College, Suite 500
 6                         Tyler, TX 75702

 7  Court Reporter:        Kristie M. Davis, CRR, RMR
                           PO Box 20994
 8                         Waco, Texas 76702-0994
                           (254) 340-6114

 9

10      Proceedings recorded by mechanical stenography,

11  transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

| | | |
|---|---|---|
| 09:02 | 1 | (Hearing begins.) |
| 09:02 | 2 | DEPUTY CLERK:  Court calls Waco |
| 09:02 | 3 | 20-CV-572, 580, 584, 585, WSOU Investments LLC versus |
| 09:03 | 4 | Google LLC for a pretrial conference. |
| 09:03 | 5 | THE COURT:  Mr. Siegmund, if I could have |
| 09:03 | 6 | announcements from the plaintiffs. |
| 09:03 | 7 | MR. SIEGMUND:  Yes, Your Honor.  Good |
| 09:03 | 8 | morning, Your Honor.  Mark Siegmund on behalf of |
| 09:03 | 9 | plaintiff Brazos.  And with me this morning from the |
| 09:03 | 10 | Folio Law Group is Joe Abraham, Tim Dewberry, and Alden |
| | 11 | Lee. |
| 09:03 | 12 | And then with my firm, we have Greg Love, |
| 09:03 | 13 | Justin Allen, Melissa Ruiz, Craig Cherry, and Ryan |
| 09:03 | 14 | Johnson, as well as Scott Maynard, general counsel for |
| 09:03 | 15 | WSOU. |
| 09:03 | 16 | And we're ready to proceed, Your Honor. |
| 09:03 | 17 | THE COURT:  Welcome, everyone. |
| 09:03 | 18 | And Mr. Jones? |
| 09:03 | 19 | MR. JONES:  Your Honor, Mike Jones for |
| 09:03 | 20 | the defendant Google.  Together with Greg Lanier, Tracy |
| 09:03 | 21 | Stitt, Rita Yoon, Edwin Garcia, and Mr. Shaun Hassett. |
| 09:03 | 22 | And here today from Google itself is |
| 09:03 | 23 | Mr. Charlie Steinberg. |
| 09:03 | 24 | And we're ready to proceed, Your Honor. |
| 09:03 | 25 | Thank you, sir. |

4

| | | |
|---|---|---|
| 09:03 | 1 | THE COURT:  Very good. |
| 09:03 | 2 | Let me start -- I think we have a number |
| 09:03 | 3 | of motions where argument is not requested, and I will |
| 09:03 | 4 | go through and rule on those. |
| 09:03 | 5 | But let me -- I'm going to go slowly on |
| 09:04 | 6 | the first one to make sure I have the right list and |
| 09:04 | 7 | it's not contested.  I have Brazos' Motion For Summary |
| 09:04 | 8 | Judgment Concerning Google's Affirmative Defenses.  I |
| 09:04 | 9 | have that as not contested, correct? |
| 09:04 | 10 | Okay.  Then I'm on the right page. |
| 09:04 | 11 | That's denied. |
| 09:04 | 12 | Google's Motion to Dismiss for Failure to |
| 09:04 | 13 | State a Claim Under 12(b)(6), that is denied. |
| 09:04 | 14 | Google's Motion for Partial Summary |
| 09:04 | 15 | Judgment of Noninfringement is denied. |
| 09:04 | 16 | Google's Motion for Summary Judgment of |
| 09:04 | 17 | Indefiniteness is denied. |
| 09:04 | 18 | Google's Motion for Summary Judgment of |
| 09:04 | 19 | Patent Ineligibility is denied under Alice Step 1. |
| 09:04 | 20 | Google's Motion to Exclude Testimony of |
| 09:04 | 21 | WSOU's Technical Expert -- is it Tibor? |
| 09:04 | 22 | MR. ABRAHAM:  Tibor Kozek. |
| 09:04 | 23 | THE COURT:  -- Dr. Tibor Kozek is denied. |
| 09:04 | 24 | Brazos' Motion for Summary Judgment |
| 09:04 | 25 | Concerning Google's Affirmative Defenses is denied. |

09:04  1              Google's Motion to Dismiss for Failure to

09:04  2  Claim -- State a Claim Under 12(b)(6) is denied.

09:04  3              Google's Motion for Partial Summary

09:05  4  Judgment Under 35 United States Code Section 287 is

09:05  5  granted.

09:05  6              And Google's Motion for Summary Judgment

09:05  7  of Invalidity of U.S. Patent No. 8,737,961 is denied.

09:05  8              Also, I have -- okay.  Now I have -- the

09:05  9  next motion I have up, and my understanding is that

09:05  10  argument is requested, has to do with Google's Motion

09:05  11  to Strike and Exclude Certain Opinions of Technical

09:05  12  Expert Tamas or Tamas -- is it Tamas?

09:05  13              MR. ABRAHAM:  Tamas.

09:05  14              THE COURT:  -- Tamas Budavári.

09:05  15              And I will hear from Google on that.

09:05  16              Good morning.

09:05  17              MR. LANIER:  Thank you, Your Honor.  Good

09:05  18  morning.

09:05  19              THE COURT:  Welcome back.

09:05  20              MR. LANIER:  Thank you, sir.

09:05  21              THE COURT:  Have you appeared in Austin

09:05  22  before?

09:05  23              MR. LANIER:  Yes.  We had a pretrial

09:05  24  conference for our last trial here in this room.

09:05  25              Let me just grab my glasses, Your Honor.

09:06  1              Your Honor, if I may, if I may ask one

09:06  2  question about one of the rulings on the instant

09:06  3  motions that Your Honor just went through.

09:06  4              THE COURT:  Uh-huh.

09:06  5              MR. LANIER:  Our Motion 1, Docket 160 in

09:06  6  the 580 case, partial summary judgment of

09:06  7  noninfringement --

     8              THE COURT:  Yes.

09:06  9              MR. LANIER:  -- that's about ████████

09:06  10 ████████

     11             THE COURT:  Yes.

09:06  12             MR. LANIER:  Now, the parties -- I'm

09:06  13 going to confirm on the record that ████████████

09:06  14 ████████ is not accused of infringement in this case.

09:06  15             THE COURT:  Yes, sir.  That's what I

09:06  16 have.

09:06  17             MR. LANIER:  All right.  Just want to

09:06  18 make sure there's no dispute about that and that we

09:06  19 understand the Court's ruling.

09:06  20             THE COURT:  And that is what I have as

09:06  21 well.  Yes, sir.

09:06  22             MR. LANIER:  All right.  Thank you, Your

09:06  23 Honor.

09:06  24             All right.  So, Mr. Rudd, if we could

09:06  25 pull up the deck that starts with summary judgment of

| 09:06 | 1 | noninfringement in the 585 case, but we'll jump to |
| 09:06 | 2 | Slide 20. |
| 09:06 | 3 | Might have to do a magic step to make it |
| 09:07 | 4 | pop up here, Your Honor.  Apologies. |
| 09:07 | 5 | While they're sorting that out, Your |
| 09:07 | 6 | Honor, perhaps an introductory comment might be |
| 09:07 | 7 | helpful. |
| 09:07 | 8 | The 585 case involves the '961 patent, so |
| 09:07 | 9 | we'll occasionally say one or the other.  We're talking |
| 09:07 | 10 | about the '961 patent.  This patent shouldn't be going |
| 09:07 | 11 | to trial for two reasons.  They're related, but they're |
| 09:07 | 12 | independent. |
| 09:07 | 13 | One is that the expert's theory on which |
| 09:07 | 14 | WSOU now relies was new, never disclosed before expert |
| 09:07 | 15 | report, should be excluded.  And without that, they |
| 09:07 | 16 | don't have an infringement case. |
| 09:07 | 17 | Alternatively, relatedly but |
| 09:07 | 18 | alternatively, the motion for summary judgment is |
| 09:07 | 19 | directed to the theory, assuming -- we listen to it, |
| 09:07 | 20 | assuming we credit it and the Court doesn't exclude it. |
| 09:07 | 21 | We could proceed in either order, but |
| 09:07 | 22 | this is the order we had.  And we'll talk about why we |
| 09:07 | 23 | shouldn't be hearing that new theory at all. |
| 09:07 | 24 | And while they're still figuring that |
| 09:07 | 25 | out, I'll just start to illustrate the points for Your |

| 09:07 | 1 | Honor.  My apologies. |

Oh, it's up on the big screen.  I apologize.

Thank you.  I just couldn't see it.

You can go to the next slide.

Your Honor, this is one where the timeline tells the tale.  And if -- with the Court's indulgence, I'm just going to take a moment and walk through the timeline of this case.

In the '961 case, this patent relates to identifying where users are at a particular point. It's a specifically claimed set of method steps. There's also an apparatus claim.  And then it delivers a service at some point.

Now, plaintiffs in this case from the first day of this case accused something called ███████.  And we've illustrated here on the timeline that that language appears in their complaint. ███████ was in their final infringement contentions, the first ones.  It was in updated contentions.  It was in representations to this Court.  And we've put all that in the papers.

But the point of this timeline, Your Honor, is that from the first day of filing this case, through the close of discovery, WSOU was alleging

| 09:09 | 1 | its -- that Google's ███████ technology was accused |
| 09:09 | 2 | and that the accused products infringe because of |
| 09:09 | 3 | ████████████████████████████████████ |
| 09:09 | 4 | █████████████████████████████████████. |
| 09:09 | 5 | And Your Honor may recall that there was |
| 09:09 | 6 | some discussion of that at the claim construction |
| 09:09 | 7 | hearing.  And the Court indicated:  I know what |
| 09:09 | 8 | ████████ is.  We all know what ████████ is. |
| 09:09 | 9 | That was their accusation from the very |
| 09:09 | 10 | beginning of this case. |
| 09:09 | 11 | Fact discovery closed in March of 2023. |
| 09:09 | 12 | And then the Budavári report, Tamas Budavári.  An |
| | 13 | astrophysicist is an expert in this case for some |
| 09:09 | 14 | reason we don't fully understand, but if we have to, |
| 09:09 | 15 | we'll talk to him about that at trial. |
| 09:09 | 16 | But he doesn't mention ████████.  He |
| 09:09 | 17 | accuses something different than ████████.  He |
| 09:09 | 18 | explains that ████████ isn't relevant, and WSOU |
| 09:09 | 19 | eventually confirms in briefing here that it abandoned |
| 09:09 | 20 | the ████████ theory. |
| 09:09 | 21 | So this is the summary of it, and I'll |
| 09:10 | 22 | show Your Honor a couple of specific pieces.  None of |
| 09:10 | 23 | these facts are disputed.  They said ████████ |
| 09:10 | 24 | ████████████████████.  I can't even say ████████ |
| 09:10 | 25 | enough times to indicate how many times they said it. |

09:10    1    They came up with an entirely new theory in their

09:10    2    expert report.

09:10    3              Let's go to the next slide.

09:10    4              Just so it's crystal clear, in their

09:10    5    infringement contentions, they specifically reference

09:10    6    ██████████.  This is a reference to the cover page of

09:10    7    their infringement contentions, which are at Docket

09:10    8    173-1, referencing ██████████ a couple of places here.

09:10    9    These are the contentions under which we are operating

09:10    10   in this case.

09:10    11             Now, let's go to the next slide.

09:10    12             Your Honor may recall that there was a

09:10    13   period of -- about a year ago where -- that WSOU said,

09:10    14   we need to reset these cases.  We're going to amend our

09:10    15   infringement contentions.  We said, you shouldn't get

09:10    16   to do that.  There was a dispute over whether they

09:10    17   should have leave to amend.  The Court granted them

09:10    18   leave to amend, but it was disputed.

09:10    19             And in asking for that leave to amend,

09:11    20   here we have in their disputed motion, opposed motion

09:11    21   at Docket 107 at 14, they are indicating that in this

09:11    22   case they want to amend their contentions by clarifying

09:11    23   that Brazos' infringement allegations directed to

09:11    24   Google's ██████████ instrumentalities also include at

09:11    25   least Google Maps and Google Ads, and they go on.

—11—

```
09:11   1              But again, in asking this Court for
09:11   2    permission to proceed forward based on the amended
09:11   3    infringement contentions, they said it's ███████.
09:11   4    But there's more.
09:11   5              Let's look at the next slide.
09:11   6              There's a couple of letters.  They're
09:11   7    Exhibit 5 and Exhibit 6 to Docket 173 in this case.
09:11   8    They're discovery letters that we sent back and forth
09:11   9    to each other.  These are two letters from Mr. Love
09:11  10    right over there, and he talks about ███████ again,
09:11  11    involves Google's use of ██████ capabilities,
09:11  12    Google's ██████ in content delivery capabilities.
09:11  13    Again, this was their theory from the beginning.
09:12  14              Now, let's get to the theory they're
09:12  15    pursuing now.  That's the next slide, Slide 25.
09:12  16              Doctor -- this is from Dr. Budavári's
09:12  17    report.  It is Docket 173-6, Paragraphs 59 and 60.
09:12  18              Apologies for that, Your Honor.
09:12  19              And this is his specific accusation and
09:12  20    analysis in this case, after the close of fact
09:12  21    discovery, where he accuses something called ███.
09:12  22    It's actually named after the creature, and then they
09:12  23    came up with what those letters meant afterwards.  But
09:12  24    they accuse something called ███████████████████
09:12  25    ███████████████.
```

09:12  1                       And then he says:  In my opinion, ███

09:12  2   ████████████████████████████████████████████████████

09:12  3   ████████████████████████████████████████████████

09:12  4   ███ .

09:12  5                       So that's -- that is the accusation that

09:12  6   Dr. Budavári is making.

09:12  7                       Now, it's wrong and he doesn't support

09:12  8   it.  That's the other motion if we need to get there.

09:12  9   But that's the accusation.

09:12  10                      Now, WSOU essentially says, well, it's

09:12  11  still ████████    ████████████ .  It's the same

09:13  12  thing.  There's nothing new here.

09:13  13                      But we know unequivocally that is not

09:13  14  true, and we know that from the best source,

09:13  15  Dr. Budavári himself.

09:13  16                      And that's on the next slide, Slide 26.

09:13  17                      And here he's asked by my partner,

09:13  18  Ms. Stitt over there:  Were you ever asked to provide

09:13  19  any opinions that ██████████████████████████

09:13  20  infringes the asserted claims of the '961 patent?

09:13  21                      His answer was telling:  Again,

09:13  22  █████████████████████████████████████  █

09:13  23  ████████████████████      ████████████████

09:13  24  ████████████████████████████████████████████

09:13  25  ██████████████      ████████████████████████

```
09:13   1   ████████████████████████████████████

09:13   2              Dr. Budavári in deposition, after his

09:13   3   expert report is served, is saying, I am not talking

09:13   4   about ███████████    ███████████████████████████

09:13   5   ██████████

09:13   6              So WSOU's lawyers say in their papers,

09:13   7   and I'm sure we'll hear in a few minutes, that, well,

09:13   8   █████████, it's just code for a broad range of things

09:13   9   where really we're just narrowing and focusing the

09:14   10  allegations of infringement.  That's the lawyers

09:14   11  talking.  The expert says ███████████████████████████

09:14   12  ██████████████████.

09:14   13             So the expert, who's supposed to be

09:14   14  speaking from the perspective of one of skill in the

09:14   15  art, understanding what these terms mean, telling us

09:14   16  what his infringement accusation is, says, it's not

09:14   17  ██████████.

09:14   18             And there's a reason it's not ██████████.

09:14   19  And we see that in briefing in this case.

09:14   20             The next slide, please, Slide 27.

09:14   21             This is from their opposition, and it's

09:14   22  at Docket 193, Pages 4 to 5.

09:14   23             And what they explain is that

09:14   24  Dr. Budavári got information in discovery and offered a

09:14   25  different theory.  And again, this isn't a question of
```

```
09:14   1    narrowing ████████ or explaining it.  The evidence
09:14   2    that he got suggested that the -- ████████████
09:14   3    ████████████████████████████████
09:15   4    █████████████████████████████.
09:15   5         █████████████████████████
09:15   6    █████████████████████████████████████
09:15   7    █████████████████████.
09:15   8              So the expert says, I didn't even look at
09:15   9    ████████████.  The lawyers say that's because we
09:15   10   discovered in discovery, what's based on facts,
09:15   11   █████████ wasn't it.  And that's the theory that's
09:15   12   offered for the very first time in the expert report.
09:15   13             And there is no question that the
09:15   14   specific accusation of infringement that Dr. Budavári
09:15   15   makes on Elements, essentially, 1[c] and 1[d], that
09:15   16   we've cited here about ████████████████████, was not
09:15   17   the basis of their final infringement contentions,
09:15   18   everything was ████████████.  And the first time it shows
09:15   19   up is in the expert report.  First time after the close
09:15   20   of fact discovery.
09:15   21             Now, this didn't have to happen this way.
09:15   22   We'd reset these cases more than once, as Your Honor
09:15   23   knows.  They've been around for a little bit.  We're on
09:15   24   our third set of lead counsel.
09:15   25             We could have said, hey, we discovered
```

09:15  1   that we have a different theory.  We need to amend.

09:16  2              We might have opposed it because we've

09:16  3   been doing this a long time, but the Court would have

09:16  4   had that opportunity to make the choice, do I let them

09:16  5   change their theory?  We could have been heard on that

09:16  6   question and maybe a new prejudice could have been

09:16  7   mitigated; but now we are, less than a month before

09:16  8   trial, litigating a theory that was disclosed after the

09:16  9   close of fact discovery, disclosed for the first time

09:16  10  in the expert report, that the expert said isn't the

09:16  11  old theory and where the lawyers said the old theory

09:16  12  didn't work.

09:16  13             So now they don't have an infringement

09:16  14  theory.  Separate issue again, we can talk about

09:16  15  whether this new theory even flies.

09:16  16             Let's go to the next slide.

09:16  17             Your Honor's dealt with this more than

09:16  18  once.  We've cited one case, this is the Tomax AS

09:16  19  versus Turbo Drill Industries case.

09:16  20             This is prejudice.  We have been

09:16  21  prejudiced by this.  We have litigated a different

09:16  22  case.

09:16  23             We do not know what different prior art

09:16  24  we might have offered.  We do not know what different

09:16  25  evidence we might have looked for, what different

09:17  1    questions we might have asked in discovery if we were

09:17  2    talking about these specific infringement accusations

09:17  3    and not the geofencing that was the case, even over

09:17  4    disputes, until their expert report.

09:17  5                    That sums it up, Your Honor, and I'll

09:17  6    take a minute or two to respond, if necessary, after

09:17  7    they talk.  Thank you.

09:17  8                    THE COURT:  Response?

09:17  9                    MR. ABRAHAM:  Thank you for your

09:18 10    patience, Your Honor.

09:18 11                    THE COURT:  You're welcome.

09:18 12                    MR. ABRAHAM:  Working with technology.

09:18 13                    All right.  Few things here.  Your Honor

09:18 14    is well familiar with the law.  The purpose of

09:18 15    infringement contentions is to put the accused

09:18 16    infringer on notice of a theory.  It is not intended to

09:18 17    marshal all evidence on which you may rely.  And I

09:18 18    think what we end up having here is a difference --

09:18 19    it's a dispute that is focused on labels rather than

09:18 20    substance.

09:18 21                    At the end of the day, what is in

09:18 22    Dr. Budavári's report as support for the theory of

09:18 23    infringement that he presents there is consistent with

09:18 24    the theory of infringement to which we pointed Google

09:18 25    in our amended infringement contentions back in April

09:18   1   of 2022.  And at the end of the day, that's really

09:18   2   about all there is.

09:18   3                I can walk through a few specifics, but

09:18   4   what Google has not really pointed to -- yes, they've

09:18   5   pointed to the statement from the Tomax case, that

09:18   6   having to face a new theory is prejudice, but they

09:18   7   haven't pointed to anything other than waving their

09:18   8   hands about, oh, we might have asked some different

09:19   9   questions in discovery or we might have pursued a

09:19   10  different infringement theory as our invalidity theory.

09:19   11  There's no specifics there.

09:19   12                So let me skip through.  Very briefly, I

09:19   13  just want to make sure that we are centered.

09:19   14                Dr. Budavári is very clear that this case

09:19   15  has been about Google Maps.  Google does not appear to

09:19   16  contest that at this point, though they may bring that

09:19   17  up at some points later in the proceedings.

09:19   18                But again, they're complaining that

09:19   19  Brazos has narrowed the case relative to -- to where we

09:19   20  were.  And that's something that happens a lot.  That's

09:19   21  something that, you know, the Court wants to see.  We

09:19   22  want to focus disputes as we get closer to trial so

09:19   23  that we have a finely tuned set of facts that we are

09:19   24  asking the jury to rule on.

09:19   25                (Off-the-record bench conference.)

