```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3   WSOU INVESTMENTS LLC,              ) WA:20-CV-00585-ADA
     doing business as BRAZOS          )
 4   LICENSING AND DEVELOPMENT,        )
                                       )
 5      Plaintiff,                     )
                                       )
 6   v.                                ) WACO, TEXAS
                                       )
 7   GOOGLE LLC,                       )
                                       )
 8      Defendant.                     ) OCTOBER 2, 2023

 9          ***********************************************
                      TRANSCRIPT OF JURY VOIR DIRE
10            BEFORE THE HONORABLE DEREK T. GILLILAND
            ***********************************************
11
     APPEARANCES:
12
     FOR THE PLAINTIFF:   MARK D. SIEGMUND
13                        MELISSA SAMANO RUIZ
                          CHERRY JOHNSON SIEGMUND JAMES, PLLC
14                        400 AUSTIN AVENUE, SUITE 9TH FLOOR
                          WACO, TEXAS 76701
15
                          GREGORY PHILLIP LOVE
16                        STECKLER WAYNE CHERRY & LOVE PLLC
                          P.O. BOX 948
17                        HENDERSON, TEXAS 75653

18                        JOSEPH M. ABRAHAM
                          TIMOTHY FRANKLIN DEWBERRY
19                        FOLIO LAW GROUP PLLC
                          13492 RESEARCH BLVD, SUITE 120, NO. 177
20                        AUSTIN, TEXAS 78750

21                        ALDEN K. LEE
                          FOLIO LAW GROUP PLLC
22                        1200 WESTLAKE AVENUE NORTH, SUITE 809
                          SEATTLE, WASHINGTON 98109
23
     FOR THE DEFENDANT:   MICHAEL E. JONES
24                        POTTER MINTON
                          102 NORTH COLLEGE, SUITE 900
25                        TYLER, TEXAS 75702
```

```
 1                           THARAN GREGORY LANIER
                             JONES DAY
 2                           1755 EMBARCADERO ROAD
                             PALO ALTO, CALIFORNIA 94303
 3
                             TRACY ANN STITT
 4                           JONES DAY
                             51 LOUISIANA AVENUE NORTHWEST
 5                           WASHINGTON, D.C. 20001

 6    TRANSCRIBER:           ARLINDA RODRIGUEZ, CSR
                             501 WEST 5TH STREET, SUITE 4152
 7                           AUSTIN, TEXAS 78701
                             (512) 391-8791
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by electronic sound recording, transcript

25    produced by computer.
```

```
 1        (Proceedings began at 9:10 a.m.)

 2        (Open court, no venire)

 3        THE COURT:  All right.  Good morning, everybody.

 4  If there's nothing we need to take up, we'll just --

 5  we'll have the jury brought in.  Just remain standing for

 6  the jury.

 7        (Open court, venire present)

 8        THE COURT:  Please be seated.  Ms. Copp, will you

 9  please call the case.

10        THE CLERK:  Yes, Your Honor.  Calling case number

11  WA:20-CV-585, WSOU Investments LLC, doing business as

12  Brazos Licensing and Development v. Google LLC, called

13  for jury selection proceedings.

14        THE COURT:  And could I get announcements,

15  starting with the plaintiff.

16        MR. SIEGMUND:  Good morning, Your Honor.  Good

17  morning, everyone.  Mark Siegmund on behalf of the

18  plaintiff, and we're ready to proceed, Your Honor.

19        THE COURT:  All right.  Very good.  And for

20  defendant?

21        MR. JONES:  Your Honor, Mike Jones on behalf of

22  the defendant Google, and we're ready to proceed.

23        Thank you, Your Honor.

24        THE COURT:  All right.  Very good.  Thank you.

25        Well, ladies and gentlemen, you-all are here for
```

1  a jury selection in the case you just heard called, and

2  that's *WSOU Investments v. Google*.  We're going to go

3  through the voir dire process this morning and get a jury

4  seated for a trial that will begin on Monday.

5        Now, I know all of you-all have been through a

6  lot this morning.  You-all have been through a lot before

7  you got here, in that you-all were kind enough to fill

8  out the questionnaires for both myself and the parties.

9  So we know a fair amount about you-all because of that,

10 but you-all don't know anything about us.  So I figured

11 turnabout is only fair play, and I'll tell you a little

12 bit about myself.

13        Now, I am one of three federal judges that sit in

14 this courtroom, and I've had the pleasure of being on the

15 bench since April 1st of 2022, which I'm still trying to

16 decide whether that was a really good April Fool's joke

17 or just another day.  I -- as I said, I live here in

18 Waco, and my duty station is this courthouse and this

19 courtroom.

20        I graduated in 1993 from Texas A&M University --

21 I always pause for a "whoop" just in case -- with a

22 degree in mechanical engineering, and that was what

23 brought me to Waco originally.  I came up here and worked

24 for -- back then it was Chrysler Technologies Airborne

25 Systems; it's now known as L3Harris up in Bellmead.  Hung

1    boxes on airplanes for the United States Air Force for a

2    few years before attending Baylor Law School, where I

3    graduated back in '98.  And then I've practiced law in

4    Central Texas, East Texas, and in courts around the

5    country for 24 years before I got on the bench.

6         Now, back in '93 I met a charming woman who is

7    still my wife.  Somehow I've convinced her to stick

8    around year after year, and she was a graduate of A&M.

9    She's a full-time mom, part-time veterinarian.  We've got

10   four kids: one that's finally out on his own two feet,

11   three that are in college, and a couple that, you know,

12   hopefully will be out on their own two feet.  They range

13   in ages from 20 up to 24, though we're about to hit

14   birthdays, so they'll be 21 to 25 before that round is

15   over.  So that's a little bit about me, so you know a

16   little bit more about my background how I came to be on

17   the bench.

18        Now, I want to take a few minutes and impress

19   upon you the importance of jury service and the jury

20   system that we use today.  And the jury system we use

21   today was effectively invented by the Ancient Greeks,

22   primarily in the city-state of Athens years ago.  And

23   when the Greeks invented it, you could vote when you were

24   18 years old, but you could not serve on a jury until you

25   turned at least 30, because they felt the jury service

1   was that important.  It required a little more maturity

2   and years of experience to serve on a jury.

3           Now, the Romans picked it up from the Ancient

4   Greeks, they carried it to the British Isles.  And the

5   British, when they colonized North America, they brought

6   it to our shores and it became ingrained in the original

7   colonies and was important enough to them that, if you

8   look at the Declaration of Independence, one of the

9   specific grievances that the colonists had against the

10  British Crown is that it had eliminated the right by

11  trial by jury in a lot of civil cases.  So that made its

12  way into the Declaration of Independence, and it also

13  became enshrined in the Seventh Amendment, which is also

14  part of the Bill of Rights, without which it's unlikely

15  our Constitution would have ever been ratified and

16  adopted by the states.

17          So I tell you a little bit about that to let you

18  know the importance and the history of the jury system.

19  Now, the way that system works is those of you that are

20  selected to serve on the jury will be the judges of

21  facts.  And what that means is there's going to be a

22  dispute in this case, like there are in most cases that

23  make it to trial, over the facts about things involved in

24  the case.

25          Now, the simplest example I can give you of a

1  factual dispute, which is not this case, but if it were a

2  car wreck case and both sides swore they had the green

3  light, that's a question of fact that the jury has to

4  decide.

5         The judge for jury selection, it's me.  The trial

6  will start next week, as I said, and it will be Judge

7  Alan Albright will preside over the trial.  The judge

8  decides the questions of law or what law applies to the

9  facts, gives the jury instructions about that, and then

10 the jury decides what the facts are to reach the verdict.

11 So that's kind of how the back-and-forth of that system

12 works.

13        And now we're going to go through a process that

14 we call -- it's called a voir dire process.  And I had

15 mentioned that the Ancient Greeks invented the jury

16 system.  Well, if you look back at the Ancient Greek

17 trials that use the jury system, for example, the trial

18 of Socrates, they would impanel a jury of anywhere from

19 500 to almost 2,000 people to decide disputes.

20        We can't accommodate that many people.  The

21 courtroom is not quite that big.  So we go through a voir

22 dire process where I'll ask you a few questions, and each

23 of the sides will have the opportunity to ask a few more

24 questions.  We go through that process so we can seat a

25 jury that's a little more manageable for the

1   accommodations we have and so that we can select a jury

2   where this is the right case for you to be -- be someone

3   to sit on the jury.

4          And the reason for that is that, if you were one

5   of these parties, you would want to have a jury that was,

6   you know, unbiased and had -- had really no opinions

7   coming into the case as to how the results should work

8   out.  You'd want the process to be as fair as possible.

9   So we go through the voir dire process to make sure that

10  the jury that's seated fits that -- that mold.

11         Like I said, a good example of that is, like I

12  said, my wife's a veterinarian.  And so if I was in your

13  shoes on a jury panel and the case involved a suit

14  against a veterinarian, that would not be the right case

15  for me, because I would come into that case with a lot of

16  preconceived ideas, notions, and thoughts about how

17  veterinarians operate and should be treated that wouldn't

18  make me a good juror for that case.

19         So that's what the voir dire process is about, is

20  to find out if this is the right -- the right case for

21  you.  Now, as we go through it, "voir dire," I think

22  loosely translated means to speak the truth.  And that

23  just means that, as questions are asked of you, there are

24  no right or wrong answers.  It just means to be open and

25  candid with the attorneys involved in the questioning, or

1  with me when I ask a question.  And don't worry about

2  whether it's the right or wrong answer, because there are

3  no right or wrong answers during voir dire.  It's just

4  finding out more information about you to decide whether

5  or not this is the right case for you to serve on.

6          Now, I gave you that background of the jury

7  service because, in part, I believe that jury service is

8  the second highest calling that a member of our country,

9  a civilian can perform.  I think the first highest

10 calling in my opinion is service in the Armed Forces, and

11 I know some of you have been in the services, and I thank

12 you for your service.  But I do think the second highest

13 calling that a member of our public can perform is

14 service on a jury.  So your attendance here today, in a

15 very real and tangible way, makes you part of our fabric

16 of government and, in my opinion, has you sitting for and

17 performing a second highest form of service that you can

18 as a citizen of our country.  So I thank you for being

19 here.

20          Now, we are -- as we said, we're going to seat a

21 smaller jury.  We're going to seat a jury of seven people

22 when we're done with the voir dire process.  If at any

23 point today somebody asks a question where you don't want

24 to answer it in front of everybody because of the nature

25 of your answer, something about it makes you -- makes it

1  very private or confidential for you, let me know.  That

2  doesn't happen often.  But if it does come up, we can

3  address that with just me and the attorneys at the

4  appropriate time.  So I tell you that in case something

5  comes up and you're -- you're very, very concerned about

6  answering in front of everybody.  Let us know, and we'll

7  figure out how to deal with it.

8         All right.  So now the last thing I'll tell you

9  before we start getting into more of the details of the

10  case and the background of the case is don't try and

11  prejudge anything.  What you hear today, things I've told

12  you, things the lawyers will tell you, questions that we

13  ask you, they're not evidence.  They're nothing that the

14  case should be decided upon, so don't try and figure out

15  today who you think should win or not, because you're not

16  going to hear any evidence today at all.  It's simply

17  just the voir dire process.  So don't try and prejudge

18  anything or guess about how you think it should come out.

19         All right.  Now, the parties have prepared a

20  written statement kind of summarizing what they believe

21  the case is about, so I'm going to read the parties'

22  statement.  But this is not evidence.  It's merely a

23  summary of their belief as to what the lawsuit involves.

24  It's mainly to help orient you to this process in the

25  case so you'll understand, maybe, or have a better idea

 1  of some of the questions that are asked.

 2          Now this is a civil action for patent

 3  infringement, and it's specifically the plaintiff WSOU

 4  Investments LLC, doing business as Brazos Licensing and

 5  Development, accuses the defendant Google LLC of

 6  infringing certain claims of United States Patent Number

 7  8,737,961 and seeks damages.

 8          Google denies that it has infringed the patent

 9  and contends that the patent is invalid.

10          That concludes the parties' -- the reading of the

11  parties' statement.  So what I'm going to do next is I'm

12  going to have the attorneys introduce themselves to you

13  and their legal teams.  They're going to do it one at a

14  time.  Listen to the questions.  Mr. Siegmund, if you'll

15  approach.

16          MR. SIEGMUND:  May we approach the bench just for

17  a second?

18          THE COURT:  Yeah.  Real quick.

19          When we get to the reading of the questions and

20  introductions, after you're done I'm going to ask you if

21  you recognize anybody.  So pay attention to that.

22      (At the bench)

23          MR. SIEGMUND:  Excuse me, but you've been saying,

24  I think, the trial is next week and it starts this

25  afternoon.

```
1              THE COURT:  Oh, that's right.  That's right.
2              MR. SIEGMUND:  I thought it might get confusing.
3              THE COURT:  Yeah.  Yeah.
4              MR. SIEGMUND:  Thank you.
5         (In open court)
6              THE COURT:  All right.  You-all might have been
7    thrown off a little bit, as both counsel were, when I
8    kept saying that the trial would start next week.
9    Normally this is the -- this is like the third one of
10   these I've done in the last month, and normally we do
11   them on Tuesday and the trial starts on Monday.  We've
12   got a lot going on, and it felt like we were already
13   halfway through the week, in my opinion.  But it starts
14   this afternoon.
15             So we're going to get through this process this
16   morning, and then you're going to get to hear the
17   beginning of the case this afternoon.  So there won't be
18   any evidence presented this morning.  Nothing you hear is
19   evidence.  But those of you that are selected will have
20   to report back this afternoon.  Then you'll begin to hear
21   some of the evidence later today.
22             And thank you for that correction.
23             Okay.  So, Mr. Siegmund, if you will, introduce
24   yourself and just the legal team for the plaintiff.
25             Listen carefully and let me know if you recognize
```

1  any of the people Mr. Siegmund introduces.

2          MR. SIEGMUND:  Good morning, folks.  My name is

3  Mark Siegmund, and I'm proud to represent the plaintiff

4  in this case, Brazos Licensing and Development.  I'm with

5  the law firm of Cherry Johnson Siegmund James here in

6  Waco.  Some of the other attorneys on the case are Greg

7  Love and Melissa Ruiz with my firm.  And then also is Joe

8  Abraham, Tim Dewberry, and Alden Lee with Folio Law Group

9  out of Austin.  And that's everybody, Your Honor.

10          THE COURT:  All right.  And with that reading,

11  does anybody think they recognize Mr. Siegmund or any of

12  the attorneys or persons that he just introduced?  If you

13  do, raise your paddle.

14          All right.  I don't see any paddles.  So what I'm

15  going to ask him to do is read his list, the plaintiff's

16  potential witness list.  These are people that the

17  plaintiff may call as witnesses in the case.  Listen

18  carefully because I'm going to ask if you recognize any

19  of these people.

20          Go ahead, Mr. Siegmund.

21          MR. SIEGMUND:  Thank you, Your Honor.  Our

22  corporate representative will be Ms. Sheyanna Pietras,

23  and you're also going to hear from Dr. Yiming Ma, the

24  inventor, Mr. Tamas Budavari, Justin Blok, and Todor

25  Cooklev.  And those are our live as-call witnesses,

```
 1   Your Honor.
 2          THE COURT:  All right.  Very good.  Does anybody
 3   think they recognize any of the names that Mr. Siegmund
 4   just read?
 5          All right.  With that, thank you very much,
 6   Mr. Siegmund.
 7          Mr. Jones, if you'll introduce yourself and the
 8   legal team, and we'll do the same series of questions.
 9          MR. JONES:  Certainly, Your Honor.  Good morning.
10   My name is Mike Jones, and it's my privilege in this case
11   to represent Google.  Trying this particular case with me
12   will be Mr. Greg Lanier and Ms. Tracy Stitt.  And also
13   helping us today is Lynn Falle and Mr. Mike Collins.
14          Our witnesses -- should I proceed, Your Honor,
15   with our witnesses?
16          THE COURT:  Let me stop you there.
17          MR. JONES:  Excuse me.  I'm sorry.
18          THE COURT:  Does anybody recognize Mr. Jones or
19   any of the people that he just introduced -- think you
20   know them or recognize them?  If so, raise your paddle.
21          All right.  I don't see any paddles, so now if
22   you'll read your list of witnesses, please.
23          MR. JONES:  Thank you.  Certainly.
24          THE COURT:  And introduce your corporate rep.
25          MR. JONES:  Thank you, sir.
```

```
 1           Our corporate representative for Google will be
 2  Mr. David Feltenberger.  Mr. Feltenberger, would you
 3  please stand here.  Thank you.
 4           And our list of witnesses are the
 5  following: Ms. Marlo McGriff, a Google director of
 6  product management; Ms. Amanda Moore, a Google director
 7  of product management; Dr. Zhengrong Ji, a Google
 8  software engineer; Dr. Gregory Welch, Mr. Chris Bakewell;
 9  and by deposition: Brian Holz, Matthew Gubiotti, Craig
10  Etchegoyen, Stewart Shanus, James Maccoun, and Jenny Lee,
11  Your Honor.
12           THE COURT:  All right.  Thank you very much,
13  Mr. Jones.
14           MR. JONES:  Thank you, Your Honor.
15           THE COURT:  Does anybody know or think they know
16  any of the witnesses that Mr. Jones just read for us or
17  the corporate representative?
18           All right.  I don't see any paddles, so we'll
19  keep going.
20           Another question is:  Does anybody -- did anybody
21  know or recognize any of the court personnel you've seen
22  here today, either up here on the bench or any of the
23  court personnel you've interacted with this morning?  If
24  so, please raise your paddle.
25           All right.  I don't see any paddles.
```

1  Occasionally we get that, though, where folks know the

2  court security officers.  We once had the court

3  librarian's sister on a jury panel.  So you never know.