09:20  1            THE COURT:  I don't think I need --
09:20  2   I'm -- with regard to the issue of the argument from
09:20  3   Google that I need to strike or grant summary judgment,
09:20  4   or whatever it is, with regard to the new infringement
09:20  5   theories, I'm going to deny that.
09:20  6            The -- actually, the issue, if I could
09:20  7   hear from Google on, that I'm most interested in is the
09:20  8   issue concerning technical comparability.  If you'll
09:20  9   make an argument on that, and then I'll hear from
09:20  10  plaintiff on that.
09:20  11           MR. ABRAHAM:  Thank you, Your Honor.
09:20  12           MR. LANIER:  Thank you, Your Honor.
09:21  13           THE COURT:  And to speak more broadly,
09:21  14  the issue I -- I'm sorry.
09:21  15           MR. SIEGMUND:  I was just going to ask
09:21  16  for that clarification, Your Honor.  That's all.
09:21  17           THE COURT:  Of the multifarious motion to
09:21  18  strike, the issue I care about hearing on -- the only
09:21  19  issue I care about hearing argument on is the technical
09:21  20  comparability.
09:21  21           MR. LANIER:  Thank you, Your Honor.
09:21  22           And just so it's clear, we understand the
09:21  23  Court's ruling on the motion to strike.  We do have a
09:21  24  noninfringement argument, even assuming that theory, on
09:21  25  which we would like to be heard.  That's a separate

09:21  1    motion.

09:21  2                    THE COURT:  That's a separate motion.

09:21  3                    MR. LANIER:  Yes, Your Honor.  Just so

09:21  4    it's clear about that, and we understand the Court's

09:21  5    ruling.

09:21  6                    THE COURT:  I'm ruling on -- I'm going

09:21  7    to -- with respect to the issue of whether it's new and

09:21  8    shouldn't come in because it's new, I'm overruling

09:21  9    that.

09:21  10                    With respect to the issue of the

09:21  11   misquoted claim language, I'm denying that.

09:21  12                    With regard to the issue on ipse dixit,

09:21  13   I'm denying that, primarily because I don't know what

09:21  14   ipse dixit means.

09:21  15                    But I do care about hearing on technical

09:22  16   comparability.

09:22  17                    MR. LANIER:  I understand, Your Honor.

09:22  18   Well, ipse dixit essentially means, if I say it, it

09:22  19   must be so.  Right?  I know Your Honor knows.

09:22  20                    (Laughter.)

09:22  21                    MR. LANIER:  But that actually again

09:22  22   comes up in the summary judgment of noninfringement.

09:22  23   So we'll be back to that.

09:22  24                    So, Your Honor, on technical

09:22  25   comparability, the real problem is that Dr. -- the

—20—

| | | |
|---|---|---|
| 09:22 | 1 | damages experts rely on alleged technical comparability |
| 09:22 | 2 | assessments, but Dr. Budavári didn't actually do any |
| 09:22 | 3 | comparisons to ██████████████████████████████ |
| 09:22 | 4 | ███████████.  It's not disputed. |
| 09:22 | 5 | So I think Exhibit 7 to our motion here |
| 09:22 | 6 | at Pages 196 to 201.25, he doesn't do an actual |
| 09:22 | 7 | infringement analysis.  What he does is he says, I'll |
| 09:22 | 8 | compare some aspects of the patents to aspects of the |
| 09:22 | 9 | products. |
| 09:22 | 10 | But to opine on technical comparability, |
| 09:22 | 11 | you have to do more than that because it's not |
| 09:22 | 12 | technical -- it's got to be relevant to the patents. |
| 09:22 | 13 | You have to anchor it in the patents.  And he |
| 09:22 | 14 | doesn't -- he doesn't actually do that kind of an |
| 09:22 | 15 | analysis. |
| 09:23 | 16 | Additionally, when he's trying to exclude |
| 09:23 | 17 | the relevance of other patents and things like that, |
| 09:23 | 18 | his standard is way too stringent.  So he's operating |
| 09:23 | 19 | with inconsistent standards.  He doesn't provide a |
| 09:23 | 20 | reliable basis on which a damages expert could rely on |
| 09:23 | 21 | to assess technical comparability, either to include |
| 09:23 | 22 | something or exclude something.  He uses inconsistent |
| 09:23 | 23 | standards, and he doesn't apply them, either of them, |
| 09:23 | 24 | fully with any rigor at all. |
| 09:23 | 25 | This report is essentially all ipse |

09:23   1    dixit.  We'll talk about that on summary judgment of

09:23   2    noninfringement.  That's especially so with technical

09:23   3    comparability.  That's really the argument in a

09:23   4    nutshell, Your Honor.

09:23   5              THE COURT:  Okay.  Response?

09:23   6              MR. ABRAHAM:  Your Honor, with respect to

09:24   7    the technical comparability issue, Google is

09:24   8    essentially trying to put Brazos in a vice.  If

09:24   9    Dr. Budavári had not offered any opinions on technical

09:24  10    comparability, they would have accused our damages

09:24  11    expert, Mr. Blok, of operating without sufficient

09:24  12    foundation.

09:24  13              We agree the Federal Circuit has made it

09:24  14    very, very clear that if a damages expert is seeking to

09:24  15    rely on allegedly comparable licenses, there must be a

09:24  16    technical foundation.  We're well aware of that, and

09:24  17    the -- Dr. Budavári and Mr. Blok worked together to go

09:24  18    over these particular ███████████ that Dr. Budavári

09:24  19    uses as the basis for his technical comparability

09:24  20    opinion.

09:24  21              And let's focus on that specifically.

09:24  22    These are ██████████████.  This is not a question of

09:25  23    Dr. Budavári having plucked something from a completely

09:25  24    random other industry.  That's the cardinal sin that

09:25  25    the comparable license jurisprudence is really directed

```
09:25    1   to, where you can't find any alleged comparison or
09:25    2   point of reference between the underlying allegedly
09:25    3   comparable license and then the accused technology.
09:25    4              Here, Dr. Budavári -- Google -- sorry.
09:25    5   Let me back up.
09:25    6              The issue, of course, is that, you know,
09:25    7   Google keeps their revenues and their accounting the
09:25    8   way that they do, and that they can -- they can run
09:25    9   their business as they see fit.  With respect to ▇
09:25   10   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, there was an allocation of
09:25   11   revenue.  There is no similar set allocation of revenue
09:25   12   of which we've been made aware in discovery that
09:25   13   relates to the specifically accused feature in this
09:25   14   case -- or product and -- product and features in this
09:25   15   case.
09:25   16              But we're allowed to proceed by analogy
09:25   17   as long as we do an adequate job of technical
09:25   18   comparison.  And that's what Dr. Budavári did.
09:26   19              He took a look at the detailed product
09:26   20   documentation with respect to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
09:26   21   ▇, and he said, okay, I see what Google says ▇▇
09:26   22   ▇ does, and from what -- and based on how they
09:26   23   describe it, I can see how it relates, to a degree, to
09:26   24   what we're accusing here.
09:26   25              And he went through a list of -- I want
```

09:26    1    to say it was about 20 ████████████, and some he said

09:26    2    were comparable and others he said he didn't.  And it's

09:26    3    explained in his report which ones are comparable and

09:26    4    why, what he's relying on.

09:26    5             And the point is that, if we -- if there

09:26    6    is to be a reasonable and reliable comparison,

09:26    7    Dr. Budavári has to do that work.  He explained what he

09:26    8    did.  And I get that Google's going to take issue with

09:26    9    it.  I would be surprised if they didn't.  That's their

09:26   10    job.

09:26   11             But ultimately, any concerns that they

09:26   12    have about how Dr. Budavári performed that

09:26   13    comparability analysis are issues for cross.  That's

09:27   14    something that the Federal Circuit has made very, very

09:27   15    clear.  Generally, the degree of comparability goes to

09:27   16    weight.  It doesn't go to whether the opinion gets to

09:27   17    come in at all.

09:27   18             MR. LANIER:  Your Honor, may I briefly

09:27   19    respond?

09:27   20             THE COURT:  Yes, sir.  Of course.

09:27   21             My understanding is that the portion of

09:27   22    the expert report that we're concerned here is in --

09:27   23    there's a specific section, Paragraphs 208 to 213, and

09:27   24    I just want to make sure we're dealing with the same --

09:27   25    I think we're all on the same page, but that's the --

09:27  1   that's the issues of technical comparability.

09:27  2               Am I right about that?

09:27  3               MR. LANIER:  You're correct, Your Honor.

09:27  4               THE COURT:  Okay.  Very good.  And I'm

09:27  5   happy to hear a response.

09:27  6               MR. LANIER:  Thank you, Your Honor.

09:27  7               So Your Honor's right to focus on those

09:27  8   paragraphs.  That's the extent of his analysis.

09:27  9               And what we just heard is really telling.

09:27  10  What apparently was done was maybe a business

09:27  11  comparability or a revenue comparability analysis, but

09:27  12  the features or ███████████████████████████████

09:28  13  that Dr. Budavári did his comparable -- comparability

09:28  14  analysis on are not accused of infringement.

09:28  15              And the point of that analysis -- of that

09:28  16  comparability analysis is:  Would you need a license?

09:28  17  What's the value of a license?  Why is a license

09:28  18  comparable?

09:28  19              So unlike the Federal Circuit case where

09:28  20  we might be saying, well, we think you didn't give it

09:28  21  enough weight, we kind of disagree.  We'd cross him.

09:28  22  We understand that, Your Honor.

09:28  23              But this isn't a question of degree.

09:28  24  This is a question of quality, not quantity.  And the

09:28  25  quality he addressed here was incorrect.  That's

09:28   1   fundamentally it.

09:28   2          Google Maps by -- as a whole isn't

09:28   3   accused.  It's made of many pieces.  ███████ are

09:28   4   deployed in many different products.  They're not

09:28   5   accused.  ███ isn't even part of Google Maps.

      6          I'm sorry, Your Honor.  I didn't mean to

09:28   7   cut you off.

09:28   8          THE COURT:  No, no.  And because counsel

09:28   9   was -- and here's where I -- obviously, it's tough for

09:28   10   us on this side of the bench to deal with, but

09:29   11   essentially your argument is that it's not the result

09:29   12   he got; it's the methodology that he used.

09:29   13          And the problem you have is when you're

09:29   14   crossing -- counsel would like to say, you -- well, you

09:29   15   can just cross him on this.  But your problem is you

09:29   16   want to be able to say, you didn't do it right.

09:29   17          MR. LANIER:  Correct.

09:29   18          THE COURT:  And he's going to say,

09:29   19   nuh-uh.  I did do it right.  And that's a very

09:29   20   difficult cross.  And that's the point of your Daubert,

09:29   21   is that he didn't use the right methodology in terms of

09:29   22   essentially the way he compared the nonaccused

09:29   23   products, correct?

09:29   24          MR. LANIER:  Well said, Your Honor.

09:29   25   Better than I just said it.

09:29  1              And really, to put it in a nutshell, what

09:29  2   he's supposedly doing is saying, Mr. Damages Expert,

09:29  3   for your damages analysis, thinking about revenues and

09:29  4   everything else, I think that this license is

09:29  5   technically comparable to the technology that would be

09:29  6   licensed in the hypothetical negotiation.

09:29  7              And he didn't do that.  And if we crossed

09:30  8   him on that, we'd also run into problems like, well,

09:30  9   wait a minute.  Isn't that a Daubert issue?  Why do

09:30  10  they get to do that?  He's here.  That's the problem we

09:30  11  have.

09:30  12             THE COURT:  I got it.

09:30  13             MR. ABRAHAM:  Your Honor, may I briefly

09:30  14  be heard?

09:30  15             THE COURT:  I'm good.  I'm going to grant

09:30  16  the motion.

09:30  17             Next --

09:30  18             MR. ABRAHAM:  May I say one sentence?  I

09:30  19  will be very brief.

09:30  20             What I'm hearing from Google is that they

09:30  21  want him to have conducted an infringement analysis on

09:30  22  the foundational comparable that he's using.  That is

09:30  23  not the law.

09:30  24             You can build a damages opinion based on

09:30  25  something that does not infringe as long as it is

| | | |
|---|---|---|
| 09:30 | 1 | sufficiently comparable. |
| 09:30 | 2 | THE COURT:  Okay.  The motion's granted. |
| 09:30 | 3 | Next up I have Brazos' Daubert motion to |
| 09:30 | 4 | exclude damages opinion with respect to Mr. Bakewell. |
| 09:30 | 5 | And I will hear from the plaintiff on |
| 09:30 | 6 | that, please. |
| 09:30 | 7 | Mr. Siegmund? |
| 09:30 | 8 | MR. SIEGMUND:  Mr. Love will be handling |
| 09:30 | 9 | this, Your Honor. |
| 09:30 | 10 | THE COURT:  Okay.  Good morning. |
| 09:31 | 11 | MR. LOVE:  One second, Your Honor. |
| 09:31 | 12 | THE COURT:  Why don't I tell you what I |
| 09:31 | 13 | care about while y'all are getting that booted up? |
| 09:31 | 14 | My understanding is that there are |
| 09:31 | 15 | essentially two arguments here:  One has to do with |
| 09:31 | 16 | opinions related to whether or not there's an |
| 09:31 | 17 | assumption of infringement, and the other has to do |
| 09:31 | 18 | with reliance on agreements with respect to technical |
| 09:31 | 19 | or economic comparability, right? |
| 09:31 | 20 | MR. LOVE:  Yes, Your Honor. |
| 09:31 | 21 | THE COURT:  I just need to hear argument |
| 09:31 | 22 | on the second one. |
| 09:31 | 23 | MR. LOVE:  On the second one? |
| 09:31 | 24 | THE COURT:  Yes, sir. |
| 09:31 | 25 | MR. LOVE:  Okay.  So, Your Honor, if we |

09:31  1    can go to --

09:31  2                    Ms. Ruiz, if we can go to Slide No. 11.

09:32  3                    I'm sorry.  No. 12.

09:32  4                    So, Your Honor, there's -- there are

09:32  5    three licenses at issue:  The Brazos-███ license, the

09:32  6    Brazos-██████ license, and the Brazos-█████ license.

09:32  7                    And Mr. Bakewell, in his report, he

09:32  8    analyzed -- he analyzed these three licenses from an

09:32  9    economic standpoint.  But if you look at his report --

09:32  10                   Ms. Ruiz, if you'll go to Slide No. 18.

09:32  11                   Mr. Bakewell's report contains three

09:32  12   paragraphs with respect to each license agreement, and

09:33  13   I have those before the Court to review.

09:33  14                   Paragraph 183 addresses the ████ license

09:33  15   agreement.  And this is the sum total of the

09:33  16   technological comparability analysis that was performed

09:33  17   by Google in the case in its entirety.

09:33  18                   This paragraph, and I quote, it says:

09:33  19   ████████████████████████████████████████████████████

09:33  20   ████████████████████████████████████████████████████

09:33  21   ███████████████████████████████████

09:33  22                   That sentence is the only sentence that

09:33  23   addresses the technological comparability of the '961

09:33  24   patent and the products-in-suit -- or the

09:33  25   product-in-suit from Google's perspective and the ████

09:33    1    agreement.

09:33    2            The same occurs with respect to the

09:33    3    █████ agreement and the █████ agreement.  In

09:33    4    Paragraph 197, the █████ agreement is referenced.

09:33    5    Again, basically the exact same sentence.  Paragraph

09:33    6    216 has the exact same sentence with respect to the

09:34    7    █████ agreements.

09:34    8            Dr. Welch, who is the technical expert

09:34    9    for Google, did not address, in any way, shape, or

09:34   10    form, the technological comparability requirement with

09:34   11    respect to these three licenses and the

09:34   12    products-in-suit or the patent-in-suit.

09:34   13            So Dr. -- I mean, Mr. Bakewell's opinion

09:34   14    with respect to these licenses, there's no foundation

09:34   15    for any technological assessment that was performed by

09:34   16    Google in these cases.  And the problem with this --

09:34   17            Next slide, please.

09:34   18            -- is that, you know, the case law

09:34   19    clearly directs that a license is not comparable simply

09:34   20    because it contains the patents-in-suit.

09:34   21            Next slide, please.

09:34   22            And if you look at the MLC Intellectual

09:34   23    Property case, in that case the Federal Circuit looked

09:34   24    at a scenario where the license agreement at issue --

09:34   25    we had the same scenario where you have license

09:35    1    agreement -- agreements that reference the

09:35    2    patent-in-suit.

09:35    3                    In this case, there were 41 patents that

09:35    4    were subject to the license agreement.  In the case at

09:35    5    hand, in the instant case, we have ████████████

09:35    6    ████████████████    and the agreement addresses

09:35    7    ████████████████ .

09:35    8                    THE COURT:  Let me ask you this:  Am I

09:35    9    correct that what we're fighting over right now is

09:35   10    Mr. Bakewell wanting to respond to what I just struck

09:35   11    of yours?

09:35   12                    MR. LOVE:  Yes, Your Honor.

09:35   13                    THE COURT:  So why -- why am I -- why are

09:35   14    we taking up our time doing that if you're not going to

09:35   15    be putting on --

09:35   16                    Let me ask defense counsel:  If the

09:35   17    plaintiff doesn't put in evidence --

09:35   18                    MR. LOVE:  Well, I'm sorry, Your Honor.

09:35   19    It's a separate issue.

09:35   20                    THE COURT:  Oh, okay.

09:35   21                    MR. LOVE:  I'm sorry.  The -- so the

09:35   22    issue that was just addressed was the ████████ issue

09:35   23    within the context of the damages expert opinion with

09:35   24    respect to a different step of apportionment.

09:36   25                    THE COURT:  Okay.  As long as -- as long

09:36   1   as what Bakewell is talking about isn't just responsive

09:36   2   to what you all are --

09:36   3                  MR. LOVE:  I misunderstood the question.

09:36   4                  What I thought you were asking was:

09:36   5   Didn't Mr. Lanier just get up here and tell me that

09:36   6   this analysis had to be anchored in the claim language

09:36   7   of the patents?

09:36   8                  And the answer is:  If that is -- if that

09:36   9   is the law, then Google certainly did not comply with

09:36   10  that requirement with respect to Mr. Bakewell's view of

09:36   11  technological apportionment with respect to these three

09:36   12  license agreements.

09:36   13                  And if you want to hear from Google on

09:36   14  this point.

09:36   15                  THE COURT:  No, no, no.  I'm good.  You

09:36   16  can keep going.

09:36   17                  MR. LOVE:  Well, Your Honor, that's -- in

09:36   18  terms of the technological comparability issue,

09:36   19  that's -- you know, that's it in a nutshell.

09:36   20                  With respect to economic comparability,

09:36   21  Mr. Bakewell performed -- you know, again, he really

09:36   22  didn't perform an economic comparability in the sense

09:36   23  that he compared these licenses and the, you know,

09:37   24  issues involved with the use or the extent of use by

09:37   25  Google with respect to these -- to this technology.

| | | |
|---|---|---|
| 09:37 | 1 | And, you know, we're willing to stand on |
| 09:37 | 2 | the briefing on that particular topic, because the |
| 09:37 | 3 | failure to address the technological comparability |
| 09:37 | 4 | component, that is what I think closes the door on this |
| 09:37 | 5 | issue, from our perspective. |
| 09:37 | 6 | THE COURT:  Okay.  Thank you. |
| 09:37 | 7 | Yes, sir.  Mr. Jones. |
| 09:37 | 8 | MR. JONES:  Thank you, Your Honor. |
| 09:37 | 9 | I was a little surprised.  I think it |
| 09:37 | 10 | depends on which case we're talking about whether the |
| 09:37 | 11 | Court's prior ruling makes this moot or not.  With |
| 09:37 | 12 | regard to one of the cases, I would think it does from |
| 09:37 | 13 | what Mr. Blok did. |
| 09:37 | 14 | So I just say, I have a little bit |
| 09:37 | 15 | different answer to that question than I think I just |
| 09:38 | 16 | heard from Mr. Love.  But I just point that out to the |
| 09:38 | 17 | Court and now will turn my attention as the Court |
| 09:38 | 18 | just -- to the matters at hand with regard to the |
| 09:38 | 19 | comparabilities of the licenses. |
| 09:38 | 20 | With regard to the comparability of the |
| 09:38 | 21 | licenses, as the Court pointed out, there are two |
| 09:38 | 22 | things we need to look at.  We need to look at are they |
| 09:38 | 23 | technically comparable?  And, secondly, we need to look |
| 09:38 | 24 | at whether or not there has been a proper analysis done |
| 09:38 | 25 | so that you can account for any economic differences |

09:38  1    that are there.

09:38  2              In their briefing -- first, I'll deal

09:38  3    with the technical comparability.  In their briefing,

09:38  4    the plaintiffs take the position that we have no

09:38  5    authorities that licenses of ███████████████  should

09:38  6    be considered.

09:38  7              You know, Your Honor, the Federal Circuit

09:38  8    has taught us that actual licenses to the patented

09:38  9    technology are highly probative as to what constitutes

09:38  10   a reasonable royalty because actual licenses must

09:38  11   clearly reflect the economic value of the patented

09:39  12   technology in the marketplace.

09:39  13             To be quite clear, each of the three

09:39  14   licenses that Mr. Love just talked about includes ███

09:39  15   █████████ and includes ████████████████████████████

09:39  16   that will be in question at the time of the

09:39  17   hypothetical negotiation.  They also include █████

09:39  18   ████.  Certainly, that's true.  But they include ███

09:39  19   ████████ that are going to be in question at the

09:39  20   hypothetical negotiation.  That's beyond doubt.

09:39  21   Everybody agrees to that.