4       How about each other?  Does anybody know anyone

5  else that's on the jury panel?  All right.  Hold your

6  paddles up until you hear -- hear your number called.

7  And also, when I ask you some questions, wait until you

8  get the microphone before you start to answer.  And we're

9  going to start with Number 5, Ms. Blizzard; is that

10 right?

11       JUROR BLIZZARD:  Yes.  That's correct,

12 Your Honor.

13       THE COURT:  All right.  And who do you know

14 Ms. Blizzard.

15       JUROR BLIZZARD:  I know Ms. Shauna Seale, Number

16 24.

17       THE COURT:  Okay.  And how do you know her?

18       JUROR BLIZZARD:  She was a coworker of mine at an

19 elementary school.

20       THE COURT:  Which elementary school?

21       JUROR BLIZZARD:  Chisholm Trail Elementary in

22 Belton.

23       THE COURT:  Oh, got it.  Very good.  Now, would

24 anything about that affect your ability to listen to the

25 case?

```
1              JUROR BLIZZARD:  No, sir.

2              THE COURT:  Okay.  Very good.  Thank you,

3  Ms. Blizzard.

4              JUROR BLIZZARD:  Thank you.

5              THE COURT:  All right.  Let's -- Number 13,

6  Mr. Reynolds.

7              JUROR REYNOLDS:  Yes, sir.  I just know in

8  passing Mr. Taylor.  He's a manager of a local grocery

9  store that I go to.

10             THE COURT:  Okay.  Where is Mr. Taylor.  I'm

11 sorry.  If you'll -- oh, there you are.  Number 1.  I was

12 looking back behind you.

13             All right.  Let me be real quick, Mr. Reynolds,

14 just for clarity --

15             JUROR REYNOLDS:  Yes, sir.

16             THE COURT:  -- does anything about the fact that

17 you know or recognize Mr. Taylor affect your ability to

18 sit as a juror and listen to the evidence?

19             JUROR REYNOLDS:  No, Your Honor.

20             THE COURT:  All right.  Thank you very much.

21             All right.  Well, Mr. Taylor, did -- did you

22 recognize Mr. Blizzard [sic] from the grocery store?

23             JUROR TAYLOR:  Not right off, Your Honor.  But I

24 do now.

25             THE COURT:  Well, and it's not the setting you'd
```

```
 1   normally see him in.

 2              JUROR TAYLOR:  Correct.

 3              THE COURT:  So that's completely understandable.

 4   Does anything about that, would it affect your ability to

 5   listen to the evidence and be a juror in the case?

 6              JUROR TAYLOR:  No, Your Honor.

 7              THE COURT:  All right.  Thank you very much.  If

 8   you will -- Mr. Scott, if we can get a microphone to 24,

 9   Ms. Seale.

10              JUROR SEALE:  Yes.

11              THE COURT:  All right, Ms. Seale, I guess you

12   know Ms. Blizzard?

13              JUROR SEALE:  Yes, sir.

14              THE COURT:  Do you know anybody else?

15              JUROR SEALE:  No, sir.

16              THE COURT:  All right.  And you-all work together

17   at Chisholm?  Was it Chisholm Trail?

18              JUROR SEALE:  Chisholm Trail, uh-huh.

19              THE COURT:  All right.  Anything about that

20   affect your ability to sit as a juror and listen to the

21   evidence in the case?

22              JUROR SEALE:  No, sir.

23              THE COURT:  All right.  Thank you very much,

24   Ms. Seale.

25              JUROR SEALE:  Thank you.
```

```
 1              THE COURT:  All right.  Another question I have
 2   that comes up occasionally, not often, but does come up
 3   occasionally:  Has anybody served on a focus group or
 4   anything like that on something related to a patent case?
 5              All right.  Very good.  Well, we'll keep going.
 6              Let's see.  Now, the case is going to start
 7   today, and everybody is going to do their dead level best
 8   to have it done and over by Friday.  So it's just going
 9   to be a one-week-long trial.  But knowing that it's going
10   to go this week, does anybody have a hardship that would
11   make it very difficult to serve as a juror if you were
12   selected in the case?
13              If so, raise your paddle.
14              All right.  Number 16.  Ms. Miles will get you a
15   microphone, Mr. Warren?
16              JUROR WARREN:  Yes, sir.
17              THE COURT:  All right.  And what do you have
18   going on Mr. Warren.
19              JUROR WARREN:  I work for an insurance company.
20   We had a major hailstorm in Round Rock, and it would be
21   very difficult for me not to help my employees and my
22   customers this week.  They're all depending on us to be
23   there to get them back up to speed.
24              THE COURT:  Okay.  What's the company you work
25   for?
```

```
 1              JUROR WARREN:  Texas Farm Bureau Insurance.

 2              THE COURT:  Okay.  All right.  Thank you,

 3  Mr. Warren.

 4              JUROR WARREN:  Thank you.

 5              THE COURT:  If you'll pass the microphone back to

 6  Ms. Miles.  Thank you.

 7              All right.  Now, has anybody read or think

 8  they've read anything about this case?  I'm sure that at

 9  least some of you-all have heard of Google, but

10  specifically about this case.

11              Okay.  I see number 29, Mr. Wright.  Ms. Miles,

12  if you'll hand him a microphone.  Mr. Wright, do you

13  think you've seen something about this case?

14              JUROR WRIGHT:  Oh.  Sorry.  All I would say, when

15  I was filling out my questionnaire, I knew nothing about

16  the investment group.  I just Google searched.  I read

17  one article published in February.  I just --

18              THE COURT:  All right.  Now, I'm just going to --

19  make sure don't say anything about what you read or saw.

20  But you did do a little bit of looking into who the

21  plaintiff is?

22              JUROR WRIGHT:  When I got -- when I filled out

23  the questionnaire, I was just curious and didn't know any

24  better.  Yes, sir.

25              THE COURT:  Okay.  Would anything about that
```

1  affect your ability to listen to the evidence and make a

2  decision based solely on the evidence presented in court?

3          JUROR WRIGHT:  No, sir.

4          THE COURT:  Okay.  Thank you very much,

5  Mr. Wright.

6          And, Mr. Reynolds, I saw your hand up, too.

7          JUROR REYNOLDS:  I'm familiar with the plaintiff

8  just from articles I've read in technical journals and

9  things like that, based on litigation, things like that.

10         THE COURT:  Okay.  Now, would anything you've

11 read or seen in that, does it -- would it make it hard

12 for you to sit as a juror and make a decision based on

13 the evidence presented in the courtroom?

14         JUROR REYNOLDS:  I wouldn't think so.

15         THE COURT:  I'm sorry.  Would not?

16         JUROR REYNOLDS:  I would not think so.

17         THE COURT:  Okay.  All right.  Thank you,

18 Mr. Reynolds.

19         All right.  Let's see here.  All right.  If you

20 are selected as a juror, like I said, the jury gets to be

21 the deciders of the facts.  You get to judge the

22 credibility of witnesses and evidence, whether it's

23 documents or testamentary evidence from the witness

24 stand.  But the jurors get to be the sole judges of the

25 credibility of all the evidence presented.

1                So does anybody think they'd have a problem

2     judging the credibility of witnesses or evidence

3     presented in court?

4                All right.  I see paddles, so let me flip it

5     around now.  I told you the judge gets to decide what the

6     law is, and, as you've heard, this case involves patent

7     law.  So at the end of the trial the judge is going to

8     instruct you on what the patent law is that would apply

9     to the questions that the jury has to answer.

10               Now, does anybody as you sit here have your own

11    thoughts on what the law would be to where it would be

12    hard to decide or hard to follow the instructions that

13    the judge gives you?  Does anybody think they'd have a

14    hard time following the instructions the judge gives you

15    if they -- at any point?

16               All right.  I see no paddles, so I appreciate

17    that.

18               Lastly, I'm going to -- I'm going to describe for

19    you the burdens of proof that would apply in this case.

20    And the reason I'm going to tell you about these, I'm not

21    going to ask you any questions on them, but there's, I'm

22    sure, burden of proof that you've all heard about and the

23    juror -- or the lawyers may have a few questions for you.

24               Now, there's one burden of proof that we've all

25    heard about, or I suspect most of you have, and that's

1  called beyond a reasonable doubt.  That's the burden of

2  proof that applies in a criminal case.  It has nothing to

3  do in this case.  But it is -- it is solely applicable to

4  criminal cases and will not be applied in this case at

5  all.

6         The burdens of proof that you may be asked about

7  and you may be called upon to apply in this case are,

8  one, the preponderance of the evidence.  And I'll say

9  that again.  That's the preponderance of the evidence and

10 clear and convincing evidence.  That's the second burden

11 of proof that might apply, clear and convincing evidence.

12        Now, preponderance of the evidence means that

13 you as a juror must be persuaded by the credible

14 evidence, credible or believable evidence, that the

15 claims or defenses offered are more likely true than not

16 true.  So it's a more likely than not standard.  Clear

17 and convincing evidence, on the other hand, is the kind

18 of evidence that produces in your mind a firm belief or

19 conviction as to the truth of the matter at issue.

20        Now, those are the two burdens that would apply

21 in this case.  And if you were to think about the burdens

22 of proof along a spectrum, from something that requires a

23 significant amount of evidence or a significant -- you

24 know, a high burden, that would be beyond a reasonable

25 doubt.  Does not apply in this case.  But at the opposite

1   end would be preponderance of the evidence, where it has

2   to be more likely than not true.  Clear and convincing

3   evidence is just somewhere between those two.  And it

4   just has to be the type of evidence that produces a firm

5   belief or conviction as to the truth of the matter at

6   issue.

7          So those are the only two burdens that would

8   apply in this case: preponderance of the evidence and

9   clear and convincing evidence.  So I just tell you that

10  to kind of orient you a little bit to the burdens of

11  proof that might apply in case any of the lawyers ask you

12  about them.

13         And so, with that, I'm going to turn it over --

14  we're going to start with the plaintiff and let

15  Mr. Siegmund begin.  And would you like a warning on your

16  time?

17         MR. SIEGMUND:  I would, Your Honor, I would

18  appreciate that.  Five minutes.

19         THE COURT:  Five minutes?  Very good.

20         MR. SIEGMUND:  May it please the Court, Counsel:

21         Good morning, ladies and gentlemen.  Like I

22  said, my name is Mark Siegmund, and I want to start off

23  by saying a very sincere thank you.  Thank you-all for

24  being here.  I know you have better things to do than be

25  here with us on a Monday morning.  You've got kids and

 1  grandkids to take care of, jobs to be at.  So thank

 2  you-all for being here.  And what I want you-all to know

 3  up front is we would not be here if this was not an

 4  important case, so thank you.

 5         You-all shared quite a bit of information with

 6  us on your questionnaires, so thank you for doing that.

 7  So I think it's only fair that you hear a little bit

 8  about me.

 9         Like I said, my name is Mark Siegmund.  I grew

10  up here in Waco, a little -- little bit outside of Waco

11  in a small town called China Spring.  I don't know if any

12  of you-all have heard of it.  I've been married to my

13  wife Brook for 10 years.  We've got three kiddos here in

14  Waco schools.

15         I went to the best university, like Judge

16  Gilliland here, Texas A&M University.  After that I

17  served in the Marine Corps for five years.  I did two

18  overseas deployments there, and then I started my second

19  career after attending Baylor Law School and been doing

20  this since that time.

21         So that's the last you're going to hear about

22  me, because this is really all about you-all.  Okay?

23  This process in voir dire is just trying to help us

24  figure out who is the right person for this case.  And if

25  you're not the right person for this case, that is

 1   completely okay.  You didn't do anything wrong.

 2          So what I want you-all to know is this is a

 3   completely judgment-free zone.  You're not going to hurt

 4   my feelings; you're not going to hurt Mr. Jones's

 5   feelings.  So we want you to be open and honest with us,

 6   and just tell what you say you really think.  Okay?

 7          Easy example folks.  I told you that I was in

 8   the service.  I would not be the right juror to sit in

 9   judgment of another service member, whether that service

10   member was the one bringing a lawsuit or on the receiving

11   end of a lawsuit.  I wouldn't be the right person.  I

12   could not be fair.  So that's all we're trying to do

13   today, is to figure out who the best people are for this

14   case, and that's it.

15          So why are you-all here?  I think you as you-all

16   figured out, this is a patent case.  And I know that

17   sounds big and scary and hard, but really patent cases

18   are about one thing, and that's accountability.  We all

19   know from a young age that you can't take something that

20   isn't yours.  And, if you do, you have to be held

21   accountable.

22          So all we're saying is that Brazos is saying

23   that Google has taken our property without our

24   permission, and because they have done that, we are owed

25   what's called a reasonable royalty, or money, for that

1  use.  We're not going to talk about any evidence today.

2  I just wanted to give you that overview.  And then when

3  it's their side's turn, they're going to give you a few

4  reasons why they think that is not the case.  Okay?

5         So let's get into a few questions.  So, folks,

6  you-all saw the patent video.  You-all saw Judge Fogel

7  explain that patents are property protected by the

8  Constitution.  So Juror Number 13, Mr. Reynolds, if you

9  wouldn't mind standing up, sir, I just want to ask you a

10  real easy question.

11         JUROR REYNOLDS:  Sure.

12         MR. SIEGMUND:  What are your thoughts on

13  patents?

14         JUROR REYNOLDS:  I believe that they're a

15  necessity; that we must have them in order to protect

16  people and -- well, individuals, entities, corporations,

17  what have you, in order to have a society or industry.

18  And they're a necessary evil, so to speak.

19         MR. SIEGMUND:  Okay.  Did you see in the video

20  how long it might take to get a patent?  Were you a

21  little surprised by that one way or the other?

22         JUROR REYNOLDS:  I'm familiar, actually, yes.

23         MR. SIEGMUND:  Oh, you are?  Okay.  How are you

24  familiar?

25         JUROR REYNOLDS:  I just know people that have,

1   you know, dabbled in trying to get them and decided that

2   it's not really, you know, worth their trouble.

3           MR. SIEGMUND:  Okay.

4           JUROR REYNOLDS:  So yes.

5           MR. SIEGMUND:  Was that a negative experience or

6   just --

7           JUROR REYNOLDS:  No.  Just --

8           MR. SIEGMUND:  -- it was hard?

9           JUROR REYNOLDS:  Yeah.  Very hard and, you know,

10  things like that, you know.

11          MR. SIEGMUND:  Okay.  Thank you, sir.  I

12  appreciate it.  If you wouldn't mind passing the mic down

13  to, I think, Mr. Kasner?  Did I say that right?

14          JUROR KASNER:  Yes, sir.

15          MR. SIEGMUND:  All right, sir.

16          JUROR KASNER:  Yes, sir.

17          MR. SIEGMUND:  Same question:  What do you

18  think?  What do you think about patents any thoughts?

19          JUROR KASNER:  I don't have any thoughts.  I'm

20  not familiar with patents.  I've heard of them, and I

21  know they're there.  But I have no -- no information on

22  them or nothing.

23          MR. SIEGMUND:  Well, you're going to hear more

24  about patents if you make this jury than you'll care to

25  hear.  I can tell you that much.

```
 1              JUROR KASNER:  Okay.

 2              MR. SIEGMUND:  What do you think they're there

 3  for?  What's the purpose of them.

 4              JUROR KASNER:  Well, they're there to protect

 5  people's, like you said, inventions, their ideas, to

 6  protect someone from coming in and, you know, replicating

 7  them and making a profit off of them.

 8              MR. SIEGMUND:  Okay.  Thank you, sir.

 9              If you wouldn't mind passing the mic forward.  I

10  think -- is it Ms. Jones?  Do I have that right?  Okay.

11              And you can guess, same question, ma'am.

12              JUROR JONES:  I don't know much about them.

13  But, I do know that they've been around a long time and

14  that they do protect people who invent things or have

15  ideas.

16              MR. SIEGMUND:  And do you agree with that?  You

17  good with that?

18              JUROR JONES:  Yeah.  I think it's necessary.

19              MR. SIEGMUND:  Okay.  Thank you, ma'am.

20              All right.  So shifting gears ever so slightly.

21  If I could talk to Mrs. Moore.  I know.  I'm sorry.  I

22  called on you.  Do you remember hearing from the patent

23  video that patents are presumed valid?  And what I mean

24  by that is you go to the patent office, you get the

25  patent, they give it to you, you're entitled to presume
```

1    that it's valid.  Do you remember that?