09:39  22             Now, they then say, well, that's not

09:39  23   enough.  The mere fact that these licenses actually

09:39  24   include █████████████████████████████████

09:39  25   ██████████████████████████████████████████████

—34—

| | | |
|---|---|---|
| 09:39 | 1 | ████████████████████████, that that's not |
| 09:39 | 2 | enough for technical comparability.  And that when |
| 09:39 | 3 | Mr. Bakewell pointed it -- that out and said they were |
| 09:39 | 4 | technically comparable, that he did not do enough. |
| 09:39 | 5 | And they cite to three cases that they |
| 09:40 | 6 | contend say that this should be disregarded because |
| 09:40 | 7 | ██████████████████ were included in this portfolio |
| 09:40 | 8 | license.  But they certainly do not stand for the |
| 09:40 | 9 | proposition that's being asserted here. |
| 09:40 | 10 | The first case they cite to is Lucent |
| 09:40 | 11 | versus Gateway.  And in Lucent versus Gateway, they |
| 09:40 | 12 | don't exclude any licenses.  In fact, they say we must |
| 09:40 | 13 | accept that the licensing agreements and other evidence |
| 09:40 | 14 | were properly before the Court.  Nothing was excluded |
| 09:40 | 15 | there.  It certainly does not stand for this |
| 09:40 | 16 | proposition. |
| 09:40 | 17 | The next case they cite to is Trell |
| 09:40 | 18 | versus Marlee Electronics.  And what Trell says is that |
| 09:40 | 19 | a single licensing agreement, without more, is not |
| 09:40 | 20 | sufficient proof of an established royalty. |
| 09:40 | 21 | That case involved a expert who said, |
| 09:40 | 22 | under the Georgia-Pacific factors, I am going to say |
| 09:40 | 23 | that in this case there is an established royalty in |
| 09:41 | 24 | the marketplace for the patented invention when it's |
| 09:41 | 25 | licensed as a royalty. |

09:41  1          And they said, look, you can't just look

09:41  2     at one license agreement like that and come to that

09:41  3     conclusion.  That's the Trell case.

09:41  4          And then the case they cite to mostly

09:41  5     in -- the most important case in their briefing, is the

09:41  6     MLC Intellectual Property case.  And that case is

09:41  7     really an apportionment case.  It's not a case where a

09:41  8     license is excluded because it had more things in it.

09:41  9     In that case the plaintiff said that they were using a

09:41  10    comparable license to apportion for nonaccused

09:41  11    technologies in an infringing patent.

09:41  12          And they were relying upon Elbit versus

09:41  13    Hughes, which I know the Court's familiar with, where

09:41  14    you can use prior settlement agreements for a slightly

09:41  15    different technology to do apportionment.  And the

09:41  16    Court said, no, you know, this wasn't close enough.

09:41  17    You can't use this agreement for apportionment.

09:41  18          But when it was dealing with

09:41  19    apportionment, you clearly see how you needed more

09:42  20    technical evidence.  But the cases that they cite,

09:42  21    nowhere, nowhere do they cite a case where ██████████

09:42  22    ████████████████████████████████████████████████████

09:42  23    ███████████████████████████████████████

09:42  24    under a license where that has been found to not be

09:42  25    technologically comparable.  It just makes no sense,

09:42  1    Your Honor.
09:42  2                    Then that moves to the second point.
09:42  3                    THE COURT:  Wait.  I think my concern,
09:42  4    and the reason I asked you to look at this, is a
09:42  5    concern about whether or not Mr. Bakewell had actually
09:42  6    adequately disclosed his technical analysis in his
09:42  7    report.
09:42  8                    Do you know -- do you have -- are you
09:42  9    facile enough in the report to tell me where he
09:42  10   conducted in his report the technical analysis?  I
09:42  11   think that was the complaint --
09:42  12                    MR. JONES:  I think we're -- I think
09:42  13   we're -- and again, I want to be very clear on this
09:42  14   point, Your Honor.  His technical analysis is a fact
09:42  15   that ████████████████████████   ████████████████████████
09:43  16   ████████████████████████████████████████████████████.
09:43  17   And that's his analysis with regard to the technical
09:43  18   component, Your Honor.
09:43  19                    THE COURT:  Okay.
09:43  20                    MR. JONES:  What we have here is ██
09:43  21   ████████████████████████████████████████████████████
09:43  22   ████████████████████████████████████████████████.
09:43  23                    So he knew by looking at the license
09:43  24   agreement itself that this license agreement includes
09:43  25   ████████████████████████  that would be dealt with in the

09:43   1   hypothetical negotiation, and because of that -- and I

09:43   2   hope it's clear by the case law I just cited to the

09:43   3   Court -- he didn't need to go any further.  There was

09:43   4   no need for him to go further.

09:43   5            So what about the economic analysis?

09:43   6   What did he do there to show economic comparability?

09:43   7            Well, he did much more than's been cited

09:43   8   to the Court now.  The first thing he did was he

09:43   9   analyzed the situation of the parties that were

09:43   10  involved in the ███ agreement, the ███ agreement,

09:43   11  and the ███ agreement.

09:44   12            Could we go to Slide 3?  I'm sorry.  And

09:44   13  go to Slide 3, I think.

09:44   14            No.  I'm sorry.  I've got the wrong slide

09:44   15  up there.  Let's go to Slide 4, please.

09:44   16            Yeah.  He analyzed those agreements and

09:44   17  he looked at who the defendants -- who the licensees

09:44   18  were and what kind of companies were and how they would

09:44   19  relate to the position of Google in this case, and that

09:44   20  they were making commercial products.  He also looked

09:44   21  at -- and there are other paragraphs in his reports

09:44   22  where he looked at this, where he looked at the

09:44   23  standing of the plaintiff in this case and how it

09:44   24  compared to the license or those cases, and that it

09:45   25  would be a plaintiff that was not making products.

—38—

```
09:45   1              He also did an analysis of the time
09:45   2    frame.
09:45   3              And if we could go to Slide 5.
09:45   4              And he looked at the time frame of these
09:45   5    three agreements, and he discussed the overlapping time
09:45   6    periods.  He discussed the fact that these agreements
09:45   7    were in ████, that the hypothetical negotiation was in
09:45   8    2014, and he analyzed that difference.
09:45   9              He also looked as to the type of
09:45  10    licenses.
09:45  11              If we go to Slide 6.
09:45  12              And obviously you know you analyze the
09:45  13    types of licenses for structure issues.  And he noted
09:45  14    that they were all ████████████ and he also
09:45  15    cited evidence to the fact that ████████████
09:45  16    ████████████.
09:45  17              So he not only analyzed these agreements
09:45  18    and made sure that they included ████████████████
09:45  19    ████████, but he also did the appropriate economic
09:45  20    comparisons, Your Honor, to find that they were
09:45  21    comparative.
09:45  22              Thank you.
09:46  23              THE COURT:  Response?
09:46  24              MR. LOVE:  Your Honor, the case law is
09:46  25    fairly clear.  Just the fact that ████████ is
```

| 09:46 | 1 | included in a license agreement, that does not satisfy |
| 09:46 | 2 | the technological comparability analysis requirement. |
| 09:46 | 3 | And that is all that Mr. Bakewell points to, is that |
| 09:46 | 4 | this is one of -- in his deposition he even testified |
| 09:46 | 5 | that ████████████████████████████████ were in |
| 09:46 | 6 | this -- the license agreement -- license agreements |
| 09:46 | 7 | that he analyzed. |
| 09:46 | 8 | And so even if ███████ was included, |
| 09:46 | 9 | there's zero analysis.  Not from Mr. Bakewell, not from |
| 09:46 | 10 | Dr. Welch, about the technological comparability of |
| 09:46 | 11 | whether or not the licenses involve the infringing |
| 09:46 | 12 | products. |
| 09:46 | 13 | THE COURT:  Okay. |
| 09:46 | 14 | (Off-the-record bench conference.) |
| 09:47 | 15 | THE COURT:  Thank you for that. |
| 09:47 | 16 | The Court is going to, with respect to |
| 09:47 | 17 | this motion -- with respect to the first portion, |
| 09:47 | 18 | exclude opinions, I have it framed that do not assume |
| 09:47 | 19 | infringement.  I'm denying that. |
| 09:47 | 20 | With respect to the second, reliance and |
| 09:47 | 21 | agreements with no technological or economic |
| 09:47 | 22 | comparability, I'm going to grant that. |
| 09:47 | 23 | Next up I have Google's motion for |
| 09:47 | 24 | summary judgment of noninfringement of the '961 patent. |
| 09:48 | 25 | Let me just go through this real quickly, and I will |

| | |
|---|---|
| 09:48 | 1 |
| 09:48 | 2 |
| 09:48 | 3 |
| 09:48 | 4 |
| 09:48 | 5 |
| 09:48 | 6 |
| 09:48 | 7 |
| 09:48 | 8 |
| 09:48 | 9 |
| 09:48 | 10 |

09:48   1   hear from Google on that.

09:48   2                    MR. LANIER:  Thank you, Your Honor.

09:48   3                    If we could bring up that slide deck.

09:48   4                    And by way of introduction, Your Honor,

09:48   5   some of the things that we'll say in presenting this

09:48   6   motion will sound like are attacks on his opinion in

09:48   7   the motion to strike, but I want to be clear, we

09:48   8   understand the Court's ruling, we're not moving to

09:48   9   strike it.  What we're pointing out now is that if the

09:48   10  opinion is admitted --

09:48   11                   THE COURT:  Got it.

09:48   12                   MR. LANIER:  -- now that it is, it

09:48   13  doesn't fly.  It doesn't meet their burden.  And it

09:48   14  can't get better because it has to be entered in his

09:48   15  report.

09:48   16                   So the other introductory comment I would

09:48   17  make, Your Honor, is that this isn't one where, you

09:48   18  know, they can get up and say, well, you can just cross

09:48   19  him and point out he didn't do a good job, because the

09:48   20  only things he can -- he has to be limited by his

09:48   21  report.  Your Honor is very clear and consistent about

09:48   22  that on all these experts, and his report doesn't do

09:48   23  the job.  And he can't do more by making something up

09:48   24  later.

09:49   25                   So let's go to the next slide.  Just to

09:49   1   set the stage, Your Honor.

09:49   2                   There are several asserted claims in the

09:49   3   '961 patent.  There are two independent claims, 1 and

09:49   4   11, and the relationship matters because 1 is a method

09:49   5   claim with several specific steps; 11 is an apparatus

09:49   6   that has to have certain components to perform that

09:49   7   exact same method.

09:49   8                   So we're going to point out our motion is

09:49   9   based on their failure to meet their burden with

09:49   10  respect to Claim Elements 1[c] and 1[d] that takes out

09:49   11  all claims in the case.  And independently, they don't

09:49   12  meet their burden on the apparatus claim, Claim 11, and

09:49   13  its dependent claim, Claim 14.  So that's why we're

09:49   14  focusing on 1[b] and 1[c].  It takes out everything

09:49   15  because of the relationship between those two sets of

09:49   16  claims.

09:49   17                   Let's go to the next slide.

09:49   18                   So again, Your Honor is aware that this

09:49   19  patent relates generally to finding people in a

09:49   20  particular place, determining whether they're there,

09:50   21  where they've been, delivering services; but it's not

09:50   22  at that level of generality.  There's very specific

09:50   23  claim language and specific steps, and we've labeled

09:50   24  them here 1[a], [b], [c], [d], [e].  And for this

09:50   25  analysis, we are going to focus on Claim Elements 1[c]

```
09:50  1   and 1[d].
09:50  2              Independently, they have not met their
09:50  3   burden.  Either of these arguments takes out the entire
09:50  4   set of assertions in this case.
09:50  5              Let's go to the next slide, Slide 3
09:50  6   (sic).
09:50  7              So here what we've illustrated is Claim
09:50  8   Element 1[c], and it requires:  Incrementing of a count
09:50  9   for a stationary state associated with the set of one
09:50 10   or more distinct signal sources at the current time.
09:50 11              So you're counting something.  You're
09:50 12   incrementing it, you're adding to it, and you reach
09:50 13   certain conclusions based on that in this very specific
09:50 14   method.
09:50 15              Now, here's one thing that's very
09:50 16   important to get clear at the outset.  The accused
09:50 17   functionality and the product within which those
09:50 18   accused functionality is included, Google Maps Mobile,
09:51 19   ███████████████        ████████████████████,
09:51 20   but saying it counts a lot of things doesn't do the
09:51 21   job, as Your Honor is well aware.
09:51 22              You have to say you count the thing
09:51 23   that's required by this element, and you have to show
09:51 24   where that happens.  That's the expert's job.  And
09:51 25   that's, in a nutshell, what they fail to do here.
```

| | | |
|---|---|---|
| 09:51 | 1 | Now, let's go to the next slide. |
| 09:51 | 2 | To be very clear here, we are focusing on |
| 09:51 | 3 | the analysis that the expert gave in his report, as |
| 09:51 | 4 | amplified, or as we tried to ask him questions about it |
| 09:51 | 5 | at his deposition, but fundamentally is, as Ms. Stitt |
| 09:51 | 6 | asked him:  If you were asked what is the ███████ |
| 09:51 | 7 | ████████████████████ as required by this claim limitation, |
| 09:51 | 8 | what is your answer? |
| 09:51 | 9 | And he says:  What's in the report. |
| 09:51 | 10 | But the report doesn't do the job. |
| 09:51 | 11 | Let's go to the next slide, Slide 6. |
| 09:51 | 12 | And this is from Dr. Budavári's report. |
| 09:51 | 13 | It's Paragraph 75.  It's in the record. |
| 09:51 | 14 | And what he says is:  With regard to |
| 09:51 | 15 | Google Maps -- again, that's Google Maps, now Google |
| 09:52 | 16 | Maps Mobile is really the focus.  Not the specific |
| 09:52 | 17 | accused functionalities, but Google Maps. |
| 09:52 | 18 | I note that although a count for a |
| 09:52 | 19 | stationary state associated with a set of one or more |
| 09:52 | 20 | distinct signal sources at the current time -- remember |
| 09:52 | 21 | that phrase -- ████████████████████ |
| 09:52 | 22 | ████████████████████████ |
| 09:52 | 23 | ████████████████████████████ |
| 09:52 | 24 | ████████████████████████████. |
| 09:52 | 25 | So then we say okay.  What are those -- |

```
09:52   1   what are those counters?  Point to us where -- tell us
09:52   2   exactly where they are, not, ███████████████████
09:52   3   ███████   Where is it?  Where is it in the code?  Where
09:52   4   is it in the product documentation?
09:52   5                   Let's go to the next slide, Slide 7.
09:52   6                   Oh, we're there.
09:52   7                   And here's what we learned from him.
09:52   8   He's asked:  So in your opinion, there are ██████████
09:52   9   ███████████████████████████   that meet the
09:52  10   requirements of this claim limitation; is that correct?
09:52  11                   And here's what he says.  He doesn't say,
09:53  12   yes.  And here's where they are.
09:53  13                   He says:  ██████████████████████████████
09:53  14   █████████████████████████████████████████
09:53  15   ████████████████████████████████████
09:53  16   ███████████   ████████████████████████████████
09:53  17   ████████████████████████████████████.
09:53  18                   But he does not confirm.  He does not add
09:53  19   anything to the report.  He shouldn't be allowed to add
09:53  20   to the report.  But what he confirms is that his report
09:53  21   lists ██████████   It doesn't actually map the ██████████
09:53  22   to the required claim element, saying, this is ██████████
09:53  23   of the specific thing.
09:53  24                   Because if we were to go back to the
09:53  25   claim language, and we'll show it again in a minute,
```

—45—

| | | |
|---|---|---|
| 09:53 | 1 | the claim requires counting of different things. |
| 09:53 | 2 | Incrementing counts of different things.  And he never |
| 09:53 | 3 | does that mapping.  He just says, ████████████ |
| 09:53 | 4 | ████████    That's literally what he says.  We just saw |
| 09:53 | 5 | it. |
| 09:53 | 6 | Let's look at Slide 8. |
| 09:53 | 7 | So now this is what he says in his |
| 09:53 | 8 | report.  This is the closest that Dr. Budavári gets in |
| 09:53 | 9 | his report to which he must be held by his own |
| 09:54 | 10 | testimony, as well as the law, that where the count and |
| 09:54 | 11 | then 1[c] is. |
| 09:54 | 12 | And he says "it may qualify."  That's the |
| 09:54 | 13 | strongest he gets.  It might be it.  But we are at |
| 09:54 | 14 | summary judgment now.  We're on the verge of trial.  It |
| 09:54 | 15 | has to be better than "may qualify."  It has to be, I |
| 09:54 | 16 | have an opinion and my opinion is this functionality to |
| 09:54 | 17 | which I can point meets that claim element.  And the |
| 09:54 | 18 | strongest he ever gets is "it may qualify." |
| 09:54 | 19 | Now, this isn't just loose wording or |
| 09:54 | 20 | anything else.  This is a problem with his report.  It |
| 09:54 | 21 | is broad.  And as we just saw, it just ████████████ |
| 09:54 | 22 | without tying them. |
| 09:54 | 23 | So we asked him more questions about it. |
| 09:54 | 24 | Let's go to Slide 9. |
| 09:54 | 25 | And this is the kind of question that |

09:54 1   you'd expect at deposition and you'd certainly hear at

09:54 2   trial:  So my question to you is, is ███████████

09:54 3   ███████████████████████████, in your opinion, does

09:54 4   that qualify -- does that meet the requirements of the

09:55 5   ██████████████████████████████   in Claim Element

09:55 6   1[c]?

09:55 7             That is as tight a question as can be

09:55 8   asked on exactly this point.

09:55 9             And his answer is:  ███████████████

09:55 10  ████████   ███████████████

09:55 11           ████████████████████████████████

09:55 12  ███████████████████████████████████████

09:55 13  ███████████████████████████████████████

09:55 14  ████████████████████   ███████████████████

09:55 15  ████

09:55 16             Obviously that's what we're after.

09:55 17             And he never does it.  He doesn't do it.

09:55 18  He can't do it.  The most he can say is that there are

09:55 19  ██████████  and I believe these things happen.  But he

09:55 20  doesn't say, ██████████  is 1[c], ██████████  is 1[d],

09:55 21  and here's the evidence that that ██████  actually occurs

09:55 22  as required by the claim.

09:55 23             Stopping where he stops is our good

09:55 24  friend ipse dixit, right?  He just says it, but he

09:55 25  doesn't show it.  He doesn't prove it.

| | | |
|---|---|---|
| 09:55 | 1 | Now, of course we can cross him on it. |
| 09:55 | 2 | But the problem is, then, that puts us in the position |
| 09:55 | 3 | of saying, please amplify and expand on your report to |
| 09:56 | 4 | fill in the gaps, which he'll obviously be well |
| 09:56 | 5 | prepared to do. |
| 09:56 | 6 | And that's not -- and again, Your Honor's |
| 09:56 | 7 | guidance on experts and their reports is crystal clear. |
| 09:56 | 8 | We all know it.  We have to hold our experts to their |
| 09:56 | 9 | reports, so do they.  But if we're put in the position |
| 09:56 | 10 | of solving this by crossing him aggressively and |
| 09:56 | 11 | vigorously, all we do is let him build up his |
| 09:56 | 12 | infringement opinion beyond his report and beyond what |
| 09:56 | 13 | he has said he's able to do. |
| 09:56 | 14 | Now, let's look at Slide 10. |
| 09:56 | 15 | This is where the lawyers come in.  And |
| 09:56 | 16 | the lawyers argue and they say, he's identified |
| 09:56 | 17 | ▮▮▮▮▮▮▮▮▮▮ that can and do meet the limitations |
| 09:56 | 18 | of the asserted claims. |
| 09:56 | 19 | Now, there are ▮▮▮▮▮▮▮▮.  We |
| 09:56 | 20 | don't think they meet the limitations of the asserted |
| 09:56 | 21 | claim, but proving noninfringement is not our burden. |
| 09:56 | 22 | Proving infringement -- and proving infringement isn't |
| 09:56 | 23 | just saying it, as Your Honor knows.  It's saying, |
| 09:56 | 24 | here's ▮▮▮▮▮▮.  Here's the claim language.  Here's |
| 09:56 | 25 | how it meets it.  Otherwise, he's just waving his |

09:56  1   hands.

09:56  2                So this isn't actually an issue about,

09:57  3   oh, there's too many paths to infringement.  There are

09:57  4   too many ███████, and none of them are linked to the

09:57  5   claim language.

09:57  6                So let's actually just establish this

09:57  7   isn't lawyer argument.  This isn't me saying this.

09:57  8   This is Dr. Budavári saying this.

09:57  9                Let's look at Slide 11.

09:57  10                So again, credit my partner Ms. Stitt for

09:57  11   asking a nice, precise question:  ███████████████

09:57  12   ██████████████████████████████████

09:57  13   ████████████████████████████████████████

09:57  14                That's the question.

09:57  15                And his answer, it's very long, as all

09:57  16   his answers are.  We've highlighted the relevant point:

09:57  17   ████████████████████████  ███████████

09:57  18   ██████████████████████████

09:57  19                That determines it.  He cannot tell you

09:57  20   where the counting happens.  He just says it happens.

09:57  21                The source code was produced.  It's

09:57  22   available.  Technical documentation was produced.

09:57  23   Witnesses were examined.  And he cannot answer the

09:58  24   question of where a count that meets the requirements

09:58  25   of the claims happen.  He can tell you where ██████

09:58  1    happen, but he can't do the job he's required to do for

09:58  2    them to be able to put on their infringement case.

09:58  3                      But it gets worse.  Let's go to Slide 12.

09:58  4                      It's a longer question, but it's still a

09:58  5    good one:  So your opinion, just so I understand, is

09:58  6    that because ██████████████████████████████████████████

09:58  7    ██████████████████████, it's your opinion that Google Maps

09:58  8    as a product must perform an incrementing of a count

09:58  9    somewhere, but you are unable to tell me specifically

09:58  10   where the incrementing of a count occurs; is that

09:58  11   correct?