2           JUROR MOORE:  Yes.

3           MR. SIEGMUND:  Okay.  Do you think that's fair?

4           JUROR MOORE:  Yes.

5           MR. SIEGMUND:  Okay.  Well, good.  Because the

6    law agrees with you, that patents are presumed valid.

7    And when someone challenges that, like these folks over

8    here might do at the trial, they have to overcome the

9    presumption of the validity.  That sound good to you?

10          JUROR MOORE:  Yes.

11          MR. SIEGMUND:  Okay.  Thank you, ma'am.  You can

12   sit down.

13          JUROR MOORE:  Oh.

14          MR. SIEGMUND:  And so what I wanted talk about,

15   and this kind of comes up now in this context --

16   Judge Gilliland hit on it a little bit earlier -- is the

17   burden of proof.  Okay?

18          So we as the plaintiff have the burden of proof

19   to show by a preponderance of the evidence that the

20   claims of our patent are infringed, more likely than not.

21   Everyone with me so far?

22          Okay.  Now, when it's these folks' turn and

23   they're going to argue that the patent is invalid, they

24   have a higher burden of proof.  That was clear and

25   convincing evidence, a firm conviction without any

1   hesitation.  Okay?  You-all with me so far?

2        All right.  So let me call on Ms. Blizzard.  I

3   know.  I'm sorry.  I'm going to try to talk to everybody.

4   And the question is real easy:  Do you think that that's

5   fair?  That Brazos has the preponderance of the evidence

6   to show infringement and Google has the burden of proof

7   for clear and convincing evidence to show invalidity?

8        Do you think that's fair.

9        JUROR BLIZZARD:  I do.

10       MR. SIEGMUND:  Okay.  Why do you think that,

11  ma'am?

12       JUROR BLIZZARD:  I knew that was coming.  I

13  would say because Brazos has the patent already, so they

14  have already kind of gone through that process; that to

15  prove that it is invalid would require more evidence to,

16  I guess, have the opposition of the work and the effort

17  that has already been put into to acquire that patent

18  originally.

19       MR. SIEGMUND:  And that kind of goes to the

20  presumption.

21       JUROR BLIZZARD:  Yes.

22       MR. SIEGMUND:  Okay.  You put it very well.

23  Thank you very much for that.  I appreciate it.

24       If you wouldn't mind passing the microphone to,

25  yes, there you go yes, ma'am.  What's your name?

```
 1            JUROR GRIEWAHN:  Samantha Griewahn.

 2            MR. SIEGMUND:  Samantha Griewahn.  Okay.  Thank

 3    you for being here, ma'am.  What do you think about that?

 4            JUROR GRIEWAHN:  I also agree that it's fair.

 5            MR. SIEGMUND:  Okay.  Well, that was easy.  Any

 6    thoughts about why you think that's fair?

 7            JUROR GRIEWAHN:  She touched on most of it.  You

 8    guys have already gone through the process and had to

 9    provide evidence to make it valid, so you wouldn't need

10    as high a burden of proof as Google would.

11            MR. SIEGMUND:  Okay.  Thank you, ma'am.  Thank

12    you.  You can sit down.  Thank you so much.

13            So let me ask everybody at large here:  Does

14    anyone disagree that that is fair?  Anyone have any

15    contrary view on that?

16            All right.  Good.  Seeing no hands.  We will

17    move on.

18            Okay.  Let me talk to Ms. Kilcrease.  Did say I

19    that right, ma'am?  Okay.  Juror Number 10.  Thank you.

20    Let's say that you own some property, okay?  I'm going to

21    give you some property.  It's your lucky day.  And let's

22    say it's some acreage that you don't necessarily live on,

23    okay?  And you go out there one day and you think, I'm

24    going to go visit my property, maybe go fishing, have a

25    good time.
```

```
 1              And you go out there, and you see some cows on
 2  your property.  The only problem is you didn't put the
 3  cows there.  And then you go check out your barn, and you
 4  see a whole bunch of hay in there, only you didn't bale
 5  the hay.  And then you go to your lake, and you see
 6  someone has a trailer parked there and they're out there
 7  swimming in your lake.
 8              How does -- how does that make you feel, ma'am,
 9  right off the bat?
10              JUROR GRIEWAHN:  Well, that is like my life.  I
11  live on a big ranch, so I would not like that.  That
12  would be my property, and, therefore, you should not be
13  on it.
14              MR. SIEGMUND:  Right.  And if somebody's on your
15  property, what are you going to do?  Don't tell me shoot
16  them.  We're in a federal courthouse.
17              JUROR GRIEWAHN:  Oh, I am --
18              MR. SIEGMUND:  Something else.
19              JUROR GRIEWAHN:  I am calling my husband, and he
20  is going to take care of it very quickly and they do not
21  want to come back.
22              MR. SIEGMUND:  Okay.  And if your husband isn't
23  around, who can you call to take care of it for you?
24              JUROR GRIEWAHN:  My dad.
25              MR. SIEGMUND:  Well, just, in general,
```

1  philosophically, who can come and help you?

2          JUROR GRIEWAHN:  Okay.

3          MR. SIEGMUND:  9-1-1 perhaps?

4          JUROR GRIEWAHN:  Okay.  Yes.  For sure.

5          MR. SIEGMUND:  You could call the law is what

6  I'm getting at.

7          JUROR GRIEWAHN:  Okay.  I would honestly call

8  like three or four people before that.  But sure.  I

9  would eventually get there.

10          MR. SIEGMUND:  Okay.  Okay.

11          JUROR GRIEWAHN:  Okay.

12          MR. SIEGMUND:  And my point is this, ma'am:

13  Have you heard of anything called the patent police

14  before?

15          JUROR GRIEWAHN:  No.

16          MR. SIEGMUND:  No, you haven't.  There are no

17  patent police.  And what the video told you is if

18  someone -- if you're accusing someone of infringement,

19  the only thing you can do is you file a lawsuit, okay?

20  Does that sound fair to you, ma'am?

21          JUROR GRIEWAHN:  Yes.

22          MR. SIEGMUND:  Okay.  So here's my question:  Do

23  you hold it against Brazos/WSOU, for bringing a lawsuit

24  because we believe these folks are infringing on our

25  property?

```
 1              JUROR GRIEWAHN:  No.

 2              MR. SIEGMUND:  Thank you so much.

 3              JUROR GRIEWAHN:  Okay.  You're welcome.

 4              MR. SIEGMUND:  And everybody at large, I know

 5    people here that, gosh, there's just too many lawsuits

 6    out there, fender benders and all that stuff.  So here's

 7    my question.  You-all figured this out.  This is not a

 8    fender bender case.  This is not a personal injury case.

 9    This is about constitutional property.  So let me ask

10    everybody:  Does anyone here have an issue with Brazos

11    bringing this case to protect our property?

12              All right.  Seeing no hands.

13              Ms. MacMillan, if I can call on you for a

14    second, ma'am.  Juror Number 2.  Thank you.  I think you

15    expressed in your questionnaire that you had a somewhat

16    negative view of lawsuits.  And I don't know if that was

17    directed to more kind of what I just talked about, but if

18    you could tell me about that.

19              JUROR MACMILLAN:  Yeah.  More about what you

20    just talked about.

21              MR. SIEGMUND:  Okay.

22              JUROR MACMILLAN:  Frivolous lawsuits.

23              MR. SIEGMUND:  Okay.  So you're -- in your mind

24    you're kind of thinking -- and I'm not trying to

25    denigrate anything, but like slip and fall, personnel
```

```
 1  injury --

 2           JUROR MACMILLAN:  Yes.

 3           MR. SIEGMUND:  -- that's kind of what you're

 4  talking about?

 5           JUROR MACMILLAN:  Yes, sir.

 6           MR. SIEGMUND:  Okay.  All right.  Thank you,

 7  ma'am.

 8           Mrs. Garcia, same question to you, ma'am.

 9           JUROR GARCIA:  Frivolous lawsuits are

10  ridiculous.

11           MR. SIEGMUND:  Okay.  And what do you mean by

12  that?

13           JUROR GARCIA:  Again, the slip and fall, the --

14  I'm a registered nurse, so I see a lot of things.

15           MR. SIEGMUND:  You probably see a whole bunch of

16  things.

17           JUROR GARCIA:  Too many.  So that sort of thing,

18  you know.  Personal injury, that sort of thing.

19           MR. SIEGMUND:  Okay.  Let me just ask you, since

20  we are the plaintiff in this case and we brought the

21  lawsuit, does that cause you to lean in favor of Google

22  or us in any way?

23           JUROR GARCIA:  No.

24           MR. SIEGMUND:  Okay.  Wouldn't bother you?  As

25  long as the evidence is there, you're good to go?
```

```
1            JUROR GARCIA:  Uh-huh.  Yeah.

2            MR. SIEGMUND:  All right.  That's all we can

3  ask.  Thank you.  I appreciate it.

4            All right.  Let's go to -- who have we not

5  talked to yet?  All right.  Juror Number 1, it's your

6  lucky day.  I'm going to call on you real quick, sir.

7  Mr. Taylor?

8            JUROR TAYLOR:  That's correct.

9            MR. SIEGMUND:  Okay.  Thank you, sir.  And I saw

10 that you were in the military.  What was your MOS, sir?

11           JUROR TAYLOR:  I was a 12 Bravo in Army, which

12 is combat engineer.

13           MR. SIEGMUND:  Okay.  Well, thank you for your

14 service, sir.  I appreciate it.

15           Let's say that -- kind of similar to what I was

16 talking about earlier.  Let's say you have some land,

17 okay, and you're not using the land.  But is it okay in

18 your opinion for people to have their cows out there and

19 set up a camp and use it?

20           JUROR TAYLOR:  No, sir, it would not be.

21           MR. SIEGMUND:  Okay.  And would you agree that

22 let's say that they are having their cattle on there,

23 they're grazing on your grass and baling hay and all that

24 stuff, do you think it's fair that they should be able to

25 provide you some compensation for the use of your land?
```

```
 1              JUROR TAYLOR:  Absolutely.

 2              MR. SIEGMUND:  Why do you think that?

 3              JUROR TAYLOR:  Well, that's my land.  My

 4  efforts, my tool that brought me that land.  And I

 5  believe I would deserve that compensation.

 6              MR. SIEGMUND:  Okay.  Are you sure?  You're not

 7  using it.

 8              JUROR TAYLOR:  Absolutely I'm sure.

 9              MR. SIEGMUND:  Okay.  All right.  Thank you,

10  sir.

11              Does anyone disagree with what Mr. Taylor told

12  us?  Anyone have different thoughts on that?  Okay.  I'd

13  be a little worried if that was the case.

14              Okay.  You-all are going to learn that I really

15  like property analogies, so I'm sorry in advance for

16  that.  But I have another one for you.  And let's go to,

17  if I could, Ms. Scholwinski.  And I'm so sorry if I

18  butchered that.

19              JUROR SCHOLWINSKI:  No.  That's fine.

20              MR. SIEGMUND:  Okay.  Did I say it right, ma'am?

21              JUROR SCHOLWINSKI:  It's Scholwinski, yes.

22              MR. SIEGMUND:  Scholwinski, okay.  Sorry.  Let's

23  say it's your lucky day, and you inherited 100 acres of

24  land, okay?  You haven't been out to see it or anything,

25  but, you know, it's land.  It's got to be worth
```

1 something, right?

2          So let's just say you decide to sell a little

3 piece of your land for $1,000 an acre, okay?  You go to

4 somebody and say, hey, you want to buy it for 1,000

5 bucks -- $1,000 an acre.  Excuse me.  And they say, No,

6 thank you.  I'm not interested.

7          And then you think to yourself, You know what?

8 Maybe the better idea is to go get my property appraised,

9 get it evaluated.  And you do that, and then guess what?

10 Lo and behold, they find oil underneath your property,

11 meaning your property is going to be worth a whole heck

12 of a lot more money.  You with me?

13          JUROR SCHOLWINSKI:  Yes.

14          MR. SIEGMUND:  Okay.  Now, that person that you

15 originally offered it to comes back and says, I've got

16 the deal for you, Ms. Scholwinski.  I would like to buy

17 that property for $1,000 an acre.

18          You think that's fair?

19          JUROR SCHOLWINSKI:  I wouldn't do it, no.

20          MR. SIEGMUND:  Okay.  I guess what I'm getting

21 at more directly is:  Do you think you should have to

22 sell it for the $1,000 even though you found out that

23 it's probably worth more than that?

24          JUROR SCHOLWINSKI:  Well, I mean, I do believe

25 in oral contracts.  But he's -- he or she, that person

1 said, no thank you, and that negated the oral contract.

2          MR. SIEGMUND:  Yes, ma'am.  That's what I'm

3 getting at.

4          JUROR SCHOLWINSKI:  Okay.

5          MR. SIEGMUND:  And so thank you for that.  Now,

6 you did offer it to him for 1,000 bucks.  You did offer

7 it to him for a $1,000.  They said no.  Do you still

8 think that's okay, that you can sell it to somebody else

9 for more money?

10          JUROR SCHOLWINSKI:  I do.

11          MR. SIEGMUND:  Okay.  Thank you, ma'am.  Thank

12 you so much.

13          Let's pass the mic down to Ms. Stevenson.  You

14 probably could have guessed you were next, huh?

15          JUROR STEVENSON:  Kind of.

16          MR. SIEGMUND:  Okay.  Ma'am.  Thank you for

17 being here.  I'm going to ask you kind of similar --

18 similar scenario, okay?  Almost the same thing.  Except

19 this time you have your land, you actually sell a little

20 bit -- a piece of it for $1,000, okay?  So you've still

21 got some left, but you sell a little bit for $1,000 an

22 acre.  Then you go get it appraised, and then you find

23 out, ah, there is oil and gas under there and it's worth

24 a lot more money.

25          Now, are you stuck, in your opinion, with having

```
 1   to sell the remaining part of your acreage for $1,000 or
 2   can you sell it for more than that?
 3            JUROR STEVENSON:  No.  You can sell it for more.
 4   Circumstances have changed.
 5            MR. SIEGMUND:  Okay.  Thank you, ma'am.
 6            JUROR STEVENSON:  Uh-huh.
 7            MR. SIEGMUND:  Let's see.  Let me ask everybody:
 8   Is there anyone who disagrees with that.
 9            Yes, ma'am.  Number 3.
10            JUROR MOORE:  Well, you made an agreement with
11   the first person.  And just because the circumstances,
12   you --
13            MR. SIEGMUND:  Oh.  I don't know if I was clear.
14   You have some other land.  The one that you already sold,
15   yeah, that's gone.
16            JUROR MOORE:  Oh, okay.
17            MR. SIEGMUND:  We can all agree there.  Yeah.
18   We're not going to go back on our word.  That's gone.
19   But I'm saying, for the remaining part of the land, the
20   part that you haven't sold, you wouldn't have to stick
21   with the original selling price just because you sold it
22   to somebody else for $1,000.
23            JUROR MOORE:  Oh, no.
24            MR. SIEGMUND:  Okay.  I'm sorry.  I probably
25   messed that up.
```

1          JUROR MOORE:  I thought they were going to go

2  back on their word.

3          MR. SIEGMUND:  No, no, no.

4          JUROR MOORE:  Okay.

5          MR. SIEGMUND:  Okay.  Let's see here.

6          Mr. Warren, what do you think about that, sir?

7  You on board with everybody else, or do you have contrary

8  views on that?

9          JUROR WARREN:  Yes.  I believe that's true.

10         MR. SIEGMUND:  Okay.  And let me ask you, sir.

11 I'm sorry.  I should have waited for you to get the

12 microphone.

13         What are your thoughts on patents?

14         JUROR WARREN:  I think patents are necessary.  I

15 think they protect the people who've originally come up

16 with the idea, and I think it's like protecting yourself

17 and the government allowing, you know, you to be

18 protected.

19         MR. SIEGMUND:  Okay.  Thank you, sir.  I

20 appreciate that.  Let's see.  All right, folks.  Let me

21 tell you about this for a second.  So I think you heard a

22 little bit about it, but Brazos is a -- what we call a

23 patent holding company.  And all I mean about that is our

24 business is to buy intellectual property, patents, and

25 hold them as assets, like you might with land.  And then

1  we license those assets to other people out there.  Okay?

2  And by doing that, that's how we make a profit, okay?

3       Now, what Brazos does not do, we do not make any

4  physical products.  We do not design physical products,

5  and we don't make things like Ford or Intel or somebody

6  like that.

7       Okay.  Now, the law doesn't require that a

8  patent owner like Brazos use the idea of the patent.

9  They have to own it.  Okay?  But maybe some folks might

10  have an issue with that.  So I just wanted to put it to

11  the panel.  Anyone have any issue with that?