09:58  12                      This is what the report says.

09:58  13                      That is it in a nutshell.  And we -- and

09:58  14   probably there's a reason we got to this problem --

09:58  15   this point.  Not -- well, the real reason is because

09:58  16   Google's products don't work in the way the claims

09:58  17   require.  So we can't point to something specific, but

09:58  18   there's another problem.

09:59  19                      Slide 13.

09:59  20                      And that's because he assigned no

09:59  21   specific meaning to the claim language.

09:59  22                      Now, we're not complaining that he didn't

09:59  23   do a construction or there should have been a

09:59  24   construction.  He's just saying, there's no specific

09:59  25   meaning assigned to this count in regard to Claim

| 09:59 | 1 | Element 1[c]. |
| 09:59 | 2 | Now, the claim element has its language. |
| 09:59 | 3 | It refers to counting of stationary states associated |
| 09:59 | 4 | with specific distinct signal sources.  That's the |
| 09:59 | 5 | words.  That's what the claim says. |
| 09:59 | 6 | But he's saying, I don't have to do more. |
| 09:59 | 7 | I can't do more because, that element, I don't have any |
| 09:59 | 8 | particular meaning for that. |
| 09:59 | 9 | He could read it.  All he has to do for |
| 09:59 | 10 | them to meet their burden is say, that's the distinct |
| 09:59 | 11 | signal sources.  Here's how that count -- here's how |
| 09:59 | 12 | it's associated with the stationary state.  Here's how |
| 09:59 | 13 | that count is incremented.  We could cross him on that, |
| 09:59 | 14 | but he doesn't do that. |
| 09:59 | 15 | And every question we asked him to poke |
| 09:59 | 16 | out the holes fixes the problem for them that they |
| 09:59 | 17 | can't fix because he's limited by his report and he's |
| 10:00 | 18 | limited by his own confessed ignorance.  It's not just |
| 10:00 | 19 | the report.  He says, I can't do it.  I don't know |
| 10:00 | 20 | where it is. |
| 10:00 | 21 | Now, that's 1[c]. |
| 10:00 | 22 | Similar problem with Element 1[d], so |
| 10:00 | 23 | independent argument, independent basis. |
| 10:00 | 24 | Let's go to the next slide, Slide 14. |
| 10:00 | 25 | And here's the key point.  It's counting |

10:00  1    a different thing.  Element 1[c] counts one thing;

10:00  2    Element 1[d] counts another thing.

10:00  3              Now, it's interesting that on -- in their

10:00  4    slides that we saw, they include excerpts from the

10:00  5    documents to which he strings cites, but they don't

10:00  6    actually show his explanation of them.

10:00  7              But here's the point, even if you credit

10:00  8    his explanation, he's ████████ the wrong thing.  And we

10:00  9    know this because of his own analysis.

10:00  10             Let's go to Slide 15.

10:00  11             So here's what we've depicted where

10:00  12   Dr. Budavári at Paragraph 111 is of his report, which

10:00  13   is in the record.

10:00  14             This is his analysis of the particular

10:00  15   count in Claim Element 1[d].  And we put the language

10:00  16   there so the Court can see it's different.  1[d]

10:01  17   requires:  A frequently incremented count for one or

10:01  18   more similar sets of one or more distinct signal

10:01  19   sources.

10:01  20             1[c]:  A count for a stationary state

10:01  21   associated with the set of one or more distinct signal

10:01  22   sources at the current time.

10:01  23             They're different counters.  But what

10:01  24   does he do in his report?  He says, I know it's in 1[d]

10:01  25   because I found it in 1[c].

—52—

```
10:01   1                    But they're different.  But that -- and
10:01   2   that is what his report says.  I don't need to reread
10:01   3   it.  It is in the record.
10:01   4                    So independently, he fails to meet his
10:01   5   burden on Element 1[d].  It's independent basis of
10:01   6   summary judgment that takes out all claims.
10:01   7                    Now let's turn for a moment to the
10:01   8   apparatus claims.  That's Claim 11 with its dependent
10:01   9   Claim 14.
10:01  10                    Next slide, please.
10:01  11                    So again, as I mentioned in the
10:01  12   introductory remarks, it's an apparatus.  It's an
10:01  13   apparatus that has to have -- here's the difference
10:01  14   really.  It has to have at least one memory including
10:02  15   computer instructions, the at least one memory and
10:02  16   computer instructions configured to, with the at least
10:02  17   one processor, cause the apparatus at least to...
10:02  18                    So it has to do all those things.
10:02  19                    Now, it doesn't do all those things for
10:02  20   the reasons we already described, but independently
10:02  21   they can't prove that it has the required apparatus.
10:02  22                    Let's turn to the next slide.
10:02  23                    So this is from Paragraph -- Slide 17 is
10:02  24   from Paragraph 158 of Dr. Budavári's report.  And this
10:02  25   is where he says, well, it's got the stuff that it
```

—53—

10:02  1    needs.  It has the physical things because it's an

10:02  2    apparatus claim.

10:02  3              And he relies on a figure.  And he

10:02  4    actually has a piece of paper here, and he says:  The

10:02  5    following figures demonstrate that the ███████████

10:02  6    █████████████████████████████████████████████████████

10:02  7    ████████████████████████████████████████ as claimed,

10:02  8    thereby satisfying Claim Elements 11[a] and 11[b].

10:02  9              Now, he's right.  There is at least a

10:02  10   processor and there's at least one memory, but that's

10:02  11   not the requirement of the claim.  It's a claim -- it's

10:02  12   a memory and a processor that are configured with

10:03  13   instructions to do what is required.

10:03  14             And he doesn't point out -- there's two

10:03  15   problems.  One is, he never says where's the

10:03  16   instructions.  Here's the memory with the instructions.

10:03  17             And the other is, if you look at any one

10:03  18   of these accused ███████, they have two different types

10:03  19   of memory.  And he never says which memory it is or

10:03  20   that there is -- the instructions that are required.

10:03  21   They're configured with the instructions that are

10:03  22   required.  He just says, hey.  There's memories.

10:03  23   There's a processor.

10:03  24             We agree there's memories.  We agree

10:03  25   there's a processor.  That's not what the claim

10:03    1    requires.  It requires more.

10:03    2                    Let's look at the next slide.

10:03    3                    So now at deposition he says, well, it's

10:03    4    got to be RAM, because a person of ordinary skill would

10:03    5    understand RAM is the memory.  Now, there, either he's

10:03    6    doing claim construction or he's missing the exercise.

10:03    7    We're not doing claim construction here.  He's required

10:03    8    to say, this is the memory that is configured with the

10:03    9    instructions.  He says it's the RAM, but he admits it's

10:03    10   not in his report.

10:03    11                   And he still doesn't say that the

10:04    12   instructions are in there, that it's configured with

10:04    13   those instructions.  And there's a reason why he cannot

10:04    14   say that.  The lawyers told us that.

10:04    15                   And that's on the next slide, Slide 19.

10:04    16                   This is from their opposition brief,

10:04    17   Docket 191 at Page 12, where they're justifying what he

10:04    18   said.  Well, even if you credit RAM, he picked the RAM.

10:04    19   It can and does hold computer instructions and

10:04    20   variables when a computer or mobile device is

10:04    21   operating.

10:04    22                   Now, they don't show that it ever holds

10:04    23   the required instructions.  And it's when a computer

10:04    24   device or a mobile device is operating, which means you

10:04    25   have to turn it on, because as we know, RAM is volatile

10:04    1    memory.  There's nothing in it unless it's on.  And

10:04    2    then something has to be loaded into it.

10:04    3            So an app has to selected, the app has to

10:04    4    be turned on, it has to be loaded, it has to be

10:04    5    operated.  And Google doesn't do that; the user does

10:04    6    that.  But this is a direct infringement case.  Google

10:04    7    cannot directly infringe.  So for that related

10:05    8    independent reason, we're entitled to summary judgment

10:05    9    of noninfringement on these apparatus claims.

10:05   10            So I'll stop there and address any

10:05   11    questions afterwards.  Thank you, Your Honor.

10:05   12            THE COURT:  Thank you.

10:05   13            A response?

10:05   14            MR. LEE:  All right.  Hello, Your Honor.

10:05   15    Alden Lee for plaintiff Brazos.

10:05   16            First of all, is there anything that you

10:05   17    wanted me to address right off the bat?  Anything you

10:05   18    had -- just launch right into it then.

10:06   19            I did want to bring something up.  I see

10:06   20    folks in the gallery there.  The information that I'm

10:06   21    going to show may implicate source code.  Are we all

10:06   22    good?

10:06   23            MR. LANIER:  No.  Actually, we'd just

10:06   24    send people out under protective order.  Step out if

10:06   25    you're going to show source code, and we appreciate you

—56—

| | | |
|---|---|---|
| 10:06 | 1 | raising it. |
| 10:06 | 2 | MR. LEE:  Yeah.  We will be showing you |
| 10:06 | 3 | certain source code or things that implicate source |
| 10:06 | 4 | code, so want to raise that right off the bat and go |
| 10:06 | 5 | ahead and... |
| 10:06 | 6 | MR. LANIER:  So can we... |
| 10:06 | 7 | MR. LEE:  Yeah. |
| 10:06 | 8 | MR. LANIER:  I don't know if the guy -- I |
| 10:06 | 9 | don't know who the other folks in the room are.  That's |
| 10:06 | 10 | one of our team over there.  I don't know who these |
| 10:06 | 11 | three folks are. |
| 10:06 | 12 | MR. SIEGMUND:  They're at my firm. |
| 10:06 | 13 | They're under the PO. |
| 10:06 | 14 | MR. LANIER:  All right.  Thank you. |
| 10:06 | 15 | (Sealed proceedings.) |



| | | |
|---|---|---|
| 10:11 | 1 | |
| 10:12 | 2 | |
| 10:12 | 3 | |
| 10:12 | 4 | |
| 10:12 | 5 | |
| 10:12 | 6 | |

09:42    7              (Sealed proceedings end.)

10:12    8              THE COURT:  Okay.

10:12    9              MR. LANIER:  Thank you.

10:12   10              And we appreciate the warning on that as

10:12   11    well.  Thank you.

10:12   12              So, Your Honor, I'll respond to the

10:12   13    points that were made in the order that they were made,

10:12   14    just very briefly.  The first point that was made was

10:12   15    that various apps are preinstalled.  The user has to

10:12   16    decide to have them.  I have apps preinstalled on my

10:12   17    phone that I do not use, I have not turned on.  I don't

10:12   18    use those services.

10:12   19              The user has to make that election.  Even

10:12   20    if an app is preinstalled and available, the user has

10:12   21    to make that choice.  And so that choice is not

10:12   22    Google's choice.  The option's available, but the user

10:13   23    has to turn it on.  And there's no evidence of Google's

10:13   24    control of the user, as we say, you could do this thing

10:13   25    if you wished, but that's not direct infringement to

```
10:13   1    say, you could do this if you wanted; you're doing it,

10:13   2    not Google.

10:13   3                 So Claims 11 and 14 should drop on that

10:13   4    basis alone; and additionally, for the other reasons we

10:13   5    identified, and I won't repeat them, about failing to

10:13   6    identify the code, et cetera.

10:13   7                 Now, let's turn to Elements 1[c] and

10:13   8    1[d].

10:13   9                 So what we saw, Your Honor, was a parade

10:13   10   of source code references.  We saw a bunch of titles to

10:13   11   source code.  We did not see, because we didn't see it

10:13   12   in the report, a mapping of that to the claim element

10:13   13   and an explanation of how that evidence satisfies the

10:13   14   requirements of the claim element.

10:13   15                 A parade of source code is a list of

10:13   16   things that are going on in there, that in the words --

10:13   17   I think it's at Paragraph 99 -- implies, suggests, or

10:13   18   otherwise evidences that the thing is happening; but

10:13   19   the job of the expert, the job of the plaintiff is not

10:14   20   to imply or suggest.

10:14   21                 They need to evidence, they need to show;

10:14   22   and they do not do that.  And the reason they do not do

10:14   23   that is illustrated on Slide 11, which is, again, from

10:14   24   Dr. Budavári.

10:14   25
```

10:14   1   ████████       ████████████████████████████

10:14   2   ████████████████

10:14   3          He cannot show, even with that parade of

10:14   4   source code, where the infringement or where the

10:14   5   practicing of that element occurs.  And that's their

10:14   6   burden, that's their requirement.

10:14   7          Now, the other thing that's worth

10:14   8   pointing out is if you look at Paragraph 83 of

10:14   9   Dr. Budavári's report, the parade of source code was

10:14   10  designed to say, hey, look, we showed you that they

10:14   11  counted; but what Dr. Budavári says is, █████████

10:14   12  ██████████████████████████████████████████████

10:14   13  ████████████████████████████████████

10:14   14  ████████████████████.

10:14   15         But let's jump to Slide 3, I believe.

10:15   16  Slide 4.

10:15   17         But it's not just a count of a stationary

10:15   18  state that's required by the Claim Element 1[c].  It's

10:15   19  a count of a stationary state associated with the set

10:15   20  of one or more distinct signal sources at the current

10:15   21  time.

10:15   22         And Dr. Budavári does not establish that.

10:15   23  I'll reread his report again.  █████████████████

10:15   24  ████████████████████████████████████████

10:15   25  ████████████████████████████████████████

10:15   1   ████████████████████████

10:15   2                   But this is a method claim with specific

10:15   3   requirements.  This requirement is not met, and he

10:15   4   doesn't even say it does because as we know, he can't.

10:15   5   He testified that he can't.

10:15   6                   Now let's turn to Claim Element 1[d].

10:15   7                   And bring up Slide 15, if we could.

10:15   8                   Now, there was a variety of evidence that

10:15   9   was shown, as we pointed out in our papers.  What was

10:15   10  in his report is what they're limited to.  A lot of

10:15   11  that was not in his report, but here's the more

10:15   12  important point.  That all goes to the point of

10:15   13  establishing that there are -- got to dry my glasses --

10:16   14  a primary stationary state or a primary set of

10:16   15  stationary states.

10:16   16                  But the count in Element 1[d] that is

10:16   17  incremented is for similar sets of one or more distinct

10:16   18  signal sources.  So they're using -- relying on

10:16   19  Element 1[c] to meet 1[d], but they're not proving up

10:16   20  all of 1[d], which is the frequently incremented count

10:16   21  for one or more similar sets of one or more distinct

10:16   22  signal sources.

10:16   23                  So they've taken their shot.  He had his

10:16   24  report.  He was deposed.  They've marshaled it

10:16   25  together, and in neither -- with respect to any of the

| | | |
|---|---|---|
| 10:16 | 1 | three elements we challenged that independently take |
| 10:16 | 2 | out some or all of the claims in the case, they have |
| 10:16 | 3 | not shown you a specific linkage of the evidence to the |
| 10:16 | 4 | claim language, parts of the claim language, different |
| 10:16 | 5 | claim language; not all of it, and that's what's |
| 10:16 | 6 | required. |
| 10:16 | 7 | I'll stop there unless Your Honor has any |
| 10:16 | 8 | questions. |
| 10:16 | 9 | THE COURT:  I don't. |
| 10:16 | 10 | MR. LANIER:  Thank you, Your Honor. |
| 10:16 | 11 | MR. LEE:  If I may, Your Honor. |
| 10:17 | 12 | Alden Lee for Brazos again.  I just |
| 10:17 | 13 | wanted to raise two points. |
| 10:17 | 14 | Everything I showed you, Your Honor, was |
| 10:17 | 15 | from Dr. Budavári's report and would be enough to carry |
| 10:17 | 16 | our burden regarding all the disputed claim elements. |
| 10:17 | 17 | For instance, if we -- if I could just |
| 10:17 | 18 | show a portion of Dr. Budavári's report, you'll see |
| 10:17 | 19 | kind of what I mean and where he does tie his opinions |
| 10:17 | 20 | to the evidence. |
| 10:17 | 21 | I apologize for the technical |
| 10:18 | 22 | difficulties, Your Honor. |
| 10:18 | 23 | Okay.  There we go. |
| 10:18 | 24 | So what I'm showing you is Paragraph 99 |
| 10:18 | 25 | of Dr. Budavári's report where he clearly goes through |

```
10:18   1   pieces of the source code.  And actually, he goes and
10:18   2   ties it to his opinion.
10:18   3               So I'm not exactly sure what counsel's
10:18   4   talking about when he alleges that we're not doing what
10:18   5   we're supposed to be doing to show infringement.
10:18   6               And just like to reemphasize that at
10:18   7   trial, we will not ask Dr. Budavári to stray from his
10:18   8   expert report.
10:18   9               And with that, do you have any other --
10:19   10  any questions for me, Your Honor?
10:19   11              THE COURT:  I don't.
10:19   12              MR. LEE:  Thank you.
10:19   13              (Off-the-record bench conference.)
10:19   14              THE COURT:  The Court is going to deny
10:19   15  the motion.
10:19   16              Next up -- give me one second -- I have
10:19   17  the Daubert motion to exclude certain damage opinions
10:19   18  of Mr. Bakewell in terms of reliance on incomparable
10:19   19  agreements.  I'll hear that next.
10:19   20              MR. SIEGMUND:  And, Your Honor, it's the
10:19   21  exact same issue that you just granted.  So I don't
10:19   22  think we need to take up argument unless Google thinks
10:19   23  we do.  But it's the exact same argument on
10:19   24  technological comparability.
10:20   25              MR. JONES:  Yes, Your Honor.  If I
```

| | | |
|---|---|---|
| 10:20 | 1 | understand the Court's ruling with regard to the three |
| 10:20 | 2 | ███████ agreements, the ████ agreement, the ██████ |
| 10:20 | 3 | agreement, and the █████ agreement, the Court has |
| 10:20 | 4 | ruled and excluded any portions of Mr. Bakewell's |
| 10:20 | 5 | report that relies upon those agreements. |
| 10:20 | 6 | THE COURT:  Correct. |
| 10:20 | 7 | MR. JONES:  But the rest of his report |
| 10:20 | 8 | remains intact. |
| | 9 | THE COURT:  Yes. |
| 10:20 | 10 | MR. JONES:  With that understanding -- |
| 10:20 | 11 | thank you, Your Honor. |
| 10:20 | 12 | THE COURT:  Next I have Google's motion |
| 10:20 | 13 | to exclude the testimony of Mr. Blok, B-l-o-k. |
| 10:20 | 14 | MR. JONES:  Your Honor, if I could, on |
| 10:20 | 15 | behalf of time, I'll probably address both the motions |
| 10:20 | 16 | concerning Mr. Blok with regard to the 580 case and the |
| 10:20 | 17 | 585 case together since, as we just saw with regard to |
| 10:20 | 18 | Mr. Bakewell, there's some similarities there. |
| 10:20 | 19 | With regard to the 580 case and |
| 10:20 | 20 | Mr. Blok's opinion, I would -- I would rest on the |
| 10:21 | 21 | papers with regard to that particular motion, with one |
| 10:21 | 22 | exception.  There's one thing that gets very confusing |
| 10:21 | 23 | in the briefing, and I would like to point out what |
| 10:21 | 24 | this particular problem is with Mr. Blok's opinion. |
| 10:21 | 25 | With regard to ██████ , which is the |

—67—

10:21  1    accused product in the 580 case, there is ███████████

10:21  2    ████████████████████████████.

10:21  3         Originally in this case, ███████

10:21  4    ███████ were accused of infringement.  There is no

10:21  5    doubt now, based upon the motion for summary judgment

10:21  6    that was filed by the defendants, as well as by

10:21  7    statements by the plaintiffs, that ███████ is not in

10:21  8    question in this suit, is not accused of infringement.

10:21  9         Now, the way this particular product

10:21  10   works is ████████████████████████████

10:22  11   ███████████████ ███████████████

10:22  12   ████████ ████████████████████████

10:22  13   ████████████████████████████.

10:22  14        ██████████████████████████████

10:22  15   ██████████████████████████ ██████

10:22  16   ██████████████████████████████

10:22  17   ████████████████████████████████

10:22  18   ████████████████████████████████

10:22  19   ██████████████████████████ ██████

10:22  20   ████████████████████████████

10:22  21   ███████████

10:22  22        Now, what Mr. Blok has done is he says,

10:22  23   well, look.  ████████ came out in April of 2019.  And

10:23  24   then he assumes that after that, any time a scan is

10:23  25   done, ██████████████████████████████

68

10:23  1    ███████████████████████████████████████.

10:23  2                    But the facts in this case clearly show

10:23  3    us that that is not correct.  What we see when we

10:23  4    review the factual record is that that is, in fact,

10:23  5    ████████████████████████████████████████████████████

10:23  6    ██████████████████████.

10:23  7                    In fact, the evidence -- and it's quite

10:23  8    confusing on this, but there's evidence in this case

10:23  9    that was cited to you in the briefing that shows ████

10:23  10   ████████████████████████████████████████████████████

10:23  11   ██████████████████████████████. So we know

10:23  12   that there are noninfringing scans by ████████████

10:24  13   ██████████ included in Mr. Blok's totals.

10:24  14                   Furthermore, there's evidence from the

10:24  15   deposition testimony in the case -- and again, it's

10:24  16   quite confusing -- as to when, in fact, they stopped

10:24  17   using altogether ████████████████████████████, that

10:24  18   everybody says noninfringes.