12       All right.  Let's -- a little bit?

13       JUROR REYNOLDS:  It's -- just to be honest, it's

14  just the nature of being a creative individual.  I

15  understand completely.  Please take no offense to this.

16       MR. SIEGMUND:  I -- you do not -- you're not

17  going to a offend me.  That's okay.  Go ahead.

18       JUROR REYNOLDS:  I understand if you buy

19  something and you own something, it is your property.

20       MR. SIEGMUND:  Uh-huh.

21       JUROR REYNOLDS:  But as an intellectual myself,

22  it -- it's almost something about it just doesn't --

23  something about it doesn't sit right.

24       MR. SIEGMUND:  Okay.

25       JUROR REYNOLDS:  And I completely understand,

1  because you own said property.  But it -- something about

2  it just doesn't -- I don't know how to explain it, and I

3  apologize.

4          MR. SIEGMUND:  No.  That's okay.  That's

5  perfectly okay.

6          JUROR REYNOLDS:  But that's my honest opinion,

7  and I'm --

8          MR. SIEGMUND:  Sir, that is all we can ask for.

9  I appreciate that.  Let me just ask you a question, then.

10          JUROR REYNOLDS:  Sure.

11          MR. SIEGMUND:  Because the law doesn't require

12  that.

13          JUROR REYNOLDS:  Yes.

14          MR. SIEGMUND:  Okay.

15          JUROR REYNOLDS:  Oh, I understand.  Most

16  definitely, yeah.

17          MR. SIEGMUND:  Okay.  And are you going to be

18  leaning a little bit in favor of the defendant in this

19  case?

20          JUROR REYNOLDS:  No.  The letter of the law is

21  the most important thing in this.  Without that we really

22  aren't worth anything.

23          MR. SIEGMUND:  Okay, sir.  That's all we can ask

24  of you.  Thank you for sharing that.  I really appreciate

25  it that.

```
 1              Let's see.  Mrs. Stevenson, I know we already
 2    talked.  I'm sorry.  But real quick, on your
 3    questionnaire you indicated that, I don't know, you might
 4    have somewhat of a negative view of a company that has
 5    patents but doesn't make products.  Is that -- I mean,
 6    did things change, or just tell me about that?
 7              JUROR STEVENSON:  No.  A little bit of what he
 8    said.  It just feels -- this is the wrong word, but I
 9    can't think of another one -- greedy, that -- to just
10    hold -- I mean, just to buy up things that you're not
11    going to use just to make money.
12              MR. SIEGMUND:  Okay.  Well, let me ask you this:
13    Do you see it any differently for somebody -- I'm sure
14    you have people or you know companies that buy real
15    estate, don't you?
16              JUROR STEVENSON:  Sure.
17              MR. SIEGMUND:  And if they buy a bunch of real
18    estate and they rent it out to different folks, do you
19    have a problem with that?
20              JUROR STEVENSON:  No.  And I see where you're
21    going -- you're getting.
22              MR. SIEGMUND:  And I'm not trying to argue with
23    you.  I'm just trying to understand.
24              JUROR STEVENSON:  I think it feels more like
25    that intellectual property versus actual property.
```

1          MR. SIEGMUND:  Okay.

2          JUROR STEVENSON:  But, you know, I can't quite

3  explain it.

4          MR. SIEGMUND:  That's okay, ma'am.  That's okay.

5  I appreciate your honesty.

6          JUROR STEVENSON:  Of course.

7          MR. SIEGMUND:  Thank you so much.

8          JUROR STEVENSON:  Of course.

9          MR. SIEGMUND:  Okay, folks.  Let's talk a little

10 bit about Google.  Couple of questions on that.  Now, a

11 couple of you indicated that you had a very positive view

12 of Google.  You can understand why I want to ask somebody

13 about that.

14         So, Mrs. Kilcrease, tell me about that.

15         JUROR KILCREASE:  Okay.  Well, I am a teacher.

16         MR. SIEGMUND:  Okay.

17         JUROR KILCREASE:  And so we Google all the time.

18 By "we" I mean the teachers, not the children.

19         MR. SIEGMUND:  Well, that's good to hear.  Okay.

20         JUROR KILCREASE:  We look for images.  We look

21 for information.  Just I use it frequently.

22         MR. SIEGMUND:  Okay.  Now, this -- this

23 particular suit, we're not going to get into the facts.

24 But it's not about the search engine Google, just so you

25 know.

```
 1              JUROR KILCREASE:  That's the only thing I know.

 2              MR. SIEGMUND:  Okay.  Now, your viewpoints on

 3   that, does that have Google leaning -- are you leaning a

 4   little bit in favor of Google because of that?

 5              JUROR KILCREASE:  No.

 6              MR. SIEGMUND:  Okay.

 7              JUROR KILCREASE:  No.

 8              MR. SIEGMUND:  So you can put that out of your

 9   mind, no problem.  Okay.  I wouldn't think so.  Thank you

10   very much, ma'am.

11              JUROR KILCREASE:  Okay.  You're welcome.

12              MR. SIEGMUND:  Ms. MacMillan, same question.

13              JUROR MACMILLAN:  I use Google for search, for

14   work, but it wouldn't affect me either way.

15              MR. SIEGMUND:  Okay.  I wouldn't think so.

16   Thank you.

17              JUROR MACMILLAN:  I use Bing also and another

18   search engines, so ...

19              MR. SIEGMUND:  Thank you very much, ma'am.

20              And, finally, Ms. Cunningham.  Same question,

21   ma'am.

22              JUROR CUNNINGHAM:  I use it for work also, but

23   it would not affect my opinion either way.  I mean, it's

24   not -- if it wasn't Google on my desktop, it would have

25   been something else and that's what I would have to go
```

```
1  with.  But that's what our administration does, so I
2  think -- it won't affect me either way.
3          MR. SIEGMUND:  So it's not going to affect you
4  either way?
5          JUROR CUNNINGHAM:  No, sir.
6          MR. SIEGMUND:  I can sleep soundly at night
7  knowing that it's not going to affect you.
8          JUROR CUNNINGHAM:  No, sir.
9          MR. SIEGMUND:  Okay.  Thank you, ma'am.  And let
10 me ask you this while I have you:  What are your thoughts
11 on patents in general?
12         JUROR CUNNINGHAM:  I really don't have any.
13         MR. SIEGMUND:  Okay.
14         JUROR CUNNINGHAM:  I mean, really and
15 truthfully, I mean, I -- I know what they are, I know
16 what they're, I mean for.  But, I mean, if someone asks
17 me, I'm, like, I don't care about patents.  I really
18 don't.  That's the honest opinion.  I really don't.
19         MR. SIEGMUND:  And that is completely okay.  Did
20 you think the video was at least a little bit
21 enlightening?  We're not going to comment on it might
22 have been a little dry, but was it at least helpful for
23 you?
24         JUROR CUNNINGHAM:  Yes, it was.
25         MR. SIEGMUND:  Okay.  All right.  Thank you so
```

 1 | much, ma'am.  I appreciate it.

 2 |        Okay.  Ms. Beseda, we haven't had a chance to

 3 | speak with you yet this morning.  Did I say your name

 4 | right?  I'm sorry if I butchered it.  Okay.

 5 |        JUROR BESEDA:  Beseda.

 6 |        MR. SIEGMUND:  See, I knew I would.  Okay.  I'm

 7 | sorry.  Ms. Beseda.  Let's talk about property again.

 8 | And I think you might be very qualified to answer this

 9 | next question, and it might be the hardest question of

10 | the day.  So are you ready?

11 |        JUROR BESEDA:  Yes.

12 |        MR. SIEGMUND:  Okay.  Now, when you buy a piece

13 | of property, especially if you're doing it for an

14 | investment, what do you expect the value of it to do?

15 |        JUROR BESEDA:  You expect it to appreciate.

16 |        MR. SIEGMUND:  That's exactly right.

17 |        JUROR BESEDA:  Or you hope it does.

18 |        MR. SIEGMUND:  And I didn't mean to cut you off.

19 | That's exactly right, ma'am.  Thank you.  That was the

20 | hardest question of the day.

21 |        JUROR BESEDA:  Okay.

22 |        MR. SIEGMUND:  Do you buy a piece of property

23 | with the expectation that it goes down in value?

24 |        JUROR BESEDA:  No.

25 |        MR. SIEGMUND:  I know.  It seems like a silly

1    question to even ask.  So let me ask you this, too:  What

2    are your thoughts on -- on patents, ma'am?

3              JUROR BESEDA:  I just think they're cool.

4              MR. SIEGMUND:  You like technology?

5              JUROR BESEDA:  I love technology.  So it's

6    always interesting to -- the process of someone doing it

7    and then getting it to where they can patent it.

8              MR. SIEGMUND:  Okay.  Well, you might be one of

9    the rare few that might be excited about hearing about a

10   patent case, because I think everyone else wants to run

11   as far away from it as they possibly can.  So thank you

12   for that, ma'am.  I appreciate it.

13             Okay.  One other thing that I wanted to talk to

14   you folks about.  Now, Brazos did not come up with the

15   idea of the '961 patent.  Those of you who make the jury

16   are going to hear from the inventor, Dr. Ma.  We're not

17   going to talk about that right now.  But we're not going

18   to claim that we said we invented the patent.  But own

19   the patent because we got it from the company who did.

20   Okay?

21             Now, again, the law doesn't require us as the

22   patent owner -- excuse me.  The law does not require that

23   only the inventor can enforce the patent.  But that may

24   not sit right -- sit right with a few folks.  So I just

25   wanted to ask:  Does anyone have any problem with that or

1  any concerns or any thoughts on that?  It's kind of what

2  we already talked about, but I wanted to ask you-all

3  about it.

4        Okay.  Let's see here.  If I could ask

5  Mr. Warren a question real quick, sir.  All right.  So

6  going back to the patent video, you saw that this morning

7  where it said that, if someone uses patent property, then

8  we can charge what's called a reasonable royalty.  Do you

9  remember that, sir?

10        JUROR WARREN:  Yes, sir.

11        MR. SIEGMUND:  And, in general, you're okay with

12  that concept?

13        JUROR WARREN:  Yes, sir.

14        MR. SIEGMUND:  You think that's fair?

15        JUROR WARREN:  I do.

16        MR. SIEGMUND:  Now, if you make the jury, you're

17  going to hear evidence that Google makes a whole bunch of

18  money from using our alleged technology.  We're not here

19  to talk about that.  We're getting to the question.  All

20  I want to know, sir, is:  If we're going to ask for a

21  reasonable royalty in the millions of dollars, is that

22  going to be a problem for you?

23        Philosophically, you might think, you know, I

24  just can't award a really large sum of money.  Other

25  people, if the evidence is there, no problem.  So I just

1  wanted to ask you:  What do you think about that?

2      JUROR WARREN:  Yeah.  If the evidence is there

3  and it's a fair amount, I would agree with that.

4      MR. SIEGMUND:  Okay.

5      THE COURT:  You have five minutes remaining,

6  Mr. Siegmund.

7      MR. SIEGMUND:  Thank you, Judge.  So you're okay

8  with the amount as long as the evidence is there?

9      JUROR WARREN:  Correct.

10     MR. SIEGMUND:  Whether it's, you know,

11 $5 billion or $100, you're good either way?

12     JUROR WARREN:  Correct.  If the evidence is

13 there and it's fair, I would -- I would agree with it.

14     MR. SIEGMUND:  Okay.  That's all we can ask.

15     If you wouldn't mind passing the microphone to

16 Ms. Davis, yes.  What do you think about that, ma'am?

17     JUROR DAVIS:  I would agree with Mr. Warren, if

18 it's a fair amount and the evidence has been presented.

19     MR. SIEGMUND:  Okay.

20     JUROR DAVIS:  Yes.

21     MR. SIEGMUND:  And by fair amount, do you mean

22 as long as the evidence shows that it's fair?

23     JUROR DAVIS:  Correct.

24     MR. SIEGMUND:  All right.  That's all we can

25 ask.  And then, Ms. Cunningham, same question, ma'am.

1          JUROR CUNNINGHAM:  I wouldn't -- I mean, I would

2     think the same thing.  I mean, it's -- it's -- if the

3     evidence is there, I mean, I would think that they should

4     get the fair amount because, I mean, it's their

5     invention.  I mean, you know ...

6          MR. SIEGMUND:  Okay.  Thank you, ma'am.

7          Does anyone disagree with any of the -- any of

8     the folks who just spoke?  Anyone disagree with them?

9          All right.  Okay.  Now, on our questionnaire we

10    also had a few people indicate some concerns about

11    advertising and privacy concerns and like that.  So I

12    want to ask -- I think I want to start with Mr. Taylor.

13    Yes, sir.  I think you actually said you might -- you had

14    a positive view on location tracking.  I just wanted to

15    ask you about that.

16         JUROR TAYLOR:  Yes.  The positive view is, you

17    know, it kind of gets me to where I'm going.

18         MR. SIEGMUND:  Okay.

19         JUROR TAYLOR:  Right.  And if there's, like,

20    advertisements in that -- that particular area or

21    something like that, that would be beneficial for me.

22         MR. SIEGMUND:  Okay.  So you don't -- so you

23    don't have an issue with it?

24         JUROR TAYLOR:  No.

25         MR. SIEGMUND:  And while I got you, what do you

1  think about patents, sir?  You got any thought on this.

2           JUROR TAYLOR:  No thoughts.  I believe, you

3  know, if you create something and you have a patent for

4  it, then you have your right to protect it.

5           MR. SIEGMUND:  Okay.  Thank you, sir.  Let's see

6  if you could pass the mic to Mr. Reynolds.  I think you

7  had a different view on the tracking type stuff.

8           JUROR REYNOLDS:  Yes, sir.

9           MR. SIEGMUND:  What -- explain that to me, sir.

10          JUROR REYNOLDS:  I believe that if a lot of

11 people truly thought about some of the tracking -- well,

12 not exactly, just different algorithms in tracking,

13 capabilities of certain entities, you know, like Google

14 and things like, that if they actually thought about it

15 and read into their agreements, they probably wouldn't be

16 okay with that.  And that's -- that's pretty much my

17 only, you know, thought about that.

18          MR. SIEGMUND:  Okay.

19          JUROR REYNOLDS:  Some people would, and some

20 people wouldn't.  Most people just click, and that's

21 just --

22          MR. SIEGMUND:  Not really think about it?

23          JUROR REYNOLDS:  And that's pretty much my only

24 issue with it.

25          MR. SIEGMUND:  Okay.  Thank you, sir.  Anyone

1  else just by show of hands have any other similar

2  thoughts as Mr. Reynolds?

3         Okay.  Number 8.  Anybody else?  All right.

4  Thank you, folks.  I appreciate it.

5         Okay.  So I think my time is probably almost up

6  here, so let me wrap up real quick.

7         I'm not that smart of a lawyer, but I am smart

8  enough to know that I don't always ask the right

9  questions.  So you-all know who I represent.  So if you

10 were in my position, is there anything I didn't ask you

11 that you might know that I should know?  And if that's

12 the case, please let me know.  Raise your hand.  We can

13 even talk about it, you know, in private if it's

14 something like that.  Anybody have anything else that

15 they think I should know based on who I represent?

16        All right, folks.  Last piece of free advice.

17 Probably the only time you'll hear a lawyer say I'm going

18 to give you free advice.  And this probably the only time

19 you're going to hear that.  The courtroom that we're

20 going to use for trial right over there is very, very

21 cold.  I highly recommend you bring a jacket.  You think

22 I'm kidding.  We're in Texas.  I know.  But, seriously, I

23 think you will thank me later.

24        So all I want to say is thank you-all so much

25 for your time.  I really, really, really appreciate your

1  time.  For those of you who are selected on the jury, we

2  look forward to presenting our case to you.  Thank you.

3          THE COURT:  Thank you, Mr. Siegmund.  Mr. Jones,

4  whenever you're ready, and would you like a warning on

5  your time as well?

6          MR. JONES:  Please.  Ten minutes, if you don't

7  mind, Your Honor.

8          THE COURT:  Ten minutes?  You got it.

9          MR. JONES:  Thank you, Your Honor.

10         Good morning.  I appreciate each one of you

11 being here.  I will follow the example that

12 Judge Gilliland as well as my colleague Mr. Siegmund and

13 introduce myself to you, since you-all have spent an

14 incredible amount of time telling us about yourselves.

15 And I do appreciate it.  I do thank you for it.

16         My name is Mike Jones again.  I'm a lawyer from

17 Tyler, Texas.  I have been doing this for too long to

18 tell you how long I've been doing it all over the state

19 of Texas and a couple of other places.

20         Like Judge Gilliland, I went to Baylor Law

21 School.  And when I got out, I went to Tyler, Texas and

22 found my wife, Pam, who I married then.  We've been

23 married for over 40 years.  We have two children that are

24 grown and three grandchildren.  And Mr. Siegmund just

25 gave you free advice; I'm going to give you some advice

1  that's more important.  If you don't have grandchildren,

2  get them.  They are the best things that can happen to

3  you.