10:24  19                   The exact extent of how many ██████████

10:24  20   ██████████ are being counted by Mr. Blok is hard to

10:24  21   tell.  But, Your Honor, that is certainly not the fault

10:24  22   of the defendants.

10:24  23                   The plaintiff accused ██████████████████

10:24  24   until March the 22nd, 2023, when fact discovery closed.

10:24  25   They served an infringement report on April the 4th,

| | | |
|---|---|---|
| 10:24 | 1 | 2023.  And it was then, after discovery had closed, for |
| 10:24 | 2 | the first time they dropped ████████████████   And |
| 10:25 | 3 | that's why, when they dropped it in their infringement |
| 10:25 | 4 | report, that we moved for summary judgment. |
| 10:25 | 5 | So where we stand here today is what we |
| 10:25 | 6 | know is Mr. Blok's report bases his damage figure in |
| 10:25 | 7 | the 580 case upon scans, and it's on scans that have to |
| 10:25 | 8 | be done by ████████ combined with ████████ or |
| 10:25 | 9 | ████████ combined with ██████████████   And we know |
| 10:25 | 10 | from the evidence in this case that there are pure |
| 10:25 | 11 | ████████ scans involved in the basis that he used. |
| 10:25 | 12 | Now, that's my argument with regard to |
| 10:25 | 13 | the 580 case and the motion to strike there. |
| 10:25 | 14 | And now I'd like to move to the 585 case |
| 10:25 | 15 | with Your Honor's permission.  And also, I'm about to |
| 10:25 | 16 | get into some confidential matters with regard to the |
| 10:25 | 17 | 585 and request that the courtroom be sealed. |
| 10:26 | 18 | (Sealed proceedings.) |
| 10:26 | 19 | ████████████  ████████████████ |
| 10:26 | 20 | ████████████████████████████████████████ |
| 10:26 | 21 | ██████████████████████ |
| 10:26 | 22 | ██████████████████████████████ |
| 10:26 | 23 | ████████████████████████████████████ |
| 10:26 | 24 | ████████████████  ████████████████ |
| 10:26 | 25 | ████████████████████████████████████ |



|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
| 10:34 | 1  |                                                             |
| 10:34 | 2  |                                                             |
| 10:34 | 3  |                                                             |
| 10:34 | 4  |                                                             |
| 10:34 | 5  |                                                             |
| 10:34 | 6  |                                                             |
| 10:34 | 7  |                                                             |
| 10:34 | 8  |                                                             |
| 10:34 | 9  |                                                             |
| 10:34 | 10 |                                                             |
| 10:35 | 11 |                                                             |
| 10:35 | 12 |                                                             |
| 10:35 | 13 |                                                             |
| 10:35 | 14 |                                                             |
| 10:35 | 15 |                                                             |
| 09:42 | 16 | (Sealed proceedings end.)                                   |
| 10:35 | 17 | THE COURT:  If you'll give me one second.                   |
| 10:35 | 18 | (Off-the-record bench conference.)                          |
| 10:35 | 19 | THE COURT:  Okay.  A response?                               |
| 10:35 | 20 | MR. SIEGMUND:  Yes, Your Honor.  Went a                      |
| 10:36 | 21 | little out of order here.  So we're going to address        |
| 10:36 | 22 | the 580 motion first, which Ms. Ruiz -- this will be        |
| 10:36 | 23 | her first argument in federal court -- is going to          |
| 10:36 | 24 | address, and then Mr. Love will address the 585 case.       |
| 10:36 | 25 | THE COURT:  Welcome.  I hope you feel                        |

```
10:36    1   comfortable in the courtroom.
10:36    2                 MS. RUIZ:  Oh, I do.  It's very nice
10:36    3   here.  Good morning, Judge Albright.
10:36    4                 THE COURT:  Good morning.
10:36    5                 MS. RUIZ:  I'm happy to be here.
10:36    6                 THE COURT:  With regard to the 580 --
10:36    7                 MS. RUIZ:  Yes, Your Honor.
10:36    8                 THE COURT:  -- what I care a lot about is
10:36    9   how your expert came up with the ███████████
10:36   10   ███████████.  That is the issue that is
10:36   11   concerning to me.
10:36   12                 MS. RUIZ:  In the 580?
10:36   13                 THE COURT:  It might be ███████.
10:36   14   Basically the number that was --
10:36   15                 MR. LOVE:  Excuse me, Your Honor.  That's
10:36   16   in the 585 case.  Mr. Jones took us a little bit out of
10:36   17   order, no fault to him.  But that's the 585 case, and I
10:36   18   can address that now if you would like.
10:37   19                 THE COURT:  Let's go ahead and do that
10:37   20   because -- let's go ahead and take that up, and then
10:37   21   I'll take the -- I'm sorry but I'm backwards.  I did --
10:37   22   but that -- when I -- with what Mr. Jones has argued
10:37   23   about that number is what I care about from that
10:37   24   patent.  And then I'll take up the other patent on the
10:37   25   580.
```

| | |
|---|---|
| 10:37 | 1 |
| 10:37 | 2 |
| 10:37 | 3 |
| 10:37 | 4 |
| 10:37 | 5 |
| 10:38 | 6 |
| 10:38 | 7 |
| 10:38 | 8 |
| 10:38 | 9 |
| 10:38 | 10 |
| 10:38 | 11 |
| 10:38 | 12 |
| 10:38 | 13 |
| 10:38 | 14 |
| 10:38 | 15 |
| 10:38 | 16 |
| 10:38 | 17 |
| 10:38 | 18 |
| 10:38 | 19 |
| 10:38 | 20 |
| 10:38 | 21 |
| 10:38 | 22 |
| 10:38 | 23 |
| 10:39 | 24 |
| 10:39 | 25 |

MR. LOVE:  Okay.  So, Your Honor, I think it's important for the Court to understand when we talk about use cases and what we have accused of infringement, from a consumer-facing perspective, the use cases involved in this case, they consist of what I have up on the screen here.  And if you look at the way that Google describes them, you have promoted pins, text search, auto suggest, local universal immersive.

And the struggle that Mr. Blok had to grapple with, not only, you know, from the traditional standpoint that Google is the one that defines the arena within which he provides his opinions from a damages evidence standpoint, but Google monetizes their products and services from a very complicated, complex perspective.

And so I want to take the Court through just this sort of narrow perspective from a consumer-facing side and let the Court see what we're talking about when we talk about just infringement of Google Maps Mobile.

So the first example, if you just open -- and this is illustrative, this is demonstrative.  This is from my phone.  Excuse the Pizza Hut icon.  I eat there frequently.

This is GMM when you open it.  This is

| | | |
|---|---|---|
| 10:39 | 1 | Google Maps Mobile when you open the application on |
| 10:39 | 2 | your phone.  The next one, you'll see this is the |
| 10:39 | 3 | screen recording of promoted pins.  And this is in |
| 10:39 | 4 | little Henderson, Texas, not Austin.  But you can see |
| 10:39 | 5 | promoted pin doesn't require a text search. |
| 10:39 | 6 | The next one is a text search where a |
| 10:39 | 7 | user can type in, for example, Schlotzsky's, or coffee, |
| 10:39 | 8 | and it uses the device location to generate results |
| 10:39 | 9 | that are relevant to the area and then feed the user an |
| 10:39 | 10 | advertisement, and then the user has different options |
| 10:39 | 11 | to take directions there or whatnot. |
| 10:39 | 12 | But this type of use case is dependent |
| 10:39 | 13 | upon what's called ████████████.  The location |
| 10:39 | 14 | of the device. |
| 10:39 | 15 | If you go to the next screen recording, |
| 10:39 | 16 | we see what Google calls auto suggest.  And again, |
| 10:39 | 17 | typing in Schlotzsky's, the results depend upon |
| 10:40 | 18 | ████████████████  And you can see the different |
| 10:40 | 19 | results for Schlotzsky's, from Henderson to Kilgore to |
| 10:40 | 20 | Tyler, all East Texas. |
| 10:40 | 21 | And then the last example is ███████ |
| 10:40 | 22 | ████████████████  And what that is, is when you |
| 10:40 | 23 | open up -- if you have an iOS device, you open up |
| 10:40 | 24 | Safari on your browser, you type in oil change near me, |
| 10:40 | 25 | this will take you through the steps to arrive at |

| | | |
|---|---|---|
| 10:40 | 1 | Google Maps Mobile and serve you advertisements. |
| 10:40 | 2 | So these are the use cases that we are -- |
| 10:40 | 3 | we say are at issue here. |
| 10:40 | 4 | Next slide, please. |
| 10:40 | 5 | Now, what Google would like this case to |
| 10:40 | 6 | be about is what I have up on the screen now, and that |
| 10:40 | 7 | is ███████████████████████████████████, |
| 10:40 | 8 | when you type in a search for a business, again, |
| 10:40 | 9 | dependent on ████████████████.  And ███████████ |
| 10:40 | 10 | is part of the ████████████ shows up and you can see |
| 10:41 | 11 | the ██████████████ of a business; but again, this is |
| 10:41 | 12 | dependent upon ████████████████. |
| 10:41 | 13 | And the next example of what Google would |
| 10:41 | 14 | like this case to be about, of the narrow view, is |
| 10:41 | 15 | ██████, which is the next slide. |
| 10:41 | 16 | And ████████ just generally, is the |
| 10:41 | 17 | ability for a user to check out their history, if they |
| 10:41 | 18 | have this functionality turned on, to check out |
| 10:41 | 19 | ████████ of their -- of their locations over a certain |
| 10:41 | 20 | time period. |
| 10:41 | 21 | These are all consumer-facing use cases, |
| 10:41 | 22 | and this -- these two functionalities, ███████████ |
| 10:41 | 23 | ██████████ -- if you want to look at the universe of |
| 10:41 | 24 | use cases, we're looking at a piece of pie about this |
| 10:41 | 25 | big, but ███████████████████████ is a very, very |

| | | |
|---|---|---|
| 10:41 | 1 | small part of the infringement case, and the use cases |
| 10:41 | 2 | at issue. |
| 10:41 | 3 | So I just wanted to make sure the Court |
| 10:42 | 4 | understood that. |
| 10:42 | 5 | Now, with respect to the technical |
| 10:42 | 6 | comparability analysis.  If you look at -- |
| 10:42 | 7 | If we go to Slide 22, Ms. Ruiz. |
| 10:42 | 8 | These are a description of the -- of the |
| 10:42 | 9 | technical apportionment steps that Mr. Blok performed |
| 10:42 | 10 | in Georgia-Pacific Factor 13.  The first thing that he |
| 10:42 | 11 | did was he looked at the 2021 product revenue report |
| 10:42 | 12 | and, you know, he applied this factor -- |
| 10:42 | 13 | If we go back to Slide 14, Ms. Ruiz.  14. |
| 10:42 | 14 | Mr. Jones made the comment that Mr. Blok |
| 10:42 | 15 | applied this factor, this ██████████████ to global |
| 10:43 | 16 | revenue.  And so I have for the Court just an |
| 10:43 | 17 | illustration of what this revenue picture looks like. |
| 10:43 | 18 | If you look at the blue bar, the global |
| 10:43 | 19 | revenue ████████████████████████████.  The |
| 10:43 | 20 | yellow bar is U.S. revenue ████████████████ |
| 10:43 | 21 | ████████████████ but Mr. Blok did not |
| 10:43 | 22 | utilize. |
| 10:43 | 23 | THE COURT:  I was -- on the first one |
| 10:43 | 24 | when you -- on all these when you say "global revenue," |
| 10:43 | 25 | are we talking about -- how was it distinguished just |

10:43  1    for the Mobile?  That's what I care about.

10:43  2                MR. LOVE:  Right.  And that's what I

10:43  3    wanted to make sure if the Court understood, was that

10:43  4    Mr. Jones said that Mr. Blok applied this ████████ to

10:43  5    global revenue of -- and that global revenue ████████

10:43  6    ██████████████.  Mr. Blok did not apply that

10:43  7    ███████████ to that number.  He conducted steps of

10:43  8    apportionment before he ever got to ████, which is for

10:43  9    U.S. revenue only.  Not global revenue.  So I just want

10:44  10   to make sure that the Court was clear on that.

10:44  11               THE COURT:  Well, in addition, I want to

10:44  12   make sure that it has to do with revenue that's

10:44  13   tethered only to the accused -- to the accused

10:44  14   functionality.

10:44  15               MR. LOVE:  Of course.  Of course, Your

10:44  16   Honor.  And if you look at Slide No. 12 --

10:44  17               Ms. Ruiz, No. 12.

10:44  18               We can see that Mr. Blok utilized what's

10:44  19   called a ██████████████████████████ -- to determine

       20   that the appropriate revenue bucket to apply this

10:44  21   factor to was the ██████████████████.  And if you

10:44  22   look at the ██████████████████████ and you look at

10:44  23   Mr. Blok's report, he describes what is in this ████████

       24   ██████████████ based on the testimony of Google

       25   30(b)(6) witnesses.

—83—

10:44   1          And if you look at, you know, the revenue

10:45   2   that's reported there overall, on the screen, you

10:45   3   can -- you can see the size of the pie of all revenue

10:45   4   that's subject to that report.  What Mr. Blok did was

10:45   5   he chose the ███████████, which is the green portion,

10:45   6   which is ████████████ of the overall revenue

10:45   7   reported in the ██████████████████████.

10:45   8          And GMM stands for Google Maps Mobile.

10:45   9          So the universe of revenue that Mr. Blok

10:45   10  applied his ████████ the use cases that correspond

10:45   11  with that revenue, like we talked about earlier, if you

10:45   12  look at Slide 13 -- Ms. Ruiz -- we can see that what

10:45   13  Mr. Vlahov for Google, a 30(b)(6) deposition witness,

10:45   14  described as a typical use case, local universal

10:45   15  immersive, and Maps.

10:45   16          These are the three categories of use

10:45   17  cases that Mr. Blok depended upon when he selected the

10:46   18  ███████ from the Maps portion of the xBridge

10:46   19  revenue report.  So he -- you know, before he ever gets

10:46   20  to applying the █████████, he conducted these levels

10:46   21  of apportionment to get down to the ████████

10:46   22  figure.

10:46   23          Now, to the Court's question, more

10:46   24  specifically, with respect to the technical

10:46   25  apportionment factor -- unless the Court wants to hear

10:46   1    any more about the revenue bucket --

10:46   2                    Okay.   In terms of this factor being

10:46   3    applied.

10:46   4                    If we go to Slide 22, Ms. Ruiz.

10:46   5                    These -- this is the general description

10:46   6    of the steps that were reported that Mr. Blok took.

10:46   7    And you can see that he took the 2021 product revenue

10:46   8    report which identified net revenue for comparable

10:46   9    ███████ which the Court has already addressed in the

10:47   10   previous argument, and you've said Dr. Budavári's

10:47   11   opinion on that is not coming in the case.

10:47   12                    Now, that would have resulted in a

10:47   13   ████████████ technical apportionment factor.   But what

10:47   14   the Court hasn't discussed with us is the ███████████

10:47   15   factor that was applied based on the ███████████

10:47   16   ██████████ naming for the functionality at issue.   And

10:47   17   that's what I want to talk with about the Court

10:47   18   primarily.

10:47   19                    Ms. Ruiz, go to Slide No. 26.

10:47   20                    And Dr. Budavári's report, which I have

10:47   21   up on the screen here on Slide 26, it appears in

10:47   22   Paragraph 213 of Dr. Budavári's report, but it also

10:47   23   appears in Paragraphs 214 and 215 of Mr. Blok's report.

10:47   24   And this is what Dr. Budavári discusses with respect to

10:47   25   ████████████████████████████████████████

10:47  1        The way that I understand ████████ is not

10:48  2  a discrete feature of Google Maps Mobile. ██████

10:48  3  ████████████████████████████████████████████████

10:48  4  ████████████  It's not a feature set.  It's not a

10:48  5  clearly defined feature like ██████████████████████.

10:48  6  It is a monicker for functionality.

10:48  7        So when you look at Dr. Budavári's

10:48  8  opinion, he's referring to ████ in his report, and then

10:48  9  he refers to the specific Google documents that clearly

10:48  10  describe and connect this description of functionality,

10:48  11  this monicker, with the functionality at issue in this

10:48  12  case.

10:48  13        And so based on that technical connection

10:48  14  between Dr. Budavári's opinion and this type of

10:48  15  functionality or the monicker used by Google, Mr. Blok

10:48  16  did an analysis that depended upon a document that's

10:49  17  very important to Google.  And it's called the ██████

10:49  18  ████████████████████████████████

10:49  19        It's on Page 25, Ms. Ruiz.

10:49  20        Slide 25.  I'm sorry.

10:49  21        So in this technical document where

10:49  22  Google describes signals used to infer current ██████

10:49  23  ██████████████████, the document places ████████████

10:49  24  ████████ that corresponds with ██████████████████

10:49  25  ████████ for device with respect to ████.  That

—86—

| | | |
|---|---|---|
| 10:49 | 1 | ████████ is where Mr. Blok found this number in |
| 10:49 | 2 | Google's documents. |
| 10:49 | 3 | Now, of course, they want to -- they want |
| 10:49 | 4 | to run away from their own documents, but this is |
| 10:49 | 5 | where -- this is the basis for Mr. Blok's ████████ |
| 10:49 | 6 | that he used as a technical apportionment factor. |
| 10:49 | 7 | And if you look on Page -- |
| 10:50 | 8 | Slide 27, Ms. Ruiz. |
| 10:50 | 9 | The technical apportionment calculation, |
| 10:50 | 10 | which appears in Paragraph 215 of Mr. Blok's report, |
| 10:50 | 11 | you can see that the ████████ is applied for the time |
| 10:50 | 12 | period which Mr. Block calculates on a ████████ |
| 10:50 | 13 | ████. |
| 10:50 | 14 | So if there's any more questions about |
| 10:50 | 15 | this particular issue, Your Honor, I can answer those |
| 10:50 | 16 | questions. |
| 10:50 | 17 | THE COURT:  No.  I'm good. |
| 10:50 | 18 | MR. LOVE:  Okay. |
| 10:50 | 19 | THE COURT:  And now the other motion -- I |
| 10:50 | 20 | mean, the other patent? |
| 10:50 | 21 | MS. RUIZ:  Hello, Your Honor. |
| 10:50 | 22 | THE COURT:  Yes, ma'am. |
| 10:50 | 23 | MS. RUIZ:  Just let me know when -- |
| 10:50 | 24 | THE COURT:  I'm ready. |
| 10:50 | 25 | MS. RUIZ:  -- you're ready.  Then I'm |

| | | |
|---|---|---|
| 10:50 | 1 | ready too. |
| 10:50 | 2 | This is the 580 motion, so the |
| 10:50 | 3 | barcode-scanning technology. |
| 10:51 | 4 | And so Google's motion should be denied |
| 10:51 | 5 | for several reasons.  The first one is that we |
| 10:51 | 6 | established earlier, and it is known to the Court, that |
| 10:51 | 7 | there are several versions of ███████ that build upon |
| 10:51 | 8 | another, and what Brazos accuses is ██████████ |
| 10:51 | 9 | ██████ |
| 10:51 | 10 | Mr. Blok was aware of this information, |
| 10:51 | 11 | and he apportioned the value of the accused |
| 10:51 | 12 | instrumentality that is limited to the contributions of |
| 10:51 | 13 | the patent-in-suit to his ███████ |
| 10:51 | 14 | And I have -- it's kind of a crude visual |
| 10:51 | 15 | here where there is ████████████████████ |
| 10:51 | 16 | ███████ And with software code, these versions |
| 10:51 | 17 | were wrapped around each other.  And each version -- |
| 10:51 | 18 | like ██████ contains portions or lines of source |
| 10:51 | 19 | code from ██████  Same with ██████  And they |
| 10:51 | 20 | cannot be separated. |
| 10:52 | 21 | One of the documentation submitted by |
| 10:52 | 22 | Google indicates that ████████████████. |
| 10:52 | 23 | And similarly, ██████████████████, meaning -- |
| 10:52 | 24 | or sorry -- the ████████████████████ |
| 10:52 | 25 | ██████ |

—88—

```
10:52   1              In Mr. Blok's report, he acknowledges
10:52   2    that there are core functionalities associated with
10:52   3    enabling the barcode and QR code scanning on a mobile
10:52   4    device that are part of the accused technology.
10:52   5              And so he -- he used that in his
10:52   6    reasonable royalty base, and he considered an
10:52   7    incremental improvement of the accused technology over
10:52   8    the prior iteration of ██████████   And I will go into
10:52   9    that step-by-step how he did that.
10:52  10              So Mr. Blok uses scans as a ████████████
10:53  11    ████████████████████████   for actual revenue attributable
10:53  12    to the accused products.  He -- where he apportions out
10:53  13    the ████████████   from the accused technology is in
10:53  14    this step the royalty rate per scan.
10:53  15              And within that calculation of the
10:53  16    royalty rate per scan, there's an ██████████   a percent
10:53  17    attributable to the patent-in-suit.  Google argues that
10:53  18    this percentage is arbitrary, that it has no basis.
10:53  19    And on the contrary, Mr. Blok goes through this step by
10:53  20    step in his report.
10:53  21              For example, in Paragraph 216 of his
10:53  22    report, he showed that he used one of Google's
10:53  23    documentation that showed an evaluation of the accused
10:54  24    technology.  And it looked to measuring improvements
10:54  25    over -- of the accused technology over the prior
```

10:54  1   iteration, meaning improvements from ████████

10:54  2   ███████████████████████████████████████████

10:54  3              It include percentages, as you can see in

10:54  4   a screenshot, where ██████████████████████████████

10:54  5   ████████████████████████████████████████

10:54  6   ██████████████

10:54  7              And Mr. Blok summarized this information

10:54  8   in his report on Page 98, which you can see at the

10:54  9   bottom of the screen.