4           First thing I want to do is join Mr. Siegmund

5  and thank you for your jury service.  I agree with the

6  Court; I agree with Mr. Siegmund.  Most people believe

7  strongly that jury service is the greatest service you

8  can do for your country except for military service.

9           Many of you, like Mr. Davis, have served our

10 country in the military.  I thank all of you for your

11 service.  I thank you today for your service here as

12 members of this panel.  I join Mr. Siegmund.  It's an

13 important case.  It's a very important case to my client.

14 More importantly, it's a very important case to the

15 people that created the product that we're going to be

16 talking about.  They're going to be witnesses in this

17 case who feel and who will testify that they do not

18 infringe this patent.  And I also thank you for filling

19 out the questionnaires.  That's been very helpful, and

20 that makes the process go so much quicker.

21          I'm going to do two things in just a few minutes

22 that I have to ask you questions.  First I want to ask

23 you a couple of questions about the information you put

24 in your questionnaires, and then I'll ask you a couple of

25 questions about your feelings about certain legal

```
 1  principles.

 2          But let's -- let's start out.  Let's start at

 3  the beginning here.  You just heard from Mr. Siegmund.

 4  He said that Google infringed a valid patent owned by

 5  Brazos Licensing and that Google owes millions of dollars

 6  for it.

 7          Now, before we start the trial, before we start

 8  the evidence, is there anybody that thinks, you know, I

 9  heard what Mr. Siegmund says, and it sounds like, you

10  know, Google is in trouble.  Mr. Jones, you're in a jam.

11  You're already behind before we get started.  This sounds

12  real bad.  Anybody feel that way?

13          Anybody feel that, you know, we wouldn't be here

14  in federal court, we wouldn't be bothering Judge

15  Gilliland, if there wasn't something to all this.

16  Anybody feel that way?

17          Or is anybody just anxious to say, go ahead and

18  pick a jury and let's get into the evidence, and find out

19  who is right and wrong?  Is that how you feel as you sit

20  there?  Okay.  Great.  Everybody feel that way?  If not,

21  raise your paddle and just tell me about it.

22          Thank you so much.

23          Secondly, has anybody seen any news or press

24  reports, because Google is in the news all the time,

25  whether you-all might know it or not.  I know you do.
```

1   Has anybody seen any news or press articles, TV shows,

2   about Google that has caused you to have a negative

3   impression of my client?  Anybody?  Raise your paddle.

4           Thank you so much.

5           And, finally, you know, we're into a political

6   season.  I guess we're always into political seasons.

7   I'm not going to ask you anything about your political

8   beliefs.  But my question to you is simply this:  There

9   have been some news articles to the extent that somehow

10  Google suppresses political beliefs.  Does anybody have

11  that opinion as we start this case about Google?

12  Anybody?  If so, would you raise your paddle.

13          Thank you.  I appreciate it.

14          Now to individual questions.  Again, I don't ask

15  anything to pry.  I just want to find out, like

16  Judge Gilliland said, are you the right person for this

17  case.  And, in doing so, if I do ask any question that's

18  private, let me know and we'll take it up in a private

19  fashion.

20          If I could, I'd like to ask a question of

21  Ms. MacMillan.  Ms. MacMillan, if I got it right when I

22  read your questionnaire -- and, again, thank you for

23  it -- you stated with regard to patents that you were not

24  sure if they really worked.  And I didn't really know

25  what you meant by that.  Could you tell me a little bit

 1  more about it?

 2          JUROR MACMILLAN:  On patent.  I don't know.  I

 3  guess sometimes I see that, I mean, have patents, but

 4  then somebody comes along and does the same thing.  So I

 5  guess I don't really know that much about them, so ...

 6          MR. JONES:  Okay.  Okay.

 7          JUROR MACMILLAN:  For me on that I was kind of

 8  I'm not sure about them.  Because I don't really know

 9  about them, so.

10          MR. JONES:  I understand.  Well, you raise a

11  good issue, and I'd like to follow up with a question:

12  This is, of course, a paper clip.

13          JUROR MACMILLAN:  Yes, sir.

14          MR. JONES:  The first paper chip was invented in

15  1847 by a guy named Samuel Fay.  This particular paper

16  clip was invented, I believe in 1899.  It was called the

17  gem clip.  Now, there are hundreds of patents on how you

18  clip paper, you know, basically doing the same thing.

19          And you say, Well, why can he have so many

20  patents on clipping paper?  That's because there are

21  different ways to clip paper.  So a patent on this clip

22  would not be infringed by this clip.  Does that make

23  sense?

24          JUROR MACMILLAN:  Right.  But they're different

25  to me.

1          MR. JONES:  Yeah.  They're different.  So the

2     mere fact that you do something does not mean that you

3     are infringing a patent that shows another way to do it.

4     Fair enough?

5          JUROR MACMILLAN:  Fair enough.

6          MR. JONES:  Is that concept something that you

7     would agree with?

8          JUROR MACMILLAN:  Yes, sir.

9          MR. JONES:  Okay.  Okay.

10          Now, in this particular case, the technology,

11     writ very large, is technology about locating the site of

12     a device like a smartphone, okay?  And there's going to

13     be no question whatsoever that, you know, Google does

14     that.  And there's no -- there's going to be no question

15     whatsoever that this patent, writ large, is in that area.

16     The question is going to be:  Does Google do it that

17     specific way that's required by the patent?  That's going

18     to be the issue in this case.

19          And there's a patent law principle that you

20     heard on the film.  And that principle is simply this:

21     That for a product to infringe, like for this product to

22     infringe a patent on the gem clip, it must meet each and

23     every element of the claim of the patent.  And patents,

24     as you heard on the film, have boundaries just like land.

25     And they're defined by the elements.

1           And so if this is going to infringe, it's got to

2    meet each element of the claim about how this patent

3    clips paper.  Does all this make sense?

4           JUROR MACMILLAN:  Yes, sir.

5           MR. JONES:  Okay.  Now, my question to you is

6    that:  Do you think that principle is fair?

7           JUROR MACMILLAN:  But to me that's not a paper

8    clip like that is.

9           MR. JONES:  Okay.  Okay.

10           JUROR MACMILLAN:  That's a clip, and that's a

11    paper clip.  Those are two different things to me.

12           MR. JONES:  I got you.  I got you.

13           But they both clip paper, right?

14           JUROR MACMILLAN:  Right.

15           MR. JONES:  But they're two different things.

16           JUROR MACMILLAN:  But they're two different

17    things.

18           MR. JONES:  Okay.  But my question to you is --

19    is:  Moving into the patent area, this patent principle

20    that for this to infringe it must meet each and every

21    element of a patent that applied to this clip, you have

22    to look at it and decide if it meets each and every

23    element.  And if it just only does not meet one element,

24    then the law instructs you to say it doesn't infringe.

25    Close is not good enough.  Is that -- is that -- does

1  that seem fair to you?

2          JUROR MACMILLAN:  To me I would have to see all

3  the details --

4          MR. JONES:  Okay.  Certainly.  Certainly.

5          JUROR MACMILLAN:  -- to be able to --

6          MR. JONES:  I'm just asking about the principle

7  of law, the one that was talked about in the film.  And

8  if the judge instructed you that was a correct --

9          JUROR MACMILLAN:  If the judge instructed me

10 then, yes.

11         MR. JONES:  You would follow it?

12         JUROR MACMILLAN:  Right.  I would follow what

13 the judge tells me, yes.

14         MR. JONES:  Okay.  Thank you.  Thank you so

15 much.  I appreciate it.  Ms. Moore, you indicated that

16 you had certain specialized training in the field of

17 telecommunications.

18         JUROR MOORE:  Well, that was a big -- yes.

19         MR. JONES:  Could you tell me what it is?

20         JUROR MOORE:  Well, I wasn't sure, because it

21 wasn't defined.  It just, well, because I worked in oil

22 and gas, so I was there for like 17 years.  So it

23 involved a lot of technology and stuff.  That's -- that's

24 what I was referring to, like computers and new phone

25 systems and that kind of technology.  Not anything to do

```
 1   with patents or anything like that.

 2            MR. JONES:  Thank you, ma'am.  I appreciate it.

 3            Ms. Griewahn?

 4            JUROR GRIEWAHN:  Yes.

 5            MR. JONES:  Did I pronounce that right?

 6            JUROR GRIEWAHN:  Griewahn.

 7            MR. JONES:  Thank you.  Wahn is the -- I

 8   appreciate it.  What specialized training do you have in

 9   navigation systems?  I think you said that, if I didn't

10   get it wrong.

11            JUROR GRIEWAHN:  If I did, I think that was

12   pressed in error.

13            MR. JONES:  I got you.  I got you.  Thank you so

14   much.  I appreciate it.

15            And if we could Ms. Stevenson I think on row

16   two.  Thank you.  Ms. Stevenson, I believe in your

17   questionnaire you indicated that you were very negative

18   about the fact that smartphone technology out there

19   existed that tracked them.  It also stated that you

20   strongly agree that tech companies invaded privacy.

21            JUROR STEVENSON:  Yes.

22            MR. JONES:  And that small businesses needed to

23   be protected from large businesses.

24            JUROR STEVENSON:  Yes.

25            MR. JONES:  Now, in light of those things, you
```

1  know, my question to you is certainly very

2  straightforward:  You know, you're entitled to every

3  belief you have.  I am not arguing with any of them.

4           JUROR STEVENSON:  Thank you.

5           MR. JONES:  My question to you is:  Would those

6  beliefs go into the jury box, and would that color your

7  ability to review the evidence in this case?

8           JUROR STEVENSON:  Right.  I've been thinking

9  about that kind of that entire time.  I'd like to believe

10 no, that I would listen to just the facts and side with

11 whoever showed the evidence.  But I don't honestly know.

12          MR. JONES:  Well, and your candor, I appreciate

13 it.  Thank you so much.  Voir dire I think stands for

14 speak the truth, and you certainly are.  So you're just

15 telling us right now as we start this case, due to those

16 beliefs, it does make you worry whether or not you're the

17 right person for this case.  Fair enough?

18          JUROR STEVENSON:  I worry a little bit.  I'd

19 like to think I'd be completely fair and just listen to

20 facts and evidence, but I'm already a little bit -- I

21 know where my brain leans when it comes to big companies.

22 So I'd hope that I wouldn't be prejudiced but, you know,

23 your brain.

24          MR. JONES:  Thank you so much for your candor.

25 I appreciate that.

```
1              JUROR STEVENSON:  Of course.

2              MR. JONES:  Ms. Scholwinski?  I'm sure I

3  butchered that.  I do apologize.  You indicated in your

4  questionnaire that you had certain specialized training

5  in product research, if I got it right.

6              Could you tell me that, or did I get it wrong?

7              JUROR SCHOLWINSKI:  Okay.  You know how in the

8  mall they ask you to test things?

9              MR. JONES:  I got you.  I understand.

10             JUROR SCHOLWINSKI:  I couldn't get out of the

11 survey without choosing one of those.

12             MR. JONES:  I know.  I know.  We've got to work

13 on that.  Mr. Siegmund and I got to work on that, yes,

14 ma'am.  I appreciate that.  Thank you much.

15             Ms. Carr, please, Juror Number 12.  Excuse me.

16 Ms. Carr, I believe on your questionnaire that you said

17 you would take certain beliefs of yours into the jury

18 box, and I certainly -- you know, everybody does that.

19             JUROR CARR:  Uh-huh.

20             MR. JONES:  We wouldn't have any jurors if they

21 didn't take their beliefs in the jury box.  Nothing wrong

22 with that.  My question to you, though, is going to drill

23 down on that a little bit and would say this:

24             If the judge were to instruct you on something,

25 like, if Judge Gilliland or Judge Albright, that will
```

1    actually be trying the case, if he were to instruct you

2    on something and say, This is a principal law and you

3    must follow it that was different than your beliefs,

4    would you be able to put your beliefs aside and follow

5    his instruction?

6              JUROR CARR:  I don't know if I can do that or

7    not, to be honest.

8              MR. JONES:  Thank you so much.  I appreciate

9    your candor.  The mask is a little bit --

10             JUROR CARR:  Oh, I'm sorry.

11             MR. JONES:  Can I repeat it just to make sure I

12   get it right?

13             JUROR CARR:  Sure.

14             MR. JONES:  I think you said I don't know if I

15   could do that.  I have a problem with that.  Is that

16   correct, ma'am?

17             JUROR CARR:  Correct.

18             MR. JONES:  Thank you, ma'am.  I sure appreciate

19   your candor.  Sure appreciate your help.

20             Mr. Reynolds, good morning.  How are you, sir?

21             JUROR REYNOLDS:  Good morning.

22             MR. JONES:  Now, my understanding from what you

23   said earlier is that you've already done research on the

24   plaintiffs in this case and gotten some information about

25   them.

```
1              JUROR REYNOLDS:  Not exactly research.  But I

2   read -- you know, I actually just read in different -- I

3   don't remember exactly where it was, but I'm familiar,

4   obviously, with Google.  And I can't remember if it

5   was -- if it was --

6              MR. JONES:  And I'll tell you, excuse me.  I

7   apologize for interrupting.

8              JUROR REYNOLDS:  Yes.

9              MR. JONES:  But there's certain rules I'm

10  supposed to follow.  And I can't ask you, you know, what

11  you saw.  I would be doing wrong if I --

12             JUROR REYNOLDS:  Oh, understand.  Sorry.

13             MR. JONES:  So I want to let you know -- I

14  wanted to let you know I'm not doing that so I don't

15  violate any rules that we are supposed to follow here.

16             JUROR REYNOLDS:  I'm just familiar with the

17  entities in the case.

18             MR. JONES:  Sure.

19             JUROR REYNOLDS:  Yes.

20             MR. JONES:  Sure.  I just wanted you to know

21  what you did, not what you found out.  Let me ask you

22  this:  But you did find out certain information that you

23  know applicable to the plaintiff, right?  Not asking what

24  it is, but you did find out some information?

25             JUROR REYNOLDS:  Yes.  Not about any of this, I
```

1  don't believe.  I mean, this was --

2          MR. JONES:  Thank you, Mr. Reynolds.

3          JUROR REYNOLDS:  -- a year ago or so.

4          MR. JONES:  Sure, sure.  Thank you,

5  Mr. Reynolds.

6          Let me ask you this:  You -- you indicated on

7  your questionnaire that, with regard to Google, you had

8  very negative opinions of them, you had very negative

9  opinions of tech companies, and you strongly agreed that

10  small businesses needed protection from larger

11  corporations.

12          Is there anything about these beliefs, which

13  obviously you take into the jury box, that would color

14  the way you might look at the evidence?

15          JUROR REYNOLDS:  I -- like the lady said before,

16  I would not like to think so.  I've worked for quite a

17  few large tech companies.  And it's hard not to let your

18  beliefs, or at least things you've seen, not cloud your

19  judgment.  But, like I said earlier, the letter of the

20  law is one of the most important things we have.  So

21  it's -- it should be your guide in this process.

22          MR. JONES:  So it's something that you're kind

23  of worried about, that it might color the way that you

24  would view the evidence?

25          JUROR REYNOLDS:  I think any of us, being human,

1  not taking that into consideration would be not being

2  truthful to ourselves.

3       MR. JONES:  I got you.  And I appreciate that.

4  Thank you.  I appreciate your candor with me.

5       You know, before this case starts out, you know,

6  those beliefs are something that you would hold in your

7  mind and think about when you consider the testimony and

8  evidence in this case, right, sir?

9       JUROR REYNOLDS:  Yes.

10      MR. JONES:  And, you know, with regard to that,

11 and just to be fair, would it be right to say that, you

12 know, I may scrutinize Google's evidence a little harder.

13 I may be a little more skeptical toward them.  Is that

14 fair?

15      JUROR REYNOLDS:  I don't think that would be the

16 case, actually.

17      MR. JONES:  Okay.  Thank you.  Thank you.  I

18 appreciate it.  Thank you so much for your time.

19      JUROR REYNOLDS:  Yes, sir.

20      MR. JONES:  Mr. Kasner?

21      JUROR KASNER:  Yes, sir.

22      MR. JONES:  Good morning, sir.

23      JUROR KASNER:  Good morning.

24      MR. JONES:  On your questionnaire, you stated

25 that you strongly agree that small businesses needed to

1   be protected from larger corporations.  You know, let's

2   be totally up front and open about this.  Google is a

3   large corporation, duh, and the smaller corporation in

4   this case will be Brazos Licensing.

5            My question to you is simply this:  As we start

6   this case, due to that belief, do you kind of see a need

7   as a juror to kind of try to protect the smaller entity?

8            JUROR KASNER:  No, sir.

9            MR. JONES:  Okay.

10           JUROR KASNER:  No, sir.

11           MR. JONES:  Would that belief on your part in

12  any shape, form, or fashion color the way that you might

13  look at the evidence in this case?