10:54  10             So Mr. Blok looked -- had spoken to

10:55  11   Dr. Kozek, as well as referred to Dr. Kozek's report

10:55  12   indicating that the invention claimed by the teachings

10:55  13   of the patent-in-suit, absent this invention, that

10:55  14   Google would not be able to realize the improvements

10:55  15   and benefits.

10:55  16             Below are some screenshots from a -- on

10:55  17   the -- on the far left is from Mr. Blok's report.  And

10:55  18   it shows the percentages of what he was -- of what

10:55  19   ended up being the ██████████████

10:55  20             There was also a screenshot from Google's

10:55  21   own evaluation report showing that incremental

10:55  22   improvement.

10:55  23             Eventually, Mr. Blok took the averages of

10:55  24   those two improvements in order to apportion out the █

10:55  25   █████████████████   the accused technology.  And

```
10:55   1    ultimately, he ended up at an  ████████████

10:56   2    ██████████████████████████████████████

10:56   3                   Does Your Honor have any questions

10:56   4    before --

10:56   5                   THE COURT:  I was hoping you would get to

10:56   6    the base number that he used.  How did he get to the

10:56   7    starting point of what the appropriate base was?

10:56   8                   MS. RUIZ:  The appropriate base for -- at

10:56   9    the very beginning of his  ████████████████████

10:56   10                  THE COURT:  What the appropriate amount

10:56   11   of the  ██████████████  that he was going to attribute

10:56   12   to the technology that's in this patent.

10:56   13                  MS. RUIZ:  So we were at the  ██████████

10:56   14   here in his calculation.

10:56   15                  Does Your Honor have the question on this

10:56   16   percent, this number?

10:56   17                  THE COURT:  Not the percent.  How did

10:56   18   he -- where does he get the base number that he starts

10:57   19   with?  Google has X revenue, but you're not entitled to

10:57   20   apportion to all of that revenue.

10:57   21                  What -- where did you get the starting

10:57   22   base number?

10:57   23                  MS. RUIZ:  Yes, Your Honor.  I'm going to

10:57   24   go to Slide 19.

10:57   25                  So  ████████████████████████████████████
```

10:57   1   ███████████████████████████████████████████

10:57   2   ████████████████████████.   Thus, Mr. Blok used a number

10:57   3   of scans in order to establish a reasonable royalty

10:57   4   base.

10:57   5                 THE COURT:   A number of what?

10:57   6                 MS. RUIZ:   A number of scans, barcode

10:57   7   scans.

10:57   8                 THE COURT:   Okay.

10:57   9                 MS. RUIZ:   He got this -- he explains it

10:57   10  in his report that he got ███████████████████ from

10:57   11  a Google document, which is -- you can see on the

10:57   12  screen below.

10:58   13                 And he looked at the metadata of this

10:58   14  Google document, and it indicates that this usage data

10:58   15  was likely from early 2022.  And this becomes important

10:58   16  later in his calculation.

10:58   17                 He also utilized an ███████████████

10:58   18  ███████████████████ from a Google document, which

10:58   19  as you can see below, which indicates that QR code

10:58   20  usage ████████████████████████████████████

10:58   21  ██████████████████.

10:58   22                 So we have this ███████████████████████

10:58   23  number, and we also have the █████████████ number.

10:58   24                 THE COURT:   And so how does he turn that

10:58   25  into the base number?

| | | |
|---|---|---|
| 10:58 | 1 | MS. RUIZ:  So he turns this into the base |
| 10:58 | 2 | number by addressing ███████████████ on the -- |
| 10:58 | 3 | in 2022, and then he calculates what those scans were |
| 10:59 | 4 | in either direction, subtracting ████████ from the |
| 10:59 | 5 | previous years and then adding ██████████ in |
| 10:59 | 6 | 2023. |
| 10:59 | 7 | He multiplied that estimated percentage |
| 10:59 | 8 | in the U.S., because these were worldwide scans, and he |
| 10:59 | 9 | multiplied by ████████ in order to get that base |
| 10:59 | 10 | revenue valuing. |
| 10:59 | 11 | THE COURT:  What does he use to get the |
| 10:59 | 12 | base revenue value? |
| 10:59 | 13 | MS. RUIZ:  So in order to get to that |
| 10:59 | 14 | base revenue value, he looked to Google's distribution |
| 10:59 | 15 | of revenue by geography from the accused dates 2019 |
| 10:59 | 16 | through 2022 and he looked at Google's 10-K and their |
| 10:59 | 17 | revenues.  And he used -- he determined that |
| 11:00 | 18 | ███████████████████ of revenues attributed by |
| 11:00 | 19 | Google were from the U.S., and so he applied that -- |
| 11:00 | 20 | THE COURT:  And how did he get that |
| 11:00 | 21 | number? |
| 11:00 | 22 | MS. RUIZ:  He got that number -- as you |
| 11:00 | 23 | can see below, on the very last screenshot of his |
| 11:00 | 24 | report, and -- Mr. Blok looked to revenue that Google |
| 11:00 | 25 | attributed -- that Google received in the United States |

11:00  1   and in Europe, other Americas, all over the world, and

11:00  2   he -- just to see what the percentage of revenue Google

11:00  3   received from the U.S. versus worldwide.

11:00  4                    And he attributed that ████████ to

11:00  5   the barcode scans worldwide in order to achieve barcode

11:00  6   scans performed using the accused technology within the

11:00  7   U.S. only.

11:01  8                    Does that answer Your Honor's question?

11:01  9                    THE COURT:  Not quite.  I'm -- yes.  It

11:01  10  answers my question of what he did, but not how he did

11:01  11  it.  So if that makes sense.

11:01  12                    I mean, I'm expecting your expert to come

11:01  13  in and explain what he did here.  And I hear what

11:01  14  you're saying he did, but not -- what numbers did he

11:01  15  use -- where did he get the numbers he used to

11:01  16  distinguish between, A, global and U.S.; and, two, what

11:01  17  did he do -- what is in his report where he tethered

11:01  18  what he was using to some -- something that a technical

11:01  19  person or someone did that said, this is why you get to

11:01  20  use this amount?

11:01  21                    That's what -- how -- where did he get

11:01  22  that -- where did he get the number from?

11:01  23                    MS. RUIZ:  I think what Your Honor's

11:01  24  referring to is the reasonable royalty rate per scan,

11:01  25  which is in the dollar amount.  And that -- that's how

—94—

11:02  1   he converted scans to dollars.

11:02  2                   THE COURT:  Okay.  Yes.

11:02  3                   MS. RUIZ:  Is that what you're referring

11:02  4   to?

11:02  5                   THE COURT:  Yes.

11:02  6                   MS. RUIZ:  Apologies.  I had a

11:02  7   misunderstanding.

11:02  8                   So to achieve the reasonable royalty rate

11:02  9   per scan, Mr. Blok began with the market value of the

11:02  10  accused technology.

11:02  11                  Now, there are several third-party

11:02  12  companies that use similar technologies to that of the

11:02  13  accused technology ██████████.

11:02  14                  Notably, Mr. Blok used a third-party

11:02  15  company called Scandit.  And the reason why he used

11:02  16  Scandit in his analysis is because ████████████

11:02  17  ████████████████████.  Google produced some documents

11:02  18  indicating ████████████████████████████

11:03  19  ████████████████████████████████, which

11:03  20  leverages the accused technology of barcode scanning.

11:03  21                  And you can see on the bottom of the

11:03  22  screen the two documents -- or the two screenshots

11:03  23  there are from the same document ████████████████

11:03  24  ████████████████████████████████████████████

11:03  25  ████████

| | | |
|---|---|---|
| 11:03 | 1 | Mr. Blok looked up the website for |
| 11:03 | 2 | Scandit in the -- in a previous year.  And the Scandit |
| 11:03 | 3 | technology -- the pricing for the Scandit technology |
| 11:03 | 4 | was listed on its website. |
| 11:03 | 5 | THE COURT:  Okay.  Anything else? |
| 11:03 | 6 | MS. RUIZ:  So eventually to get to that |
| 11:03 | 7 | reasonable royalty rate per scan, so we've reached |
| 11:04 | 8 | that, he started off with a base price value from |
| 11:04 | 9 | Scandit.  We talked about the ███████████████ |
| 11:04 | 10 | ███████████████.  And Mr. Blok also applied a |
| 11:04 | 11 | split of economic value. |
| 11:04 | 12 | Would Your Honor like to hear about the |
| 11:04 | 13 | split of economic value? |
| 11:04 | 14 | THE COURT:  Yes. |
| 11:04 | 15 | MS. RUIZ:  Okay.  Mr. Blok's split of |
| 11:04 | 16 | economic value was ███████.  Earlier opposing |
| 11:04 | 17 | counsel indicated that this was an arbitrary number.  I |
| 11:04 | 18 | think it was like a Nash kind of value.  However, that |
| 11:05 | 19 | has nothing to do with how Mr. Blok chose ███████. |
| 11:05 | 20 | First, he applied the facts to -- he |
| 11:05 | 21 | applied his calculations to the facts of the case.  He |
| 11:05 | 22 | took the entire balance of the Georgia-Pacific factors |
| 11:05 | 23 | and he found that Brazos and Google's would have |
| 11:05 | 24 | possessed similar leverage at the time of the |
| 11:05 | 25 | hypothetical negotiation from his analysis of the |

```
11:05   1    Georgia-Pacific factors.

11:05   2              And from there he determined that there

11:05   3    would be a ███████████ between Brazos and Google in the

11:05   4    hypothetical negotiation.  In addition, as you can see,

11:05   5    the -- we have a second point and a third point -- or

11:05   6    excuse me -- two different paragraphs below.  Mr. Blok

11:05   7    also looked to two different points in addition to the

11:05   8    ███████████ split.

11:05   9              On the second paragraph that you see, he

11:05  10    considered Google's weighted average ROIC percentage

11:06  11    spanning the licensing periods to date.  In his

11:06  12    Exhibit 7, he goes through Google's return on

11:06  13    investment capital from the years 2019 to 2022.  From

11:06  14    there he determined that there would be a ███████████

11:06  15    ███████

11:06  16              He also considered a third point which

11:06  17    included third-party mobile applications that are

11:06  18    commercialized through Google's mobile application

11:06  19    store, and he determined that the split would be

11:06  20    between ███████████████████████ of the revenues

11:06  21    generated.

11:06  22              So Mr. Blok didn't just choose a ████████

11:06  23    split.  He looked at the Georgia-Pacific factors and

11:06  24    summary.  He also looked at this ████████████████ and

11:06  25    a ██████████ split data point, and he chose the most
```

```
11:06   1   conservative point, which gave Google the -- the
11:07   2   highest percentage split, which was the ███████
11:07   3   ████ .
11:07   4               And from there, Your Honor, in order to
11:07   5   get to the ████████████████████████████████████
11:07   6   value --
11:07   7               THE COURT:  I'm good.  You've covered
11:07   8   what I wanted.
11:07   9               MS. RUIZ:  Okay.  All right.  Thank you,
11:07  10   Your Honor.  Is there anything else?
11:07  11               THE COURT:  No.
11:07  12               MS. RUIZ:  All right.  Thank you, Your
11:07  13   Honor.
11:07  14               THE COURT:  Anything else from Google?
11:07  15               MR. JONES:  Again, Mike Jones for Google.
11:07  16               I would like to very pointedly address
11:07  17   the questions the Court asked, first with regard to the
11:07  18   580 case, what we just heard from my colleague.
11:07  19               The question the Court asked was about
11:07  20   the royalty base, you know, and really what she
11:07  21   answered about was the royalty rate.  Which is the way
11:07  22   Mr. Blok's opinion works in the 580 case is you take a
11:07  23   rate of ████████ multiply it by a number of scans.
11:08  24   And there is no dispute, you heard no dispute from the
11:08  25   plaintiff, that those number of scans are all scans
```

| 11:08 | 1 | that occurred after April of 2019 when ████████ came |
| 11:08 | 2 | out. |
| 11:08 | 3 | But the evidence before the Court -- and |
| 11:08 | 4 | again, it's pointed out in our papers, and I don't |
| 11:08 | 5 | think there's been any dispute made of it today -- is |
| 11:08 | 6 | that ███████████ continued to be used after that |
| 11:08 | 7 | date.  So when ██████████ continued to be used after |
| 11:08 | 8 | that date, when ████████████ after the close of fact |
| 11:08 | 9 | discovery, no longer became a accused product, we enter |
| 11:08 | 10 | into the situation where we know, we know for a fact |
| 11:08 | 11 | that nonaccused products are being included in the |
| 11:09 | 12 | royalty base. |
| 11:09 | 13 | And there has been no effort after |
| 11:09 | 14 | █████████████ out, and after we know ████████████ is |
| 11:09 | 15 | still in play -- and again, I'm talking about the |
| 11:09 | 16 | ██████████ only product -- there's been no attempt to |
| 11:09 | 17 | take them out, and that's a fatal flaw with regard to |
| 11:09 | 18 | Mr. Blok's opinion that cannot be cured by |
| 11:09 | 19 | cross-examination. |
| 11:09 | 20 | Moving to the 585 case and the question |
| 11:09 | 21 | asked by the Court.  The question asked by the Court |
| 11:09 | 22 | was:  Where does the ██████████ figure come where |
| 11:09 | 23 | they're due the apportionment for the technical |
| 11:09 | 24 | functionality in this case?  Could we go -- |
| 11:09 | 25 | Could y'all put up your Slide 22 again, |

| | | |
|---|---|---|
| 11:09 | 1 | that Mr. Love used? |
| 11:09 | 2 | (Off-the-record discussion.) |
| 11:09 | 3 | MR. JONES:  Switching gears now to the |
| 11:09 | 4 | 585. |
| 11:09 | 5 | Now, when he first -- you first asked him |
| 11:10 | 6 | about the ███████, and he first talked about |
| 11:10 | 7 | ████████████████████████.  And he talked |
| 11:10 | 8 | about how they were used and how they were part of |
| 11:10 | 9 | Google Maps Mobile, he didn't really answer your |
| 11:10 | 10 | question because none of that data comes in question |
| 11:10 | 11 | with regard to the ██████. |
| 11:10 | 12 | The ██████ comes from this.  It comes |
| 11:10 | 13 | from looking at certain ████ and looking at the |
| 11:10 | 14 | ████████████ and how these particular features |
| 11:10 | 15 | are discussed in certain Google documents and then |
| 11:10 | 16 | using them -- and these are the exact words of |
| 11:10 | 17 | Mr. Blok -- as a proxy for the patented technology. |
| 11:10 | 18 | So he tells us, I'm going to look at |
| 11:10 | 19 | these things, I'm going to look how Google uses these |
| 11:11 | 20 | things, and I am going to use them as a proxy for the |
| 11:11 | 21 | patented functionality.  Now, keep in mind, full stop, |
| 11:11 | 22 | these ████ are not accused of infringement.  The |
| 11:11 | 23 | ████████████████, is not accused of |
| 11:11 | 24 | infringement.  This is not the patented technology |
| 11:11 | 25 | we're dealing with in this suit.  So how can he do |

11:11  1    that?  How can he use something that is not the

11:11  2    patented technology and use it for a proxy?

11:11  3              He tells us in Paragraph 209 of his

11:11  4    report:  In order to determine the portion of Google's

11:11  5    realizable incremental profit or benefit that would be

11:11  6    directly attributable to the teachings of the

11:11  7    patent-in-suit, I asked Dr. Budavári to review various

11:11  8    documents produced by Google during the course of this

11:11  9    litigation that appear to provide indications of the

11:11  10   contribution value of the accused functionality.

11:11  11             He's relying upon Dr. Budavári.  He

11:12  12   didn't do it.  I can't cross-examine him about how he

11:12  13   came up with this ████████ because he relied on

11:12  14   Dr. Budavári, and the Court has stricken that opinion.

11:12  15             So if we could, let's go to Slide -- one

11:12  16   more time, let's go to Slide 10.

11:12  17             Oh, excuse me.  Go to Slide 10 of our

11:12  18   slide deck.  I'm sorry.  I apologize.

11:12  19             Thank you so much.

11:12  20             This is their four steps.  Step 3 is the

11:12  21   ████████.  And that's where we get down to the

11:12  22   patented functionality.  That is gone.  Because they

11:12  23   relied on an ███ and they relied on █████ that are based

11:12  24   upon Dr. Budavári's opinion.

11:12  25             Mr. Blok didn't know that.  Mr. Blok

11:13  1    doesn't say, oh, I could say that I could use these and

11:13  2    analyze these somehow and come up with the ███████ .

11:13  3    No.  He says Dr. Budavári did that.  You've stricken

11:13  4    that opinion.

11:13  5              Step 4 deals with an overall company net

11:13  6    income and invested capital return, which is certainly

11:13  7    much, much more broad than the patented technology.

11:13  8    The only way, the only way they get there is to look at

11:13  9    these app developers, and those are, again, based upon

11:13  10   Dr. Budavári.

11:13  11             So apportionment has not been done.  They

11:13  12   admit they had to do apportionment.  And here we see it

11:13  13   hasn't been done due to the fact that they have nothing

11:13  14   to base their opinions upon with regard to this

11:13  15   apportionment due to the striking of Dr. Budavári's

11:13  16   opinion.

11:13  17             Thank you, Your Honor.

11:13  18             THE COURT:  Okay.

11:13  19             Yes, sir?

11:13  20             MR. LOVE:  Your Honor, can I take the 585

11:13  21   issues --

11:13  22             THE COURT:  Yes, please.

11:13  23             MR. LOVE:  -- that Mr. Jones raised?

11:14  24             THE COURT:  I thought I heard you suggest

11:14  25   an alternative to what I've stricken in your earlier

—102—

| | | |
|---|---|---|
| 11:14 | 1 | argument. |
| 11:14 | 2 | MR. LOVE:  This is correct.  This is |
| 11:14 | 3 | correct. |
| 11:14 | 4 | THE COURT:  Okay. |
| 11:14 | 5 | MR. LOVE:  Mr. Jones, if you could pull |
| 11:14 | 6 | up Slide 10. |
| 11:14 | 7 | MR. JONES:  Sure. |
| 11:14 | 8 | MR. LOVE:  So I think the issue is that |
| 11:14 | 9 | Mr. Jones is conflating the source of the percentages. |
| 11:14 | 10 | In Mr. Blok's report, and what the Court addressed |
| 11:14 | 11 | earlier this morning with respect to the ████, which we |
| 11:14 | 12 | readily admit, those are -- you know, those are |
| 11:14 | 13 | separate products with their own universe and their own |
| 11:14 | 14 | teams that put them out on the market, and third |
| 11:14 | 15 | parties use those. |
| 11:14 | 16 | That's where -- that's where the |
| 11:14 | 17 | ████████████ that Mr. Blok utilized in his report |
| 11:14 | 18 | came from, with respect to the Google ████. |
| 11:14 | 19 | The ████████ that was actually used in |
| 11:15 | 20 | his analysis, and you can see it in Google's |
| 11:15 | 21 | illustration here in Step 3, they reference the |
| 11:15 | 22 | ████████.  But they don't reference the ████████ |
| 11:15 | 23 | anywhere in the slide.  And they conflate the two |
| 11:15 | 24 | concepts in order to convince the Court that the |
| 11:15 | 25 | ████████ should be struck.  But the ████████ -- |

```
11:15    1              Ms. Ruiz, if you'll look -- if you will
11:15    2     pull up Slide No. 22.
11:15    3              If you look at Slide 22, which we
11:15    4     provided to the Court, we clearly separate the two
11:15    5     concepts.  The ███████████ is tied to the Google ████
11:16    6     which the Court did not agree with and the Court
11:16    7     addressed this morning.
11:16    8              The ██████████, which is tied to the
11:16    9     ████████████████████ monicker and tied to Google's
11:16   10     documents, that is the apportionment factor that was
11:16   11     applied in the 585 case; and that the Court should find
11:16   12     reasonable in the way that it was utilized in this case
11:16   13     and the fact it was based on Google's documents and
11:16   14     Dr. Budavári's opinion with respect to the
11:16   15     technological comparability in his report.
11:16   16              And if the Court has any other questions
11:16   17     on that?
11:16   18              THE COURT:  I don't.
11:16   19              MR. LOVE:  Thank you, Your Honor.
11:16   20              MS. RUIZ:  Your Honor, a response on the
11:16   21     580?
11:16   22              THE COURT:  I don't need it.
11:16   23              (Off-the-record bench conference.)
11:17   24              THE COURT:  If there's anything else the
11:17   25     plaintiff would like to add on the 580 case, I'm happy
```