14           JUROR KASNER:  No, sir.

15           MR. JONES:  Thank you.  I appreciate it.  Thank

16  you, sir.

17           If we could go to Juror 15, which I think is

18  Ms. -- I'm going to -- Beseda?

19           JUROR BESEDA:  Beseda.

20           MR. JONES:  Beseda.  I'm sorry.  I apologize.

21           In your questionnaire you stated that you

22  strongly agree that small business needed to be

23  protected, and you were very negative about tracking that

24  might be done of cell phones.

25           And my question to you is this:  Would that

1  feeling that you have, that smaller business needed to be

2  protected from larger corporations, cause you to start

3  this case thinking as a juror, I better be careful that I

4  protect the smaller entity?

5          JUROR BESEDA:  No.  Because it all depends on

6  what is presented in this court and what the judge

7  requires of us.  So --

8          MR. JONES:  Great.

9          JUROR BESEDA:  -- the law, basically.

10         MR. JONES:  Thank you, ma'am.  Thank you, ma'am.

11 I'm sure you're right.  Thank you.

12         Could we go to Mr. Lloyd, Juror Number 20.  Good

13 morning, Mr. Lloyd.  Mr. Lloyd, you stated I believe on

14 your questionnaire that large tech companies invaded

15 privacy.  You strongly agree on that.  And also you

16 stated that small businesses needed protection from

17 larger corporations.

18         Obviously, you know what my question is going to

19 be.  Would those beliefs on your part in any way color or

20 affect the way you might look at the evidence in this

21 case?

22         JUROR LLOYD:  No, it wouldn't.

23         MR. JONES:  Thank you, sir.

24         THE COURT:  You have 10 minutes remaining,

25 Mr. Jones.

1              MR. JONES:  Thank you.  I'd like to turn from

2    asking you about individual questions and ask you some

3    general questions.  And the first one is this:  I don't

4    remember exactly which it was among you, but I thought it

5    was interesting, when asked about Google and Google ads,

6    someone says they're too nosy.  How many people would

7    agree with your colleague there that Google is too nosy?

8    If you would, just raise your hands.

9              Eight.  Anybody else?  Thank you so much.  Two

10   and I've got three on that, too.  I've got eleven.  I'm

11   getting more bids as time goes by.  I feel like an

12   auctioneer.  Thanks for the paddle.  I appreciate it.

13             Now, I'd like to -- and I asked this question

14   individually just a second ago, but I'd like to ask it

15   generally.  There is a key principle of law that's going

16   to come up in this case, and that is:  Everybody is going

17   to agree that Google has technology that locates devices.

18   Everybody is going to agree to that.

19             The question is going to be, kind of like this

20   clip and this paper clip -- I won't call this a paper

21   clip anymore.  I've learned better.  But the question is

22   going to be:  Does Google do it the way it's claimed by a

23   patent that's called the '961 patent?

24             And the film told you this, and I believe the

25   judge will tell you this:  That in order to make that

1  determination, you've got to look at the patent claims,

2  compare it to the way Google does it, and find that they

3  practice each and every element.

4       Now can everybody follow that instruction?

5  Anybody that cannot, would you raise your hand.

6       Thank you.  Now, Ms. *Gilcrease*, could I talk to

7  you just for a second?

8       JUROR KILCREASE:  It's with a "K."

9       MR. JONES:  Excuse me?

10      JUROR KILCREASE:  It's with a "K."

11      MR. JONES:  Yeah.  Kilcrease.  I'm sorry.  I

12  apologize so much.

13      JUROR KILCREASE:  No problem.

14      MR. JONES:  You stated you owned certain land

15  and we got to an example there.

16      JUROR KILCREASE:  Okay.  I don't own it my.  My

17  husband manages it.

18      MR. JONES:  Okay.

19      JUROR KILCREASE:  So we live there.

20      MR. JONES:  Why don't we follow Mr. Siegmund's

21  example --

22      JUROR KILCREASE:  Okay.

23      MR. JONES:  -- and we'll pretend.

24      JUROR KILCREASE:  Okay.

25      MR. JONES:  Let's pretend you own the land and

```
 1    you're running your cattle on that land.  And somebody
 2    comes over to you and says, Hey, you need to take the
 3    cattle off that land.  You know, that's my land.  Now,
 4    generally speaking, what most people would do, I think,
 5    is go and say, Well, show me your deed.  Show me, you
 6    know, the description of your property, and let's find
 7    out if our cattle are on your land or not.  We're going
 8    to look at your deed and see whether they're on that
 9    property.
10          And if you look at his deed and you see my
11    cattle are on my land, not his property, you know, if he
12    were to sue you, would there be anything wrong in
13    Mr. Siegmund's example for you to say, No, no.  We're
14    going to look at your deed and we're going to show you
15    we're not on your property.  Would there be anything
16    wrong with that?
17          JUROR KILCREASE:  It would have to do with
18    fencing, and that's part of our job and their job, to
19    have the proper fence between the two.
20          MR. JONES:  Right.
21          JUROR KILCREASE:  And it depends on what
22    happened in the past.  Maybe if we've come to them to fix
23    fence and they disagreed, then it would be their fault
24    that they're on our property.
25          MR. JONES:  Certainly.  And to determine where
```

1   that fence, whether it's in the right place or not,

2   you're going to look at your deeds right?

3           JUROR KILCREASE:  Correct.

4           MR. JONES:  Okay.  And that's exactly what

5   Google is going to do in this case.  Google is going to

6   say, Let's look at your patent and let's look at your

7   claim, and let's see if we're using your property.

8           Anything wrong with that?

9           JUROR KILCREASE:  No.

10          MR. JONES:  Okay.  That's what's going to happen

11  in this case.  Now, does anybody -- as we start out, I

12  know everybody wants to get on with the evidence and

13  we'll see who is right and who is wrong.  But does

14  anybody think there's anything wrong with Google saying,

15  Well, let's look at your deed to your property and your

16  patent claims and see if we're doing that?

17          Anything wrong with that?

18          Thank you so much.  I appreciate it,

19  Ms. Kilcrease.

20          Now, another issue in this case is going to be

21  invalidity.  And my question on this is pretty simple.

22  Some people, when they hear whether a patent is valid is

23  ultimately determined by jurors, not by the patent

24  office, if anybody raises that issue, it's jurors that

25  decide validity, not by the patent office.  And, as the

1   film said, that's usually surprising to people.

2           Now, does anybody think that's a role we just --

3   I just don't want to take on?  Anybody?

4           Thank you.  The film also told you that there

5   were reasons for that.  And the reasons for that were

6   that only the patent holder, the patent applicant, gets

7   to present evidence to the patent office.  And that when

8   he asserts that patent, then anybody that's, you know,

9   accused of infringing has a right to also present

10  evidence, so that you, jurors, that decide invalidity

11  oftentimes see evidence that the patent examiner never

12  saw.  Never saw.  Now, does anybody think that's unfair?

13          Could everybody consider evidence on this

14  subject even though the patent examiner was not shown it?

15  Because that's going to happen in this case.

16          Thank you.

17          The final patent principle is this, on damages.

18  I believe the Court will instruct those of you selected

19  as jurors that damages in this case can only be what is

20  proven in the evidence and that Brazos Licensing has an

21  obligation to prove by evidence what damages they have

22  incurred.  Anybody disagree with that principle?  Hold up

23  your paddle.

24          I also believe that, besides proving it as --

25  everything about their claims for damages with evidence,

1  I also believe that the Court will instruct you that even

2  though a patent is infringed, no amount of money should

3  be awarded to punish the infringer.  It's only the amount

4  of money due for damages to compensate with a reasonable

5  royalty.  Anybody disagree with that?

6          Then let's go on, and I would like to talk a

7  little bit about Mr. Siegmund's example.  Let's go with,

8  if we could, to Mr. Davis.  We'll just go to Juror 1.

9          JUROR TAYLOR:  It's Taylor.

10         MR. JONES:  Oh, I'm sorry.  I'm sorry.  I

11 apologize, Mr. Taylor.

12         JUROR TAYLOR:  That's all right.

13         MR. JONES:  I apologize.  Mr. Taylor, if you

14 were going to value a house and you needed evidence of

15 what the value of that house was, you might look at what

16 it sold for in the past, you might look at what other

17 similar houses are selling for, and you might look at

18 what negotiations have been over that house in the past.

19         Is that fair?

20         JUROR TAYLOR:  That's fair.

21         MR. JONES:  But with regard to evidence of

22 damages, I think the judge is going to instruct the jury,

23 those members of the jury, that that's the kind of

24 evidence they're going to look at.  That they're going to

25 look at what's the past history with regard to this

1 patent.  Has it ever been licensed by itself and for how

2 much?  Let's look at how much it sold for.  Let's look

3 about the prices when people negotiated over it what they

4 were.  They're -- the Court's going to instruct you that

5 those are the type of things to look at.

6          Do you have any problem with that?  Does that

7 seem unfair?

8          JUROR TAYLOR:  That does not seem unfair.  That

9 seems reasonable.

10         MR. JONES:  Okay.  I'd ask that to the whole

11 panel, to all the jurors:  If you -- if you think for

12 some reason that if the Court instructs you that way you

13 couldn't follow it, could you raise your paddles.

14         Further, in this particular case, in

15 Mr. Siegmund's analogy, he said that, you know, the

16 property changes, there's an oil well on it, it's a

17 gusher, and all that.  He says we're going to prove an

18 oil well.  But I believe another principle of damages law

19 is that the Court's going to instruct you that, when you

20 look at a patent and try to evaluate it, you look at its

21 usefulness, you look at, for example, whether or not

22 anybody has ever used it in a product.  You look at it

23 for how it differs from old methods.  You look at it and

24 try to determine what value there is actually in the

25 method it claims.  Okay?  That's what the Court I believe

1   will instruct you in general terms about.

2          Could you follow that instruction?  Does that

3   seem fair to you?

4          JUROR TAYLOR:  That does seem fair.

5          MR. JONES:  I mean, you need -- if they're

6   claiming that suddenly an oil well has sprung up on this

7   property, there needs to be evidence of that.  That's

8   what -- what I think the principle means.  Is that fair?

9          JUROR TAYLOR:  Yes, sir.  That's fair.

10          MR. JONES:  And could you follow that

11   instruction, sir?

12          JUROR TAYLOR:  I believe I could.

13          MR. JONES:  Thank you.  To the panel, writ

14   large:  Anybody that couldn't follow that instruction,

15   please raise your paddle.

16          Thank you so much.  I've come to the end, and I

17   have just two questions here to conclude this.  You know,

18   whether I've asked the question or not or Mr. Siegmund

19   has asked the question or not, is there anybody sitting

20   there that says, you know -- and besides those that have

21   already told us about the Internet searches that you've

22   done -- is there anybody sitting out there that says, you

23   know, I have heard something about this case the more I

24   hear these people talk about it.  Or I know something

25   about this.  Or, you know, this whole circumstance kind

1    of gives me the feeling of déjà vu.  I -- you know some

2    circumstance that's really identical to what they're

3    talking about in my life.  Anybody have that impression?

4    If so, raise your paddle.

5            THE COURT:  All right, Mr. Jones.  Your time is

6    expired.

7            MR. JONES:  Thank you.

8            THE COURT:  Thank you.  All right.  Ladies and

9    gentlemen, we're going to take a recess and do -- there

10   are going to be some issues involving me and just the

11   attorneys.  There may be one or two of you that we need

12   to speak with privately.  If so, we'll get you brought

13   back in and talk to you.

14           But for the meantime, rather than have everybody

15   wait a little bit longer, we're going to let you-all

16   retire back to the jury room.  Don't -- as I said, don't

17   try and -- don't talk about this case necessarily.  Don't

18   try and do any investigation into this case.  And,

19   remember, nothing you've heard so far is evidence of any

20   kind.

21           So, with that, please rise for the jury.

22       (Venire recessed)

23           THE COURT:  Please be seated.  So let me do

24   this:  I'm going to start with the plaintiff.  Is there

25   anybody that the plaintiff wants to call back for further

1  questioning?

2           MR. SIEGMUND:  Judge, I think the only one --

3  and it sounds like Mr. Jones probably might agree with

4  me -- is, for us, Juror Number 12, Ms. Carr.  I think

5  she's one that -- she's the one who just said probably

6  couldn't follow your instructions.

7           THE COURT:  Okay.  Mr. Jones, is there --

8           MR. SIEGMUND:  And Number 13.

9           THE COURT:  Okay.  If they're going to move to

10  strike Ms. Carr for cause, are you ...

11           MR. JONES:  We are, as well as others.  But,

12  yes, we will be moving to strike Ms. Carr.

13           THE COURT:  So it sounds like there's an

14  agreement on Ms. Carr?

15           MR. SIEGMUND:  I think there is.

16           THE COURT:  If they move to strike Ms. Carr,

17  would you oppose their move?

18           MR. JONES:  I agree.

19           THE COURT:  Okay.  So Ms. Carr, we'll go ahead

20  and strike her for cause.  And then the other one the

21  plaintiff had was 13, Mr. Reynolds.

22           What's the plaintiff's position on Mr. Reynolds?

23           MR. SIEGMUND:  I think we probably just need to

24  talk to him a little bit more, Judge.  He was a little

25  bouncing around on the different questions.  He might

1   have saved himself there at the end, but I think we just

2   need to ask him a couple of clarifying questions about

3   whether he'll set aside his beliefs and follow your

4   instructions.

5          THE COURT:  Okay.

6          MR. JONES:  Your Honor, I don't -- I don't think

7   that solves all the problems, a magic question like that.

8   But, again, I would just say, for everybody's benefit to

9   help the process move along, we're going to have cause

10   challenges to Ms. Stevenson and Mr. Reynolds.

11          THE COURT:  Mr. Reynolds and Ms. Stevenson?

12          MR. JONES:  Yes.

13          THE COURT:  Okay.

14          MR. JONES:  Which would be Jurors 8 and 13.

15          THE COURT:  Okay.  So if they're going to -- let

16   me ask you, Mr. Siegmund, if they're going to move to

17   strike 8 and 13 for cause, are you-all going to oppose

18   one or both of those?

19          MR. SIEGMUND:  On Number 8, definitely,

20   Your Honor.  And then 13 I think we just need -- I think

21   we just need some clarification.

22          THE COURT:  Okay.  So you want to try and

23   clarify and try to challenge or oppose their ...

24          MR. SIEGMUND:  Correct, Your Honor.  Sorry.

25          THE COURT:  Okay.  Okay.  And do you have

1   another one, Mr. Jones?

2           MR. JONES:  Ms. Stevenson clearly stated that

3   her feelings about Google would color the way she would

4   review evidence, and she says:  I hope it wouldn't.  I

5   hope I wouldn't hold it against you.  But I just don't

6   know.

7           THE COURT:  Right.

8           MR. JONES:  I think it might.

9           THE COURT:  Right.

10          MR. JONES:  And I think that clearly establishes

11  that she should be -- the challenge for cause should be

12  sustained.

13          THE COURT:  Okay.  Well, let's do this.  Let's

14  get -- let's go ahead and bring in Ms. Reynolds.  I'm

15  going to give each side just a couple of minutes, no more

16  than two minutes, to ask her some follow-up questions on

17  it.  And then I may have some questions for her myself.

18  But I'll give you just real brief questions to ask her.

19  And my recollection --

20          MR. SIEGMUND:  On who, Your Honor?  I'm sorry.

21          THE COURT:  We're going to start with

22  Ms. Stevenson.

23          MR. SIEGMUND:  Okay.  Great.

24          THE COURT:  And then we'll bring in

25  Mr. Reynolds.

```
 1            MR. SIEGMUND:  Sounds good.  Thank you,
 2   Your Honor.
 3            THE COURT:  Come in, Ms. Stevenson.  If you
 4   could come to the mic that's on the stand right there.
 5   We just had a few follow-up questions for you.  You can
 6   adjust it however you see fit.  If it falls, we've got
 7   somebody that can help you.  Mr. Scott will help you with
 8   it.
 9            Okay.  I'm going to start by letting -- see.
10   That was -- I'll just note for the record that was all
11   caused by the court.
12            JUROR STEVENSON:  I'll just hold it.
13            THE COURT:  Okay.  Very good.  Mr. Siegmund, I'm
14   going to let him ask you just a couple of questions.
15            MR. SIEGMUND:  Okay.
16            THE COURT:  Yeah.
17            MR. SIEGMUND:  Thank you, ma'am.
18            JUROR STEVENSON:  Of course.
19            MR. SIEGMUND:  I know this is a little
20   intimidating.  You didn't do anything wrong.  Just a
21   couple of questions.  Don't worry.
22            JUROR STEVENSON:  Okay.
23            MR. SIEGMUND:  I think you -- you had a
24   conversation with Mr. Jones about some beliefs that you
25   had on Google.
```

```
1               JUROR STEVENSON:  Yes.

2               MR. SIEGMUND:  Okay.  So are your beliefs so

3  strong, 100 percent strong, that you cannot set them

4  aside and focus on the evidence and the court's

5  instructions?

6               JUROR STEVENSON:  I don't think so.  I mean, I

7  want to be clear.  It's not just Google.  It's all big

8  business, really, honestly.

9               MR. SIEGMUND:  Uh-huh.

10              JUROR STEVENSON:  It's more a political thing

11 than anything else.  I don't think -- like I said before,

12 I don't -- I'd like to think no, but I am not 100 percent

13 sure.

14              MR. SIEGMUND:  You're -- okay.

15              JUROR STEVENSON:  I'd like to think, no, I could

16 set it aside.  But I'm not 100 percent sure.

17              MR. SIEGMUND:  Okay.  So even if the Court gives

18 you instructions and says, Ms. Stevenson --

19              JUROR STEVENSON:  Right.

20              MR. SIEGMUND:  -- you can't use your beliefs;

21 you've got to follow the law and the evidence.

22              JUROR STEVENSON:  Well, if they say that, then

23 yes, I think I can put it aside.

24              MR. SIEGMUND:  Right.  Because -- because I

25 don't think it will be Judge Gilliland, it's going to be
```

1   Judge Albright.

2          JUROR STEVENSON:  Right.

3          MR. SIEGMUND:  And he's going to tell all the

4   jurors:  Ladies and gentlemen, you cannot use your

5   personal beliefs in deciding this case.  You have to

6   follow the law and the evidence.