—104—

| | | |
|---|---|---|
| 11:17 | 1 | to hear it. |
| 11:17 | 2 | MS. RUIZ:  Hello again, Your Honor.  Hi. |
| 11:18 | 3 | So as we heard Mr. Jones once again |
| 11:18 | 4 | talking about how Google accuses Mr. Blok of not |
| 11:18 | 5 | factoring out the nonaccused ███████ |
| 11:18 | 6 | technology, and I want to bring up again that he does |
| 11:18 | 7 | factor out the -- this technology because it's a |
| 11:18 | 8 | percent attributable to the patent-in-suit at |
| 11:18 | 9 | ██████  He saw from Google's own documentation, |
| 11:18 | 10 | Google's own experimentation with █████, and he |
| 11:18 | 11 | calculated that the improvement from -- or the |
| 11:18 | 12 | incremental benefit from ████████ would be |
| 11:18 | 13 | ██████. |
| 11:18 | 14 | Furthermore, Mr. Blok only considers |
| 11:18 | 15 | scans in the United States and not worldwide. |
| 11:19 | 16 | Mr. Jones is confusing the steps.  And further, I think |
| 11:19 | 17 | there might have been some confusion on what was done |
| 11:19 | 18 | in the 580 versus 585, and so there was a little bit of |
| 11:19 | 19 | mix of that. |
| 11:19 | 20 | In the end, the steps that Mr. Blok took |
| 11:19 | 21 | in order to create a ████████ are |
| 11:19 | 22 | clearly laid out in his report.  He used documentation |
| 11:19 | 23 | and data from Google's produced documents, and if |
| 11:19 | 24 | Google does not agree with how he calculated a |
| 11:19 | 25 | particular item, they can cross-examine him during |

| 11:19 | 1 | trial. |

        If there's anything else?  All right.
Thank you, Your Honor.
        THE COURT:  Mr. Jones, I don't think
you're confusing those, but I'll give you a chance
to --
        MR. JONES:  Excuse me?
        THE COURT:  I don't think you're
confusing those numbers.  I have concerns about whether
or not domestic or global numbers were used.  If
there's anything you'd like to add on the record in
that regard.
        MR. JONES:  No, Your Honor.  I don't.
Again, I think it's a royalty base issue, as the Court
has stated.  And I think we've demonstrated that it's
not -- what she just talked about was with regard to
the application or the determination of the royalty
rate.  That's a -- that's a different question that we
really haven't been talking about here today in our
argument.
        What I'm directing my attention to is the
royalty base.
        THE COURT:  So as I understand it, your
concern is whether or not -- and this is my word, you
probably would have a better one -- but they didn't

| | | |
|--|--|--|
| 11:20 | 1 | sufficiently sift with regard to the ███████ |
| 11:20 | 2 | They didn't -- |
| 11:20 | 3 | MR. JONES:  Right.  Right.  They didn't |
| 11:20 | 4 | sift to that when that issue came up. |
| 11:20 | 5 | THE COURT:  And then also having -- they |
| 11:20 | 6 | didn't use, in your opinion, a reliable proxy with |
| 11:20 | 7 | respect to the division between the domestic and the |
| 11:20 | 8 | global numbers. |
| 11:21 | 9 | MR. JONES:  Yes, Your Honor. |
| 11:21 | 10 | THE COURT:  Those are your two points. |
| 11:21 | 11 | MR. JONES:  Yeah.  With regard to the 580 |
| 11:21 | 12 | case.  Yes, Your Honor. |
| 11:21 | 13 | THE COURT:  Right.  Let me make it clear, |
| 11:21 | 14 | just regard to the 580. |
| 11:21 | 15 | MR. JONES:  Okay.  Okay. |
| 11:21 | 16 | THE COURT:  Yes. |
| 11:21 | 17 | Did I summarize what you were saying? |
| 11:21 | 18 | MR. JONES:  Yeah.  Can I turn to the 585, |
| 11:21 | 19 | or do you not want to hear that? |
| 11:21 | 20 | THE COURT:  I don't need to hear it.  I'm |
| 11:21 | 21 | fine. |
| 11:21 | 22 | So with respect to the 585, I'm going to |
| 11:21 | 23 | deny the defendant's motion.  But with respect to the |
| 11:21 | 24 | 580 patent (sic), I'm going to grant the motion. |
| 11:21 | 25 | Now, I've been through this before.  And |

11:21  1    it's -- it seems to me -- I could be wrong.  I'll hear

11:21  2    from plaintiff's counsel.  It seems to me that this

11:21  3    makes your -- plaintiff, your damages case very

11:21  4    difficult on the 580 with the report as it's currently

11:21  5    constituted; is that fair?

11:22  6                   MR. SIEGMUND:  It might make it a little

11:22  7    difficult, Your Honor.

11:22  8                   THE COURT:  Well, no.  Here's what I'm --

11:22  9    I'm not -- I'm really not kidding.

11:22  10                  Here's my question, is, I've had this

11:22  11   situation where I've essentially gutted the plaintiff's

11:22  12   argument on damages, and that doesn't work out well for

11:22  13   anyone because I now have a plaintiff who's saying, I

11:22  14   get damages but I can't prove damages.  And so the case

11:22  15   just kind of flounders.

11:22  16                  So I will give you all -- if you all want

11:22  17   to do a different damages opinion, you have two

11:22  18   choices.  You could either say I'm wrong in what I'm

11:22  19   doing and, you know, you could take it up, or -- and

11:22  20   that's fine, or you can say because there are two

11:22  21   trials -- and this is me speaking -- because there are

11:23  22   two trials in this case, we could kick the 580 patent

11:23  23   (sic) to the second trial.  And I would give you all an

11:23  24   opportunity to redo the damages report if you would

11:23  25   rather do that.  And I'll -- is that something you all

| | | |
|---|---|---|
| 11:23 | 1 | would prefer to do? |
| 11:23 | 2 | MR. SIEGMUND:  I think that's probably |
| 11:23 | 3 | right.  But could you just give us a few minutes to |
| 11:23 | 4 | just quickly confer?  But I'm thinking that's probably |
| 11:23 | 5 | the option we'll choose, Your Honor.  But I just want |
| 11:23 | 6 | to confirm with the team. |
| 11:23 | 7 | THE COURT:  What I have left are -- let |
| 11:23 | 8 | me take this up -- why don't we do this?  Because I'd |
| 11:23 | 9 | like to, if we can, get finished with these. |
| 11:23 | 10 | I think all we have left is the motion |
| 11:23 | 11 | for -- Google's motion for partial summary judgment. |
| 11:23 | 12 | MR. SIEGMUND:  And that is on the 580 |
| 11:23 | 13 | case, Your Honor, if that makes a difference for you. |
| 11:23 | 14 | THE COURT:  Why don't we take a short |
| 11:23 | 15 | recess?  And -- I need one anyway.  And the plaintiff |
| 11:24 | 16 | can tell me what to do.  And my intention would be |
| 11:24 | 17 | probably if you -- but I'll hear from -- y'all can sit |
| 11:24 | 18 | down. |
| 11:24 | 19 | Here's what I probably would do:  If the |
| 11:24 | 20 | plaintiff is going to kick the -- if you want a do-over |
| 11:24 | 21 | and we're going down, I would ask Google whether you |
| 11:24 | 22 | want to go ahead and argue the motion now on the 580 or |
| 11:24 | 23 | if you want to wait till a different pretrial |
| 11:24 | 24 | conference.  And I'm agnostic.  I'll do either one. |
| 11:24 | 25 | So you all -- you all figure out what you |

```
11:24   1   want to do.  And then Google -- I'll take up whatever
11:24   2   Google wants me to do on the other.
11:24   3                   THE BAILIFF:  All rise.
11:24   4                   (Recess taken.)
11:33   5                   THE BAILIFF:  All rise.
11:33   6                   THE COURT:  Thank you.  You may be
11:33   7   seated.
11:33   8                   Okay.  Mr. Siegmund?
11:34   9                   MR. SIEGMUND:  Yes, Your Honor.  I think,
11:34  10   big surprise to the Court, we're going to take
11:34  11   Option 2.  And we'll come up with a timeline to work
11:34  12   with Google and get that figured out with the next
11:34  13   pretrial conference and trial date.
11:34  14                   THE COURT:  Okay.
11:34  15                   MR. SIEGMUND:  And then whatever the
11:34  16   Court wants to do on the 580 is fine with us in terms
11:34  17   of the one remaining motion.
11:34  18                   THE COURT:  Do you want to go ahead and
11:34  19   argue it?
11:34  20                   MR. LANIER:  Very briefly, Your Honor.  I
11:34  21   just want to make a couple of other points as well.
11:34  22                   THE COURT:  Okay.
11:34  23                   MR. LANIER:  So while we're doing the
11:34  24   mechanics of pulling up some slides on the 580 motion
11:34  25   for summary judgment of noninfringement, Your Honor, I
```

11:34    1    just want to be sure we understand the record before

11:34    2    the Court puts pen to paper.

11:34    3                    Our understanding of the Court's ruling

11:34    4    on technical comparability, our Daubert there was

11:34    5    striking Paragraphs 208 through 213.

11:34    6                    THE COURT:  Correct.

11:34    7                    MR. LANIER:  Specifically confirmed on

11:34    8    the record.

11:34    9                    THE COURT:  Yes.

11:34   10                    MR. LANIER:  And the Court may recall

11:34   11    from -- we wanted to make sure there was no confusion.

11:34   12    Because in the discussion on the 585 Daubert on

11:34   13    damages, that █████issue is Paragraph 213, that was

11:35   14    struck.

11:35   15                    So we'd ask the Court -- just,

11:35   16    respectfully, we understand the Court's made a ruling,

11:35   17    but we'd ask the Court to consider that in light of the

11:35   18    confirmed ruling on technical comparability on the 585

11:35   19    case before the Court puts pen to paper.

11:35   20                    So just wanted to make sure that was

11:35   21    clear so we have a clear record going forward.

11:35   22                    THE COURT:  That's fine.

11:35   23                    MR. LANIER:  Thank you, Your Honor.

11:35   24                    Then with respect to the '491, I think

11:35   25    the reason that we'd like to be heard on it briefly now

| | | |
|--|--|--|
| 11:35 | 1 | is twofold.  One is, it's a very straightforward |
| 11:35 | 2 | motion.  The other is, at present, we'd have three |
| 11:35 | 3 | patents for that second trial.  And I don't think |
| 11:35 | 4 | anyone's in a position to pull one up to the earlier |
| 11:35 | 5 | trial because witnesses are available when they're |
| 11:35 | 6 | available.  So it might be useful if the Court has time |
| 11:35 | 7 | to consider this motion. |
| 11:35 | 8 | THE COURT:  No.  I -- |
| 11:35 | 9 | MR. LANIER:  We'll present it and see |
| 11:35 | 10 | what the Court thinks. |
| 11:35 | 11 | THE COURT:  I'd be happy to. |
| 11:35 | 12 | MR. LANIER:  Thank you.  Appreciate that. |
| 11:35 | 13 | So let's just turn to Slide No. 2. |
| 11:35 | 14 | So, Your Honor, this '491 patent relates |
| 11:35 | 15 | to barcode scanning.  It's not just any barcode |
| 11:35 | 16 | scanning.  It's a specific method of doing barcode |
| 11:36 | 17 | scanning that reflects the very old technology from way |
| 11:36 | 18 | back when, when this patent was filed, back in the 2000 |
| 11:36 | 19 | aughts, when cameras were different, phones were |
| 11:36 | 20 | different. |
| 11:36 | 21 | And it requires that you do two things: |
| 11:36 | 22 | You take a picture of that image, you process that |
| 11:36 | 23 | image, make sure you got a good picture, and then you |
| 11:36 | 24 | go try to decode it.  There's two big steps there. |
| 11:36 | 25 | Now, if you don't have a good picture, |

| | | |
|---|---|---|
| 11:36 | 1 | you might switch to a different way of taking the |
| 11:36 | 2 | picture.  That's the first switch that we've |
| 11:36 | 3 | illustrated here from both the claim language and |
| 11:36 | 4 | Figure 6. |
| 11:36 | 5 | The second thing you do then is you try |
| 11:36 | 6 | to decode it, but if you can't decode it, well, then |
| 11:36 | 7 | you try a different method of decoding. |
| 11:36 | 8 | So what's critical here on the '491 |
| 11:36 | 9 | patent is to keep in mind that it's not just trying |
| 11:36 | 10 | different methods to get to the right result.  It's |
| 11:36 | 11 | specifically if you don't get good image processing, |
| 11:36 | 12 | try different image processing.  And if you don't get |
| 11:36 | 13 | good decoding, try different decoding. |
| 11:36 | 14 | And that is from the claim language |
| 11:37 | 15 | determining whether processing of the input image is |
| 11:37 | 16 | successful based on a determination as to whether the |
| 11:37 | 17 | correction is completed, and then you do that -- what |
| 11:37 | 18 | we call the first switch, which we're just doing for |
| 11:37 | 19 | shorthand. |
| 11:37 | 20 | So then the question is:  What is the |
| 11:37 | 21 | image processing that's relevant here? |
| 11:37 | 22 | Let's turn to Slide 3. |
| 11:37 | 23 | This is from their expert Dr. Kozek. |
| 11:37 | 24 | This is his report.  And he says that:  The image |
| 11:37 | 25 | processing is ███████████████████████.  That |

11:37  1   is, you center it -- that's the ███████

11:37  2   ████████████ -- and then you █████████████████

        3   ████████████

11:37  4            That is what Dr. Kozek at Docket 180,

11:37  5   Exhibit F, Paragraphs 7 and 9 of his report and,

11:37  6   similarly, in several other places, that's how he

11:37  7   defines the image processing.

11:37  8            So now let's go back to Slide 2 for a

11:37  9   minute because that's the claim language.

11:37  10           So that first switch takes place, that

11:38  11  Claim Element No. 3, switching to one of a different

11:38  12  barcode-reading method in response to the processing of

11:38  13  the image -- input image being unsuccessful.

11:38  14           So that switch that happens, that trying

11:38  15  of a new method, is if the image processing fails.  And

11:38  16  we know --

11:38  17           Slide 3.

11:38  18           -- that image processing is the affine

11:38  19  and crop.

11:38  20           So then the question is:  What does

11:38  21  Google do if ███████████ doesn't happen successfully?

11:38  22           Let's go to Slide 4.

11:38  23           Well, we know what Dr. Kozek says.  If

11:38  24  it's true, you just go to the next step.  So you don't

11:38  25  do a switch.  You go to the next steps and you move on.

| | | |
|---|---|---|
| 11:38 | 1 | That's summarized on our Slide 4, but it's from |
| 11:38 | 2 | Dr. Kozek's report at Paragraphs 141, 188, and 195. |
| 11:38 | 3 | The question, though, because this |
| 11:38 | 4 | element relates to what happens if the switch -- if the |
| 11:38 | 5 | image processing, nothing else, image processing is |
| 11:38 | 6 | unsuccessful, is what happens if it fails? |
| 11:38 | 7 | Let's go to the next slide. |
| 11:38 | 8 | And that's from Paragraph 170 of his |
| 11:39 | 9 | report:  Upon the failure of the ███████ |
| 11:39 | 10 | ████████████ -- again, that's the image processing -- |
| 11:39 | 11 | false is returned. |
| 11:39 | 12 | And he's referring to the source code |
| 11:39 | 13 | there and a function called ███████████  Was it true? |
| 11:39 | 14 | Was it false?  If it is true, it worked.  You move on. |
| 11:39 | 15 | If it's false, you try something different. |
| 11:39 | 16 | That would be the first switch on failure |
| 11:39 | 17 | of image processing.  But that first switch never |
| 11:39 | 18 | happens in Google's products, and Dr. Kozek actually |
| 11:39 | 19 | admits it. |
| 11:39 | 20 | Let's go to Slide 6. |
| 11:39 | 21 | This is his deposition testimony, again, |
| 11:39 | 22 | referring to Paragraph 170, where he says:  This is |
| 11:39 | 23 | when the switch would happen. |
| 11:39 | 24 | And it's worth emphasizing that:  Upon |
| 11:39 | 25 | the failure of the █████████████████████ |

11:39   1   ███████████   ██████████████████████████

11:39   2   ████████████████████████████████████████████

11:39   3              So the barcode, the switch happens if

11:39   4   the -- if the source code ██████████████ if it didn't

11:40   5   work.  But it ██████████████████   ████████████████████

11:40   6              It's ████████████████████████████████

11:40   7   █████████████████████████████████████████████████████████

11:40   8   ███████████████████████████████████████████   ████

11:40   9   █████████████████   So there cannot be a switch in

11:40  10   response to a failure if ████████████████████████.

11:40  11   The -- there is never a switch upon a failure of the

11:40  12   image processing.

11:40  13              Let's just skip to Slide 8.

11:40  14              So we put the big red X to illustrate

11:40  15   there that there is no switch, but the reason there is

11:40  16   no switch, that first switch doesn't happen because the

11:40  17   specific step from which it would be switching, the

11:40  18   using of that image -- or the conducting the image

11:40  19   processing, ████████████████████████████████████

11:40  20              Again, put this patent in context, it's

11:40  21   old.  It's older cameras.  They didn't work quite so

11:40  22   well.  Cameras and everything else have moved along.

11:40  23   Google always skips that step.

11:41  24              Now, you're going to hear a lot in

11:41  25   response about, well, there's ████████████████████████

| 11:41 | 1 | and everything else.  And there might be switches that |
| 11:41 | 2 | happen there, but that is always after an attempt to |
| 11:41 | 3 | ████████████████  which is not that image |
| 11:41 | 4 | processing. |
| 11:41 | 5 | Dr. Kozek defined image processing as a |
| 11:41 | 6 | ██████████  That's that first step.  ████████ is the |
| 11:41 | 7 | image processing under this patent claim under the '491 |
| 11:41 | 8 | patent.  The third element, you only -- you do that |
| 11:41 | 9 | switch if that ████████████  It ██████████████ |
| 11:41 | 10 | Now, they refer to -- |
| 11:41 | 11 | Let's go to Slide 9. |
| 11:41 | 12 | We'll hear -- I'm sure we're going to |
| 11:41 | 13 | hear about, look, well, what happens if ██████████ |
| 11:41 | 14 | ████████████  You do some other image |
| 11:41 | 15 | processing.  But the point is, that's not what the |
| 11:41 | 16 | patent claims.  That's what Google does.  But that's |
| 11:41 | 17 | not what the patent claims. |
| 11:41 | 18 | The patent claim says process the image, |
| 11:41 | 19 | then if that fails, try to process the image a |
| 11:42 | 20 | different way.  Then try to decode. |
| 11:42 | 21 | Google's system is different.  ██████ |
| 11:42 | 22 | ████████████████████████  In a |
| 11:42 | 23 | nutshell, that is the difference. |
| 11:42 | 24 | It is very straightforward.  And |
| 11:42 | 25 | everything Your Honor is about to hear relates to after |

| 11:42 | 1 | trying to ███████████████, not that first thing |
| 11:42 | 2 | that their own expert defined as image-processed. |
| 11:42 | 3 | I'll stop there for the moment, Your |
| 11:42 | 4 | Honor.  Thank you. |
| 11:42 | 5 | MR. DEWBERRY:  Good morning, Your Honor. |
| 11:42 | 6 | Tim Dewberry with Folio Law Group.  Good to see you |
| 11:42 | 7 | again. |
| 11:42 | 8 | I'm going to briefly respond to the |
| 11:42 | 9 | points that Mr. Lanier made. |
| 11:43 | 10 | I think the parties actually are in |
| 11:43 | 11 | remarkable agreement about what the claim requires |
| 11:43 | 12 | here.  But there is definitely disagreement about how |
| 11:43 | 13 | Google's system works.  And interestingly enough, I |
| 11:43 | 14 | think that Mr. Lanier's position is contradicted not |
| 11:43 | 15 | only by Dr. Kozek but his own expert, as we'll |
| 11:43 | 16 | demonstrate. |
| 11:43 | 17 | And I did want to apologize in advance. |
| 11:43 | 18 | There's a lot of source code in here.  There's a lot of |
| 11:43 | 19 | talking about code.  It may be a bit tedious.  But |
| 11:43 | 20 | please, Your Honor, if there was anything before I |
| 11:43 | 21 | start marching down this road that you wanted me to hit |
| 11:43 | 22 | first, happy to do so; otherwise, I will start |
| 11:43 | 23 | marching, and please feel free to stop me whenever |
| 11:43 | 24 | you'd like. |
| 11:43 | 25 | THE COURT:  March away. |