7          And so would you be able to set aside your

8   feelings and follow the law and the evidence?

9          JUROR STEVENSON:  Yes.

10         MR. SIEGMUND:  Okay.

11         THE COURT:  Thank you, Mr. Siegmund.

12         MR. SIEGMUND:  That's all I needed to know.

13         THE COURT:  Mr. Jones, I'll let you ask just a

14  couple of follow-up questions.

15         MR. JONES:  Sure.  Sure.  Mr. Siegmund and I are

16  going to disagree on some things in this case.  And I --

17  I think that where we are is this:  You have been so kind

18  as to tell us that you have some strongly held beliefs.

19  You have been very truthful about that, right, ma'am?

20         JUROR STEVENSON:  Yes.

21         MR. JONES:  And you have also been asked, you

22  know, is that -- those beliefs going to affect the way

23  and color the way I view the evidence in this case.  And

24  you have been very truthful with us and very candid with

25  us and said, you know, I'd like to hope I could put

1   everything aside and make sure they didn't, but I'm not

2   100 percent sure about that, right?

3           JUROR STEVENSON:  Yes, sir.

4           MR. JONES:  And you wanted us to know that kind

5   of going back to Judge Gilliland's example just because,

6   like he said, look, if the case is about a veterinarian,

7   the way I feel about my wife is such that I'm not the

8   right juror for that particular case due to my beliefs.

9   Do you remember that example?

10          JUROR STEVENSON:  I do.

11          MR. JONES:  Okay.  Okay.  And I believe you're

12  raising this because you just have an issue in your mind

13  if you're the perfect, right juror for this case, right?

14          JUROR STEVENSON:  Correct.

15          MR. JONES:  Thank you so much.  I appreciate it.

16          JUROR STEVENSON:  Of course.

17          MR. JONES:  You're very kind.

18          JUROR STEVENSON:  Thank you so much.

19          THE COURT:  All right.  Ms. Stevenson, I've got

20  a real quick question for you myself.

21          JUROR STEVENSON:  Oh.  Of course.

22          THE COURT:  And, again, it -- if I was in your

23  shoes and there was a veterinarian standing here and

24  somebody said, Can you set aside everything you know and

25  believe about veterinarians? I would have to say no.

1            But, anyway, so I tell you that to tell you

2    that, just because I'm asking the question, don't feel

3    that you should agree with it.  Just be honest with us,

4    okay?

5            JUROR STEVENSON:  Okay.

6            THE COURT:  Okay.  I know that's a tough thing

7    when they, you know, put all the accoutrements around me

8    here.

9            But -- but let me ask you:  As you stand here,

10   knowing what you know and the beliefs that are in your

11   head, is the defendant starting off at a disadvantage?

12           JUROR STEVENSON:  I feel like yes.

13           THE COURT:  Okay.  And would it be difficult for

14   you to set all those things aside?

15           JUROR STEVENSON:  No.  But, again, I worry just

16   subconsciously --

17           THE COURT:  Got you.

18           JUROR STEVENSON:  -- that it would creep in.

19           THE COURT:  Okay.

20           JUROR STEVENSON:  I mean, I don't know,

21   obviously, because no facts have been presented yet.

22   So --

23           THE COURT:  Understood.

24           JUROR STEVENSON:  But yes.

25           THE COURT:  All right.  Thank you,

```
 1  Ms. Stevenson.

 2          JUROR STEVENSON:  You're welcome.  Am I done?

 3          THE COURT:  You're done.  Thank you so much.

 4          JUROR STEVENSON:  Okay.  Thank you so much.

 5  You-all have a good day.

 6          THE COURT:  You, too.

 7          All right.  So I think we've got Mr. Reynolds

 8  coming in real quick, but I'm going to grant Defendant's

 9  challenge for cause on Ms. Stevenson.

10          MR. SIEGMUND:  Understood.  Thank you,

11  Your Honor.

12          MR. JONES:  Thank you, Your Honor.

13          THE COURT:  And then on Mr. Reynolds, I guess

14  Defense is going to move to strike him for cause.  Is

15  Plaintiff going to oppose that, so you want to ask some

16  questions of him?

17          MR. SIEGMUND:  No, Your Honor.  We don't want to

18  waste anyone's time.  That's fine.

19          THE COURT:  Okay.  So Mr. Reynolds will be

20  struck for cause by agreement.  We can tell him when he

21  walks in or if they can catch him.  I imagine he'll be --

22  I was going to say I thought I saw the door moving.

23          Mr. Reynolds, we spoke too soon.  I appreciate

24  you coming in here, but we don't need to speak with you

25  after all.  So you can go ahead and return and relax.
```

1 | But thank you very much.

2 |         JUROR STEVENSON:  Thank you.

3 |         THE COURT:  Okay.  He's struck.  So my notes are

4 | that we -- we have Jurors 8, 12, and 13 have all been

5 | struck for cause.  Does that fit with what you have,

6 | Mr. Siegmund?

7 |         MR. SIEGMUND:  Yes, Your Honor.

8 |         THE COURT:  And Mr. Jones?

9 |         MR. JONES:  Yes, sir.

10 |         THE COURT:  Okay.  Very good.  So we will give

11 | each of you has four minutes -- I mean, four strikes.  Is

12 | there anything else, Mr. Jones?

13 |         MR. JONES:  I was just -- I always want to make

14 | sure that I don't make a mistake.  That would put us

15 | through 18 with -- with our strikes, right?

16 |         MR. SIEGMUND:  That's what I have.

17 |         MR. JONES:  Thank you.  I appreciate it.

18 |         THE COURT:  I believe that's right.

19 |         MR. JONES:  Okay.

20 |         THE COURT:  Assuming no double-strikes.

21 |         MR. JONES:  Yeah.

22 |         THE COURT:  So each side is going to get four

23 | peremptory strikes.  Ms. Copp has your sheets up here;

24 | you can get those from her.  And we'll go ahead and have

25 | them back by -- by 11:05.  So that gives you about 17

1  minutes.  Is that going to be long enough, do you think?

2          MR. JONES:  Can I get 10?  11:10?

3          THE COURT:  Yeah.  We'll make it 11:10, yeah.

4          MR. JONES:  Thank you, sir.

5          THE COURT:  Yeah.  We'll go 11:10.  Have them

6  turned in by 11:10.  If you turn them in early, then

7  we'll get -- we'll get them done earlier, and then we'll

8  get them seated.  After you turn them in, it will take

9  about 10 more minutes to get final list developed.

10         All right.  With that, we will be adjourned.  Or

11 stand in recess, I guess.

12     (Recess from 10:45 to 11:14 a.m.)

13     (Open court, no venire)

14         THE COURT:  Okay.  I was informed that

15 Judge Albright will be available at 11:30 if there are

16 any disputes the parties need to address with him before

17 opening statements.  Otherwise, do we have the jury ready

18 to come in?

19         THE CLERK:  We do.

20         THE COURT:  All right.  Just remain standing for

21 the jury.

22     (Open court, venire present)

23         THE COURT:  All right.  Ladies and gentlemen,

24 Ms. Copp is about to read the names of the impaneled

25 jurors.  So if you hear your name called, please come

1   forward, and the marshal will direct you to where to sit

2   in the jury box.

3          With that, Ms. Copp, will you please read the

4   names of the impaneled jurors.

5          THE CLERK:  Yes, Your Honor.  The first juror to

6   be called is Robert Lee Taylor.  The second juror to be

7   called, Jaime Lynn Blizzard.  The third juror to be

8   called is Jennifer Michelle Jones.  The fourth juror to

9   be called is Rhonda June Scholwinski.  The fifth juror to

10  be called is Lindsey Kilcrease.  The sixth juror to be

11  called is Margaret Beseda.  The seventh and final juror

12  to be called is Katherine Cunningham.

13         THE COURT:  Mr. Siegmund, is the plaintiff

14  satisfied with the jury?

15         MR. SIEGMUND:  Yes, Your Honor.  Thank you.

16         THE COURT:  All right.  Mr. Jones, is the

17  defense?

18         MR. JONES:  Yes, Your Honor.  Thank you.

19         THE COURT:  All right.  Very good.  Ms. Copp,

20  will you please administer the oath.

21      (Jurors sworn)

22         THE COURT:  All right.  Ladies and gentlemen,

23  you-all can be seated.  Thank you very much.  Ladies and

24  gentlemen, at this point, we've got one more formality

25  that we need to go through with the impaneled jurors, and

1   that's the reading of the preliminary instructions.

2        And I wanted to thank everybody for their time

3   and attention this morning.  Even though you weren't

4   selected, what you do and what you did this morning was a

5   very real and tangible part of our judicial system and a

6   very important part of the process.  So if you'd like to

7   stay, you're obviously welcome to stay and listen to the

8   reading of the preliminary instructions.  But you're also

9   free to go, and Ms. Miles can answer any questions you

10  have before you leave the courthouse.

11       So we'll pause for a minute to let everybody who

12  would like to exit the courtroom do so at this time.

13     (Venire excused)

14       THE COURT:  All right.  Please be seated.  Okay.

15  Ladies and gentlemen, all right, we're going to cover

16  some preliminary instructions before we recess and let

17  you have a lunch break.  Now, you've now been sworn in as

18  the jury to try the case.  And as the judge, the judge

19  will decide all questions of law and procedure.  As the

20  jury, you are the judges of the facts.  At the end of the

21  trial, the judge will instruct you on the rules of law

22  that you must apply to facts as you find them.

23       You may take notes during the trial, but do not

24  allow your note-taking to distract you from listening to

25  the testimony.  Your notes are an aid to your memory, and

1  if your memory should later be different from your notes,

2  you should rely on your memory.  Do not be unduly

3  influenced by the notes of other jurors.  A juror's notes

4  are not entitled to any greater weight than each juror's

5  recollection of the testimony and the evidence.

6          Until this trial is over, do not discuss this

7  case with anyone, and do not permit anyone to discuss the

8  case in your presence.  This includes everyone you

9  know: your spouse, your children, relatives, coworkers,

10 anyone you deal with during the day.

11         During your jury service, you must not

12 communicate any information about this case by any means

13 or with the tools of technology.  For example, do not

14 talk face to face or use any electronic device or media,

15 such as a telephone, a cell or smartphone, camera,

16 recording device, Blackberry, PDA, computer, the Internet

17 or any Internet service, any text or instant messaging

18 service, any Internet chat room, blog, or website such as

19 Facebook, Myspace, YouTube, Snapchat, Instagram, or

20 Twitter, or any other way to communicate to anyone any

21 information about this case, until I accept your verdict

22 or excuse you as a juror.

23         Now, I will say, if your family asks or someone

24 asks, just tell them you've been selected to serve as a

25 juror on a patent case involving WSOU Investments and

 1   Google.  That's about all you can tell them.

 2          Now, do not discuss the case with the other

 3   jurors until the end of the case, when I tell you that it

 4   is okay for you to begin to deliberate.  It is unfair to

 5   discuss the case before then because you won't have all

 6   the evidence, and you must never become an advocate for

 7   one side or the other.

 8          The parties, the witnesses, the attorneys, and

 9   everyone associated with this case are not permitted to

10   communicate with you in any way.  So do not think if you

11   pass them in the hallway and they don't say "hi" or "good

12   morning" or smile, don't think they're being impolite.

13   They're simply following the court's instructions.

14          Now, when I say you cannot discuss the case,

15   you're still free to discuss anything else you want with

16   each other.  Just don't talk about the case.

17          Do not speak with anyone else in or around the

18   courthouse other than your fellow jurors or court

19   personnel.  And by that I mean you're free to talk about

20   the Dallas Cowboys, the weather, or other related

21   matters, because you're going to be spending a fair

22   amount of time together this week.  But don't talk to

23   anyone other than other jurors or court personnel,

24   because there's no telling until it's too late if

25   somebody you encounter might be involved in the case.

1  And we don't want to have any appearance of impropriety

2  because of that.

3         Now, do not conduct any independent

4  investigation of the case.  You must rely solely on what

5  you see and hear within this courtroom.  Do not try to

6  obtain information about the case from any other source.

7  In particular, you may not use any electronic device or

8  media, such as a telephone, cell phone, smartphone or

9  computer, to research any issue that might be related to

10 this case.

11        Do not go online or read any newspaper account

12 of this trial or listen to any newscast about it in any

13 format.  Do not visit or view any place that might be

14 discussed in this case, and do not use Internet programs

15 or other devices to search for or to view any place that

16 is discussed in the testimony.

17        In sum, you may not research any information

18 about this case, the law, or the people involved,

19 including the parties, the witnesses, the lawyers, or

20 myself, until after you have been excused as jurors.

21        Now, there are some issues of law or procedure

22 that Judge Albright will have to decide and that

23 attorneys and he must discuss.  These issues are not part

24 of what you must decide, and they are not properly

25 discussed in your presence.  So, to avoid having you

1    leave the courtroom every time and to save time, Judge

2    Albright may discuss those issues with the attorneys at

3    the bench, out of your hearing.

4           When he confers with the attorneys at the bench,

5    please do not listen to what they are saying or what they

6    are discussing.  If the discussions require more time, he

7    will have you leave the courtroom until the lawyers and

8    the judge have resolved the issues.  Judge Albright I'm

9    sure will try to keep these interruptions to as few and

10   as brief as possible.

11          And, of course, keep an open mind during the

12   entire trial.  Do not decide the case until you have

13   heard all of the evidence, the court's instructions, and

14   the closing arguments.

15          Now, this case involves a dispute relating to

16   United States patents.  Now, the patents are granted by

17   the United States Patent and Trademark Office that will

18   be sometimes referred to as the "PTO" or "USPTO," and a

19   valid United States patent gives the patent holder the

20   right for up to 20 years from the date the patent

21   application was filed to prevent others from making,

22   using, offering to sell, or selling the patented

23   invention within the United States or from importing it

24   into the United States without the patent holder's

25   permission.

1          A violation of the patent holder's rights is

2    called "infringement."  The patent holder may try to

3    enforce a patent against persons believed to be

4    infringers by a lawsuit filed in federal court.

5          The process of obtaining a patent is called

6    "patent prosecution."  To obtain a patent, one must first

7    file an application with the PTO.  The PTO is an agency

8    of the federal government and employs trained examiners

9    who review applications for patents.  The application

10   includes what is called a "specification," which contains

11   a written description of the claimed invention telling

12   what the invention is, how it works, how it -- how to

13   make it, and how to use it.

14          The specification concludes with one or more

15   numbered sentences.  These are what the patent claims.

16   If a patent is eventually granted by the PTO, the claims

17   define the boundaries of its protection and give notice

18   to the public of those boundaries.

19          After the applicant files the application, an

20   examiner reviews the application to determine whether or

21   not the claims are patentable or appropriate for patent

22   protection, and whether or not the specification

23   adequately describes the invention claimed.

24          In examining a patent application, the examiner

25   reviews certain information about the state of technology

 1    at the time the application was filed.  The PTO searches

 2    for and reviews information that is publicly available or

 3    that is submitted by the applicant.  This information is

 4    called "prior art."  The examiner reviews this prior art

 5    to determine whether or not the invention is truly an

 6    advance over the state of the art at the time.

 7            Prior art is defined by law, and the court will

 8    give you at a later time during these instructions

 9    specific instructions as to what constitutes prior art.

10    However, in general, prior art includes information that

11    demonstrates the state of technology that existed before

12    the claimed invention was made or before the application

13    was filed.

14            A patent lists the prior art that the examiner

15    considered.  This lists is called the "cited references."

16    After the prior art search and examination of the

17    application, the examiner informs the applicant in

18    writing of what the examiner has found and whether the

19    examiner considers any claim to be patentable and, thus,

20    would be allowed.