—118—

| | | |
|---|---|---|
| 11:43 | 1 | MR. DEWBERRY:  All right.  Let's start. |
| 11:43 | 2 | MR. LANIER:  Can we just briefly ask to |
| 11:43 | 3 | go on the confidential record for this, please?  The |
| 11:43 | 4 | room is fine with the people in it, but if we can go on |
| 11:43 | 5 | the confidential record. |
| 11:43 | 6 | That's one of my partners back there. |
| 11:43 | 7 | MR. DEWBERRY:  That was the only person I |
| 11:43 | 8 | wasn't quite sure about. |
| 11:43 | 9 | MR. LANIER:  Understood. |
| 11:44 | 10 | MR. DEWBERRY:  He looks trustworthy, |
| 11:44 | 11 | though. |
| 11:44 | 12 | (Sealed proceedings.) |



| 11:44 | 1 | |
| 11:44 | 2 | |
| 11:44 | 3 | |
| 11:44 | 4 | |
| 11:44 | 5 | |
| 11:45 | 6 | |
| 11:45 | 7 | |
| 11:45 | 8 | |
| 11:45 | 9 | |
| 11:45 | 10 | |
| 11:45 | 11 | |
| 11:45 | 12 | |
| 11:45 | 13 | |
| 11:45 | 14 | |
| 11:45 | 15 | |
| 11:45 | 16 | |
| 11:45 | 17 | |
| 11:45 | 18 | |
| 11:45 | 19 | |
| 11:45 | 20 | |
| 11:45 | 21 | |
| 11:45 | 22 | |
| 09:42 | 23 | (Sealed proceedings end.) |
| 11:45 | 24 | THE COURT:  Okay.  Why don't we do this? |
| 11:45 | 25 | I don't think I can get through all of this before |

| | | |
|---|---|---|
| 11:45 | 1 | noon.  And I don't want to rush it.  Why don't we -- |
| 11:45 | 2 | let me do this.  Let me get through the first three |
| 11:46 | 3 | Brazos motions in limine and then we will take our |
| 11:46 | 4 | lunch break. |
| 11:46 | 5 | MR. DEWBERRY:  Very good, Your Honor. |
| 11:46 | 6 | THE COURT:  Okay. |
| 11:46 | 7 | MR. DEWBERRY:  I believe that's someone |
| 11:46 | 8 | other than me. |
| 11:46 | 9 | THE COURT:  No one's arguing. |
| 11:46 | 10 | MR. DEWBERRY:  Thank you, Your Honor. |
| 11:46 | 11 | THE COURT:  And so the first motion is to |
| 11:46 | 12 | preclude Google from presenting the deposition |
| 11:46 | 13 | testimony of its own corporate representative during |
| 11:46 | 14 | its case-in-chief. |
| 11:46 | 15 | Actually, I guess I do -- what does |
| 11:46 | 16 | Google intend to do with this? |
| 11:46 | 17 | MR. LANIER:  Your Honor, Mr. Jones will |
| 11:46 | 18 | address that. |
| 11:46 | 19 | MR. JONES:  Thank you, Your Honor. |
| 11:46 | 20 | I think their position is that we can't |
| 11:46 | 21 | call, in our case, Google witnesses by way of |
| 11:46 | 22 | depositions that are beyond the subpoena power of the |
| 11:46 | 23 | Court, beyond 100 miles. |
| 11:46 | 24 | Basically, you know, the Federal Rules of |
| 11:46 | 25 | Civil Procedure say we can.  The Federal Rules of Civil |

| 11:47 | 1 | Procedure say:  A party may use for any purpose the |
| 11:47 | 2 | deposition of a witness, whether or not a party, if the |
| 11:47 | 3 | Court finds the witness is more than 100 miles from the |
| 11:47 | 4 | place of hearing or trial. |
| 11:47 | 5 | And all of these witnesses -- |
| 11:47 | 6 | THE COURT:  So as long as -- here's what |
| 11:47 | 7 | I'm -- here's why I didn't understand it and why I |
| 11:47 | 8 | asked you to speak.  These aren't corporate 30(b)(6) |
| 11:47 | 9 | depositions. |
| 11:47 | 10 | MR. JONES:  No. |
| 11:47 | 11 | THE COURT:  This is a deposition of Mike |
| 11:47 | 12 | Smith, Google employee. |
| 11:47 | 13 | MR. JONES:  Right.  Google employees. |
| 11:47 | 14 | THE COURT:  And you'd rather play -- they |
| 11:47 | 15 | took his deposition. |
| 11:47 | 16 | MR. JONES:  Right. |
| 11:47 | 17 | THE COURT:  You'd rather play the |
| 11:47 | 18 | deposition than call him live. |
| 11:47 | 19 | MR. JONES:  Right. |
| 11:47 | 20 | THE COURT:  I'm fine with that. |
| 11:47 | 21 | MR. ABRAHAM:  Your Honor, if I may.  They |
| 11:47 | 22 | are 30(b)(6) depositions. |
| 11:47 | 23 | THE COURT:  Well, a 30(b)(6) deposition, |
| 11:47 | 24 | either side gets to play regardless -- that's why I was |
| 11:47 | 25 | trying to figure this out.  So 30(b)(6), they |

11:47  1  absolutely get to play it.  It's a 30(b)(6), it's not a

11:47  2  witness.  It's not a human.  It's a 30(b)(6)

11:47  3  deposition.

11:47  4              If it's that, then either side gets to

11:47  5  play any 30(b)(6) whenever they want.  If it's -- but

11:48  6  if -- to Mr. Jones' point, if it's Mike Jones, Google

11:48  7  engineer, who just doesn't want to come here, and he's

11:48  8  outside of 100 miles and you want to play his

11:48  9  deposition rather than have him come here, I'm fine

11:48  10  with that too.

11:48  11              MR. JONES:  Thank you, sir.

11:48  12              THE COURT:  Motion in Limine No. 2 is:

11:48  13  To preclude evidence, testimony, or argument regarding

11:48  14  the presence or absence at trial of any of the

11:48  15  inventors of the asserted patents.

11:48  16              So here's what I'm going to do on this.

11:48  17  I'm going to hear what the -- I'm going to grant the

11:48  18  motion in limine on this.  In other words, you have to

11:48  19  approach.  I'm not excluding it.  I'm going to listen

11:48  20  to what the plaintiff says and determine whether or

11:48  21  not -- and let me give you an example.  Because I've

11:48  22  done this.

11:48  23              If the plaintiff indicates that this was

11:48  24  the greatest patent that ever happened and how -- how

11:49  25  phenomenally important it was to the inventor and gives

11:49  1     the jury that impression, and then the inventor isn't

11:49  2     called, you get to talk about that.  If they just -- if

11:49  3     the inventor's never mentioned by them, then the fact

11:49  4     that he didn't show up is not going to come in.

11:49  5              So essentially, it will be an -- there's

11:49  6     a motion in limine unless the plaintiff opens the door

11:49  7     and I think gives Google a fair reason to point out

11:49  8     that the inventor is not, in fact, there; otherwise, it

11:49  9     won't be relevant to me.

11:49  10             No. 3:  To preclude evidence, testimony,

11:49  11    or argument suggesting a party's corporate

11:49  12    representative at trial is obligated to prepare on a

11:49  13    particular topic or is in charge of knowledge of

11:49  14    others.

11:49  15             I don't really know what this means, but

11:49  16    it doesn't sound like it should be done.  I don't know

11:49  17    what it means.  I'm denying it.  I don't know what it

11:49  18    means.

11:49  19             So I've been through a lot of trials, and

11:50  20    I don't know what it means.

11:50  21             MR. SIEGMUND:  Your Honor, would you like

11:50  22    to -- or just keep moving?  Because this exact MIL was

11:50  23    granted in the previous trial as well as in --

11:50  24             THE COURT:  What does it mean?

11:50  25             MR. SIEGMUND:  Right, Your Honor.  So all

| 11:50 | 1 | we're trying to say is that Google should be prevented |

11:50  1   we're trying to say is that Google should be prevented

11:50  2   from suggesting that our corporate rep, who's going to

11:50  3   be at trial, know everything about the company and

11:50  4   every single facet under there.  Because we had

11:50  5   previous people who testified, and we don't think it'd

11:50  6   be fair for them to suggest that she doesn't know what

11:50  7   someone else testified to.  That's it.

11:50  8                THE COURT:  If -- okay.  I get it.

11:50  9                MR. SIEGMUND:  Okay.

11:50  10               THE COURT:  If they ask a question along

11:50  11   these lines you think is irrelevant, just object it's

11:50  12   irrelevant.

11:50  13               MR. SIEGMUND:  Understood, Your Honor.

11:50  14               THE COURT:  And so -- and this is both

11:50  15   ways.  You know, when the Google person gets on.  You

11:50  16   know, if the Google person thinks the cross is

11:50  17   objectionable, you can object.  I think the jury will

11:50  18   survive hearing the question and hearing the objection

11:51  19   and won't be scarred by it.

11:51  20               I'll go ahead and let me see if I can get

11:51  21   through a couple more of these.

11:51  22               Plaintiff and its experts should be

11:51  23   precluded from testifying about or referring to

11:51  24   licensing negotiations given that plaintiff denied

11:51  25   Google discovery of such information.

| | | |
|---|---|---|
| 11:51 | 1 | So specifically what, from Google's |
| 11:51 | 2 | perspective, are they worried that plaintiff is going |
| 11:51 | 3 | to be talking about regarding licensing negotiations |
| 11:51 | 4 | that you did not get? |
| 11:51 | 5 | MR. GARCIA:  Sure, Your Honor.  Their |
| 11:51 | 6 | damages expert wants to color some of the negotiations |
| 11:51 | 7 | behind the transferring of the patents and the |
| 11:51 | 8 | purchasing of the patents and licensing of the patents. |
| 11:51 | 9 | We were never allowed to get any discovery behind those |
| 11:51 | 10 | negotiations, so their expert's trying to bootstrap |
| 11:51 | 11 | that with conversations with some of the corporate |
| 11:51 | 12 | people at WSOU.  However, they didn't allow us any |
| 11:51 | 13 | document requests on that or a 30(b)(6). |
| 11:51 | 14 | THE COURT:  A response? |
| 11:51 | 15 | MR. SIEGMUND:  Yes, Your Honor.  I can |
| 11:51 | 16 | show you exactly what was testified to.  So |
| 11:52 | 17 | essentially, all that the experts are going to say is |
| 11:52 | 18 | that in the prior license agreements, there was no |
| 11:52 | 19 | invalidity analysis, there's no infringement analysis. |
| 11:52 | 20 | It was a blind, hey, would you take an offer of these |
| 11:52 | 21 | patents?  Yes, great. |
| 11:52 | 22 | And that's exactly what our witnesses |
| 11:52 | 23 | testified to on 30(b)(6), and that's the licensing |
| 11:52 | 24 | negotiation that we're talking about. |
| 11:52 | 25 | THE COURT:  So here's what I'm going to |

```
11:52    1    do at trial.

11:52    2                    The plaintiff will be limited -- and I

11:52    3    think this is fine by your -- in their perspective.

11:52    4    Plaintiff will be limited to putting on testimony with

11:52    5    regard to these negotiations that was disclosed during

11:52    6    discovery.  And if it wasn't disclosed during

11:52    7    discovery, then you can object when they try and put it

11:52    8    on through their expert.

11:52    9                    MR. GARCIA:  Your Honor, point of

11:52   10    clarity.  None of this was disclosed during discovery

11:52   11    because we weren't allowed discovery on this.

11:52   12                    THE COURT:  Well, they're going to have

11:52   13    to play it.  They're going to have to ask their --

11:52   14    they're going to have to introduce this evidence at

11:52   15    trial.  And if they ask a question that you were

11:53   16    prohibited from, approach the bench, and I'll strike

11:53   17    it.

11:53   18                    If they ask -- if Mr. Siegmund is telling

11:53   19    me that they want to put into evidence what their

11:53   20    witnesses testified to in their depositions, and if

11:53   21    they do that, then you have notice of it; if they go

11:53   22    beyond that, approach the bench, and I will -- I won't

11:53   23    let them do it.

11:53   24                    MR. GARCIA:  Thank you for that clarity,

11:53   25    Your Honor.
```

| 11:53 | 1 | THE COURT:  MIL No. 2:  Plaintiff, its |
| 11:53 | 2 | experts, and ███████████ should be precluded from |
| 11:53 | 3 | testifying about -- |
| 11:53 | 4 | MR. SIEGMUND:  This one's agreed, Your |
| 11:53 | 5 | Honor. |
| 11:53 | 6 | THE COURT:  Okay. |
| 11:53 | 7 | MS. YOON:  Your Honor, if I may.  Rita |
| 11:53 | 8 | Yoon for Google.  I'd like to note our agreement on the |
| 11:53 | 9 | record as to Motion in Limine No. 2. |
| 11:53 | 10 | THE COURT:  Okay. |
| 11:53 | 11 | MS. YOON:  We appreciate plaintiff |
| 11:53 | 12 | confirming last night by e-mail that plaintiff will not |
| 11:53 | 13 | present third-party witness ███████████ at trial in |
| 11:53 | 14 | the 585 and 580 cases.  Plaintiff also confirmed that |
| 11:54 | 15 | plaintiff will not make any argument, introduce any |
| 11:54 | 16 | evidence or testimony about any common licensing |
| 11:54 | 17 | practices or any licensing practices of ███████ |
| 11:54 | 18 | ███████████ based on any statements or |
| 11:54 | 19 | conversations or testimony or evidence from |
| 11:54 | 20 | ███████████ |
| 11:54 | 21 | Thank you. |
| 11:54 | 22 | MR. SIEGMUND:  And that's correct, Your |
| 11:54 | 23 | Honor. |
| 11:54 | 24 | THE COURT:  Okay. |
| 11:54 | 25 | MS. YOON:  Thank you very much. |

| 11:54 | 1 | THE COURT:  Next I have No. 3:  Any |
|---|---|---|

11:54  1          THE COURT:  Next I have No. 3:  Any

11:54  2  reference to purported deficiencies in Google's

11:54  3  document production or insinuation...

11:54  4          Nothing about discovery comes up during

11:54  5  trial.  That's a rule.

11:54  6          Number -- next one:  Plaintiff and its

11:54  7  experts should be precluded from making any argument or

11:54  8  reference to issues not addressed...

11:54  9          If it's not in the expert report, it's

11:54  10  not coming in.  So that's granted.

11:54  11          The last one:  Plaintiff and its experts

11:54  12  should be precluded from making any reference to or

11:55  13  arguments about Google's financials and revenues not

11:55  14  used in plaintiff's damages calculation.

11:55  15          If it's not in the plaintiff's expert

11:55  16  report, it's not coming in.

11:55  17          So now let me go ahead and say the

11:55  18  following.  Trial begins October 2nd at 9:00 a.m.  You

11:55  19  are going to have ten hours per side, does not include

11:55  20  opening or closing.  Generally speaking, we go from

11:55  21  8:30 to 6:00.

11:55  22          When depositions are played, please make

11:55  23  sure you give to Kristie and our -- my law clerk who

11:55  24  gets charged for the time.

11:55  25          The charge conference will take place

11:55  1  sometime on Wednesday probably.  Y'all -- everyone here

11:55  2  has been through a charge conference.  You know how

11:55  3  they work.

11:55  4           At the end of plaintiff's case, we will

11:56  5  take a break.  You'll orally make your motion.  At the

11:56  6  end of defendant's case, we'll take a break.  Motions.

11:56  7  At the end of trial, we'll take motions.

11:56  8           Your voir dire will take place on

11:56  9  September 28th at 9:00 a.m., seven jurors, four strikes

11:56  10  per side.

11:56  11           Friday, September 29th at 1:30, the

11:56  12  courtroom will be open for your tech people to come in.

11:56  13           You all know, I think, about the -- how

11:56  14  to upload things.  You've all done the uploading of --

11:56  15  to JERS.

11:56  16           I'm going to say this just because she

11:56  17  would kill me if I didn't.  For our unbelievably great

11:56  18  court reporter, Kristie, please turn the mic on every

11:56  19  time you speak during trial.  None of you will, but I'm

11:56  20  saying this anyway.

11:56  21           Please also directly send her all slides

11:56  22  and demonstratives by e-mail.

11:56  23           I think you all know this also about how

11:56  24  insistent I am that -- to go -- about going off and on

11:56  25  the confidential record.

| | | |
|---|---|---|
| 11:57 | 1 | Finally, I think all of you know all of |
| 11:57 | 2 | the other -- I don't think there's anything here that |
| 11:57 | 3 | you all haven't been through with me. |
| 11:57 | 4 | I will -- I'll start with Mr. Siegmund. |
| 11:57 | 5 | Is there any questions from plaintiff? |
| 11:57 | 6 | MR. SIEGMUND:  Yes, Your Honor. |
| 11:57 | 7 | On MIL No. 5, I understand the Court's |
| 11:57 | 8 | ruling, I think just with one caveat.  I believe Google |
| 11:57 | 9 | owes us some supplementation of revenue information |
| 11:57 | 10 | that we haven't received yet because I think they |
| 11:57 | 11 | provided it at one quarter in the past and they just |
| 11:57 | 12 | haven't provided the updated revenue. |
| 11:57 | 13 | But subject to that, obviously, we don't |
| 11:57 | 14 | have any issue with that ruling.  But that's -- we've |
| 11:57 | 15 | requested that information.  They've agreed to provide |
| 11:57 | 16 | it.  We just haven't received it yet.  That's all. |
| 11:57 | 17 | THE COURT:  Okay.  Anything else? |
| 11:57 | 18 | MR. SIEGMUND:  And then one other |
| 11:57 | 19 | question, Your Honor, is on the Court's preferences on |
| 11:57 | 20 | impeachment by prior deposition testimony. |
| 11:57 | 21 | Are we going with I guess what I would |
| 11:57 | 22 | call the traditional method of provide the statement, |
| 11:57 | 23 | walk them through -- |
| 11:57 | 24 | THE COURT:  Yes. |
| 11:58 | 25 | MR. SIEGMUND:  Okay.  That's all I needed |

| 11:58 | 1 | to know.  Thank you, Your Honor. |
| 11:58 | 2 | THE COURT:  Yes, sir. |
| 11:58 | 3 | MR. LOVE:  Yes, Your Honor.  Just one |
| 11:58 | 4 | quick question. |
| 11:58 | 5 | We have not conferred on questionnaires |
| 11:58 | 6 | to submit to the potential jury members, venire panel. |
| 11:58 | 7 | When does the Court need that by? |
| 11:58 | 8 | THE COURT:  It'd better be quick, because |
| 11:58 | 9 | you all's trial's not very far away.  If you want to |
| 11:58 | 10 | get them back, it'd better be pretty quick. |
| 11:58 | 11 | MR. LOVE:  Okay.  Thank you, Your Honor. |
| 11:58 | 12 | MR. LANIER:  Two small questions for us, |
| | 13 | Your Honor.  Very small. |
| 11:58 | 14 | One just on scheduling.  Your Honor |
| 11:58 | 15 | referred to voir dire on September 28th at 9:00 a.m. |
| 11:58 | 16 | Is that the actual voir dire or is that voir dire |
| 11:58 | 17 | conference that Judge Gilliland sometimes -- |
| 11:58 | 18 | THE COURT:  That's when you'll be picking |
| 11:58 | 19 | the jury. |
| 11:58 | 20 | MR. LANIER:  Great.  Thank you very much, |
| | 21 | Your Honor. |
| 11:58 | 22 | And then there's been a slight dispute |
| 11:58 | 23 | about the scope of the rebuttal case.  Our |
| 11:58 | 24 | understanding is plaintiff's rebuttal case responds to |
| 11:58 | 25 | our invalidity case -- |

| | | |
|---|---|---|
| 11:58 | 1 | (Simultaneous speakers.) |
| 11:58 | 2 | THE COURT:  The plaintiff will put on a |
| 11:58 | 3 | rebuttal case to your invalidity case. |
| 11:58 | 4 | MR. LANIER:  Thank you, Your Honor. |
| 11:58 | 5 | THE COURT:  That's what they'll get to |
| 11:58 | 6 | do. |
| 11:58 | 7 | MR. SIEGMUND:  And on that point, Your |
| 11:58 | 8 | Honor, is cross limited to invalidity? |
| 11:58 | 9 | THE COURT:  The -- so you're putting on |
| 11:59 | 10 | your invalidity expert? |
| 11:59 | 11 | MR. SIEGMUND:  That's correct. |
| 11:59 | 12 | THE COURT:  And they are crossing your |
| 11:59 | 13 | invalidity rebuttal expert? |
| 11:59 | 14 | MR. SIEGMUND:  Yes.  Are they allowed |
| 11:59 | 15 | to -- |
| 11:59 | 16 | THE COURT:  It's limited to invalidity. |
| 11:59 | 17 | MR. SIEGMUND:  Thank you. |
| 11:59 | 18 | MR. LANIER:  Understood, Your Honor. |
| 11:59 | 19 | Thank you. |
| 11:59 | 20 | THE COURT:  So I thought it was a trick |
| 11:59 | 21 | question. |
| 11:59 | 22 | Anything else? |
| 11:59 | 23 | MR. LANIER:  I believe not from us, Your |
| 11:59 | 24 | Honor. |
| 11:59 | 25 | MR. SIEGMUND:  Nothing from us, Your |

11:59  1  Honor.  Thank you.

11:59  2              MR. LANIER:  I'm reminded, Your Honor

11:59  3  didn't give us precise times for opening and closing.

11:59  4  You've done it before.  I don't know if you have it

11:59  5  this time.

11:59  6              THE COURT:  30 minutes per side --

11:59  7              MR. LANIER:  Thank you, Judge.

11:59  8              THE COURT:  -- on each.

11:59  9              MR. LANIER:  Thank you.  No other

11:59 10  questions from us.

11:59 11              THE COURT:  Anything else?

11:59 12              MR. SIEGMUND:  No, Your Honor.

11:59 13              THE COURT:  Okay.  Y'all have a good day.

11:59 14              (Hearing adjourned.)

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS     )

3

4

5                I, Kristie M. Davis, Official Court

6   Reporter for the United States District Court, Western

7   District of Texas, do certify that the foregoing is a

8   correct transcript from the record of proceedings in

9   the above-entitled matter.

10               I certify that the transcript fees and

11  format comply with those prescribed by the Court and

12  Judicial Conference of the United States.

13               Certified to by me this 10th day of

14  September 2023.

15

16                        */s/ Kristie M. Davis*
                          KRISTIE M. DAVIS
17                        Official Court Reporter
                          800 Franklin Avenue
18                        Waco, Texas 76701
                          (254) 340-6114
19                        kmdaviscsr@yahoo.com

20

21

22

23

24

25

11:59