21            This writing from the examiner is called an

22    "office action."  If the examiner rejects the claims, the

23    applicant has an opportunity to respond to the examiner

24    to try to persuade the examiner to allow the claims and

25    to change the claims or to submit new claims.  This

1    process may go back and forth for some time, until the

2    examiner is satisfied that the application meets the

3    requirements for a patent and application issues as a

4    patent, or that the application should be rejected and no

5    patent should issue.

6            Sometimes patents are issued after appeals

7    within the PTO or to a court.  The papers generated

8    during these communications between the examiner and the

9    applicant are called the "prosecution history."  The fact

10   that the PTO grants a patent does not necessarily mean

11   that any invention claimed in the patent in fact deserves

12   the protection of a patent.

13           For example, the PTO may not have had available

14   to it all the prior art that will be presented to you.

15   In addition, there is the possibility that mistakes were

16   made or that information was overlooked.  Examiners have

17   a lot of work to do, and no process is perfect.  Also,

18   unlike a court proceeding, patent prosecution takes place

19   without input from those who are later alleged to

20   infringe the patent.

21           A person accused of infringement has the right

22   to argue here in federal court that a claimed invention

23   in a patent is invalid because it does not meet the

24   requirements for a patent.  It is your job to consider

25   the evidence presented by the parties and determine

1   independently whether or not Google has proven that one

2   or more of the patents in this case are invalid.

3           Now, to help you follow the evidence, I will

4   give you a summary of the parties' positions.  The

5   plaintiff is WSOU Investments LLC, doing business as

6   Brazos Licensing and Development.  During the course of

7   the trial, you may hear the plaintiff referred to as

8   either "WSOU" or "Brazos."

9           The defendant is Google LLC, and during the

10  trial you will hear the defendant referred to as

11  "Google."

12          The case involves United States Patent

13  Number 8,737,961.  For convenience, the parties and I

14  will often refer to the patent by the last three digits

15  of the patent number, namely, as the "'961 patent" or the

16  "asserted patent."

17          Brazos filed suit in this court seeking money

18  damages from Google for allegedly infringing the '961

19  patent by making, using, selling, and offering for sale

20  within the United States products that Brazos argues are

21  covered by Claims 1, 4 through 5, 9, 11, and 14 of the

22  '961 patent.  These are known as the asserted claims.

23          Brazos alleges that certain Google products

24  infringe the '961 patent.  These may be referred to as

25  the "accused products."

1          Google denies that it has infringed any of the

2    asserted claims of the '961 patent.  Google also argues

3    that the asserted claims are invalid.  I will instruct

4    you later as to the ways in which a patent may be

5    invalid.  In general, however, a patent is invalid if it

6    is not new or is obvious in view of the state of the art

7    at the relevant time, if a patent specification fails to

8    describe in full, clear, and exact terms the nature and

9    extent of the claimed invention, or if a patent

10   specification fails to enable the full scope of the

11   claimed invention.

12          Your job will be to decide whether or not any

13   asserted claims have been infringed and whether or not

14   those claims are invalid.  If you decide that any of the

15   asserted claims have -- claims both have been infringed

16   and are valid, you will then need to decide any money

17   damages to be awarded to Brazos to compensate it for the

18   infringement.

19          Now, in deciding the issues that I just

20   discussed, you will be asked to consider specific legal

21   standards, and I will give you an overview of those

22   standards now and will review them in more detail before

23   the case is submitted to you for your verdict.

24          The first issue you will be asked to decide is

25   whether Google has infringed the asserted claims of the

1    '961 patent.

2         Infringement is assessed on a claim-by-claim

3    basis.  Therefore, there may be infringement as to one

4    claim but not infringement as to another.  In general, to

5    prove direct infringement, Brazos must prove by a

6    preponderance of the evidence that Google made, used,

7    sold, or offered for sale in the United States a product

8    meeting all the requirements of an asserted claim of the

9    '961 patent.  I will provide you with more detailed

10   instruction on the requirements for infringement at the

11   conclusion of the case.

12        Another issue you will be asked to decide is

13   whether the asserted claims of the '961 patent are

14   invalid.  A patent may be invalid for a number of

15   reasons, including because it claims subject matter that

16   is not new or is obvious.

17        For a claim to be invalid because it is not new,

18   Google must show by clear and convincing evidence that

19   all the requirements of a claim are present in a single

20   piece of prior art.  If a claim is not new, it is said to

21   be "anticipated."

22        Another way that a claim may be invalid is that

23   it may have been obvious.  Even if it was not previously

24   disclosed or described in full, a patent claim is invalid

25   if the claimed invention would have been obvious to a

1  person of ordinary skill in the patent's field of

2  technology before the filing date of the patent.

3          Another way that a claim may be invalid is that

4  it lacks written description support.  The written

5  description requirement asks whether the patent

6  specification describes in full, clear, and exact terms

7  the nature and extent of the claimed invention.  If the

8  patent specification fails to provide this description,

9  the claim lacks the written description support.

10          Another way that a claim may be invalid is that

11  it is not enabled.  Patent emblement requires the patent

12  specification contain sufficiently full and --

13  sufficiently full and clear description of the invention

14  to have allowed a person of ordinary skill in the

15  patent's field of technology to make and use the full

16  scope of the claimed invention as of the priority date of

17  the patent.  If the -- if a patent specification fails to

18  provide this description, the claim is not enabled.

19          I will provide you with more detailed

20  instructions on the requirements for invalidity at the

21  conclusion of the case.

22          If you find that Google infringed an asserted

23  claim of the '961 patent, and that the claim is not

24  invalid, you must determine an amount of damages to be

25  awarded to Brazos for the infringement.  On the other

1  hand, if you find that each of the asserted claims is

2  invalid, not infringed, or both, then you should not

3  reach any damages issues.

4  If you award damages, the amount should be

5  adequate to compensate Brazos for the infringement.  Your

6  damages award, if you reach this issue, should put Brazos

7  in approximately the same financial position that it

8  would have been in had the infringement not occurred.

9  The damages you award are meant to compensate

10 Brazos and not to punish Google.  You may not include in

11 your award any additional amount as a fine or penalty in

12 order to punish Google.

13 I will give you more detailed instructions on

14 the calculation of damages at the conclusion of the case.

15 Now, the trial will begin shortly after a lunch

16 break.  First, each side will make -- may make an opening

17 statement.  An opening statement is not evidence.  It is

18 simply an opportunity for the lawyers to explain what

19 they expect the evidence will show.

20 There are two standards of proof that you will

21 apply to the evidence, depending on the issue you are

22 deciding.  On some issues you must decide whether certain

23 facts have been proven by a preponderance of the

24 evidence.  For a fact to be proven by a preponderance of

25 the evidence, you must find that the fact is more likely

1    true than not.  That is, the evidence in favor of the

2    fact being true is sufficient to tip the scale, even if

3    slightly, in its favor.

4            On other issues that I will identify for you,

5    you must use a higher standard and decide whether the

6    fact has been proven by clear and convincing evidence.

7    That is, that you have been left with a clear conviction

8    that the fact has been proven.

9            These standards are different from what you may

10   have heard about in criminal proceedings where a fact

11   must be proven beyond a reasonable doubt.  On a scale of

12   these various standards of proof, as you move from

13   preponderance of the evidence, where the proof need only

14   be sufficient to tip the scale in favor of the party

15   proving the fact, to beyond a reasonable doubt, where the

16   fact must be proven to a very high degree of certainty,

17   you may think of clear and convincing evidence as being

18   between the two standards.

19           After opening statements, Brazos will present

20   its evidence in support of its contention that the

21   asserted claims of the '961 patent have been and continue

22   to be infringed by Google.

23           To prove infringement of any claim, Brazos must

24   persuade you that it is more likely than not that Google

25   has infringed that claim.

1          Google will then present its evidence that the

2   asserted claims of the '961 patent are invalid.  To prove

3   invalidity of any claim, Google must persuade you by

4   clear and convincing evidence that the claim is invalid.

5          In addition to presenting its evidence of

6   invalidity, Google will put on evidence responding to

7   Brazos's evidence of infringement.

8          Brazos may then put on additional evidence

9   responding to Google's evidence that the accused claims

10  of the '961 patent are invalid.  This is referred to as

11  "rebuttal evidence."  Brazos's rebuttal evidence may

12  respond to any evidence of invalidity offered by Google.

13         Finally, Google -- okay.  Okay.  And then --

14  excuse me.

15         Okay.  During the trial, both parties will also

16  present evidence related to the issue of damages, or the

17  amount of money Brazos should receive, if it can prove

18  infringement of a valid claim.  Brazos has the burden of

19  proving the amount of its damages by a preponderance of

20  the evidence.  Google will have the opportunity to

21  present evidence that contests Brazos's proposed amount

22  of damages, but in presenting this evidence, Google is

23  not agreeing that Brazos is entitled to any damages.

24         I will give you more detailed instructions about

25  damages later.

1           After the evidence has presented, the attorneys
2  will make closing arguments, and I will give you final
3  instructions on the law that applies to the case.  These
4  closing arguments by the attorneys are not evidence.

5           After closing arguments and instructions, you
6  will then retire to decide the case.

7           Now, the evidence you will hear consists of the
8  testimony of witnesses, the documents, and other exhibits
9  admitted into evidence, the stipulations to which the
10 lawyers have agreed, and any fair inferences and
11 reasonable conclusions you may draw from the facts and
12 circumstances that have been proven.

13          Nothing else is evidence.  Generally speaking,
14 there are two types of evidence.  One is direct evidence,
15 such as testimony of an eyewitness.  The other is
16 indirect or circumstantial evidence.  Circumstantial
17 evidence is evidence that proves a fact from which you
18 can logically conclude another fact exists.

19          As a general rule, the law makes no distinction
20 between direct and circumstantial evidence, but simply
21 requires that you determine the facts from all of the
22 evidence that you will hear in this case, whether direct,
23 circumstantial, or any combination.

24          In judging the facts, you must consider all the
25 evidence, both direct and circumstantial.  That does not

1   mean you have to believe all of the evidence.  It is

2   entirely up to you to give the evidence you will receive

3   in this case whatever weight you individually believe it

4   deserves.  It will be up to you to decide which witnesses

5   to believe, which witnesses not to believe, the weight

6   you give any testimony you hear, and how much of any

7   witness's testimony you chose to accept or reject.

8          For example, let me give you some ideas of what

9   is not evidence.  The statements and opening arguments by

10  the lawyers are not evidence.  During witness

11  examinations from the podium, the questions the lawyers

12  ask are not evidence.  Objections to questions are not

13  evidence.

14         The attorneys in this case may object if they

15  think that documents or testimony offered into evidence

16  are improper under the rules of evidence.  My legal

17  rulings as to those objections are not evidence.  My

18  comments and questions are not evidence.  If I sustain an

19  objection, then just pretend the question -- the question

20  was never asked.  If the -- if there is an answer given,

21  ignore it.  If I overrule the objection, act like the

22  objection was never made.

23         You must follow -- if I give you instructions

24  that some item of evidence is to be received for a

25  limited purpose, you must follow my instruction.  If I

1  give any limiting instruction during the trial, you must

2  follow it, and any testimony I tell to you to exclude or

3  disregard is not evidence and may not be considered.

4         Now, you must not conduct any independent

5  research or investigation.  You must make your decision

6  based only on the evidence here and nothing else.

7         Now, you alone are to determine the question of

8  credibility of witnesses and truthfulness of witnesses.

9  In weighing the testimony of the witnesses, you may

10  consider the witness's manner and demeanor on the witness

11  stand, any feelings or interest in the case, or any

12  prejudice or bias about the case that he or she may have,

13  and the consistency or inconsistency of his or her

14  testimony considered in light of the circumstances.

15         Has the witness been contradicted by other

16  credible evidence?  Has he or she made statements at

17  other times and places contrary to those made here on the

18  witness stand?  You must give the testimony of each

19  witness the credibility that you think it deserves.

20         In determining the weight to give to the

21  testimony of a witness, consider whether there was

22  evidence that at some other time the witness said or did

23  something, or failed to say or do something, that

24  contradicted the testimony given by that witness at

25  trial.

1            A simple mistake by a witness does not

2    necessarily mean that the witness did not tell the truth

3    as he or she remembers it.  We are people.  People may

4    forget some things or remember other things inaccurately.

5            If a witness made a misstatement, consider

6    whether that misstatement was an intentional falsehood or

7    just a mistake.  The significance of that misstatement

8    may depend on whether it has to do with an important fact

9    or only an unimportant detail.  That being said, it is

10   exclusively in your province to believe every word that

11   any witness says or to disregard anything they say or do,

12   because you all are the exclusive judges of the facts in

13   this case.

14           Even though a witness may be a party to the

15   action and therefore interested in its outcome, the

16   testimony may be accepted if it is not contradicted by

17   direct evidence or by any inference that may be drawn

18   from the evidence if you believe that testimony.

19           You are not to decide the case by counting the

20   number of witnesses who have testified on the opposing

21   sides.  Witness testimony is weighed; witnesses are not

22   counted.  The test is not the relative number of witness

23   but the relative convincing force of the evidence.  The

24   testimony of a single witness is sufficient to prove any

25   fact even if a greater number of witnesses testified to

1    the contrary if, after considering all of the other

2    evidence, you believe that witness.

3           Certain testimony may be presented to you

4    through a deposition.  A deposition is the sworn,

5    recorded answers to questions a witness was asked in

6    advance of trial.  Under some circumstances, if a witness

7    cannot be present to testify from the witness stand, that

8    witness's testimony may be presented under oath in the

9    form of a deposition.

10          Sometime before this trial, attorneys

11   representing the parties in this case questioned the

12   witness under oath.  A court reporter was present and

13   recorded the testimony.  The questions and answers may be

14   shown to you.  Deposition testimony is entitled to the

15   same consideration and is to be weighed or otherwise

16   considered by you in the same manner as if the witness

17   had been present and had testified from the witness stand

18   here in court.

19          Some of the video recordings of witnesses you

20   may see may be of lower quality because the witness had

21   their deposition taken remotely.  You should not hold the

22   quality of the video or the location of the witness

23   against either party.

24          Expert testimony is testimony from a person who

25   has special -- a special skill or knowledge in some

1   science, profession, or business.  This skill or

2   knowledge is not common to the average person but has

3   been acquired by the expert through special study or

4   experience.

5          In weighing expert testimony, you may consider

6   the expert's qualifications, the reasons for the expert's

7   opinions, and the reliability of the information

8   supporting the expert's opinions, as well as the factors

9   I have previously mentioned for weighing testimony of any

10  other witness.  Expert testimony should receive whatever

11  weight and credit you think appropriate, given all the

12  other evidence in this case.  You are not required to

13  accept the opinion of any expert.  Rather, you are free

14  to accept or reject the testimony of experts just as with

15  any other witness.

16         Now, to assist you in the deliberations, you

17  will receive a notebook that will contain the following

18  items: some paper to take notes on, a copy of the '961

19  patent, the patent at issue, witness photographs, and the

20  definition of any terms that the court has defined.  Now,

21  these materials have been jointly submitted by the

22  parties, and you can refer to them throughout and during

23  the trial.

24         You will receive your notebook before opening

25  statements.  And when you get it, make sure to write your

```
 1  name in the notebook so you don't get your notebooks
 2  confused with each other.  And don't take the notebook
 3  outside of the courtroom or the jury room.  When you
 4  leave for the day, leave it in the jury room so it
 5  doesn't get misplaced or lost overnight.
 6          And, with that, let me see Ms. Copp.
 7          All right.  So we're going to give you just a
 8  one-hour lunch break today.  We need everybody to report
 9  back at one o'clock so we can start with opening
10  statements after lunch.
11          Again, as you come and go from the courthouse,
12  don't talk to anybody but each other and court personnel.
13  Don't talk about this case at all, and don't do any
14  research or anything into the facts or parties underlying
15  the case.
16          With that, the marshal will show you to your
17  accommodations for the week, and please be back promptly
18  at one o'clock.
19      (Jury recessed)
20          THE COURT:  All right.  Well, is there anything
21  else from the plaintiff we need to address?
22          MR. SIEGMUND:  No, Your Honor.  Thank you.
23          THE COURT:  All right.  For the defense?
24          MR. JONES:  None, Your Honor.
25          THE COURT:  All right.  Very good.  Well, I'll
```

1  wish you-all the best of luck, and you-all need to be

2  back by 1:00, I assume, or probably a little before next

3  door.  So we'll be in recess.

4       (Proceedings concluded at 11:49 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2        I, Arlinda Rodriguez, do hereby certify that the foregoing

3    was transcribed from an electronic recording made at the time

4    of the aforesaid proceedings and is a correct transcript, to

5    the best of my ability, made from the proceedings in the

6    above-entitled matter, and that the transcript fees and format

7    comply with those prescribed by the Court and Judicial

8    Conference of the United States.

9

10   /S/ Arlinda Rodriguez                    October 24, 2023

11   ARLINDA RODRIGUEZ                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25